# U.S. Bankruptcy Court
## Eastern District of Wisconsin (Milwaukee)
## Bankruptcy Petition #: 09–35931–pp

*Date filed:* 11/03/2009
*Date converted:* 02/16/2010

*Assigned to:* Pamela Pepper
Chapter 13
Previous chapter 7
Voluntary
Asset

| | |
|---|---|
| ***Debtor***<br>**Edward Blaine Kohler**<br>5310 S. Skyline Drive<br>New Berlin, WI 53151<br>SSN / ITIN: xxx–xx–1463 | represented by **Rollie R. Hanson**<br>6737 W. Washington Street<br>Suite 1420<br>West Allis, WI 53214–5649<br>414–321–9733<br>Fax : 414–321–9601<br>Email: rollie@hansonlaw.net |
| ***Joint Debtor***<br>**Patricia Lynn Kohler**<br>5310 S. Skyline Drive<br>New Berlin, WI 53151<br>SSN / ITIN: xxx–xx–2596 | represented by **Rollie R. Hanson**<br>(See above for address) |

***Trustee***
**Mary B. Grossman**
Chapter 13 Trustee
P.O. Box 510920
Milwaukee, WI 53203
414–271–3943

***Trustee***
**Michael F. Dubis**
208 East Main Street
Waterford, WI 53185
262–534–6950
*TERMINATED: 02/17/2010*

***U.S. Trustee***
**Office of the U. S. Trustee**
517 East Wisconsin Ave.
Room 430
Milwaukee, WI 53202
414–297–4499

| Filing Date | # | Docket Text |
|---|---|---|
| 11/03/2009 | 1<br>pgs: 71 | Chapter 7 Voluntary Petition Filed by Edward Blaine Kohler, Patricia Lynn Kohler Fee Amount: . (Hanson, Rollie) (Entered: 11/03/2009) |

| 11/03/2009 | 2 pgs: 2 | Certificate of Credit Counseling Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 11/03/2009) |
|---|---|---|
| 11/03/2009 | | Receipt of Voluntary Petition (Chapter 7)(09–35931) [misc,volp7a] ( 299.00) Filing Fee. Receipt number 4365892. Fee amount 299.00. (U.S. Treasury) (Entered: 11/03/2009) |
| 11/03/2009 | 3 pgs: 2 | Meeting of Creditors to be held on 12/11/2009 at 09:30 AM in Waukesha, Brookfield Safety Building. Last day to oppose discharge or dischargeability is 02/09/2010. (Hanson, Rollie) (Entered: 11/03/2009) |
| 11/06/2009 | 4 pgs: 5 | BNC Certificate of Mailing – Meeting of Creditors. (RE: 3 Meeting of Creditors (Chapter 7)) Service Date 11/06/2009. (Admin.) (Entered: 11/07/2009) |
| 12/09/2009 | 5 pgs: 10, 31 | Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin., in addition to Motion to Abandon with Notice of Motion and Certificate of Service filed by Melissa M. Pingel of Bass &Moglowsky, S.C. on behalf of Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. Objections due by 12/23/2009. (Attachments: # Exhibit) Fee Amount . (Pingel, Melissa) (Entered: 12/09/2009) |
| 12/09/2009 | | Receipt of Motion to Abandon(09–35931–pp) [motion,mabn] ( 150.00) Filing Fee. Receipt number 4471583. Fee amount 150.00. (U.S. Treasury) (Entered: 12/09/2009) |
| 12/14/2009 | 6 pgs: 10 | Reaffirmation Agreement with North Shore Bank with Declaration of the Attorney for the Debtor. Disclosures, Instructions and Notice to Debtor have been filed with this Reaffirmation. Filed by North Shore Bank . (hk, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | | Chapter 7 Trustee's Report of No Distribution: I, Michael F. Dubis, having been appointed trustee of the estate of the above–named debtor(s), report that I have neither received any property nor paid any money on account of this estate; that I have made a diligent inquiry into the financial affairs of the debtor(s) and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over and above that exempted by law. Pursuant to Fed R Bank P 5009, I hereby certify that the estate of the above–named debtor(s) has been fully administered. I request that I be discharged from any further duties as trustee. Key information about this case as reported in schedules filed by the debtor(s) or otherwise found in the case record: This case was pending for 1 months. Assets Abandoned: $ 241344.00, Assets Exempt: $ 47042.54, Claims Scheduled: $ 487918.10, Claims Asserted: Not Applicable, Claims scheduled to be discharged without payment: $ 487918.10. (Dubis, Michael) (Entered: 12/15/2009) |
| 12/21/2009 | | Remark: Per Judge Pepper, no hearing is required for this reaffirmation agreement; there is no presumption of undue hardship. (RE: 6 Reaffirmation filed by Creditor North Shore Bank) (pwm, Judicial Assistant) (Entered: 12/21/2009) |
| 12/23/2009 | 7 pgs: 3 | Objection Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (Re: 5 Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin. filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Motion to Abandon ) (Hanson, Rollie) (Entered: 12/23/2009) |

| | | |
|---|---|---|
| 12/29/2009 | <u>8</u><br>pgs: 1 | Notice of Hearing re <u>5</u> Motion for Relief from Stay and Abandonment by US Bank NA. Hearing to be held on 1/11/2010 at 02:00 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (pwm, Judicial Assistant) (Entered: 12/29/2009) |
| 12/31/2009 | <u>9</u><br>pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: <u>8</u> Notice of Hearing) Service Date 12/31/2009. (Admin.) (Entered: 01/01/2010) |
| 01/05/2010 | | Hearing Set (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 1/25/2010 at 10:45 AM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (kgw, Courtroom Deputy) (Entered: 01/05/2010) |
| 01/10/2010 | <u>10</u><br>pgs: 2 | Notice to debtor(s) regarding the Requirement to File a Certification of Completion of Course Concerning Personal Financial Management. (adkt) (Entered: 01/10/2010) |
| 01/13/2010 | <u>11</u><br>pgs: 3 | BNC Certificate of Mailing. (RE: <u>10</u> Notice to debtor(s) regarding the requirement to file form 23.) Service Date 01/13/2010. (Admin.) (Entered: 01/14/2010) |
| 01/15/2010 | <u>12</u><br>pgs: 1 | Motion to Convert Case to Chapter 13 from a Chapter 7 filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 01/15/2010) |
| 01/22/2010 | | Hearing Canceled On 1/25/10, the parties advised that the matter was settled and a stipulation and order would be submitted. (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Motion to Abandon) Document to be reviewed by 2/22/2010. (pwm, Judicial Assistant) (Entered: 01/22/2010) |
| 01/22/2010 | <u>13</u><br>pgs: 2 | Notice of Motion Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (RE: <u>12</u> Motion to Convert Case to Chapter 13 from a Chapter 7 ). Objections due by 2/8/2010. (Hanson, Rollie) (Entered: 01/22/2010) |
| 01/22/2010 | <u>14</u><br>pgs: 4 | Certificate of Service Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (RE: <u>12</u> Motion to Convert Case to Chapter 13 from a Chapter 7 , <u>13</u> Notice of Motion). (Hanson, Rollie) (Entered: 01/22/2010) |
| 02/01/2010 | <u>15</u><br>pgs: 4 | Stipulation Regarding Substitution of Attorney for the Debtor(s) *Creditor(s)*. (Teske, Eric) (Entered: 02/01/2010) |
| 02/02/2010 | <u>16</u><br>pgs: 3 | Order For Substitution of Counsel (RE: <u>15</u> Stipulation Regarding Substitution of Attorney for the Debtor(s)Creditor(s)). (jth, Deputy Clerk) (Entered: 02/02/2010) |
| 02/04/2010 | <u>17</u><br>pgs: 4 | BNC Certificate of Mailing – PDF Document. (RE: <u>16</u> Order on Stipulation) Service Date 02/04/2010. (Admin.) (Entered: 02/05/2010) |
| 02/09/2010 | <u>18</u><br>pgs: 1 | Affidavit of No Objection/Response/Answer Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (Re: <u>12</u> Motion to Convert Case to Chapter 13 from a Chapter 7 ) (Hanson, Rollie) (Entered: 02/09/2010) |

| | | |
|---|---|---|
| 02/11/2010 | 19 pgs: 2 | Financial Management Course Certificate Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 02/11/2010) |
| 02/16/2010 | 20 pgs: 1 | Order Granting Motion to Convert Case to Chapter 13. (Related Doc # 12 ) (jth, Deputy Clerk) (Entered: 02/16/2010) |
| 02/17/2010 | 21 pgs: 2 | Meeting of Creditors to be held on 4/1/2010 at 10:00 AM in Milwaukee, U.S. Courthouse, Room 428. Proofs of Claims due by 6/30/2010 Last day to oppose discharge or dischargeability is 6/1/2010. (jth, Deputy Clerk) (Entered: 02/17/2010) |
| 02/18/2010 | 22 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 20 Order on Motion to Convert Case To Chapter 13) Service Date 02/18/2010. (Admin.) (Entered: 02/19/2010) |
| 02/19/2010 | 23 pgs: 7 | BNC Certificate of Mailing – Meeting of Creditors. (RE: 21 Meeting of Creditors Chapter 13) Service Date 02/19/2010. (Admin.) (Entered: 02/20/2010) |
| 02/26/2010 | 24 pgs: 11 | Chapter 13 Plan. Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 02/26/2010) |
| 02/26/2010 | 25 pgs: 3 | Amended Schedule I, Schedule J, Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 02/26/2010) |
| 02/26/2010 | 26 pgs: 7 | Statement of Current Monthly Income – Form 22 *C*. Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 02/26/2010) |
| 02/28/2010 | 27 pgs: 14 | BNC Certificate of Mailing – PDF Document. (RE: 24 Chapter 13 Plan filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) Service Date 02/28/2010. (Admin.) (Entered: 03/01/2010) |
| 03/01/2010 | 28 pgs: 2 | Stipulation By U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 and *debtors* Filed by Penny G. Gentges on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (RE: 5 Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin., Motion to Abandon ). (Gentges, Penny) (Entered: 03/01/2010) |
| 03/02/2010 | 29 pgs: 2 | Order for Payroll Deduction from debtor's income. (jth, Deputy Clerk) (Entered: 03/02/2010) |
| 03/02/2010 | 30 pgs: 2 | Order Modifying Stay (RE: 28 Stipulation). (jth, Deputy Clerk) (Entered: 03/02/2010) |
| 03/02/2010 | | Court Certificate of Mailing – employee information and order mailed to employer. (Related document: # 29 )(Admin.) (Entered: 03/02/2010) |
| 03/04/2010 | 31 pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: 29 Order to Pay Wages) Service Date 03/04/2010. (Admin.) (Entered: 03/05/2010) |
| 03/04/2010 | 32 pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: 29 Order to Pay Wages) Service Date 03/04/2010. (Admin.) (Entered: 03/05/2010) |

| | | |
|---|---|---|
| 03/04/2010 | <u>33</u><br>pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: <u>30</u> Order on Stipulation) Service Date 03/04/2010. (Admin.) (Entered: 03/05/2010) |
| 03/08/2010 | <u>34</u><br>pgs: 2 | Order for Payroll Deduction from debtor's income. (jth, Deputy Clerk) (Entered: 03/08/2010) |
| 03/10/2010 | <u>35</u><br>pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: <u>34</u> Order to Pay Wages) Service Date 03/10/2010. (Admin.) (Entered: 03/11/2010) |
| 03/11/2010 | <u>36</u><br>pgs: 2 | Order for Payroll Deduction from debtor's income. (jth, Deputy Clerk) (Entered: 03/11/2010) |
| 03/12/2010 | <u>37</u><br>pgs: 6, 17 | Motion for Relief from Stay as to (2d mortgage). with Notice of Motion and Certificate of Service filed by Penny G. Gentges on behalf of Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. Objections due by 3/26/2010. (Attachments: # Exhibit) (Gentges, Penny) (Entered: 03/12/2010) |
| 03/12/2010 | | Receipt of Motion for Relief From Automatic Stay(09–35931–pp) [motion,mrlfsty] ( 150.00) Filing Fee. Receipt number 4750729. Fee amount 150.00. (U.S. Treasury) (Entered: 03/12/2010) |
| 03/13/2010 | <u>38</u><br>pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: <u>36</u> Order to Pay Wages) Service Date 03/13/2010. (Admin.) (Entered: 03/14/2010) |
| 03/22/2010 | <u>39</u><br>pgs: 6 | Renewed Motion/Letter Renewal <u>5</u> Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin. filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Motion to Abandon and Certificate of Service filed by Eric Teske of Bass &Moglowsky, S.C. on behalf of Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. Objections due by 4/12/2010. (Teske, Eric) (Entered: 03/22/2010) |
| 03/26/2010 | <u>40</u><br>pgs: 4 | Objection Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler *with Affidavit of Service* (Re: <u>37</u> Motion for Relief from Stay as to (2d mortgage). filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) and Certificate of Service (Hanson, Rollie) (Entered: 03/26/2010) |
| 03/29/2010 | <u>41</u><br>pgs: 1 | Notice of Hearing re <u>37</u> Motion for Relief from Stay by U.S. Bank National Association. Hearing to be held on 4/20/2010 at 03:00 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (pwm, Judicial Assistant) (Entered: 03/29/2010) |
| 03/29/2010 | <u>42</u><br>pgs: 5, 12 | Objection to Confirmation of Plan with Notice and Certificate of Service. Filed by Eric Teske on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 (RE: <u>24</u> Chapter 13 Plan. Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler.). (Attachments: # Exhibit)(Teske, Eric) (Entered: 03/29/2010) |
| 03/31/2010 | <u>43</u><br>pgs: 1 | Notice of Hearing re <u>42</u> Objection to Confirmation of Plan by US Bank National Association. Hearing to be held on 4/20/2010 at 02:45 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (pwm, Judicial Assistant) (Entered: 03/31/2010) |

| | | |
|---|---|---|
| 03/31/2010 | <u>44</u><br>pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: <u>41</u> Notice of Hearing) Service Date 03/31/2010. (Admin.) (Entered: 04/01/2010) |
| 04/02/2010 | <u>45</u><br>pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: <u>43</u> Notice of Hearing) Service Date 04/02/2010. (Admin.) (Entered: 04/03/2010) |
| 04/05/2010 | | An initial 341 examination was scheduled for 4/1/2010. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 4/29/2010 11:30 AM. Reason(s) for adjournment: Amended Plan, Amended / Missing Schedules, Copies of req. tax returns/proof of filing. Appearances: Trustee, Debtor, Joint Debtor, Atty for Debtor. (Chapter 13 Milwaukee Office) (Entered: 04/05/2010) |
| 04/14/2010 | <u>46</u><br>pgs: 1 | Affidavit of No Objection/Response/Answer Filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 (Re: <u>39</u> Renewed Motion/Letter Renewal <u>5</u> Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin. filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates) (Teske, Eric) (Entered: 04/14/2010) |
| 04/15/2010 | <u>47</u><br>pgs: 1 | Objection Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (Re: <u>39</u> Renewed Motion/Letter Renewal <u>5</u> Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin. filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) (Hanson, Rollie) (Entered: 04/15/2010) |
| 04/16/2010 | <u>48</u><br>pgs: 237 | Adversary case 10–02206. Complaint by Rollie R. Hanson, Edward Blaine Kohler, Patricia Lynn Kohler, U.S. Bank National Association, Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Chase Home Finance LLC, Mortgage Electronic Registrations Systems, Inc., Aurora Bank, FSB on behalf of Edward Blaine Kohler, Patricia Lynn Kohler, Mary B. Grossman, Against U.S. Bank National Association, Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Chase Home Finance LLC, Mortgage Electronic Registrations Systems, Inc., Aurora Bank, FSB. Fee Amount $250 (21 (Validity, priority or extent of lien or other interest in property))(Hanson, Rollie) (Entered: 04/16/2010) |
| 04/16/2010 | <u>49</u><br>pgs: 4 | Motion to Consolidate with with Notice of Motion and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. Objections due by 4/30/2010. (Hanson, Rollie) (Entered: 04/16/2010) |
| 04/16/2010 | <u>50</u><br>pgs: 1 | Notice of Hearing re <u>39</u> Renewed Motion for Relief from Stay by U.S. Bank National Association. Hearing to be held on 4/27/2010 at 03:00 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (pwm, Judicial Assistant) (Entered: 04/16/2010) |
| 04/18/2010 | <u>51</u><br>pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: <u>50</u> Notice of Hearing) Service Date 04/18/2010. (Admin.) (Entered: 04/19/2010) |
| 04/21/2010 | <u>52</u><br>pgs: 1 | Court Minutes for the hearing held on April 20, 2010 re <u>39</u> Renewed Motion for Relief from Stay by US Bank, NA and <u>42</u> Objection to Confirmation of Plan by US Bank, NA. (pwm, Judicial Assistant) (Entered: 04/21/2010) |

| Date | Doc | Description |
|---|---|---|
| 04/21/2010 | <u>53</u><br>pgs: 2, 1 | Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) *to Modify Security Deposit to Provide Adequate Assurance of Payment* filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. (Attachments: # Exhibit WE Energies Letter dated 3/18 re: deposit) (Hanson, Rollie) (Entered: 04/21/2010) |
| 04/21/2010 | | Hearing Continued re <u>39</u> Renewed Motion for Relief from Automatic Stay by US Bank, NA and <u>42</u> Objection to Confirmation of the Chapter 13 Plan by US Bank, NA. Hearing to be held on 6/21/2010 at 11:00 AM Telephone Conference. (pwm, Judicial Assistant) (Entered: 04/21/2010) |
| 04/22/2010 | <u>54</u><br>pgs: 2 | Notice of Motion Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (RE: <u>53</u> Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) *to Modify Security Deposit to Provide Adequate Assurance of Payment*). Objections due by 5/10/2010. (Hanson, Rollie) (Entered: 04/22/2010) |
| 04/22/2010 | <u>55</u><br>pgs: 1 | Certificate of Service Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (RE: <u>53</u> Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) *to Modify Security Deposit to Provide Adequate Assurance of Payment*). (Hanson, Rollie) (Entered: 04/22/2010) |
| 04/30/2010 | | An adjourned 341 examination was scheduled for 4/29/2010. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 6/24/2010 11:30 AM. Reason(s) for adjournment: Amended Plan, Amended / Missing Schedules, Copies of req. tax returns/proof of filing. Appearances: Staff Atty For Trustee. (Chapter 13 Milwaukee Office) (Entered: 04/30/2010) |
| 04/30/2010 | <u>56</u><br>pgs: 3 | Objection Filed by Creditor Attorney WE ENergies (Re: <u>53</u> Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) *to Modify Security Deposit to Provide Adequate Assurance of Payment* filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) (Nelson, Todd) (Entered: 04/30/2010) |
| 04/30/2010 | <u>57</u><br>pgs: 1 | Certificate of Service Filed by Todd T. Nelson on behalf of WE ENergies. (RE: <u>56</u> Objection). (Nelson, Todd) (Entered: 04/30/2010) |
| 05/03/2010 | <u>58</u><br>pgs: 1 | Notice of Hearing re <u>53</u> Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b). Hearing to be held on 5/18/2010 at 02:45 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (pwm, Judicial Assistant) (Entered: 05/03/2010) |
| 05/05/2010 | <u>59</u><br>pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: <u>58</u> Notice of Hearing) Service Date 05/05/2010. (Admin.) (Entered: 05/06/2010) |
| 05/10/2010 | <u>60</u><br>pgs: 2 | Correspondence Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (RE: <u>53</u> Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) *to Modify Security Deposit to Provide Adequate Assurance of Payment*). (Hanson, Rollie) (Entered: 05/10/2010) |
| 05/21/2010 | <u>61</u><br>pgs: 2 | Court Minutes and Order Sustaining Creditor's Objection to Motion and Denying Debtor's Motion to Reduce the Amount of Deposit (Related Doc # <u>53</u>). (jth, Deputy Clerk) (Entered: 05/21/2010) |

| | | |
|---|---|---|
| 05/23/2010 | **62** pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: **61** Order on Motion for Continuation of Utility Service) Service Date 05/23/2010. (Admin.) (Entered: 05/24/2010) |
| 06/04/2010 | **63** pgs: 5 | Motion to Modify Plan *Prior to Confirmation* with Notice of Motion and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. Objections due by 6/25/2010. (Hanson, Rollie) (Entered: 06/04/2010) |
| 06/04/2010 | **64** pgs: 2 | Motion to Limit Notice (RE: **63** Motion to Modify Plan) and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 06/04/2010) |
| 06/14/2010 | **65** pgs: 1 | Order Regarding (RE: **64** Motion to Limit Notice (RE: **63** Motion to Modify Plan) ). (Pepper, Pamela) (Entered: 06/14/2010) |
| 06/17/2010 | **66** pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: **65** Order Regarding Matter (Bankruptcy)) Service Date 06/17/2010. (Admin.) (Entered: 06/18/2010) |
| 06/23/2010 | | An adjourned 341 examination was scheduled for 6/24/2010. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 8/26/2010 11:30 AM. Reason(s) for adjournment: Amended Plan, Amended / Missing Schedules, Resolution to obj. to conf., Copies of req. tax returns/proof of filing. Appearances: Staff Atty For Trustee. (Chapter 13 Milwaukee Office) (Entered: 06/23/2010) |
| 06/29/2010 | **67** pgs: 1 | Affidavit *of No Objection to Motion to Modify Plan Prior to Confirmation* Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (RE: **63** Motion to Modify Plan *Prior to Confirmation*). (Hanson, Rollie) (Entered: 06/29/2010) |
| 07/07/2010 | | Status Hearing (RE: **42** Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 8/30/2010 at 10:45 AM Telephone Hearing. (kgw, Courtroom Deputy) (Entered: 07/07/2010) |
| 08/06/2010 | | Hearing Continued (RE: **42** Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 9/20/2010 at 10:30 AM Telephone Hearing. (kgw, Courtroom Deputy) (Entered: 08/06/2010) |
| 08/25/2010 | | An adjourned 341 examination was scheduled for 8/26/2010. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 10/7/2010 11:30 AM. Reason(s) for adjournment: Amended Plan, Amended / Missing Schedules, Resolution to obj. to conf.. (Chapter 13 Milwaukee Office) (Entered: 08/25/2010) |
| 09/16/2010 | **68** pgs: 2 | Stipulation By U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 and *debtors* Filed by Penny G. Gentges on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (RE: **37** Motion for Relief from Stay as to (2d mortgage)., **39** Renewed Motion/Letter Renewal **5** Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin. filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates). With no objection from the case trustee. (Gentges, Penny) (Entered: 09/16/2010) |

| | | |
|---|---|---|
| 09/17/2010 | <u>69</u><br>pgs: 1 | Order Approving Stipulation and Modifying Stay(RE: <u>68</u> Stipulation). (jth, Deputy Clerk) (Entered: 09/17/2010) |
| 09/19/2010 | <u>70</u><br>pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: <u>69</u> Order on Stipulation) Service Date 09/19/2010. (Admin.) (Entered: 09/20/2010) |
| 09/21/2010 | | Hearing Continued (RE: <u>63</u> Motion to Modify Plan filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) Hearing to be held on 11/22/2010 at 11:30 AM Telephone Hearing. (kgw, Courtroom Deputy) (Entered: 09/21/2010) |
| 09/21/2010 | <u>71</u><br>pgs: 2 | Order for Payroll Deduction from debtor's income. (Pepper, Pamela) (Entered: 09/21/2010) |
| 09/21/2010 | <u>72</u><br>pgs: 1 | Correspondence *regarding amended claim no. 12* Filed by Penny G. Gentges on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (Gentges, Penny) (Entered: 09/21/2010) |
| 09/21/2010 | <u>73</u><br>pgs: 1 | Correspondence *regarding amended claim (no. 13)* Filed by Penny G. Gentges on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (Gentges, Penny) (Entered: 09/21/2010) |
| 09/23/2010 | <u>74</u><br>pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: <u>71</u> Order to Pay Wages) Service Date 09/23/2010. (Admin.) (Entered: 09/24/2010) |
| 10/06/2010 | | An adjourned 341 examination was scheduled for 10/7/2010. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 12/2/2010 11:30 AM. Reason(s) for adjournment: Amended Plan, Resolution to obj. to conf.. (Chapter 13 Milwaukee Office) (Entered: 10/06/2010) |
| 10/07/2010 | <u>75</u><br>pgs: 2 | Order for Payroll Deduction from debtor's income. (Pepper, Pamela) (Entered: 10/07/2010) |
| 10/09/2010 | <u>76</u><br>pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: <u>75</u> Order to Pay Wages) Service Date 10/09/2010. (Admin.) (Entered: 10/10/2010) |
| 11/22/2010 | | Status Hearing (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4). Hearing to be held on 12/13/2010 at 10:45 AM Telephone Conference. (ccb, Law Clerk) (Entered: 11/22/2010) |
| 11/22/2010 | | Status Hearing (RE: <u>42</u> Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4). Status hearing to be held on 12/13/2010 at 10:45 AM at Telephone Conference. (ccb, Law Clerk) (Entered: 11/22/2010) |
| 11/23/2010 | <u>77</u><br>pgs: 3 | Court Minutes and Order regarding Objection to Confirmation of Plan and Status hearing on Monday December 13, 2010 (RE: <u>42</u> Objection to Confirmation of the Plan). (jth, Deputy Clerk) (Entered: 11/23/2010) |
| 11/25/2010 | <u>78</u><br>pgs: 4 | BNC Certificate of Mailing – PDF Document. (RE: <u>77</u> Objection to Confirmation of Plan) Service Date 11/25/2010. (Admin.) (Entered: 11/26/2010) |

| Date | Doc | Description |
|---|---|---|
| 12/01/2010 | | An adjourned 341 examination was scheduled for 12/2/2010. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 1/6/2011 11:30 AM. Reason(s) for adjournment: Amended Plan, Amended / Missing Schedules. (Chapter 13 Milwaukee Office) (Entered: 12/01/2010) |
| 12/14/2010 | <u>79</u><br>pgs: 1 | Court Minutes from the hearing held December 13, 2010 (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 and <u>42</u> Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) (kgw, Courtroom Deputy) (Entered: 12/14/2010) |
| 12/14/2010 | | Hearing Continued (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 1/31/2011 at 11:15 AM Telephone Hearing. (kgw, Courtroom Deputy) (Entered: 12/14/2010) |
| 12/14/2010 | | Hearing Continued (RE: <u>42</u> Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 1/31/2011 at 11:15 AM Telephone Hearing. (kgw, Courtroom Deputy) (Entered: 12/14/2010) |
| 12/22/2010 | <u>80</u><br>pgs: 14, 2 | Adversary case 10–02694. Complaint filed by Rollie R Hanson on behalf of Edward and Patricia Kohler , Against Structured Asset Investment Loan Trust Mortgage Pass–Through Certificates, Series 2006–4, U. S. Bank National Association, Chase Manhattan Mortgage, Chase Home Finance LLC, Chase H.E., Mortgage Electronic Registrations Systems, Inc.,Aurora Bank FSB and Aurora Loan Services, LLC.Penny Gentges. Receipt Number WAIVED, Fee Amount $250 (Attachments: # Civil Cover Sheet) (21 (Validity, priority or extent of lien or other interest in property))(Hanson, Rollie) (Entered: 12/22/2010) |
| 01/05/2011 | | An adjourned 341 examination was scheduled for 1/6/2011. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 3/31/2011 11:30 AM. Reason(s) for adjournment: Amended Plan, Amended / Missing Schedules, Resolution to obj. to conf.. (Chapter 13 Milwaukee Office) (Entered: 01/05/2011) |
| 01/31/2011 | | Evidentiary Hearing (RE: <u>39</u> Renewed Motion/Letter Renewal filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 3/30/2011 at 01:30 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (ccb, Law Clerk) (Entered: 01/31/2011) |
| 01/31/2011 | | Evidentiary Hearing (RE: <u>42</u> Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 3/30/2011 at 01:30 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (ccb, Law Clerk) (Entered: 01/31/2011) |
| 02/01/2011 | <u>81</u><br>pgs: 3 | Court Minutes for the January 31, 2011 Status Hearing (RE: <u>39</u> Renewed Motion for Relief from Stay by US Bank et. al. & <u>42</u> Objection to Confirmation of Plan by U.S. Bank). (ccb, Law Clerk) (Entered: 02/01/2011) |

| | | |
|---|---|---|
| 02/08/2011 | | Adversary Case 2:10–ap–2206 Closed (jth, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | | Disposition of Adversary 2:10–ap–2206–Dimissed. (jth, Deputy Clerk) (Entered: 02/08/2011) |
| 02/22/2011 | 82 pgs: 5 | Motion to Modify Plan (RE: 24 Chapter 13 Plan with Notice of Motion and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. Objections due by 3/15/2011. (Hanson, Rollie) (Entered: 02/22/2011) |
| 02/22/2011 | 83 pgs: 2 | Motion to Limit Notice (RE: 82 Motion to Modify Plan) and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 02/22/2011) |
| 02/28/2011 | 84 pgs: 2 | Order for Payroll Deduction from debtor's income. (Pepper, Pamela) (Entered: 02/28/2011) |
| 03/01/2011 | 85 pgs: 12, 21, 30, 20, 43 | Objection to Amended Claim Number 12,13 by Claimant U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. *With Affidavit of Service* Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (Attachments: # Exhibit 1# Exhibit 2# Exhibit 3# Exhibit 4)(Hanson, Rollie) (Entered: 03/01/2011) |
| 03/01/2011 | 86 pgs: 14 | Brief *in Support of Objection to Original and Amended Claims Number 12 and 13* Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (RE: 85 Objection to Claim). (Hanson, Rollie) (Entered: 03/01/2011) |
| 03/02/2011 | 87 pgs: 1 | Order Regarding (RE: 83 Motion to Limit Notice (RE: 82 Motion to Modify Plan) ). (Pepper, Pamela) (Entered: 03/02/2011) |
| 03/02/2011 | 88 pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: 84 Order to Pay Wages) Service Date 03/02/2011. (Admin.) (Entered: 03/03/2011) |
| 03/03/2011 | 89 pgs: 1 | Notice of Hearing (RE: 85 Debtors' Objections to Amended Claims No. 12 and 13 of U.S. Bank, NA). Hearing to be held on 4/19/2011 at 02:30 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (kgw, Courtroom Deputy) (Entered: 03/03/2011) |
| 03/03/2011 | 90 pgs: 40 | Third Party Motion for Protective Order and Certificate of Service filed by Edward J. Lesniak of Burke, Warren, MacKay &Serritella, P.C. on behalf of Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (Lesniak, Edward) (Entered: 03/03/2011) |
| 03/04/2011 | 91 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 87 Order Regarding Matter (Bankruptcy)) Service Date 03/04/2011. (Admin.) (Entered: 03/05/2011) |
| 03/05/2011 | 92 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 89 Notice of Hearing) Service Date 03/05/2011. (Admin.) (Entered: 03/05/2011) |
| 03/10/2011 | 93 pgs: 2 | Court Minutes from the hearing held March 7, 2011 (RE: 90 Motion for Protective Order filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4; Pretrial in Adversary Case No. 2010–2694 and |

| | | |
|---|---|---|
| | | Defendants' Motion to Dismiss that Adversary Case.) (kgw, Courtroom Deputy) (Entered: 03/10/2011) |
| 03/15/2011 | 94 pgs: 1 | Notice of Change of Address *for Creditor MERS* Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 03/15/2011) |
| 03/16/2011 | 95 pgs: 1 | Affidavit of No Objection/Response/Answer Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (Re: 82 Motion to Modify Plan (RE: 24 Chapter 13 Plan) ) (Hanson, Rollie) (Entered: 03/16/2011) |
| 03/16/2011 | 96 pgs: 6 | Memorandum of Law *Memorandum of Issues* Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler ( 39 Renewed Motion). (Hanson, Rollie) (Entered: 03/16/2011) |
| 03/16/2011 | 97 pgs: 1 | Affidavit *of Service* Filed by Rollie R. Hanson on behalf of Edward Blaine Kohler, Patricia Lynn Kohler. (RE: 96 Memorandum of Law). (Hanson, Rollie) (Entered: 03/16/2011) |
| 03/17/2011 | 98 pgs: 1 | Order Regarding (RE: 90 Third Party Motion for Protective Order ). (Pepper, Pamela) (Entered: 03/17/2011) |
| 03/19/2011 | 99 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 98 Order Regarding Matter (Bankruptcy)) Service Date 03/19/2011. (Admin.) (Entered: 03/20/2011) |
| 03/22/2011 | 100 pgs: 9 | Affidavit *(supplemental affidavit in support of motions for relief from stay)* Filed by Penny G. Gentges on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (RE: 37 Motion for Relief from Stay as to (2d mortgage)., 39 Renewed Motion/Letter Renewal 5 Motion for Relief from Stay as to 5310 S. Skyline Dr.; New Berlin, Wisconsin. filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates). (Gentges, Penny) (Entered: 03/22/2011) |
| 03/25/2011 | | Evidentiary Hearing Continued (RE: 39 Renewed Motion for Relief from the Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 5/9/2011 at 01:30 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (kgw, Courtroom Deputy) (Entered: 03/25/2011) |
| 03/25/2011 | | Evidentiary Hearing Continued (RE: 42 Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, 85 Objection to Claims # 12 and #13 of US Bank, NA filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) Hearing to be held on 5/9/2011 at 01:30 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (kgw, Courtroom Deputy) (Entered: 03/25/2011) |
| 03/31/2011 | | An adjourned 341 examination was scheduled for 3/31/2011. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 5/26/2011 11:30 AM. Reason(s) for adjournment: Resolution to obj. to conf.. (Chapter 13 Milwaukee Office) (Entered: 03/31/2011) |
| 03/31/2011 | | Evidentiary Hearing Continued (RE: 39 Renewed Motion for Relief from the Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee |

| | | |
|---|---|---|
| | | for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Hearing to be held on 5/25/2011 at 02:00 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (kgw, Courtroom Deputy) (Entered: 03/31/2011) |
| 03/31/2011 | | Hearing Continued (RE: 42 Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 and 85 Objection to Claims #12 &#13 of US Bank filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) Hearing to be held on 5/25/2011 at 02:00 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin. (kgw, Courtroom Deputy) (Entered: 03/31/2011) |
| 05/25/2011 | | An adjourned 341 examination was scheduled for 5/26/2011. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 6/30/2011 11:30 AM. Reason(s) for adjournment: Resolution to obj. to conf.. Appearances: Staff Atty For Trustee. (Chapter 13 Milwaukee Office) (Entered: 05/25/2011) |
| 05/26/2011 | 101 pgs: 1 | Court Minutes for the May 25, 2011 Hearing (RE: 39 Renewed Motion for Relief from Stay filed by Creditor U.S. Bank National Association, 42 Objection to Confirmation of Plan with Notice and Certificate of Service filed by U.S. Bank National Association, and 85 Objection to Amended Claim Number 12,13 by Claimant U.S. Bank National Association filed by Debtors). (ccb, Law Clerk) (Entered: 05/26/2011) |
| 05/26/2011 | 102 pgs: 1, 3, 3, 81, 44 | Exhibits filed by Penny G. Gentges and Edward J. Lesniak on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (RE: 101 Court Minutes).(Attachments: # Exhibit– Exhibit A# Exhibit– Exhibit B# Exhibit– Exhibit C# Exhibit– Exhibit D) (jth, Deputy Clerk) (Entered: 05/26/2011) |
| 05/31/2011 | | Oral Ruling Hearing (RE: 39 Renewed Motion/Letter Renewal filed by Creditor U.S. Bank et. al., 42 Objection to Confirmation of Plan filed by Creditor U.S. Bank et. al., and 85 Debtor's Objection to Amended Claims #12, #13). Hearing to be held on 6/27/2011 at 02:00 PM Telephone Hearing. (ccb, Law Clerk) (Entered: 05/31/2011) |
| 06/02/2011 | 103 pgs: 9 | Correspondence *regarding recent U.S. Court of Appeals case* Filed by Penny G. Gentges on behalf of U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. (RE: 101 Court Minutes). (Gentges, Penny) (Entered: 06/02/2011) |
| 06/28/2011 | 104 pgs: 2 | There is no Document No. 104 for this case. This entry was docketed in error.Court Minutes for the June 27, 2011 Hearing (RE: 8 Motion to Dismiss Adversary Proceeding Filed by Defendants). (emm, Law Clerk). (Entered: 06/28/2011) |
| 06/28/2011 | 105 pgs: 2 | Court Minutes and Order Granting Motion for Relief From Automatic Stay from Hearing held on June 27, 2011 (Related Doc # 37 ) and(Related Doc # 39 ); Granting Motion To Consolidate on Case 2:09–bk–35931 and 10–2694 (Related Doc # 49 );Granting Motion to Dismiss Adversary ; Overruling Debtors' Objections to Claims #12 and #13(Related Doc # 85 ) and Sustaining Objection to Confirmation of Plan (Related Doc# 42 ). (jth, Deputy Clerk) (Entered: 06/28/2011) |

| | | |
|---|---|---|
| 06/28/2011 | 106 | Reclassification of Claim(s) number(s) 12,13– Allowed pursuant to Order signed June 28, 2011. (jth, Deputy Clerk) (Entered: 06/28/2011) |
| 06/30/2011 | 107 pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: 105 Order on Motion for Relief From Automatic Stay) Service Date 06/30/2011. (Admin.) (Entered: 07/01/2011) |
| 07/01/2011 | | An adjourned 341 examination was scheduled for 6/30/2011. The trustee reports the hearing is adjourned to Milwaukee, U.S. Courthouse, Room 428 8/11/2011 11:30 AM. Reason(s) for adjournment: Amended Plan. Appearances: Staff Atty For Trustee. (Chapter 13 Milwaukee Office) (Entered: 07/01/2011) |
| 07/06/2011 | 108 pgs: 2 | Order Granting Relief From Stay (Related Doc # 5 ). (jth, Deputy Clerk) (Entered: 07/06/2011) |
| 07/06/2011 | | Disposition of Adversary 2:10–ap–2694–Dismissed. (jth, Deputy Clerk) (Entered: 07/06/2011) |
| 07/07/2011 | 109 pgs: 4 | Correspondence filed by CT . (RE: 105 Order on Motion for Relief From Automatic Stay, Order on Renewed Motion, Order on Motion to Consolidate Case). (jth, Deputy Clerk) (Entered: 07/07/2011) |
| 07/08/2011 | 110 pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: 108 Order on Motion for Relief From Automatic Stay) Service Date 07/08/2011. (Admin.) (Entered: 07/12/2011) |
| 07/18/2011 | 111 pgs: 7 | Motion to Reconsider (related documents 108 Order on Motion for Relief From Automatic Stay) with Notice of Motion and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. Objections due by 8/1/2011. (Hanson, Rollie) (Entered: 07/18/2011) |
| 07/19/2011 | 112 pgs: 23 | Transcript regarding Hearing Held 06/27/2011 RE: Oral Ruling. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 10/17/2011. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber AudioEdge Transcription LLC, Telephone number 973–618–2310. ( 105 Court Minutes) Notice of Intent to Request Redaction Deadline Due By 7/26/2011. Redaction Request Due By 8/9/2011. Redacted Transcript Submission Due By 8/19/2011. Transcript access will be restricted until 10/17/2011. (jth, Deputy Clerk) (Entered: 07/19/2011) |
| 07/19/2011 | 113 pgs: 107 | Transcript regarding Hearing Held 05/25/2011 RE: Objections/Relief from Stay. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 10/17/2011. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber AudioEdge Transcription LLC, Telephone number 973–618–2310. (RE: 101 Court Minutes) Notice of Intent to Request Redaction Deadline Due By 7/26/2011. Redaction Request Due By 8/9/2011. Redacted Transcript Submission Due By 8/19/2011. Transcript access will be restricted until 10/17/2011. (jth, Deputy Clerk) (Entered: 07/19/2011) |
| 07/20/2011 | 114 pgs: 107 | Amended Transcript regarding Hearing Held 05/25/2011 RE: Objections/Relief from Stay. THIS TRANSCRIPT WILL BE MADE |

| | | |
|---|---|---|
| | | ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 10/18/2011. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber AudioEdge Transcription, LLC, Telephone number 973–618–2310. (RE: 101 Court Minutes) Notice of Intent to Request Redaction Deadline Due By 7/27/2011. Redaction Request Due By 8/10/2011. Redacted Transcript Submission Due By 8/22/2011. Transcript access will be restricted until 10/18/2011. (jth, Deputy Clerk) (Entered: 07/20/2011) |
| 07/27/2011 | | Hearing Set (RE: 111 Motion to Reconsider filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) Hearing to be held on 8/9/2011 at 02:45 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin for 111 , (emm, Law Clerk) (Entered: 07/27/2011) |
| 07/29/2011 | 115 pgs: 1 | Notice of Hearing re 111 Debtors' Motion to Reconsider. Hearing to be held on 8/9/2011 at 02:45 PM United States Courthouse at 517 East Wisconsin Avenue, Room 149, Milwaukee, Wisconsin for 111 , (pwm, Judicial Assistant) (Entered: 07/29/2011) |
| 07/30/2011 | 116 pgs: 6 | Response Filed by Edward J. Lesniak of Burke, Warren, MacKay &Serritella, P.C. on behalf of Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4. to 111 Motion to Reconsider (related documents 108 Order on Motion for Relief From Automatic Stay) filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler and Certificate of Service (Lesniak, Edward) (Entered: 07/30/2011) |
| 07/31/2011 | 117 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 115 Notice of Hearing) Service Date 07/31/2011. (Admin.) (Entered: 07/31/2011) |
| 08/01/2011 | 118 pgs: 3, 1 | Assignment/Transfer of Claim Transfer Agreement 3001 (e) 2 Transferor: Citibank South Dakota NA (Claim No. 18) To Citibank, N.A. Court to send Notice of Transfer of Claim. Objections due within 21 days of the date of this notice. Filed by Creditor Citibank, N.A. (Rossi, Lauren) (Entered: 08/01/2011) |
| 08/04/2011 | 119 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 118 Notice of Transfer of Claim filed by Creditor Citibank, N.A.) Service Date 08/04/2011. (Admin.) (Entered: 08/05/2011) |
| 08/08/2011 | 120 pgs: 3, 1 | Motion to Modify Plan (RE: 24 Chapter 13 Plan) with Notice of Motion and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. Objections due by 8/29/2011. (Attachments: # Affidavit of Service) (Hanson, Rollie) (Entered: 08/08/2011) |
| 08/08/2011 | 121 pgs: 2 | Motion to Limit Notice (RE: 120 Motion to Modify Plan) and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. (Hanson, Rollie) (Entered: 08/08/2011) |
| 08/11/2011 | 122 pgs: 2 | Order for Payroll Deduction from debtor's income. (Pepper, Pamela) (Entered: 08/11/2011) |
| 08/12/2011 | 123 pgs: 2 | Court Minutes (hearing held on 8/9/2011), and Order Denying Motion To Reconsider (Related Doc # 111 ). (djc, Deputy Clerk) (Entered: 08/12/2011) |
| 08/13/2011 | 124 pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: 122 Order to Pay Wages) Service Date 08/13/2011. (Admin.) (Entered: 08/13/2011) |

| | | |
|---|---|---|
| 08/14/2011 | <u>125</u><br>pgs: 3 | BNC Certificate of Mailing – PDF Document. (RE: <u>123</u> Order on Motion To Reconsider) Service Date 08/14/2011. (Admin.) (Entered: 08/14/2011) |
| 08/15/2011 | | An adjourned 341 examination was scheduled for 8/11/2011. The trustee tentatively recommends confirmation based on the plan filed 8/8/2011. A summary of the terms include $6,841.50/Monthly through August 2011; then $176.00 until the end of the plan for a total of 60 months. (Chapter 13 Milwaukee Office) (Entered: 08/15/2011) |
| 08/22/2011 | <u>126</u><br>pgs: 2, 2 | Amended Motion (related document(s): <u>121</u> Motion to Limit Notice (RE: <u>120</u> Motion to Modify Plan) filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler) and Certificate of Service filed by Rollie R. Hanson on behalf of Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler. (Attachments: # Creditor List) (Hanson, Rollie) (Entered: 08/22/2011) |
| 08/22/2011 | <u>127</u><br>pgs: 34 | Transcript regarding Hearing Held 11/22/2010 RE: Status Hearing: Motion for Relief from Automatic Stay and Objection to Confirmation of Plan. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/21/2011. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber AudioEdge Transcription, LLC, Telephone number 973–618–2310. (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Motion to Abandon, <u>42</u> Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Notice of Intent to Request Redaction Deadline Due By 8/29/2011. Redaction Request Due By 9/12/2011. Redacted Transcript Submission Due By 9/22/2011. Transcript access will be restricted until 11/21/2011. (jth, Deputy Clerk) (Entered: 08/22/2011) |
| 08/22/2011 | <u>128</u><br>pgs: 17 | Transcript regarding Hearing Held 12/13/2010 RE: Status Hearing: Motion for Relief from Automatic Stay and Objection to Confirmation of Plan. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/21/2011. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber AudioEdge Transcription, LLC, Telephone number 973–618–2310. (RE: <u>5</u> Motion for Relief From Automatic Stay filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, Motion to Abandon, <u>42</u> Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Notice of Intent to Request Redaction Deadline Due By 8/29/2011. Redaction Request Due By 9/12/2011. Redacted Transcript Submission Due By 9/22/2011. Transcript access will be restricted until 11/21/2011. (jth, Deputy Clerk) (Entered: 08/22/2011) |
| 08/22/2011 | <u>129</u><br>pgs: 34 | Transcript regarding Hearing Held 01/31/2011 RE: Evidentiary Hearing: Renewed Motion/Letter Renewal and Objection to Confirmation of Plan. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/21/2011. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber AudioEdge Transcription, LLC, Telephone number 973–618–2310. (RE: <u>39</u> Renewed Motion/Letter Renewal filed by Creditor U.S. Bank National Association, as Trustee for |

| | | |
|---|---|---|
| | | Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4, 42 Objection to Confirmation of the Plan filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4) Notice of Intent to Request Redaction Deadline Due By 8/29/2011. Redaction Request Due By 9/12/2011. Redacted Transcript Submission Due By 9/22/2011. Transcript access will be restricted until 11/21/2011. (jth, Deputy Clerk) (Entered: 08/22/2011) |
| 08/26/2011 | 130 pgs: 2 | Notice of Appeal Fee Amount $255 Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (RE: 108 Order on Motion for Relief From Automatic Stay, 123 Order on Motion To Reconsider). (Hanson, Rollie) (Entered: 08/26/2011) |
| 08/26/2011 | | Receipt of Notice of Appeal(09–35931–pp) [appeal,ntcapl] ( 255.00) Filing Fee. Receipt number 6445584. Fee amount 255.00. (U.S. Treasury) (Entered: 08/26/2011) |
| 08/29/2011 | 131 pgs: 3 | Letter to Appellee (RE: 130 Notice of Appeal filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler). (jth, Deputy Clerk) (Entered: 08/29/2011) |
| 08/30/2011 | 132 pgs: 1 | Order Approving Amended Application to Waive Notice of Request to Modify Chapter 13 Plan (Related Doc # 126 ). (jth, Deputy Clerk) (Entered: 08/30/2011) |
| 08/31/2011 | 133 pgs: 4 | BNC Certificate of Mailing – PDF Document. (RE: 131 Letter to Appellee) Service Date 08/31/2011. (Admin.) (Entered: 08/31/2011) |
| 09/01/2011 | 134 pgs: 2 | BNC Certificate of Mailing – PDF Document. (RE: 132 Order on Amended Motion) Service Date 09/01/2011. (Admin.) (Entered: 09/01/2011) |
| 09/09/2011 | 135 pgs: 6 | Appellant Designation of Contents For Inclusion in Record On Appeal Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (RE: 130 Notice of Appeal). Appellee designation due by 09/23/2011. Transmission of Designation Due by 10/11/2011. (Hanson, Rollie) (Entered: 09/09/2011) |
| 09/09/2011 | 136 pgs: 5 | Statement of Issues on Appeal with Certificate of Service, Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (RE: 135 Appellant Designation). (Hanson, Rollie) (Entered: 09/09/2011) |
| 09/19/2011 | 137 pgs: 2 | Affidavit of No Objection/Response/Answer Filed by Debtor Edward Blaine Kohler, Joint Debtor Patricia Lynn Kohler (Re: 120 Motion to Modify Plan (RE: 24 Chapter 13 Plan) ) and Certificate of Service (Hanson, Rollie) (Entered: 09/19/2011) |
| 09/20/2011 | 138 pgs: 2 | Order Confirming Chapter 13 Plan. (jth, Deputy Clerk) (Entered: 09/20/2011) |
| 09/21/2011 | 139 pgs: 3 | Appellee Designation of Contents for Inclusion in Record of Appeal with Certificate of Service Filed by Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass–Through Certificates, Series 2006–4 (RE: 130 Notice of Appeal). (Lesniak, Edward) (Entered: 09/21/2011) |

THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: March 02, 2010



_____
Honorable Pamela Pepper
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------
In Re: Kohler, Edward B. and Patricia L.

                                    Case No.  09-35931-pp
                                      Chapter   7

                        Debtors.
----------------------------------------------------------------
      U.S. Bank National Association, as Trustee for
      Structured Asset Investment Loan Trust,
      Mortgage Pass-Through Certificates, Series 2006-4

                         Plaintiff,

vs.

      Edward B. and Patricia L. Kohler
      and Michael F. Dubis, Trustee,

                     Defendants.
----------------------------------------------------------------
                ORDER MODIFYING STAY
----------------------------------------------------------------

Debtors having filed a Petition for Relief under 11 U.S.C.
Chapter 7 on November 3, 2009; and

U.S. Bank National Association, as Trustee for Structured
Asset Investment Loan Trust, Mortgage Pass-Through Certificates,
Series 2006-4, (hereinafter "Creditor") a secured creditor and a
party in interest herein, by virtue of a Note and Security
Agreement secured by real estate located at 5310 S Skyline Dr.; New
Berlin, Wisconsin (herein after "Property"); and

Creditor filed a Motion for Relief from Automatic Stay, due to
lapse of monthly mortgage payments; and

Debtors have now filed a motion to convert to a Chapter 13 and pay Creditor's claim in the Chapter 13 plan;

IT IS ORDERED that the automatic stay is hereby modified as follows:

1.    That the Debtor shall pay the arrearage claim through the Chapter 13 plan.  In the event the Debtors' Chapter 13 plan fails to contemplate paying the mortgage arrears and/or future monthly mortgage payments in accordance with the terms of the contract between the parties, or if the Debtor does not complete the conversion to a Chapter 13, Creditor may renew its motion by letter to the court for the duration of this case.

2.    That this stipulation and order does not preclude Debtor from later filing an adversary in this case.

######

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
------------------------------------------------------------------
In Re: Kohler, Edward B. and Patricia L.

                                Case No.   09-35931-pp
                                Chapter    13
                    Debtors.
------------------------------------------------------------------
     U.S. Bank National Association, as Trustee for
     Structured Asset Investment Loan Trust,
     Mortgage Pass-Through Certificates, Series 2006-4

                        Plaintiff,

vs.

     Edward B. and Patricia L. Kohler
     and Mary B. Grossman, Trustee,

                        Defendants.
------------------------------------------------------------------
          STIPULATION TO MODIFY AUTOMATIC STAY
------------------------------------------------------------------

     U.S. Bank National Association, as Trustee for Structured
Asset Investment Loan Trust, Mortgage Pass-Through Certificates,
Series 2006-4 (hereinafter "Creditor") and the undersigned debtors,
by their attorneys, hereby stipulate as follows:

     1.    That Edward B. and Patricia L. Kohler, (hereinafter
"Debtor", whether one or more), filed a petition under Chapter 7 of
the U.S. Bankruptcy Code on November 3, 2009, which converted to a
Chapter 13 case on February 16, 2010, and that Mary B. Grossman has
been appointed trustee.

     2.    That Debtor executed the following Promissory Notes: for
loans of $220,800.00 and $55,200.00; payments under said Notes are
secured by Mortgages on certain real property located at 5310 S
Skyline Dr; New Berlin, Wisconsin. A copy of said Notes and
Mortgages were filed with the Court on March 16, 2010, with the
Creditor's Proof of Claims.

3.    That the parties now wish to pursue loss mitigation and work out alternatives, including, but not limited to, a modification of the mortgage loan(s).

4.    The parties request that the court sign an order modifying the automatic stay in accordance with this Stipulation, in the form annexed hereto.

5.    This Stipulation may be executed in counterparts.

Dated: _September 2_, 2010.

HANSON LAW OFFICES                     BASS & MOGLOWSKY, S.C.
Attorneys for Debtor                   Attorneys for Creditor


_Rollie R. Hanson_                     _Penny G. Gentges_

NO OBJECTION


_Mary B. Grossman_
CHAPTER 13 TRUSTEE

THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: September 17, 2010

Honorable Pamela Pepper
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
------------------------------------------------------------------
In Re: Kohler, Edward B. and Patricia L.
                                    Case No.   09-35931-pp
                                    Chapter    13
                  Debtors.
------------------------------------------------------------------
    U.S. Bank National Association, as Trustee for
    Structured Asset Investment Loan Trust,
    Mortgage Pass-Through Certificates, Series 2006-4

                    Plaintiff,
vs.
    Edward B. and Patricia L. Kohler
    and Mary B. Grossman, Trustee,

                    Defendants.
------------------------------------------------------------------
        ORDER APPROVING STIPULATION AND MODIFYING STAY
------------------------------------------------------------------

    Creditor, U.S. Bank National Association, as Trustee for
Structured Asset Investment Loan Trust, Mortgage Pass-Through
Certificates, Series 2006-4, and Debtor, having filed a Stipulation
requesting that the court modify the automatic stay to allow the
parties to pursue loss mitigation and work out alternatives,
including, but not limited to, a modification of the mortgage
loan(s) with regard to the mortgages secured by the debtor's
homestead, located at 5310 S Skyline Dr; New Berlin, Wisconsin, and
the trustee having no objection thereto;

    IT IS ORDERED that the Stipulation is approved, and the
automatic stay is hereby modified to allow the parties to pursue
loss mitigation and loan modification(s) in accordance with their
Stipulation.

                            #####

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re:   Edward B. Kohler and Patricia L. Kohler          Chapter 13

          Debtors.                                        Case No. 09-35931-PP

**OBJECTION TO AMENDED CLAIM NO. 12 AND AMENDED CLAIM NO. 13 FILED BY U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR STRUCTURED ASSET INVESTMENT LOAN TRUST, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-4 AND MOTION TO DISMISS OBJECTION TO CONFIRMATION**

The above-referenced Debtor, by the Law Office of Rollie R. Hanson, S.C., hereby objects to Amended Claim 12 and Amended Claim 13 filed by U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2006-4, hereinafter the "Claimant" and moves this Court to dismiss the Claimant's objection to Confirmation of the Debtor's Chapter 13 Plan for lack of standing on file in this case. In support of this objection, the Debtor respectfully shows to the court as follows:

### FACTUAL ALLEGATIONS

1. This case was commenced by the filing of a Chapter 7 petition with the Clerk of this court on November 3, 2009.

2. An Order for Relief under the provisions of Chapter 7 of the Bankruptcy Code was duly entered by this Court upon the filing of the petition. This order served to invoke the provisions of Section 362(a) of the Bankruptcy Code.

3. The 341(a) meeting of creditors was held on December 11, 2009 in Waukesha, Wisconsin.

4. That a Motion for Relief from Stay and Abandonment was filed on December 9, 2009 by U.S. Bank National Association, as Trustee for Structured Asset

THE LAW OFFICE OF ROLLIE R. HANSON, S.C.
6737 West Washington Street, Suite 1420
West Allis, WI 53214
(414)321-9733 Fax (414)321-9601
Rollie@hansonlaw.net

1

Investment Loan Trust, Mortgage Pass Through Certificates, Series 2006-4 and an Objection to said motion was filed by the debtors on December 23, 2009.

5. That a Motion to Voluntarily Convert the case to a Chapter 13 proceeding pursuant to 11 USC Section 706(a) was granted by the court on February 16, 2010.

6. Prior to the filing of the bankruptcy petition in this case, the debtors refinanced their home on April 6, 2006. In order to complete the refinance, the debtors signed a note and mortgage in favor of BNC Mortgage, Inc. for the first mortgage in the amount of $220,000.00 and also signed a second mortgage at the same closing in favor of Lehmann Brothers Bank, FSB in the amount of $55,000.00.

7. The debtors have listed on Schedule D a debt to Chase Manhattan Mortgage (the pre-petition mortgage servicer) in the current outstanding amount of $226,193. The debt is disputed to the extent that the debtors deny that Chase Manhattan or the Trust hold a valid, and enforceable secured claim against property of the bankruptcy estate, specifically: the debtors' single-family home located at 5310 S. Skyline Dr., New Berlin, WI 53151 and more particularly described as follows: Lot Fifteen(15), Block Four(4), Maryknoll Heights Addition No. 1, being a Subdivision of a part of the West One-half(1/2) of the Southwest One-quarter(1/4) of Section Twenty-five(25), Township Six(6) North, Range Twenty(20) East, City of New Berlin, Waukesha County , Wisconsin.

8. The debtors signed an Adjustable Rate Note (issued on the standard Fannie/Freddie Mac Uniform instrument, Form 3520 1/01) on April 6, 2006 in the

2

principal amount of $220,800.00. The said note provides for an adjustable rate of interest with an initial interest rate of 7.475% and with initial monthly payments of $1540.09 due on the first day of each month for a term of thirty (30) years, beginning on June 1, 2006 and further provided in an Addendum to Note for interest only payments for a period of time.  The "lender" named on the note is BNC Mortgage, Inc.

9. The above-referred note was allegedly secured by a first mortgage issued on Wisconsin-Single Family- Fannie/Freddie Mac Uniform Instrument Form 3050 1/01 and an Adjustable Rate Rider recorded in the Waukesha County Register's Office on May 1, 2006.  According to the language of the mortgage, Mortgage Electronic Systems, Inc ("MERS") is named as the "mortgagee" and further states that MERS is "acting solely as a nominee for Lender and Lender's successors and assigns". The said mortgage also lists BNC Mortgage Inc. as the lender.   The plaintiffs allege that as of the date of the filing of the petition the note and mortgage had not been assigned to any other party.

10. The debtors have listed on Schedule D a debt to Chase Manhattan Mortgage (the pre-petition mortgage servicer) in the current outstanding amount of $54,793. The debt is disputed to the extent that the debtors deny that Chase Manhattan or the Trust held a valid, and enforceable secured claim against property of the bankruptcy estate, specifically the debtors' single-family home described above.

11. The debtors signed a Balloon Note (on the standard Fannie/Freddie Mac Uniform instrument, Form 3260 1/01) on April 6, 2006 in the principal amount of

3

$55,200.00. Said note provides for interest at a rate of 10.725% and with initial monthly payments of $514.25 due on the first day of each month beginning on June 1, 2006 and a maturity date of May 1, 2021. The "lender" named on the note is Lehman Brothers Bank, FSB.

12. The above-referenced note was allegedly secured by a second mortgage issued on Wisconsin-Single Family- Fannie/Freddie Mac Uniform Instrument Form 3850 1/01 and an Adjustable Rate Rider recorded in the Waukesha County Register's Office on May 1, 2006. According to the language of the mortgage, Mortgage Electronic Systems, Inc ("MERS") is named as the "mortgagee" and further states that MERS is "acting solely as a nominee for Lender and Lender's successors and assigns". The said second mortgage also lists Lehman Brothers Bank, FSB as the lender. The plaintiffs allege that as of the date of the filing of the petition the note and mortgage had not been assigned to any other party.

## I. STANDING AND REAL PARTY IN INTEREST

13. The Debtor alleges that the Claimant does not have proper standing or the status of a real party in interest to bring a Claim and Object to Confirmation of the Debtor's Amended Plan because the Claimant does not own the Debtor's note and mortgage.

14. Upon information and belief, the Claimant, Structured Asset Investment Loan Trust dated as of June 1, 2006 (hereafter SAIL Trust), is a pooled Trust created for the purpose of pooling mortgage loans and then selling certificates or bonds to investors. The SAIL Trust is on file with the Securities Exchange commission at the following web link:

http://www.sec.gov/Archives/edgar/data/1366930/000116231806000994/exhibit41.htm

4

Portions of the SAIL Trust (which is hundreds of pages long) is attached hereto as Exhibit 1.

Further, the SAIL Trust has filed a Mortgage Loan Sale and Assignment Agreement dated as of June 1, 2006 on file with the SEC as part of the SAIL Trust at the following web link:

http://www.sec.gov/Archives/edgar/data/1366930/000116231806000994/exhibit991.htm

Portions of the Mortgage Loan Sale and Assignment Agreement dated as of June 1, 2006 are attached here as Exhibit 2.

Further, said SAIL Trust has also filed a Prospectus Supplement dated June 20, 2006 with the SEC to offer certificates to investors. The Prospectus Supplement dated June 20, 2006 is located at the following weblink:

http://www.sec.gov/Archives/edgar/data/1366930/000114420406025644/v045957_fwp.htm

15. The above referenced Prospectus identifies the parties to the Trust and states the SAIL Trust will be the issuing Entity for the purpose of issuing certificates to investors and further specifically defines the SAIL Trust as "a common law trust formed under the law of the State of New York." Therefore the powers and authority of the Trustee are determined under New York law. Portions of the Prospectus dated June 20, 2006 pertaining to the Parties and the SAIL Trust as an Issuing Entity are attached hereto as Exhibit 3.

16. The above referenced Mortgage Loan Sale and Assignment Agreement(hereafter MLSA) and Prospectus identify the following companies or entities as parties to the Trust or in some way involved in the transfer and pooling of mortgage loans to the Trust.

    (a) BNC Mortgage, Inc., New Century Mortgage Corporation,

5

Lehmann Brothers Bank, FSB and Finance America, LLC are named as the primary originators of mortgage loans.

    (b)  Lehmann Brothers Holdings, Inc. as Sponsor and Seller

    (c)  Structured Asset Securities Corporation as Depositor

    (d)  U.S. Bank National Association as Trustee

    (e)  Aurora Loan Services, LLC as Master Servicer.

17. The Debtor asserts that Section 2.01(b)(i) of the SAIL Trust, titled "Creation and Declaration of Trust Fund; Conveyance of Mortgage Loans" requires the delivery by the Depositor of certain documents to the Trustee or Custodian as follows "with respect to each Mortgage Loan, the original Mortgage Note endorsed without recourse in proper form to the order of the Trustee, or in blank **(in each case, with all necessary intervening endorsements, as applicable)** or with respect to any lost Mortgage Note, a lost note affidavit stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note." (emphasis added) *See, Exhibit 1, at, §2.01(b)(i).*

18. Further, the SAIL Trust Agreement and the MLSA as well as the Prospectus referenced above show the proper conveyances required under the SAIL Trust for the proper conveyance of the debtors' mortgage loan pursuant to Claim 12 and Amended Claim 12 as follows:

BNC Mortgage Inc (the Originator)

↓

Lehman Brothers Holdings, Inc. (the Sponsor)

↓

Structured Asset Securities Corporation (the Depositor)

↓

U.S. Bank National Association (the Trustee).

Further, the SAIL Trust Agreement and the MLSA as well as the Prospectus referenced above show the proper conveyances required under the SAIL Trust for

6

the proper conveyance of the debtors' mortgage loan pursuant to Claim 13 and Amended Claim 13 as follows:

Lehman Brothers Bank, FSB (the Originator)

↓

Lehman Brothers Holdings, Inc. (the Sponsor)

↓

Structured Asset Securities Corporation (the Depositor)

↓

U.S. Bank National Association (the Trustee).

The Claimant fails to provide any documentation to show or support the proper transfers were accomplished for the negotiation of the Debtors' mortgage loans to the SAIL Trust. The Claimant has failed and refused to provide any documents or evidence to show the necessary intervening endorsements occurred as required by the SAIL Trust, the Prospectus or the MLSA.

19. Further, Section 2.02 titled "Acceptance of Trust Fund by Trustee: review of Documentation for Trust Fund", states, "Within 45 days after the Closing Date, the Trustee or the applicable custodian on behalf of the Trustee, will, for the benefit of Holders of the Certificates, review each Mortgage File to ascertain that all required documents set forth in Section 2.01 have been received and appear on their face to contain the requisite signatures by or on behalf of the respective parties thereto…" in order to make sure that proper conveyance of the mortgage loans took place as required by the SAIL Trust. Said closing date is defined in the Trust as June 30, 2006.   The Debtors assert that there is no sufficient documentation to show the Trustee or any Custodian complied with Section 2.02(b).

20. The debtors assert that the claimant has provided contradictory and conflicting documents which fail to establish the trust ownership of the debtors' mortgage loans including the note and mortgage.  The  documentation includes but is not limited to the following:

7

(a) In regard to Claim 12 and Amended Claim 12:

   (i)     Allonge dated December 2, 2009 and signed by Whitney K. Cook, Assistant Secretary for Chase Home Finance, "as Attorney-in-Fact". This allonge was dated twenty-nine (29) days after the filing of the bankruptcy petition. Further, there is no documentation to show said Cook had proper authority to sign on behalf of the originator of the loan, BNC Mortgage, Inc.

   (ii)    Assignment of Mortgage dated November 30, 2009 and signed by Attorney Shawn Hillman as Vice-President of MERS, as nominee for BNC Mortgage, Inc. This assignment occurred twenty-seven (27) days after the filing of the bankruptcy petition. Further, it does not appear that either Attorney Shawn Hillman or MERS have proper authority to accomplish an Assignment of Mortgage.

   (iii)   Undated blank allonge purportedly executed by Eleanora Martino, Vice President of Quality Assurance. There is no evidence or documentation to show when this allonge was signed, whether Eleanora Martino had authority to sign the allonge or who she worked for at the time she signed the allonge.

(b) In regard to the original and Amended Claim 13:

   (i)     Allonge dated March 8, 2010 executed by Deborah A. Lenhart, with a title of "Vice President" for "Lehmann Brothers Bank, FSB n/k/a Aurora Bank, FSB". This allonge was executed one hundred and twenty-five (125) days after the bankruptcy filing.

   (ii)    Blank, undated allonge purportedly signed by Jamie Langford, Vice-President of Lehmann Brothers Bank, FSB.

8

There is no evidence or documentation to show when this allonge was signed, whether Jamie Langford had authority to sign the allonge or who he worked for at the time he or she signed the allonge.

(iii)    Assignment of mortgage signed on March 8, 2010 by Attorney Shawn Hillman as Vice President of MERS as nominee for Lehmann Brothers Bank, FSB. This assignment of mortgage occurred one hundred and twenty-five (125) days after the filing of the bankruptcy petition in this case. Further, there is no evidence or documentation to show that staff attorney, Shawn Hillman of Bass & Moglowsky or MERS itself had proper authority to execute this assignment of mortgage.

21. There is no documentation or evidence to show the proper sequence of conveyances ever occurred to transfer or negotiate the debtors' mortgage note to the SAIL Trust as required by Section 2.01 of the Trust. There are no documents showing the necessary intervening endorsements from the Originator → the Seller/Sponsor to →the Depositor to → the Trustee for either Original or Amended Claim 12 or Original or Amended Claim 13.

22. There is no documentation or admissible evidence to show that the debtors' mortgage loans were transferred to the SAIL Trust in compliance with Section 2.02(b) of the Trust within forty-five (45) days of the closing date.

23. The debtors assert that the claimant must provide adequate documentation to show the delivery and receipt of the debtors' mortgage notes to each entity involved in the transfer of their mortgage loans to the Trust starting with the transfer of the mortgage notes from the Originator to the Seller/Sponsor. The debtors further assert that there is no documentation to show that the Depositor properly conveyed the mortgage note to the Trustee. The SAIL Trust is a common law trust created and governed under the laws of the State of New York.

9

Therefore, the depositor must provide actual delivery of the note and a true sale in order for the Trust to own the Kohler mortgage loans.

24. Further, the debtors assert that the note and mortgage separated after the closing for the debtors' loans and the claimant holds no valid or enforceable lien rights against the property of the debtor. Mortgage Electronic Registration Systems, Inc. did not have proper authority to assign the mortgages subject to Claims and Amended Claims 12 and 13. The purported Assignments of Mortgage for Amended Claims 12 and 13 are deficient because MERS has no express written authority to allow for execution of the Assignments as required under Wisconsin Law and in particular under Wis. Stat. 706.03(1m). The mortgages attached to Amended Claims 12 and 13 do not indicate MERS has the authority as a nominee of the lender to execute an Assignment of Mortgage. Further, none of the Rules of Membership pertaining to MERS can be construed to create an agency relationship or to provide the authority of MERS to execute an assignment of mortgage under either New York or Wisconsin law. The same standards apply to Attorney Shawn R. Hillman, the staff attorney executing the AOMs for Amended Claims 12 and 13.

A copy of the Merscorp, Inc. Rules of Membership is attached hereto as Exhibit 4.

The rules of membership can be found under the foreclosure link at the following weblink: http://www.mersinc.org/Foreclosures/index.aspx.

WHEREFORE, the Debtor requests the following relief:

    (1) An order that the Trust has no enforceable secured or unsecured claim againstthe property of the estate in this bankruptcy;

    (2) That the Trustee, US Bank National Association has no standing to file or maintain a claim or an objection to confirmation of this plan

    (3) The debtor recovers all reasonable legal fees in an amount to be determined by this Court;

10

(4) The debtor recovers all reasonable costs and expenses in this case in an amount to be determined by this Court;

(5) Any further relief that the Court may deem just and appropriate.

Dated at West Allis, Wisconsin this 1st day of March, 2011.

*/s/ Rollie R. Hanson*

Rollie R. Hanson
**Attorney for Debtor**

11

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

In re:  Edward B. Kohler and Patricia L. Kohler      Chapter 13

            Debtor.                                  Case No. 09-35931-PP

                                                     **AFFIDAVIT OF SERVICE**

---

STATE OF WISCONSIN              )
                                (SS
COUNTY OF MILWAUKEE             )


Leigh Anne Muller, being first duly sworn on oath, deposes and says that on March 1, 2011 she served via CM/ECF or First Class Mail at West Allis, Wisconsin, a true and correct copy of the *Objection to Amended Claim No. 12 and Amended Claim No. 13 Filed by U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2006-4 and Motion to Dismiss Objection to Confirmation* and *Brief in Support of Objection to Original and Amended Claims Number 12 and 13* to the parties of interest listed below:

|  |  |
|---|---|
| Mary G. Grossman<br>Chapter 13 Trustee | ecf@chapter13milwaukee.com |
| Office of the U.S. Trustee | ustpregion11.mi.ecf@usdoj.gov |
| Attorney Penny Gentges | Via CM/ECF |
| Attorney Edward Lesniak | Via CM/ECF |


                                        */s/ Leigh Anne Muller*

                                        _____
                                        Leigh Anne Muller


Subscribed and sworn to before
me this 1st day of March, 2011.         LAW OFFICE OF ROLLIE R. HANSON, S.C.
                                         6737 W. Washington Street, Suite 1420
  */s/ Rollie R. Hanson*                West Allis, WI 53214
 Rollie R. Hanson                       (414) 321-9733 FAX (414) 321-9601
Notary Public, State of Wisconsin        Rollie@hansonlaw.net
My Commission is permanent

12

**SAIL Trust Analysis – Selected portions**

All company filings:

http://www.sec.gov/cgi-bin/browse-
edgar?action=getcompany&CIK=0001366930&owner=exclude&count=40

Sail Trust Agreement Web Link:

http://www.sec.gov/Archives/edgar/data/1366930/000116231806000994/exhibit41.htm


EXECUTION




STRUCTURED ASSET SECURITIES CORPORATION, as Depositor,


AURORA LOAN SERVICES LLC, as Master Servicer,


WELLS FARGO BANK, N.A., as
Securities Administrator,


CLAYTON FIXED INCOME SERVICES INC., as Credit Risk Manager,



and



U.S. BANK NATIONAL ASSOCIATION, as Trustee



-------------------------------

TRUST AGREEMENT

Dated as of June 1, 2006

EXHIBIT

*1*

Prospectus dated June 20, 2006 (Selected portions)

Web Link
http://www.sec.gov/Archives/edgar/data/1366930/000114420406025644/v045957_fwp.htm

The depositor has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission (the "SEC"). The depositor has or will file with the SEC a registration statement (including a prospectus, any free writing prospectus and any related issuer free-writing prospectus) with respect to this offering (the "Offering Documentation"). You may get the Offering Documentation (when completed) for free by searching the SEC online database (EDGAR®) at www.sec.gov. Alternatively, you may obtain a copy of the Offering Documentation from Lehman Brothers Inc., 745 Seventh Ave., New York, NY, 10019, Attn: Asset Backed Fixed Income Syndicate or by calling 1-800-666-2388, extension 59519.

This free writing prospectus is not required to contain all information that is required to be included in the base prospectus and the free writing prospectus.

The information in this free writing prospectus is preliminary and is subject to completion or change.

The information in this free writing prospectus, if conveyed prior to the time of your commitment to purchase, supersedes information contained in any prior similar free writing prospectus relating to these securities.

**Free Writing Prospectus dated June 20, 2006 (to prospectus dated June 2, 2006)**

**$2,404,833,000 (Approximate)**

**STRUCTURED ASSET INVESTMENT LOAN TRUST**

**Mortgage Pass-Through Certificates, Series 2006-4**

**[AURORA LOGO]**

**Lehman Brothers Holdings Inc.**

Sponsor and Seller

**Structured Asset Investment Loan Trust 2006-4**

Issuing Entity

**Aurora Loan Services LLC**

Master Servicer

**Structured Asset Securities Corporation**

Depositor

_____

**Consider carefully the risk factors beginning on page S-20 of this free writing prospectus and on page 6 of the prospectus.**

For a list of capitalized terms used in this free writing prospectus and the prospectus, see the glossary of defined terms beginning on page S-117 in this free writing prospectus and the index of principal terms on page 204 in the prospectus.

The certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other entity.

This free writing prospectus may be used to offer and sell the certificates offered hereby only if accompanied by the prospectus.

_____

**The trust fund will issue certificates including the following classes offered hereby:**

· **five classes of senior certificates**

· **eight classes of subordinate certificates**

The classes of certificates offered by this free writing prospectus are listed, together with their initial class principal amounts and interest rates, in the table under "The Offered Certificates" on page S-1 of this free writing prospectus. This free writing prospectus and the accompanying prospectus relate only to the offering of the certificates listed in the table on page S-1 and not to the other classes of certificates that will be issued by the issuing entity as described in this free writing prospectus.

Principal and interest will be payable monthly, as described in this free writing prospectus. The first expected distribution date will be July 25, 2006. Credit enhancement for the offered certificates includes excess interest, overcollateralization, subordination, loss allocation and limited cross-collateralization features and primary mortgage insurance. Amounts payable under an interest rate swap agreement and an interest rate cap agreement, both provided by ABN AMRO Bank, N.V., will be applied to pay certain interest shortfalls, maintain

overcollateralization and repay certain losses.

The assets of the trust fund will primarily consist of three pools of conventional, first and second lien, adjustable and fixed rate, fully amortizing and balloon, residential mortgage loans, which were originated in accordance with underwriting guidelines that are not as strict as Fannie Mae and Freddie Mac guidelines.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the certificates or determined that this free writing prospectus or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

The certificates offered by this free writing prospectus will be purchased by Lehman Brothers Inc., as underwriter, from Structured Asset Securities Corporation, and are being offered from time to time for sale to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter has the right to reject any order. Proceeds to Structured Asset Securities Corporation from the sale of these certificates will be approximately [____]% of their initial total class principal amount before deducting expenses.

On or about June 30, 2006, delivery of the certificates offered by this free writing prospectus will be made through the book-entry facilities of The Depository Trust Company, Clearstream Banking Luxembourg and the Euroclear System.

*Underwriter:*

**LEHMANBROTHERS**

**The date of this free writing prospectus is June 20, 2006**

**Important notices about information presented**

**in this free writing prospectus and the accompanying prospectus:**

We provide information to you about the certificates offered by this free writing prospectus in two separate documents that progressively provide more detail: (1) the accompanying prospectus, which provides general information, some of which may not apply to your certificates and (2) this free writing prospectus, which describes the specific terms of your certificates.

---

We include cross-references in this free writing prospectus and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

**For European Investors Only**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time: (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual

or consolidated accounts; or (c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

S-ii

---

**Table of Contents**

**Free Writing Prospectus**

| | Page |
|---|---|
| The Offered Certificates | S-1 |
| Summary of Terms | S-3 |
| Risk Factors | S-20 |
| Glossary | S-32 |
| Description of the Certificates | S-32 |
| General | S-32 |
| Book-Entry Registration | S-33 |
| Distributions of Interest | S-34 |
| Determination of LIBOR | S-36 |

| | |
|---|---|
| Distributions of Principal | S-37 |
| Credit Enhancement | S-41 |
| Supplemental Interest Trust | S-44 |
| Optional Purchase of the Mortgage Loans | S-48 |
| Fees and Expenses of the Trust Fund | S-49 |
| Description of the Mortgage Pools | S-50 |
| General | S-50 |
| Adjustable Rate Mortgage Loans | S-52 |
| The Index | S-53 |
| Primary Mortgage Insurance | S-53 |
| Pool 1 Mortgage Loans | S-60 |
| Pool 2 Mortgage Loans | S-61 |
| Pool 3 Mortgage Loans | S-61 |
| Static Pool Information | S-61 |
| Material Legal Proceedings | S-61 |
| Affiliations and Relationships | S-61 |
| Additional Information | S-62 |
| The Sponsor | S-62 |
| The Depositor | S-63 |
| Origination of the Mortgage Loans and Underwriting Guidelines | S-63 |
| General | S-63 |
| BNC Mortgage, Inc. | S-63 |
| LBB Underwriting Guidelines | S-68 |
| New Century Mortgage Corporation | S-71 |
| Underwriting Standards of New Century | S-71 |

| | |
|---|---|
| General Underwriting Guidelines | S-76 |
| The Master Servicer | S-78 |
| The Servicers | S-78 |
| General | S-78 |
| Option One Mortgage Corporation | S-79 |
| Wells Fargo Bank, N.A. | S-83 |
| Aurora Loan Services LLC | S-85 |
| JPMorgan Chase Bank, National Association | S-85 |
| Administration of the Trust Fund | S-87 |
| Servicing and Administrative Responsibilities | S-87 |
| Trust Accounts | S-90 |
| Example of Distributions | S-91 |
| Mortgage Loan Servicing | S-92 |
| General | S-92 |
| Servicing Accounts and the Collection Account | S-93 |
| Servicing Compensation and Payment of Expenses | S-93 |
| Waiver or Modification of Mortgage Loan Terms | S-94 |
| Prepayment Interest Shortfalls | S-94 |
| Advances | S-94 |
| Primary Mortgage Insurance | S-94 |
| Collection of Taxes, Assessments and Similar Items | S-95 |
| Insurance Coverage | S-95 |
| Evidence as to Compliance | S-95 |
| Master Servicer Default; Servicer Default | S-96 |
| Amendment of the Servicing Agreements | S-96 |

Custody of the Mortgage Files                                     S-96

The Credit Risk Manager                                           S-96

Optional Purchase of Defaulted Mortgage Loans                     S-97

Special Servicer for Distressed Mortgage Loans                    S-97

Pledge of Servicing Rights                                        S-97

The Trust Agreement                                               S-97

General                                                           S-97

The Issuing Entity                                                S-97

The Trustee                                                       S-98

The Securities Administrator                                      S-99

Assignment of Mortgage Loans                                      S-100

Representations and Warranties                                    S-101

Certain Matters Under the Trust Agreement                         S-102

Reports to Certificateholders                                     S-105

Voting Rights                                                     S-107

Yield, Prepayment and Weighted Average Life                       S-107

General                                                           S-107

Overcollateralization                                             S-111

Subordination of the Offered Subordinate Certificates             S-111

Weighted Average Life                                             S-111

S-iii

**Page**

| | |
|---|---|
| Material Federal Income Tax Considerations | S-112 |
| General | S-112 |
| Tax Treatment of the Offered Certificates | S-113 |
| Legal Investment Considerations | S-115 |
| ERISA Considerations | S-115 |
| Legal Matters | S-116 |
| Ratings | S-116 |
| Glossary of Defined Terms | S-117 |
| Annex A: Certain Characteristics of the Mortgage Loans | S-A-1 |
| Annex B-1: Assumed Mortgage Loan Characteristics | S-B-1-1 |
| Annex B-2: Principal Amount | |
| Decrement Tables | S-B-2-1 |
| Annex C-1: Swap Agreement | |
| Scheduled Notional Amounts and Rates of Payment | S-C-1-1 |
| Annex C-2: Interest Rate Cap | |
| Agreement Scheduled Notional Amounts and Strike Rate | S-C-2-1 |

S-iv

## The Offered Certificates

The certificates consist of the classes of certificates listed in the tables below, together with the Class B1, Class B2, Class P, Class X, Class LT-R and Class R Certificates. Only the classes of certificates listed in the tables below are offered by this free writing prospectus.

| Class | Related Mortgage Pool(s) | Class Principal Amount[1] | Initial Interest Rate[2] (and Interest Rate Formula (until Initial Optional Termination Date)[3][4]) | Interest Rate Formula (after Initial Optional Termination Date)[4][5] | Principal Type | Interest Type | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|---|---|---|
| A1 | 1 | $747,827,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior | Variable Rate | Aaa | AAA | AAA |
| A2 | 2 | $391,109,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior | Variable Rate | Aaa | AAA | AAA |
| A3 | 3 | $602,379,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior, Sequential Pay | Variable Rate | Aaa | AAA | AAA |
| A4 | 3 | $190,163,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior, Sequential Pay | Variable Rate | Aaa | AAA | AAA |
| A5 | 3 | $90,492,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior, Sequential Pay | Variable Rate | Aaa | AAA | AAA |
| M1 | 1, 2 & 3 | $157,794,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Aa2 | AA | AA |
| M2 | 1, 2 & 3 | $47,705,000 | [___]%LIBOR plus | LIBOR plus | Subordinated | Variable Rate | Aa3 | AA- | AA- |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | [___]% | [___]% | | | | | |
| M3 | 1, 2 & 3 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | A1 | A+ | A+ |
| | $ 39,143,000 | | | | | | | |
| M4 | 1, 2 & 3 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | A2 | A | A |
| | $ 36,696,000 | | | | | | | |
| M5 | 1, 2 & 3 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | A3 | A- | A- |
| | $ 31,803,000 | | | | | | | |
| M6 | 1, 2 & 3 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Baa1 | BBB+ | BBB+ |
| | $ 31,803,000 | | | | | | | |
| M7 | 1, 2 & 3 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Baa2 | BBB | BBB |
| | $ 19,571,000 | | | | | | | |
| M8 | 1, 2 & 3 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Baa3 | BBB- | BBB- |
| | $ 18,348,000 | | | | | | | |

---

(1)    These balances are approximate, as described in this free writing prospectus.

(2)    Reflects the interest rate as of the closing date.

(3)    Reflects the interest rate formula up to and including the earliest possible distribution date on which the master servicer has the option to purchase the mortgage loans as described in this free writing prospectus under "Description of the Certificates—Optional Purchase of the Mortgage Loans."

(4)    Subject to the applicable net funds cap, as described in this free writing prospectus under "Summary of Terms—The Certificates—Payments on the Certificates—Interest Payments."

(5)    Reflects the interest rate formula after the option to purchase the mortgage loans is not exercised by the master servicer on the earliest possible distribution date as described in

this free writing prospectus under "Description of the Certificates—Optional Purchase of the Mortgage Loans."

S-1

The offered certificates will also have the following characteristics:

| Class | Record Date[1] | Delay/Accrual Period[2] | Interest Accrual Convention | Final Scheduled Distribution Date[3] | Expected Final Distribution Date[4] | Minimum Denominations[5] | Incremental Denominations | CUSIP Number |
|---|---|---|---|---|---|---|---|---|
| A1 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AA 0 |
| A2 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AB 8 |
| A3 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AC 6 |
| A4 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AD 4 |
| A5 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AE 2 |
| M1 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $100,000 | $1 | 86360 W AF |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| M2 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AG 7 |
| M3 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AH 5 |
| M4 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AJ 1 |
| M5 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AK 8 |
| M6 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AL 6 |
| M7 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AM 4 |
| M8 | DD | 0 day | Actual/360 | 7/25/2036 | [ ] | $100,000 | $1 | 86360 W AN 2 |

---

(1)   DD = For any distribution date, the close of business on the business day immediately before that distribution date.

(2)   0 day = For any distribution date, the interest accrual period will be the period beginning on the immediately preceding distribution date (or June 25, 2006, in the case of the first interest accrual period) and ending on the calendar day immediately before the related distribution date.

(3)   The final scheduled distribution date for the offered certificates is based upon the second distribution date after the date of the last scheduled payment of the latest maturing thirty year mortgage loan.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 48 of 428   Document 1-1
Case 09-35931-pp   Doc 85-1   Filed 03/01/11   Page 14 of 21

48

(4)     The expected final distribution date, based upon (a) a constant prepayment rate of 30% per annum and the modeling assumptions used in this free writing prospectus, each as described under "Yield, Prepayment and Weighted Average Life—Weighted Average Life" and (b) the assumption that the option to purchase the mortgage loans is exercised by the master servicer on the earliest possible distribution date as described in this free writing prospectus under "Description of the Certificates—Optional Purchase of the Mortgage Loans." The actual final distribution date for each class of offered certificates may be earlier or later, and could be substantially later, than the applicable expected final distribution date listed above.

(5)     With respect to initial European investors only, the underwriter will only sell offered certificates in minimum total investment amounts of $100,000.


S-2

---

**Summary of Terms**


·     **This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of the offering of the certificates, it is necessary that you read carefully this entire document and the accompanying prospectus.**


·     **While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this free writing prospectus and the accompanying prospectus before making any investment decision.**

- Some of the information that follows consists of forward-looking statements relating to future economic performance or projections and other financial items. Forward-looking statements are subject to a variety of risks and uncertainties, such as general economic and business conditions and regulatory initiatives and compliance, many of which are beyond the control of the parties participating in this transaction. Accordingly, what actually happens may be very different from the projections included in this free writing prospectus.

- Whenever we refer to a percentage of some or all of the mortgage loans in the trust fund, that percentage has been calculated on the basis of the total scheduled principal balance of those mortgage loans as of June 1, 2006, unless we specify otherwise. We explain in this free writing prospectus under "Glossary of Defined Terms" how the scheduled principal balance of a mortgage loan is determined. Whenever we refer in this Summary of Terms or in the Risk Factors section of this free writing prospectus to the total principal balance of any mortgage loans, we mean the total of their scheduled principal balances unless we specify otherwise.

## Parties

## Sponsor and Seller

Lehman Brothers Holdings Inc. will sell the mortgage loans to the depositor.

## Depositor

Structured Asset Securities Corporation, a Delaware special purpose corporation, will sell the mortgage loans to the issuing entity. The depositor's address is 745 Seventh Avenue, New York, New York 10019, and its telephone number is (212) 526-7000.

## Issuing Entity

Structured Asset Investment Loan Trust 2006-4, a common law trust formed under the laws of the State of New York.

**Trustee**

U.S. Bank National Association.

**Securities Administrator**

Wells Fargo Bank, N.A., will be responsible for preparing monthly distribution statements and certain tax information for investors and certain tax filings for the trust fund.

**Master Servicer**

Aurora Loan Services LLC will oversee the servicing of the mortgage loans by the servicers.

**Primary Servicers**

On the closing date, Option One Mortgage Corporation, Wells Fargo Bank, N.A., Ocwen Loan Servicing, LLC, HomEq Servicing Corporation, Aurora Loan Services LLC and JPMorgan Chase Bank, National Association will service approximately 45.36%, 41.05%, 7.31%, 5.42%, 0.86% and less than 0.01%, respectively, of the mortgage loans included in the trust fund.

*See "The Mortgage Loans—Mortgage Loan Servicing" below.*

S-3

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 51 of 428   Document 1-1
Case 09-35931-pp   Doc 85-1   Filed 03/01/11   Page 17 of 21

51

## Credit Risk Manager

Clayton Fixed Income Services Inc. will monitor and advise the servicers with respect to default management of the mortgage loans and also prepare certain loan-level reports for the trust fund which will be available for review by certificateholders.

## Originators

BNC Mortgage, Inc., New Century Mortgage Corporation, Lehman Brother Bank, FSB and Finance America, LLC originated approximately 45.36%, 38.43%, 0.86% and 0.22%, respectively, of the mortgage loans to be included in the trust fund. The remainder of the mortgage loans were originated by various other banks, savings and loans and other mortgage lending institutions, none of which originated more than approximately 7.29% of the mortgage loans.

## Swap Counterparty

ABN AMRO Bank, N.V.

## Cap Counterparty

ABN AMRO Bank, N.V.

## LPMI Insurers

On the closing date, Mortgage Guaranty Insurance Corporation, Republic Mortgage Insurance Company and PMI Mortgage Insurance Co. will provide primary mortgage insurance for certain of the first lien mortgage loans with original loan-to-value ratios in excess of 80%.

## The Certificates

The certificates offered by this free writing prospectus will be issued with the initial approximate characteristics set forth under "The Offered Certificates" in the table on page S-1.

The offered certificates will be issued in book-entry form. The minimum denominations and the incremental denominations of each class of offered certificates are set forth in the table on page S-2.

The certificates represent ownership interests in a trust fund, the assets of which will consist primarily of conventional, adjustable and fixed rate, fully amortizing and balloon, first and second lien, residential mortgage loans having a total principal balance as of the cut-off date, which is June 1, 2006, of approximately $2,446,422,263. In addition, the supplemental interest trust will hold an interest rate swap agreement and an interest rate cap agreement for the benefit of the certificateholders.

For purposes of allocating payments of interest and principal to certificateholders, the mortgage loans to be included in the trust fund will be divided into three mortgage pools: "pool 1," "pool 2" and "pool 3." Pool 1 will consist of those mortgage loans in the trust fund with original principal balances that do not exceed the applicable Fannie Mae maximum original loan amount limitations for one- to four-family residential mortgaged properties. Pool 2 will consist of those mortgage loans in the trust fund with original principal balances that do not exceed the applicable Freddie Mac maximum original loan amount limitations for one- to four-family residential mortgaged properties. Pool 3 will consist of mortgage loans with original principal balances that may be less than, equal to, or in excess of, Fannie Mae or Freddie Mac original loan amount limitations for one- to four- family residential mortgaged properties.

Payments of principal and interest on the Class A1 Certificates, or the "group 1 certificates," will be based primarily on collections from pool 1 mortgage loans. Payments of principal and interest

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 53 of 428   Document 1-1
Case 09-35931-pp   Doc 85-1   Filed 03/01/11   Page 19 of 21

53

on the Class A2 Certificates, or the "group 2 certificates," will be based primarily on collections from pool 2 mortgage loans. Payments of principal and interest on the Class A3, A4 and A5 Certificates, or the "group 3 certificates," will be based primarily on collections from pool 3 mortgage loans. Payments of principal and interest on the Class M1, M2, M3, M4, M5, M6, M7, M8, B1 and B2 Certificates will be based on collections from all of the mortgage pools as described in this free writing prospectus.

The rights of holders of the Class M1, M2, M3, M4, M5, M6, M7, M8, B1 and B2 Certificates to receive payments of principal and interest will be subordinate to the rights of the holders of certificates having a senior priority of payment, as described in this Summary of Terms under "—Enhancement of Likelihood of Payment on the Certificates—Subordination of Payments" below. We refer to the Class M1, M2, M3, M4, M5, M6, M7, M8, B1 and B2 Certificates collectively as "subordinate" certificates. We refer to the Class A1, A2, A3, A4 and A5 Certificates collectively as "senior" certificates.

The Class P Certificates will be entitled to receive all the cash flow from the mortgage pools solely arising from prepayment premiums paid by the borrowers on certain voluntary, full and partial prepayments of the mortgage loans. Accordingly, these amounts will not be available for payments to the servicers or to holders of other classes of certificates.

S-4

The Class X Certificates will be entitled to receive any monthly excess cashflow remaining after required distributions are made to the offered certificates and the Class B1 and Class B2 Certificates.

The Class B1, Class B2, Class X, Class P, Class LT-R and Class R Certificates are not offered by this free writing prospectus.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 54 of 428   Document 1-1
Case 09-35931-pp   Doc 85-1   Filed 03/01/11   Page 20 of 21

54

The offered certificates will have an approximate total initial principal amount of $2,404,833,000. Any difference between the total principal amount of the offered certificates on the date they are issued and the approximate total principal amount of the offered certificates as reflected in this free writing prospectus will not exceed 5%.

*EXECUTION*

*EXECUTION*

LEHMAN BROTHERS HOLDINGS INC.,

SELLER

and

STRUCTURED ASSET SECURITIES CORPORATION,

PURCHASER

MORTGAGE LOAN SALE AND ASSIGNMENT AGREEMENT

Dated as of June 1, 2006

Structured Asset Investment Loan Trust
Mortgage Pass-Through Certificates, Series 2006-4

EXHIBIT

2

# TABLE OF CONTENTS

ARTICLE I. CONVEYANCE OF MORTGAGE LOANS

4

Section 1.01.

Sale of Mortgage Loans.

4

Section 1.02.

Delivery of Documents.

5

Section 1.03.

Review of Documentation.

6

Section 1.04.

Representations and Warranties of the Seller.

6

Section 1.05.

Grant Clause.

22

Section 1.06.

Assignment by Depositor.

22

ARTICLE II. MISCELLANEOUS PROVISIONS

23

Section 2.01.

Binding Nature of Agreement; Assignment.

23

Section 2.02.

Entire Agreement.

23

Section 2.03.

Amendment.

23

Section 2.04.

Governing Law.

24

Section 2.05.

Severability of Provisions.

24

Section 2.06.

Indulgences; No Waivers.

24

Section 2.07.

Headings Not to Affect Interpretation.

24

Section 2.08.
      Benefits of Agreement.
                                              25

Section 2.09.
      Counterparts.
                                              25

LE A-1
Transferred Mortgage Loan Schedule (including Prepayment Charge Schedule)

LE A-2
Bank Originated Mortgage Loan Schedule (including Prepayment Charge Schedule)

LE B
Mortgage Loan Schedule for First Payment Default Mortgage Loans

EXHIBIT A
      Certain Defined Terms

EXHIBIT B
      Form of Terms Letter

This MORTGAGE LOAN SALE AND ASSIGNMENT AGREEMENT, dated as of June 1, 2006 (the "Agreement"), is executed by and between Lehman Brothers Holdings Inc. ("LBH" or the "Seller") and Structured Asset Securities Corporation (the "Depositor").

All capitalized terms not defined herein or in Exhibit A attached hereto shall have the same meanings assigned to such terms in that certain trust agreement (the "Trust Agreement") dated as of June 1, 2006, among the Depositor, Aurora Loan Services LLC, as master servicer (the "Master Servicer"), Wells Fargo Bank, N.A., as securities administrator (the "Securities Administrator"), Clayton Fixed Income Services Inc., as credit risk manager and U.S. Bank National Association, as trustee (the "Trustee").

W I T N E S S E T H:

WHEREAS, pursuant to the following specified mortgage loan purchase and warranties agreement (each, a "LBH Transfer Agreement"), the Seller has purchased or received from certain transferors identified below (each, a "LBH Transferor") certain mortgage loans, each as identified on the Mortgage Loan Schedule attached hereto as part of Schedule A-1 (collectively, the "LBH Transferred Mortgage Loans"):

1.
Flow Mortgage Loan Purchase and Warranties Agreement by and between Lehman Capital, A Division of LBH ("Lehman Capital") and Finance America, LLC dated as of October 25, 2004;

2.
Flow Mortgage Loan Purchase and Warranties Agreement by and between Lehman Capital and Finance America, LLC dated as of August 4, 2004;

3.
Flow Mortgage Loan Purchase and Warranties Agreement by and between Lehman Capital and Finance America, LLC dated as of January 1, 2003 (for conventional, fixed and adjustable rate residential mortgage loans); and

4.
Flow Mortgage Loan Purchase and Warranties Agreement by and between Lehman Capital and Finance America, LLC dated as of June 30, 1999 (for conventional, fixed and adjustable rate residential mortgage loans);

WHEREAS, Lehman Brothers Bank, FSB (the "Bank"), pursuant to the following specified mortgage loan purchase and warranties agreements (each, a "Bank Transfer Agreement," and together with the LBH Transfer Agreements, the "Transfer Agreements"), has purchased or received from certain transferors identified below (each, a "Bank Transferor," and together with the LBH Transferors, the "Transferors") certain mortgage loans, each identified on the Mortgage Loan Schedule attached hereto as part of Schedule A-1 (collectively, the "Bank Transferred Mortgage Loans" and, together with the LBH Transferred Mortgage Loans, the "Transferred Mortgage Loans"):

1.

Amended and Restated Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Equifirst Corporation and Equifirst Mortgage Corporation of Minnesota dated as of February 1, 2006;

2.

Flow Loan Purchase and Warranties Agreement by and between the Bank and Residential Mortgage Assistance Enterprise, LLC dated as of May 1, 2003 and amended as of December 29, 2005;

3.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and First NLC Financial Services, Inc. dated as of June 6, 2003 and amended as of April 21, 2006;

4.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and First Street Financial, Inc. dated as of March 1, 2004;

5.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Ameriquest Mortgage Company and AMC Mortgage Services, Inc. dated as of April 11, 2005;

6.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Choice Capital Funding, dated as of August 1, 2005;

7.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Finance America, LLC dated as of January 1, 2003 (for conventional, fixed and adjustable rate residential mortgage loans);

8.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and First Horizon Home Loan Corporation dated as of September 24, 2004 and amended for Reg AB as of March 7, 2006;

9.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Liberty American Mortgage Corp. dated as of December 23, 2004 and amended as of April 1, 2006;

10.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Metrocities Mortgage Corp. dated as of May 1, 2006;

11.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Mortgage Access Corp. d/b/a Weichert Financial Services dated as of May 23, 2005 and amended as of January 18, 2006;

12.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and National City Mortgage, Co. dated as of May 9, 2005 and amended as of February 14, 2006;

13.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and NC Capital Corporation dated as of May 18, 2004;

14.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and Pinnacle Financial Corporation dated as of February 12, 2004 and amended as of December 15, 2004; and

15.

Flow Mortgage Loan Purchase and Warranties Agreement by and between the Bank and SIB Mortgage Corp. dated as of June 10, 2002 and Amendment No. 1 dated as of November 1, 2002 and Amendment No, 2 as of September 29, 2003;

WHEREAS, the Bank Transferred Mortgage Loans, the "Bank Mortgage Loans," and the Bank Mortgage Loans, together with the LBH Transferred Mortgage Loans, collectively referred to hereinafter as the "Mortgage Loans";

WHEREAS, pursuant to an assignment and assumption agreement (the "Assignment and Assumption Agreement") dated as of June 1, 2006, between the Bank, as assignor, and LBH, as assignee, the Bank has assigned all of its right, title and interest in and to the foregoing Bank Transfer Agreements, certain of its rights (as described below) under each PPTL (as defined below) and related Bank Mortgage Loans as listed on Schedule A-1, in the case of Bank Transferred Mortgage Loans, or Schedule A-2, in the case of the Bank Originated Mortgage Loans, and LBH has accepted the rights and benefits of, and assumed the obligations of the Bank under, the Bank Transfer Agreements;

WHEREAS, LBH is a party to the following servicing agreements (collectively, the "Servicing Agreements") pursuant to which the Mortgage Loans are to be initially serviced by certain servicers as indicated below (each, a "Servicer," and collectively, the "Servicers"):

1.

Servicing Agreement dated as of June 1, 2006, by and between LBH, Aurora Loan Services LLC, as servicer, and the Master Servicer, and acknowledged by the Trustee;

2.

Securitization Servicing Agreement dated as of June 1, 2006, by and between LBH, HomEq Servicing Corporation, as servicer, and the Master Servicer, and acknowledged by the Trustee;

3.

Securitization Servicing Agreement dated as of June 1, 2006, by and among LBH, JPMorgan Chase Bank, National Association, as servicer, and the Master Servicer, acknowledged by the Trustee;

4. Securitization Servicing Agreement dated as of June 1, 2006, by and among LBH, Ocwen Loan Servicing, LLC, as servicer, and the Master Servicer, and acknowledged by the Trustee;

5. Subservicing Agreement dated as of June 1, 2006, by and among LBH, Option One Mortgage Corporation, as servicer, and the Master Servicer, and acknowledged by the Trustee;

6. Securitization Subservicing Agreement dated as of June 1, 2006, by and among LBH, Wells Fargo Bank, N.A., as servicer, and the Master Servicer, and acknowledged by the Trustee; and

7. Reconstituted Servicing Agreement dated as of June 1, 2006, by and between LBH and Wells Fargo Bank, N.A., as servicer, and acknowledged by the Master Servicer and the Trustee;

WHEREAS, the Seller desires to sell, without recourse, all of its rights, title and interest in and to the Mortgage Loans to the Depositor, assign all of its rights and interest under each Transfer Agreement, the PPTLs and each Servicing Agreement relating to the Mortgage Loans referred to above, and delegate all of its obligations thereunder, to the Depositor; and

WHEREAS, the Seller and the Depositor acknowledge and agree that the Depositor will convey the Mortgage Loans on the Closing Date to a Trust Fund created pursuant to the Trust Agreement, assign all of its rights and delegate all of its obligations hereunder to the Trustee for the benefit of the Certificateholders, and that each reference herein to the Depositor is intended, unless otherwise specified, to mean the Depositor or the Trustee, as assignee, whichever is the owner of the Mortgage Loans from time to time.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Seller and the Depositor agree as follows:

ARTICLE I.

CONVEYANCE OF MORTGAGE LOANS

Section 1.01.
  Sale of Mortgage Loans.

(a)

      <u>Sale of Mortgage Loans</u>.  Concurrently with the execution and delivery of this Agreement, the Seller does hereby transfer, assign, set over, deposit with and otherwise convey to the Depositor, without recourse, subject to Sections 1.03 and 1.04, all the right, title and interest of the Seller in and to the Mortgage Loans identified on Schedules A-1 and A-2 hereto, having an aggregate principal balance of $2,730,175,981.18.  Such conveyance includes, without limitation, the right to all distributions of principal and interest received on or with respect to the Mortgage Loans on and after the Cut-off Date, other than payments of principal and interest due on or before such date, and all such payments due after such date but received prior to such date and intended by the related Mortgagors to be applied after such date, all Prepayment Charges received on or with respect to the Mortgage Loans on or after the Cut-off Date, together with all of the Seller's right, title and interest in and to each related account and all amounts from time to time credited to and the proceeds of such account, any REO Property and the proceeds thereof, the Seller's rights under any Insurance Policies relating to the Mortgage Loans, the Seller's security interest in any collateral pledged to secure the Mortgage Loans, including the Mortgaged Properties, and any proceeds of the foregoing.

      Concurrently with the execution and delivery of this Agreement, the Seller hereby assigns to the Depositor all of its rights and interest under each Transfer Agreement (except for any rights against the related Transferor with respect to (i) first payment date defaults or early payment date defaults or (ii) reimbursement of any amount in excess of the Purchase Price for a breach of a representation or warranty; *provided, however,* that the Seller hereby assigns to the Depositor all of its rights and interest against First Horizon Home Loan Corporation, Equifirst Corporation, American Mortgage Express Financial dba Millennium Funding Group, Countrywide Home Loans, Inc., Choice Capital Funding, Mortgage Asset Corp. dba Weichert Financial Services, First Street Financial, Inc., Aegis Mortgage Corporation, and People's Choice Home Loan, Inc., with respect to first payment date defaults or early payment date defaults on the Mortgage Loans set forth in Schedule B hereto (the "First Payment Default Mortgage Loans"), assigned to the Seller under:

      (i)

      Section 6 of the Purchase Price and Terms Letter between the Bank and National City Mortgage Company dated as of January 6, 2006;

      (ii)

      Section 6 of the Purchase Price and Terms Letter between the Bank and Metrocities Mortgage Corporation dated as of April 11, 2006; and

      (iii)

      Section 6 of the Purchase Price and Terms Letter between the Bank and First NLC Financial Services, LLC dated as of March 7, 2006.

      The Seller and the Depositor further agree that this Agreement incorporates the terms and conditions of any assignment and assumption agreement or other assignment document required to be entered into under any of the Transfer Agreements (any such document, an "Assignment Agreement") and that this Agreement constitutes an Assignment Agreement under such Transfer Agreement, and the Depositor hereby assumes the obligations of the assignee under each such

Assignment Agreement. Concurrently with the execution hereof, the Depositor tenders the purchase price set forth in that certain Terms Letter dated as of the date hereof, the form of which is attached as Exhibit B hereto (the "Purchase Price"). The Depositor hereby accepts such assignment and delegation, and shall be entitled to exercise all the rights of the Seller under each Transfer Agreement, the PPTLs and each Servicing Agreement, other than any servicing rights thereunder, as if the Depositor had been a party to each such agreement.

(b)    Schedules of Mortgage Loans. The Depositor and the Seller have agreed upon which of the Mortgage Loans owned by the Seller are to be purchased by the Depositor pursuant to this Agreement and the Seller will prepare on or prior to the Closing Date a final schedule describing such Mortgage Loans (the "Mortgage Loan Schedule"). The Mortgage Loan Schedule shall conform to the requirements of the Depositor as set forth in this Agreement and to the definition of "Mortgage Loan Schedule" under the Trust Agreement. The Mortgage Loan Schedule attached hereto as Schedule A-1 specifies those Mortgage Loans that are Transferred Mortgage Loans and the Mortgage Loan Schedule attached hereto as Schedule A-2 specifies those Mortgage Loans that are Bank Originated Loans each of which categories of Bank Mortgage Loans have been assigned by the Bank to the Seller pursuant to the Assignment and Assumption Agreement.

Section 1.02.
Delivery of Documents.

(a)    In connection with such transfer and assignment of the Mortgage Loans hereunder, the Seller shall, at least three (3) Business Days prior to the Closing Date, deliver, or cause to be delivered, to the Depositor (or its designee) the documents or instruments with respect to each Mortgage Loan (each, a "Mortgage File") so transferred and assigned, as specified in the related Transfer Agreements or Servicing Agreements.

(b)    For Mortgage Loans (if any) that have been prepaid in full on or after the Cut-off Date and prior to the related Closing Date, the Seller, in lieu of delivering the related Mortgage Files, herewith delivers to the Depositor an Officer's Certificate which shall include a statement to the effect that all amounts received in connection with such prepayment that are required to be deposited in the Collection Account maintained by the Master Servicer for such purpose have been so deposited.

Section 1.03.
Review of Documentation.

The Depositor, by execution and delivery hereof, acknowledges receipt of the Mortgage Files pertaining to the Mortgage Loans listed on the Mortgage Loan Schedule, subject to review thereof by LaSalle Bank National Association, Wells Fargo Bank, N.A., Deutsche Bank National Trust Company and U.S. Bank National Association, as applicable (each, a "Custodian" and, collectively, the "Custodians"), for the Depositor. Each Custodian is required to review, within 45 days following the Closing Date, each applicable Mortgage File. If in the course of such

review the related Custodian identifies any Material Defect, the Seller shall be obligated to cure such Material Defect or to repurchase the related Mortgage Loan from the Depositor (or, at the direction of and on behalf of the Depositor, from the Trust Fund), or to substitute a Qualifying Substitute Mortgage Loan therefor, in each case to the same extent and in the same manner as the Depositor is obligated to the Trustee and the Trust Fund under Section 2.02(c) of the Trust Agreement.

Section 1.04.
Representations and Warranties of the Seller.

(a)
The Seller hereby represents and warrants to the Depositor that as of the Closing Date:

(i)
the Seller is a corporation duly organized, validly existing and in good standing under the laws governing its creation and existence and has full corporate power and authority to own its property, carry on its business as presently conducted and enter into and perform its obligations under the Assignment and Assumption Agreement and this Agreement;

(ii)
the execution and delivery by the Seller of the Assignment and Assumption Agreement and this Agreement have been duly authorized by all necessary corporate action on the part of the Seller; neither the execution and delivery of the Assignment and Assumption Agreement or this Agreement, nor the consummation of the transactions therein or herein contemplated, nor compliance with the provisions thereof or hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Seller or its properties or the certificate of incorporation or bylaws of the Seller;

(iii)
the execution, delivery and performance by the Seller of the Assignment and Assumption Agreement and this Agreement and the consummation of the transactions contemplated thereby and hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except such as has been obtained, given, effected or taken prior to the date hereof;

(iv)
each of the Assignment and Assumption Agreement and this Agreement has been duly executed and delivered by the Seller and, assuming due authorization, execution and delivery by the Bank, in the case of the Assignment and Assumption Agreement, and the Depositor, in the case of this Agreement, constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its respective terms, except as such enforceability may be subject to (A) applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally and (B) general principles of equity regardless of whether such enforcement is considered in a proceeding in equity or at law; and

(v)

there are no actions, suits or proceedings pending or, to the knowledge of the Seller, threatened or likely to be asserted against or affecting the Seller, before or by any court, administrative agency, arbitrator or governmental body (A) with respect to any of the transactions contemplated by the Assignment and Assumption Agreement or this Agreement or (B) with respect to any other matter which in the judgment of the Seller will be determined adversely to the Seller and will if determined adversely to the Seller materially and adversely affect it or its business, assets, operations or condition, financial or otherwise, or adversely affect its ability to perform its obligations under the Assignment and Assumption Agreement or this Agreement.

(b)

The representations and warranties of each Transferor with respect to the Mortgage Loans in the applicable Transfer Agreement were made as of the date of such Transfer Agreement. To the extent that any fact, condition or event with respect to a Transferred Mortgage Loan constitutes a breach of both (i) a representation or warranty of a Transferor under the applicable Transfer Agreement and (ii) a representation or warranty of the Seller under this Agreement, the sole right or remedy of the Depositor with respect to a breach by the Seller of such representation and warranty (except in the case of a breach by the Seller of the representations made by it pursuant to Sections 1.04(b)(xiii), (xiv), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxi) and (xxii)), shall be the right to enforce the obligations of such Transferor under any applicable representation or warranty made by it. The representations made by the Seller pursuant to Sections 1.04(b)(xiii), (xiv), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxi) and (xxii) shall be direct obligations of the Seller. The Depositor acknowledges and agrees that the representations and warranties of the Seller in this Section 1.04(b) (except in the case of those representations and warranties made pursuant to Sections 1.04(b)(xiii), (xiv), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxi) and (xxii)) are applicable only to facts, conditions or events that do not constitute a breach of any representation or warranty made by the related Transferor in the applicable Transfer Agreement. The Seller shall have no obligation or liability with respect to any breach of a representation or warranty made by it with respect to the Transferred Mortgage Loans (except in the case of those representations and warranties made by it pursuant to Sections 1.04(b)(xiii), (xiv), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxi) and (xxii)) if the fact, condition or event constituting such breach also constitutes a breach of a representation or warranty made by the related Transferor in such Transfer Agreement, without regard to whether the related Transferor fulfills its contractual obligations in respect of such representation or warranty; *provided, however*, that if the related Transferor fulfills its obligations under the provisions of such Transfer Agreement by substituting for the affected Mortgage Loan a mortgage loan which is not a Qualifying Substitute Mortgage Loan, the Seller shall, in exchange for such substitute mortgage loan, provide the Depositor (a) with the applicable Purchase Price for the affected Mortgage Loan or (b) within the two-year period following the Closing Date, with a Qualified Substitute Mortgage Loan for such affected Mortgage Loan.

Subject to the foregoing, the Seller represents and warrants upon delivery of the Transferred Mortgage Loans to the Depositor hereunder, as to each, that, as of the Closing Date:

(i)

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 67 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 12 of 30

67

The information set forth with respect to the Transferred Mortgage Loans on the Mortgage Loan Schedule provides an accurate listing of the Transferred Mortgage Loans, and the information with respect to each Transferred Mortgage Loan on the Mortgage Loan Schedule is true and correct in all material respects at the date or dates respecting which such information is given;

(ii)

There are no defaults (other than delinquency in payment) in complying with the terms of any Mortgage, and the Seller has no notice as to any taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing but which have not been paid;

(iii)

Except in the case of Cooperative Loans, if any, each Mortgage requires all buildings or other improvements on the related Mortgaged Property to be insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the related Mortgaged Property is located pursuant to insurance policies conforming to the requirements of the guidelines of Fannie Mae or Freddie Mac. If upon origination of the Transferred Mortgage Loan, the Mortgaged Property was in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), a flood insurance policy meeting the requirements of the current guidelines of the Federal Flood Insurance Administration is in effect, which policy conforms to the requirements of the current guidelines of the Federal Flood Insurance Administration. Each Mortgage obligates the related Mortgagor thereunder to maintain the hazard insurance policy at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at such Mortgagor's cost and expense, and to seek reimbursement therefor from the Mortgagor. Where required by state law or regulation, each Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, provided the policy is not a "master" or "blanket" hazard insurance policy covering the common facilities of a planned unit development. The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of the Depositor upon the consummation of the transactions contemplated by this Agreement;

(iv)

Each Mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission;

(v)

In the case of approximately 91.30% and 8.70% of the Mortgage Loans (by Scheduled Principal Balance as of the Cut-off Date), the related Mortgage evidences a valid, subsisting, enforceable and perfected first lien or second lien, respectively, on the related Mortgaged Property (including all improvements on the Mortgaged Property). The lien of the Mortgage is subject only to: (1) the first Mortgage, in the case of a Mortgaged Property that is

secured by a perfected second lien, (2) liens of current real property taxes and assessments not yet due and payable and, if the related Mortgaged Property is a condominium unit, any lien for common charges permitted by statute, (3) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage acceptable to mortgage lending institutions in the area in which the related Mortgaged Property is located and specifically referred to in the lender's Title Insurance Policy or attorney's opinion of title and abstract of title delivered to the originator of such Transferred Mortgage Loan, and (4) such other matters to which like properties are commonly subject which do not, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage. In the case of approximately 91.30% of the Mortgage Loans (by Scheduled Principal Balance as of the Cut-off Date), any security agreement, chattel mortgage or equivalent document related to, and delivered to the Trustee in connection with, a Transferred Mortgage Loan establishes a valid, subsisting and enforceable first lien on the property described therein and the Depositor has full right to sell and assign the same to the Trustee;

(vi)

Immediately prior to the transfer and assignment of the Transferred Mortgage Loans to the Depositor, the Seller was the sole owner of record and holder of each Transferred Mortgage Loan, and the Seller had good and marketable title thereto, and has full right to transfer and sell each Transferred Mortgage Loan to the Depositor free and clear, except as described in paragraph (v) above, of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest, and has full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign each Transferred Mortgage Loan pursuant to this Agreement;

(vii)

Each Transferred Mortgage Loan other than any Cooperative Loan is covered by either (i) an attorney's opinion of title and abstract of title the form and substance of which is generally acceptable to mortgage lending institutions originating mortgage loans in the locality where the related Mortgaged Property is located or (ii) an ALTA Mortgagee Title Insurance Policy or other generally acceptable form of policy of insurance, issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the originator of the Transferred Mortgage Loan, and its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of the Transferred Mortgage Loan (subject only to the exceptions described in paragraph (v) above). If the Mortgaged Property is a condominium unit located in a state in which a title insurer will generally issue an endorsement, then the related Title Insurance Policy contains an endorsement insuring the validity of the creation of the condominium form of ownership with respect to the project in which such unit is located. With respect to any Title Insurance Policy, the originator is the sole insured of such mortgagee Title Insurance Policy, such mortgagee Title Insurance Policy is in full force and effect and will inure to the benefit of the Depositor upon the consummation of the transactions contemplated by this Agreement, no claims have been made under such mortgagee Title Insurance Policy and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything that would impair the coverage of such mortgagee Title Insurance Policy;

(viii)        No foreclosure action is being threatened or commenced with respect to any Transferred Mortgage Loan.  There is no proceeding pending for the total or partial condemnation of any Mortgaged Property (or, in the case of any Cooperative Loan, the related cooperative unit) and each such property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty, so as to have a material adverse effect on the value of the related Mortgaged Property as security for the related Transferred Mortgage Loan or the use for which the premises were intended;

(ix)

        There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under the law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(x)

        [Reserved]

(xi)

        Each Transferred Mortgage Loan will have a CLTV of 100% or less as of the Closing Date;

(xii)

        Each Transferred Mortgage Loan is a "qualified mortgage" within the meaning of Section 860G of the Code and Treas. Reg. §1.860G-2;

(xiii)

        Each Transferred Mortgage Loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory, abusive and fair lending laws; and, specifically, (a) no Transferred Mortgage Loan secured by a Mortgaged Property located in New Jersey is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A. 46:10B-22 *et seq.*); (b) no Transferred Mortgage Loan secured by a Mortgaged Property located in New Mexico is a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004 (N.M. Stat. Ann. §§ 58-21A-1 *et. seq.*); (c) no Transferred Mortgage Loan secured by a Mortgaged Property located in Massachusetts is a "High-Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 (Mass. Ann. Laws Ch. 183C); and (d) no Transferred Mortgage Loan secured by a Mortgaged Property located in Indiana is a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act effective January 1, 2005 (Ind. Code Ann. § 24-9-1 *et seq.*);

(xiv)

        No Transferred Mortgage Loan is a "High Cost Loan" or "Covered Loan," as applicable, as such terms are defined in the then current Standard & Poor's LEVELS® Glossary.  In addition, no Transferred Mortgage Loan is a "high-cost," "high-cost home," "covered," "high-risk home" or "predatory" loan under any applicable federal, state or local predatory or abusive lending law (or a similarly classified loan using different terminology under a law

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 70 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 15 of 30

70

imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees);

(xv)
No Transferred Mortgage Loan was at the time of origination subject to the Home Ownership and Equity Protection Act of 1994 (15 U.S.C. § 1602(c)) ("HOEPA"), Regulation Z (12 CFR 226.32) or any comparable state law;

(xvi)
The information set forth in the Prepayment Charge Schedules, included as part of the Mortgage Loan Schedules at Schedules A-1 and A-2 hereto (including the Prepayment Charge Summary attached thereto) is complete, true and correct in all material respects on the date or dates on which such information is furnished and each Prepayment Charge is permissible, originated in compliance with, and enforceable in accordance with its terms under, applicable federal, state and local law (except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws affecting creditor's rights generally or the collectibility thereof may be limited due to acceleration in connection with foreclosure);

(xvii)
No Transferred Mortgage Loan was originated (or modified) on or after October 1, 2002, and before March 7, 2003, which is secured by a mortgaged property located in Georgia;

(xviii)
In addition to the foregoing representations and warranties made in subparagraphs (i) through (xvii) of this Section 1.04(b), the Seller further represents and warrants upon delivery of the Pool 1 Transferred Mortgage Loans, as to each such Mortgage Loan, that:

(a)
Each Pool 1 Mortgage Loan is in compliance with the anti-predatory lending eligibility for purchase requirements of Fannie Mae's Selling Guide;

(b)
No Pool 1 Transferred Mortgage Loan secured by a Mortgaged Property located in Georgia is a "High-Cost Home Loan" as defined in the Georgia Fair Lending Act; no Pool 1 Transferred Mortgage Loan secured by a Mortgaged Property located in New York is a "High-Cost Home Loan" as defined in Section 6-1 of the New York State Banking Law; no Pool 1 Transferred Mortgage Loan secured by a Mortgaged Property located in Arkansas is a "High-Cost Home Loan" as defined in the Arkansas Home Loan Protection Act effective June 24, 2003 (Act 1340 of 2003); no Pool 1 Transferred Mortgage Loan secured by a Mortgaged Property located in Kentucky is a "High-Cost Home Loan" as defined in the Kentucky high-cost home loan statute effective June 24, 2003 (Ky. Rev. Stat. Section 360.100); no Pool 1 Transferred Mortgage Loan secured by a Mortgaged Property located in Illinois is a "High-Risk Home Loan" as defined in the Illinois High-Risk Home Loan Act (815 Ill. Comp. Stat. 137/1 *et seq.*);

(c)

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 71 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 16 of 30

71

To the best of the Seller's knowledge, except with respect to broker yield spread premium ("YSP") as permitted by law, no borrower was required to select a Pool 1 Transferred Mortgage Loan product offered by the Transferor which is a higher cost product designed for less creditworthy borrowers, unless at the time of such Mortgage Loan's origination, the borrower did not qualify taking into account credit history and debt-to-income ratios for a lower-cost credit product then offered by the Transferor or an affiliate of the Transferor. If, at the time of the loan application, the borrower may have qualified for a lower-cost credit product then offered by any mortgage lending affiliate of the Transferor, the Transferor referred the borrower's application to such affiliate for underwriting consideration;

(d)

To the best of the Seller's knowledge, the methodology used in underwriting the extension of credit for each Pool 1 Transferred Mortgage Loan does not rely solely on the borrower's equity in the collateral for determining approval of credit extension, but relies on additional factors such as the borrower's income, assets, liabilities and/or credit history. Such underwriting methodology confirmed that at the time of origination (application/approval), the borrower had a reasonable ability to make timely payments on the related Pool 1 Transferred Mortgage Loan;

(e)

With respect to any Pool 1 Transferred Mortgage Loan that contains a provision permitting imposition of a Prepayment Charge upon a prepayment prior to maturity, to the best of the Seller's knowledge: (i) pursuant to the Transferor's underwriting guidelines, the borrower agreed to such a premium in exchange for a monetary benefit, including but not limited to a rate or fee reduction, (ii) prior to such Pool 1 Transferred Mortgage Loan's origination, the borrower was offered the option of obtaining a mortgage loan that did not require payment of such Prepayment Charge, (iii) the Prepayment Charge is disclosed to the borrower in the loan documents pursuant to applicable state and federal law, (iv) the duration of the prepayment period shall not exceed three years from the date of the note, and (v) notwithstanding any state or federal law to the contrary, the applicable Servicer shall not impose such Prepayment Charge in any instance when the mortgage debt is accelerated as the result of the borrower's default in making the loan payments;

(f)

To the best of the Seller's knowledge, no borrower was required to purchase any credit life, disability, accident, unemployment or health insurance product or debt cancellation agreement as a condition of obtaining the extension of credit evidenced by the Pool 1 Transferred Mortgage Loan. No borrower obtained a prepaid single-premium credit life, disability, accident, unemployment, mortgage or health insurance policy in connection with the origination of the Pool 1 Transferred Mortgage Loan; and no proceeds from any Pool 1 Transferred Mortgage Loan were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Pool 1 Transferred Mortgage Loan;

(g)

To the best of the Seller's knowledge, all points and fees related to each Pool 1 Transferred Mortgage Loan were disclosed in writing to the borrower in accordance with applicable state and federal law and regulation. Except in the case of a Pool 1 Transferred Mortgage Loan in an original principal amount of less than $60,000 which would have resulted in an unprofitable origination, no borrower was charged "points and fees" (whether or not financed) in an amount greater than 5% of the principal amount of such Pool 1 Transferred Mortgage Loan, such 5% limitation calculated in accordance with Fannie Mae's anti-predatory lending requirements as set forth in the Fannie Mae Selling Guide;

(h)
All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Pool 1 Transferred Mortgage Loan have been disclosed in writing to the borrower in accordance with applicable state and federal law and regulation;

(i)
The Seller shall cause the applicable Servicer to transmit full-file credit reporting data for each Pool 1 Transferred Mortgage Loan pursuant to Fannie Mae Guide Announcement 95-19 and, with respect to each Pool 1 Mortgage Loan, the Seller shall cause the applicable Servicer to report one of the following statuses each month as follows: new origination, current, delinquent (30-, 60-, 90-days, etc.), foreclosed, or charged-off;

(j)
The applicable Servicer for each Pool 1 Transferred Mortgage Loan has fully furnished in the past (and the Seller shall cause the applicable Servicer to furnish in the future), in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company, on a monthly basis;

(k)
The outstanding Scheduled Principal Balance of each Pool 1 Transferred Mortgage Loan does not exceed the applicable maximum original loan amount limitations with respect to first lien or subordinate lien one-to-four family residential mortgage loans, as applicable, as set forth in the Fannie Mae Selling Guide;

(l)
No Pool 1 Transferred Mortgage Loan is a balloon mortgage loan that has an original stated maturity of less than seven years;

(m)
No Pool 1 Transferred Mortgage Loan is subject to mandatory arbitration except when the terms of the arbitration also contain a waiver provision that provides that in the event of a sale or transfer of the Mortgage Loan or interest in the Mortgage Loan the Seller shall waive the terms of the arbitration (or in the event of a sale or transfer of the Mortgage Loan or interest therein to Fannie Mae, the terms of the arbitration are null and void). The Seller or applicable servicer will notify the borrower in writing within sixty days of the sale or transfer of the Mortgage Loan to Fannie Mae that the terms of the arbitration are null and void; and

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 73 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 18 of 30

73

(n)

With respect to Pool 1 Transferred Mortgage Loans secured by manufactured housing, each contract is secured by a "single family residence" within the meaning of Section 25(e)(10) of the Code. The fair market value of the manufactured home securing each contract was at least 80% of the adjusted issue price of the contract at either (i) the time the contract was originated (determined pursuant to the REMIC provisions of the Code or (ii) the time the contract was transferred to the Seller). Each such contract is a "qualified mortgage" under Section 860G(a)(3) of the Code.

(xix)

In addition to the foregoing representations and warranties made in subparagraphs (i) through (xvii) of this Section 1.04(b), the Seller further represents and warrants upon delivery of the Pool 2 Transferred Mortgage Loans, as to each such Mortgage Loan, that:

(a)

The outstanding Scheduled Principal Balance of each Pool 2 Transferred Mortgage Loan does not exceed the applicable maximum original loan amount limitations with respect to first lien or subordinate lien one-to-four family residential mortgage loans, as applicable, as set forth in the Freddie Mac Selling Guide;

(b)

With respect to any Pool 2 Transferred Mortgage Loan that is a subordinate lien mortgage loan, (i) such lien is on a one- to four-family residence that is the principal residence of the borrower; (ii) the original principal balance does not exceed the applicable limitations with respect to subordinate lien mortgage loans as set forth in the Freddie Mac Selling Guide; and (iii) the original principal balance of the first lien mortgage loan plus the original principal balance of any subordinate lien mortgage loans relating to the same mortgaged property do not exceed the applicable limitations with respect to first lien mortgage loans for that property type as set forth in the Freddie Mac Selling Guide;

(c)

There is no Pool 2 Transferred Mortgage Loan that was originated on or after March 7, 2003 which is a "high cost home loan" as defined under the Georgia Fair Lending Act;

(d)

No borrower obtained a prepaid single-premium credit life, credit disability, credit unemployment or credit property insurance policy in connection with the origination of any Pool 2 Transferred Mortgage Loan; no proceeds from any Pool 2 Transferred Mortgage Loan were used to purchase single premium credit insurance policies or debt cancellation agreements as part of the origination of, or as a condition to closing, such Pool 2 Transferred Mortgage Loan;

(e)

The applicable Servicer for each Pool 2 Transferred Mortgage Loan has fully furnished in the past (and the Seller shall cause the applicable Servicer to furnish in the future), in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian and Trans Union Credit Information Company, on a monthly basis;

(f)

        With respect to any Pool 2 Transferred Mortgage Loan that contains a provision permitting imposition of a Prepayment Charge upon a prepayment prior to maturity, to the best of the Seller's knowledge: (i) the Pool 2 Transferred Mortgage Loan provides some benefit to the borrower (e.g., a rate or fee reduction) in exchange for accepting such Prepayment Charge; (ii) the Pool 2 Transferred Mortgage Loan's originator had a written policy of offering the borrower, or requiring third-party brokers to offer the borrower, the option of obtaining a mortgage loan that did not require payment of such Prepayment Charge; (iii) the Prepayment Charge was adequately disclosed to the borrower in the loan documents pursuant to applicable state and federal law; (iv) no subprime loan originated on or after October 1, 2002, will provide for a Prepayment Charge for a term in excess of three years and any subprime loan or non-subprime loan originated prior to such date will not provide for a Prepayment Charge for a term in excess of five years; in each case unless such loan was modified to reduce the prepayment period to no more than three years from the date of the note in the case of a subprime loan and no more than five years from the date of the note in the case of a non-subprime loan and the borrower was notified in writing of such reduction in prepayment period; and (v) such Prepayment Charge shall not be imposed in any instance where the Pool 2 Transferred Mortgage Loan is accelerated or paid off in connection with the workout of a delinquent mortgage or due to the borrower's default, notwithstanding that the terms of the Pool 2 Transferred Mortgage Loan or state or federal law might permit the imposition of such Prepayment Charge;

(g)

        With respect to any Pool 2 Transferred Mortgage Loan originated on or after August 1, 2004, neither the related mortgage nor the related mortgage note requires the borrower to submit to arbitration to resolve any dispute arising out of or relating in any way to the mortgage loan transaction;

(h)

        With respect to any Pool 2 Transferred Mortgage Loan secured by manufactured housing, (i) each contract is secured by a "single family residence" within the meaning of Section 25(e)(10) of the Code and (ii) the manufactured housing is the principal residence of the borrower. The fair market value of the manufactured home securing each contract was at least 80% of the adjusted issue price of the contract at either (i) the time the contract was originated (determined pursuant to the REMIC provisions of the Code) or (ii) the time the contract was transferred to the Seller. Each such contract is a "qualified mortgage" under Section 860G(a)(3) of the Code;

(i)

        To the best of the Seller's knowledge, no borrower was encouraged or required to select a Pool 2 Transferred Mortgage Loan product offered by the Transferor which is a higher cost product designed for less creditworthy borrowers, unless at the time of the Transferor's origination, such borrower did not qualify, taking into account such facts as, without limitation, the related Pool 2 Transferred Mortgage Loan's requirements and the borrower's credit history, income, assets and liabilities, for a lower cost credit product then offered by the mortgage loan's originator or any affiliate of the Transferor. If, at the time of loan application, the borrower may have qualified for a lower cost credit product then offered by any mortgage lending affiliate of

the Transferor, the Transferor referred the borrower's application to such affiliate for underwriting consideration;

(j)
To the best of the Seller's knowledge, the methodology used in underwriting the extension of credit for each Pool 2 Transferred Mortgage Loan did not rely on the borrower's equity in the collateral as the principal determining factor in approving the extension of credit, but rather related such facts as, without limitation, the borrower's credit history, income, assets or liabilities, to the proposed mortgage payment. Such underwriting methodology confirmed that at the time of origination (application/approval), the borrower had a reasonable ability to make timely payments on the related Pool 2 Transferred Mortgage Loan;

(k)
No borrower under a Pool 2 Transferred Mortgage Loan was charged "points and fees" in an amount greater than (a) $1,000 or (b) 5% of the principal amount of such Pool 2 Transferred Mortgage Loan, such limitation calculated in accordance with Freddie Mac's anti-predatory lending requirements as set forth in the Freddie Mac Selling Guide; and

(l)
No Pool 2 Transferred Mortgage Loan was originated more than twelve months prior to the Closing Date.

(xx)
As of the Closing Date, approximately 0.49% of the Mortgage Loans were 29 days or more delinquent, as determined in accordance with the OTS method, and, with respect to such Mortgage Loans, the related borrower will make a payment in full of such delinquent amount no later than June 30, 2006;

(xxi)
With respect to approximately 37.37% of the Mortgage Loans, in the event that such Mortgage Loan has not made its initial payment due on the mortgage note within two calendar months as of its first payment due date, then the Seller will purchase such Mortgage Loan;

(xxii)
With respect to approximately 0.27% of the Mortgage Loans, in the event that such Mortgage Loan has not made its initial payment due on the mortgage note within 45 days as of its first payment due date, then the Seller will purchase such Mortgage Loan;

(c)
In addition to the representations and warranties set forth in Section 1.04(b), all of which are also made by the Seller with respect to the Bank Originated Mortgage Loans as of the Closing Date (taking into account the applicable Mortgage Pool, in the case of subparagraphs (xviii), (xix), (xx), (xxi) and (xxii)), the Seller hereby further represents and warrants to the Depositor upon the delivery to the Depositor on the Closing Date of any Bank Originated Mortgage Loans, but solely as to each Bank Originated Mortgage Loan, that, as of the Closing Date, as applicable:

(i)

With respect to any hazard insurance policy covering a Bank Originated Mortgage Loan and the related Mortgaged Property, the Seller has not engaged in, and has no knowledge of the Bank's or the borrower's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for therein, or the validity and binding effect of either, including without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by the Seller;

(ii)

Neither the Seller nor the Bank has waived the performance by the borrower of any action, if the Mortgagor's failure to perform such action would cause a Bank Originated Mortgage Loan to be in default, nor has the Seller or the Bank waived any default resulting from any action or inaction by the borrower;

(iii)

The terms of the Mortgage Note and Mortgage have not been impaired, waived, altered or modified in any respect, except by a written instrument which has been recorded, if necessary to protect the interests of the Depositor and which has been delivered to the Custodian;

(iv)

The Mortgaged Property relating to each Bank Originated Mortgage Loan is a fee simple property located in the state identified in the Mortgage Loan Schedule and consists of a parcel of real property with a detached single family residence erected thereon, or a two- to four-family dwelling, or an individual condominium unit in a low-rise condominium project, or an individual unit in a planned unit development; *provided, however*, that any condominium project or planned unit development shall conform with the applicable Freddie Mac requirements regarding such dwellings. No portion of the Mortgaged Property is used for commercial purposes;

(v)

The Mortgage Note and the Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Mortgage Note and the Mortgage and any other related agreement had legal capacity to enter into the Bank Originated Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage and any other related agreement, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. To the best of Seller's knowledge, no fraud was committed in connection with the origination of the Bank Originated Mortgage Loan;

(vi)

Each Bank Originated Mortgage Loan has been closed and the proceeds of the Bank Originated Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 77 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 22 of 30

77

improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Bank Originated Mortgage Loan and the recording of the Mortgage were paid, and the borrower is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(vii)     There is no default (other than delinquency in payment), breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and neither the Seller nor its predecessors has waived any default, breach, violation or event of acceleration;

(viii)    All improvements which were considered in determining the Appraised Value of the Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property and no improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation;

(ix)      Each Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the related Mortgaged Property of the benefits of the security, including (A) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (B) otherwise by judicial or non-judicial foreclosure. There is no homestead or other exemption available to the related Mortgagor which would materially interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage subject to the applicable federal and state laws and judicial precedent with respect to bankruptcy and rights of redemption. Upon default by a Mortgagor on a Bank Originated Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Bank Originated Mortgage Loan will be able to deliver good and merchantable title to the property;

(x)       The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage;

(xi)      In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Depositor to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(xii)     The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered for the Bank Originated Mortgage Loan by the Seller under

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 78 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 23 of 30

78

this Agreement as set forth in Section 1.02 hereof have been delivered to the Custodian. The Seller is in possession of a complete, true and accurate Mortgage File in compliance with Section 1.02 hereof, except for such documents the originals of which have been delivered to the Custodian;

(xiii)      The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(xiv)      The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Bank Originated Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the Mortgagee thereunder;

(xv)      No Bank Originated Mortgage Loan contains provisions pursuant to which Monthly Payments are paid or partially paid with funds deposited in any separate account established by the Mortgagor or anyone on behalf of the Mortgagor, or paid by any source other than the Mortgagor, nor does any Bank Originated Mortgage Loan contain any other similar provisions currently in effect which may constitute a "buydown" provision. No Bank Originated Mortgage Loan is a graduated payment mortgage loan and no Bank Originated Mortgage Loan has a shared appreciation or other contingent interest feature;

(xvi)      Any future advances made prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is insured by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Freddie Mac. The consolidated principal amount does not exceed the original principal amount of any Bank Originated Mortgage Loan;

(xvii)      The origination and collection practices used with respect to each Bank Originated Mortgage Loan have been in accordance with Accepted Servicing Practices, and have been in all respects in compliance with all applicable laws and regulations. With respect to escrow deposits and escrow payments, all such payments are in the possession of the Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. All escrow payments have been collected in full compliance with state and federal law. An escrow of funds is not prohibited by applicable law and has been established in an amount sufficient to pay for every item which remains unpaid and which has been assessed but is not yet due and payable. No escrow deposits or escrow payments or other charges or payments due the Seller have been capitalized under the Mortgage or the Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(xviii)

The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Bank Originated Mortgage Loan application by a qualified appraiser, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof; and whose compensation is not affected by the approval or disapproval of the Bank Originated Mortgage Loan, and the appraisal and appraiser both satisfy the requirements of Title XI of the Federal Institutions Reform, Recovery, and Enforcement Act of 1989 and the regulations promulgated thereunder, all as in effect on the date the Bank Originated Mortgage Loan was originated;

(xix)

The Mortgaged Property is free from any and all toxic or hazardous substances and there exists no violation of any local, state or federal environmental law, rule or regulation. There is no pending action or proceeding directly involving any Mortgaged Property of which the Seller is aware in which compliance with any environmental law, rule or regulation is an issue; and to the best of the Seller's knowledge, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation;

(xx)

The Bank Originated Mortgage Loan does not contain a provision permitting or requiring conversion to a fixed interest rate Mortgage Loan;

(xxi)

No Bank Originated Mortgage Loan was made in connection with (i) the construction or rehabilitation of a Mortgaged Property or (ii) facilitating the trade-in or exchange of a Mortgaged Property;

(xxii)

No action, inaction or event has occurred and no state of facts exists or has existed that has resulted or will result in the exclusion from, denial of or defense to coverage under any applicable special hazard insurance policy, borrower paid primary mortgage loan insurance policy or bankruptcy bond, irrespective of the cause of such failure of coverage. In connection with the placement of any such insurance, no commission, fee or other compensation has been or will be received by the Seller or any designee of the Seller or any corporation in which the Seller or any officer, director or employee had a financial interest at the time of placement of such insurance; and

(xxiii)

Each original Mortgage was recorded and, except for those Bank Originated Mortgage Loans subject to the MERS identification system, all subsequent assignments of the original Mortgage (other than the assignment to the Depositor) have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the liens thereof as against creditors of the Seller, or are in the process of being recorded.

(d)

With respect to any of the foregoing representations and warranties made in subparagraphs (xiii) (xiv), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxi) and (xxii) of Section

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 80 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 25 of 30

80

1.04(b), a breach of any such representations or warranties shall be deemed to materially and adversely affect the value of the affected Mortgage Loan and the interests of Certificateholders therein, irrespective of the Seller's knowledge of such breach.

It is understood and agreed that the representations and warranties set forth in Sections 1.04(b) and 1.04(c) herein shall survive the Closing Date. Upon discovery by either the Seller or the Depositor of a breach of any of the foregoing representations and warranties (excluding a breach of subparagraph (xvi) under Section 1.04(b)) that adversely and materially affects the value of the related Mortgage Loan and that does not also constitute a breach of a representation or warranty of a Transferor in the related Transfer Agreement, the party discovering such breach shall give prompt written notice to the other party; *provided, however,* that notwithstanding anything to the contrary herein, this paragraph shall be specifically applicable to a breach by the Seller of the representations made pursuant to subparagraphs (xiii), (xiv), (xv), (xvii), (xviii), (xix), (xx), (xxi) and (xxii) of Section 1.04(b) irrespective of the Transferor's breach of a comparable representation or warranty made in the related Transfer Agreement. Within 60 days of the discovery of any such breach, the Seller shall either (a) cure such breach in all material respects, (b) repurchase such Mortgage Loan or any property acquired in respect thereof from the Depositor at the applicable Purchase Price or (c) within the two-year period following the Closing Date, as applicable, substitute a Qualifying Substitute Mortgage Loan for the affected Mortgage Loan.

Notwithstanding the second paragraph of Section 1.04(d), in connection with the Seller's representations and warranties made in subparagraph (xvi) of Section 1.04(b) and within 90 days of the earlier of discovery by the Seller or receipt of notice from the applicable Servicer of a breach of such representation and warranty by the Seller, which breach materially and adversely affects the interests of the Class P Certificateholders in any Prepayment Charge, the Seller shall, if (i) such representation and warranty is breached and a Principal Prepayment has occurred or (ii) if a change in law subsequent to the Closing Date limits the enforceability of the Prepayment Charge (other than in the circumstances set forth in subparagraph (xvi) of Section 1.04(b)), pay, at the time of such Principal Prepayment or change in law, the amount of the scheduled Prepayment Charge, for the benefit of the holders of the Class P Certificates, by depositing such amount into the Certificate Account no later than the Deposit Date immediately following the Prepayment Period in which such Principal Prepayment on the related Mortgage Loan or such change in law has occurred, net of any Servicer Prepayment Charge Payment Amount made by the applicable Servicer with respect to the related Mortgage Loan in lieu of collection of such Prepayment Charge.

(e) Promptly upon discovery by the Seller or the Depositor that any First Payment Default Mortgage Loan may be repurchased by the related Transferor, the Depositor shall enforce its rights under the related PPTL. If the price at which the related Transferor is required to purchase any First Payment Default Mortgage Loan is less than the Purchase Price as defined in the Trust Agreement, the Seller shall be obligated to pay such difference to the Depositor on the date of repurchase.

Section 1.05.
Grant Clause.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 81 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 26 of 30

81

It is intended that the conveyance of the Seller's right, title and interest in and to the Mortgage Loans and other property conveyed pursuant to this Agreement on the Closing Date shall constitute, and shall be construed as, a sale of such property and not a grant of a security interest to secure a loan. However, if any such conveyance is deemed to be in respect of a loan, it is intended that: (a) the rights and obligations of the parties shall be established pursuant to the terms of this Agreement; (b) the Seller hereby grants to the Depositor a first priority security interest to secure payment of an obligation in an amount equal to the purchase price set forth in Section 1.01(a) in all of the Seller's right, title and interest in, to and under, whether now owned or hereafter acquired, the Mortgage Loans and other property; and (c) this Agreement shall constitute a security agreement under applicable law.

Section 1.06.
        Assignment by Depositor.

Concurrently with the execution of this Agreement, the Depositor shall assign its interest under this Agreement with respect to the Mortgage Loans to the Trustee, and the Trustee then shall succeed to all rights of the Depositor under this Agreement. All references to the rights of the Depositor in this Agreement shall be deemed to be for the benefit of and exercisable by its assignee or designee, specifically including the Trustee.

ARTICLE II.

MISCELLANEOUS PROVISIONS

Section 2.01.
        Binding Nature of Agreement; Assignment.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 2.02.
        Entire Agreement.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

Section 2.03.
        Amendment.

        (a)
                This Agreement may be amended from time to time by the Seller and the Depositor, with the consent of the Trustee but without notice to or the consent of any of the Certificateholders, (i) to cure any ambiguity, (ii) to cause the provisions herein to conform to or

be consistent with or in furtherance of the statements made with respect to the Certificates, the Trust Fund, the Trust Agreement or this Agreement in the Prospectus Supplement; or to correct or supplement any provision herein which may be inconsistent with any other provisions herein, (iii) to make any other provisions with respect to matters or questions arising under this Agreement or (iv) to add, delete, or amend any provisions to the extent necessary or desirable to comply with any requirements imposed by the Code and the REMIC Provisions. No such amendment effected pursuant to clause (iii) of the preceding sentence shall adversely affect in any material respect the interests of any Certificateholder. Any such amendment shall be deemed not to adversely affect in any material respect any Certificateholder if the Trustee receives written confirmation from each Rating Agency that such amendment will not cause such Rating Agency to reduce the then current rating assigned to the Certificates, if any (and any Opinion of Counsel received by the Trustee in connection with any such amendment may rely expressly on such confirmation as the basis therefor).

(b)     This Agreement may also be amended from time to time by the Seller and the Depositor with the consent of the Trustee and the Certificateholders of not less than 66-2/3% of the Class Principal Amount or Class Notional Amount (or Percentage Interest) of each Class of Certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Certificateholders; *provided, however*, that no such amendment may (i) reduce in any manner the amount of, or delay the timing of, payments received on Mortgage Loans which are required to be distributed on any Certificate without the consent of the Certificateholder of such Certificate or (ii) reduce the aforesaid percentages of Class Principal Amount or Class Notional Amount (or Percentage Interest) of Certificates of each Class, the Certificateholders of which are required to consent to any such amendment without the consent of the Certificateholders of 100% of the Class Principal Amount or Class Notional Amount (or Percentage Interest) of each Class of Certificates affected thereby. For purposes of this paragraph, references to "Certificateholder" or "Certificateholders" shall be deemed to include, in the case of any Class of Book-Entry Certificates, the related Certificates Owners.

(c)     It shall not be necessary for the consent of Certificateholders under this Section 2.03 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Section 2.04.
Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND

REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN
ACCORDANCE WITH SUCH LAWS.

Section 2.05.
Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement
shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or
terms shall be deemed severable from the remaining covenants, agreements, provisions or terms
of this Agreement and shall in no way affect the validity or enforceability of the other provisions
of this Agreement.

Section 2.06.
Indulgences; No Waivers.

Neither the failure nor any delay on the part of a party to exercise any right, remedy,
power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or
partial exercise of any right, remedy, power or privilege preclude any other or further exercise of
the same or of any other right, remedy, power or privilege, nor shall any waiver of any right,
remedy, power or privilege with respect to any occurrence be construed as a waiver of such right,
remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective
unless it is in writing and is signed by the party asserted to have granted such waiver, as well as
the Trustee.

Section 2.07.
Headings Not to Affect Interpretation.

The headings contained in this Agreement are for convenience of reference only, and
they shall not be used in the interpretation hereof.

Section 2.08.
Benefits of Agreement.

The parties to this Agreement agree that it is appropriate, in furtherance of the intent of
such parties set forth herein, that the Trustee enjoys the full benefit of the provisions of this
Agreement each as an intended third party beneficiary; *provided, however*, nothing in this
Agreement, express or implied, shall give to any Person, other than the parties to this Agreement
and their successors hereunder, the Trustee and the Certificateholders, any benefit or legal or
equitable right, power, remedy or claim under this Agreement.

Section 2.09.
Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be
deemed to be an original, and all of which together shall constitute one and the same instrument.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 84 of 428   Document 1-1
Case 09-35931-pp   Doc 85-2   Filed 03/01/11   Page 29 of 30

84

IN WITNESS WHEREOF, the Seller and the Depositor have caused their names to be signed hereto by their respective duly authorized officers as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.,
    as Seller


By:     /s/ Joseph J. Kelly
    Name: Joseph J. Kelly
    Title:  Authorized Signatory


STRUCTURED ASSET SECURITIES CORPORATION,
    as Purchaser


By:     /s/ Ellen V. Kiernan
    Name: Ellen V. Kiernan
    Title:  Senior Vice President

Prospectus dated June 20, 2006 (Selected portions)

Web Link
http://www.sec.gov/Archives/edgar/data/1366930/000114420406025644/v045957_fwp.htm

The depositor has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission (the "SEC"). The depositor has or will file with the SEC a registration statement (including a prospectus, any free writing prospectus and any related issuer free-writing prospectus) with respect to this offering (the "Offering Documentation"). You may get the Offering Documentation (when completed) for free by searching the SEC online database (EDGAR®) at www.sec.gov. Alternatively, you may obtain a copy of the Offering Documentation from Lehman Brothers Inc., 745 Seventh Ave., New York, NY, 10019, Attn: Asset Backed Fixed Income Syndicate or by calling 1-800-666-2388, extension 59519.

This free writing prospectus is not required to contain all information that is required to be included in the base prospectus and the free writing prospectus.

The information in this free writing prospectus is preliminary and is subject to completion or change.

The information in this free writing prospectus, if conveyed prior to the time of your commitment to purchase, supersedes information contained in any prior similar free writing prospectus relating to these securities.

**Free Writing Prospectus dated June 20, 2006 (to prospectus dated June 2, 2006)**

**$2,404,833,000 (Approximate)**

**STRUCTURED ASSET INVESTMENT LOAN TRUST**

**Mortgage Pass-Through Certificates, Series 2006-4**

**[AURORA LOGO]**

EXHIBIT
3

**Lehman Brothers Holdings Inc.**

Sponsor and Seller

**Structured Asset Investment Loan Trust 2006-4**

Issuing Entity

**Aurora Loan Services LLC**

Master Servicer

**Structured Asset Securities Corporation**

Depositor

---

**Consider carefully the risk factors beginning on page S-20 of this free writing prospectus and on page 6 of the prospectus.**

For a list of capitalized terms used in this free writing prospectus and the prospectus, see the glossary of defined terms beginning on page S-117 in this free writing prospectus and the index of principal terms on page 204 in the prospectus.

The certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other entity.

This free writing prospectus may be used to offer and sell the certificates offered hereby only if accompanied by the prospectus.

**The trust fund will issue certificates including the following classes offered hereby:**

· **five classes of senior certificates**

· **eight classes of subordinate certificates**

The classes of certificates offered by this free writing prospectus are listed, together with their initial class principal amounts and interest rates, in the table under "The Offered Certificates" on page S-1 of this free writing prospectus. This free writing prospectus and the accompanying prospectus relate only to the offering of the certificates listed in the table on page S-1 and not to the other classes of certificates that will be issued by the issuing entity as described in this free writing prospectus.

Principal and interest will be payable monthly, as described in this free writing prospectus. The first expected distribution date will be July 25, 2006. Credit enhancement for the offered certificates includes excess interest, overcollateralization, subordination, loss allocation and limited cross-collateralization features and primary mortgage insurance. Amounts payable under an interest rate swap agreement and an interest rate cap agreement, both provided by ABN AMRO Bank, N.V., will be applied to pay certain interest shortfalls, maintain

overcollateralization and repay certain losses.

_____

The assets of the trust fund will primarily consist of three pools of conventional, first and second lien, adjustable and fixed rate, fully amortizing and balloon, residential mortgage loans, which were originated in accordance with underwriting guidelines that are not as strict as Fannie Mae and Freddie Mac guidelines.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the certificates or determined that this free writing prospectus or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

The certificates offered by this free writing prospectus will be purchased by Lehman Brothers Inc., as underwriter, from Structured Asset Securities Corporation, and are being offered from time to time for sale to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter has the right to reject any order. Proceeds to Structured Asset Securities Corporation from the sale of these certificates will be approximately [____]% of their initial total class principal amount before deducting expenses.

On or about June 30, 2006, delivery of the certificates offered by this free writing prospectus will be made through the book-entry facilities of The Depository Trust Company, Clearstream Banking Luxembourg and the Euroclear System.

*Underwriter*:

**LEHMANBROTHERS**

**The date of this free writing prospectus is June 20, 2006**

_____

**Important notices about information presented**

**in this free writing prospectus and the accompanying prospectus:**

We provide information to you about the certificates offered by this free writing prospectus in two separate documents that progressively provide more detail: (1) the accompanying prospectus, which provides general information, some of which may not apply to your certificates and (2) this free writing prospectus, which describes the specific terms of your certificates.

_____

We include cross-references in this free writing prospectus and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

**For European Investors Only**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time: (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual

or consolidated accounts; or (c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

S-ii

---

**Table of Contents**

**Free Writing Prospectus**

| | Page |
|---|---|
| The Offered Certificates | S-1 |
| Summary of Terms | S-3 |
| Risk Factors | S-20 |
| Glossary | S-32 |
| Description of the Certificates | S-32 |
| General | S-32 |
| Book-Entry Registration | S-33 |
| Distributions of Interest | S-34 |
| Determination of LIBOR | S-36 |

| | |
|---|---|
| Distributions of Principal | S-37 |
| Credit Enhancement | S-41 |
| Supplemental Interest Trust | S-44 |
| Optional Purchase of the Mortgage Loans | S-48 |
| Fees and Expenses of the Trust Fund | S-49 |
| Description of the Mortgage Pools | S-50 |
| General | S-50 |
| Adjustable Rate Mortgage Loans | S-52 |
| The Index | S-53 |
| Primary Mortgage Insurance | S-53 |
| Pool 1 Mortgage Loans | S-60 |
| Pool 2 Mortgage Loans | S-61 |
| Pool 3 Mortgage Loans | S-61 |
| Static Pool Information | S-61 |
| Material Legal Proceedings | S-61 |
| Affiliations and Relationships | S-61 |
| Additional Information | S-62 |
| The Sponsor | S-62 |
| The Depositor | S-63 |
| Origination of the Mortgage Loans and Underwriting Guidelines | S-63 |
| General | S-63 |
| BNC Mortgage, Inc. | S-63 |
| LBB Underwriting Guidelines | S-68 |
| New Century Mortgage Corporation | S-71 |
| Underwriting Standards of New Century | S-71 |

| | |
|---|---|
| General Underwriting Guidelines | S-76 |
| The Master Servicer | S-78 |
| The Servicers | S-78 |
| General | S-78 |
| Option One Mortgage Corporation | S-79 |
| Wells Fargo Bank, N.A. | S-83 |
| Aurora Loan Services LLC | S-85 |
| JPMorgan Chase Bank, National Association | S-85 |
| Administration of the Trust Fund | S-87 |
| Servicing and Administrative Responsibilities | S-87 |
| Trust Accounts | S-90 |
| Example of Distributions | S-91 |
| Mortgage Loan Servicing | S-92 |
| General | S-92 |
| Servicing Accounts and the Collection Account | S-93 |
| Servicing Compensation and Payment of Expenses | S-93 |
| Waiver or Modification of Mortgage Loan Terms | S-94 |
| Prepayment Interest Shortfalls | S-94 |
| Advances | S-94 |
| Primary Mortgage Insurance | S-94 |
| Collection of Taxes, Assessments and Similar Items | S-95 |
| Insurance Coverage | S-95 |
| Evidence as to Compliance | S-95 |
| Master Servicer Default; Servicer Default | S-96 |
| Amendment of the Servicing Agreements | S-96 |

Custody of the Mortgage Files                                      S-96

The Credit Risk Manager                                            S-96

Optional Purchase of Defaulted Mortgage Loans                      S-97

Special Servicer for Distressed Mortgage Loans                     S-97

Pledge of Servicing Rights                                         S-97

The Trust Agreement                                                S-97

General                                                            S-97

The Issuing Entity                                                 S-97

The Trustee                                                        S-98

The Securities Administrator                                       S-99

Assignment of Mortgage Loans                                       S-100

Representations and Warranties                                     S-101

Certain Matters Under the Trust Agreement                          S-102

Reports to Certificateholders                                      S-105

Voting Rights                                                      S-107

Yield, Prepayment and Weighted Average Life                        S-107

General                                                            S-107

Overcollateralization                                              S-111

Subordination of the Offered Subordinate Certificates              S-111

Weighted Average Life                                              S-111

S-iii

**Page**

| | |
|---|---|
| Material Federal Income Tax Considerations | S-112 |
| General | S-112 |
| Tax Treatment of the Offered Certificates | S-113 |
| Legal Investment Considerations | S-115 |
| ERISA Considerations | S-115 |
| Legal Matters | S-116 |
| Ratings | S-116 |
| Glossary of Defined Terms | S-117 |
| Annex A: Certain Characteristics of the Mortgage Loans | S-A-1 |
| Annex B-1: Assumed Mortgage Loan Characteristics | S-B-1-1 |
| Annex B-2: Principal Amount | |
| Decrement Tables | S-B-2-1 |
| Annex C-1: Swap Agreement | |
| Scheduled Notional Amounts and Rates of Payment | S-C-1-1 |
| Annex C-2: Interest Rate Cap | |
| Agreement Scheduled Notional Amounts and Strike Rate | S-C-2-1 |

S-iv

---

**The Offered Certificates**

The certificates consist of the classes of certificates listed in the tables below, together with the Class B1, Class B2, Class P, Class X, Class LT-R and Class R Certificates. Only the classes of certificates listed in the tables below are offered by this free writing prospectus.

| Class | Related Mortgage Pool(s) | Class Principal Amount[1] | Initial Interest Rate[2] (Interest Rate Formula (until Initial Optional Termination Date)[3][4]) | Interest Rate Formula (after Initial Optional Termination Date)[4][5] | Principal Type | Interest Type | Moody's | S&P | Fitch |
|---|---|---|---|---|---|---|---|---|---|
| A1 | 1 | $747,827,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior | Variable Rate | Aaa | AAA | AAA |
| A2 | 2 | $391,109,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior | Variable Rate | Aaa | AAA | AAA |
| A3 | 3 | $602,379,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior, Sequential Pay | Variable Rate | Aaa | AAA | AAA |
| A4 | 3 | $190,163,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior, Sequential Pay | Variable Rate | Aaa | AAA | AAA |
| A5 | 3 | $ 90,492,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Senior, Sequential Pay | Variable Rate | Aaa | AAA | AAA |
| M1 | 1, 2 & 3 | $157,794,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Aa2 | AA | AA |
| M2 | 1, 2 & 3 | $ 47,705,000 | [___]%LIBOR plus | LIBOR plus | Subordinated | Variable Rate | Aa3 | AA- | AA- |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | [___]% | [___]% | | | | |
| M3 | 1, 2 & 3 | $ 39,143,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | A1 | A+ | A+ |
| M4 | 1, 2 & 3 | $ 36,696,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | A2 | A | A |
| M5 | 1, 2 & 3 | $ 31,803,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | A3 | A- | A- |
| M6 | 1, 2 & 3 | $ 31,803,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Baa1 | BBB+ | BBB+ |
| M7 | 1, 2 & 3 | $ 19,571,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Baa2 | BBB | BBB |
| M8 | 1, 2 & 3 | $ 18,348,000 | [___]%LIBOR plus [___]% | LIBOR plus [___]% | Subordinated | Variable Rate | Baa3 | BBB- | BBB- |

---

(1)   These balances are approximate, as described in this free writing prospectus.

(2)   Reflects the interest rate as of the closing date.

(3)   Reflects the interest rate formula up to and including the earliest possible distribution date on which the master servicer has the option to purchase the mortgage loans as described in this free writing prospectus under "Description of the Certificates— Optional Purchase of the Mortgage Loans."

(4)   Subject to the applicable net funds cap, as described in this free writing prospectus under "Summary of Terms—The Certificates—Payments on the Certificates—Interest Payments."

(5)   Reflects the interest rate formula after the option to purchase the mortgage loans is not exercised by the master servicer on the earliest possible distribution date as described in

this free writing prospectus under "Description of the Certificates—Optional Purchase of the Mortgage Loans."

S-1

The offered certificates will also have the following characteristics:

| Class | Record Date[(1)] | Delay/Accrual Period[(2)] | Interest Accrual Convention | Final Scheduled Distribution Date[(3)] | Expected Final Distribution Date[(4)] | Minimum Denominations[(5)] | Incremental Denominations | CUSIP Number |
|---|---|---|---|---|---|---|---|---|
| A1 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AA 0 |
| A2 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AB 8 |
| A3 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AC 6 |
| A4 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AD 4 |
| A5 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $25,000 | $1 | 86360 W AE 2 |
| M1 | DD | 0 day | Actual/360 | 7/25/2036 | [___] | $100,000 | $1 | 86360 W AF |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| M2 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AG 7 |
| M3 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AH 5 |
| M4 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AJ 1 |
| M5 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AK 8 |
| M6 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AL 6 |
| M7 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AM 4 |
| M8 | DD | 0 day | Actual/360 | 7/25/2036 | [__] | $100,000 | $1 | 86360 W AN 2 |

---

(1)  DD = For any distribution date, the close of business on the business day immediately before that distribution date.

(2)  0 day = For any distribution date, the interest accrual period will be the period beginning on the immediately preceding distribution date (or June 25, 2006, in the case of the first interest accrual period) and ending on the calendar day immediately before the related distribution date.

(3)  The final scheduled distribution date for the offered certificates is based upon the second distribution date after the date of the last scheduled payment of the latest maturing thirty year mortgage loan.

(4)     The expected final distribution date, based upon (a) a constant prepayment rate of 30% per annum and the modeling assumptions used in this free writing prospectus, each as described under "Yield, Prepayment and Weighted Average Life—Weighted Average Life" and (b) the assumption that the option to purchase the mortgage loans is exercised by the master servicer on the earliest possible distribution date as described in this free writing prospectus under "Description of the Certificates—Optional Purchase of the Mortgage Loans." The actual final distribution date for each class of offered certificates may be earlier or later, and could be substantially later, than the applicable expected final distribution date listed above.

(5)     With respect to initial European investors only, the underwriter will only sell offered certificates in minimum total investment amounts of $100,000.


S-2

_____

_____


## Summary of Terms

·   **This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of the offering of the certificates, it is necessary that you read carefully this entire document and the accompanying prospectus.**


·   **While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this free writing prospectus and the accompanying prospectus before making any investment decision.**

- Some of the information that follows consists of forward-looking statements relating to future economic performance or projections and other financial items. Forward-looking statements are subject to a variety of risks and uncertainties, such as general economic and business conditions and regulatory initiatives and compliance, many of which are beyond the control of the parties participating in this transaction. Accordingly, what actually happens may be very different from the projections included in this free writing prospectus.

- Whenever we refer to a percentage of some or all of the mortgage loans in the trust fund, that percentage has been calculated on the basis of the total scheduled principal balance of those mortgage loans as of June 1, 2006, unless we specify otherwise. We explain in this free writing prospectus under "Glossary of Defined Terms" how the scheduled principal balance of a mortgage loan is determined. Whenever we refer in this Summary of Terms or in the Risk Factors section of this free writing prospectus to the total principal balance of any mortgage loans, we mean the total of their scheduled principal balances unless we specify otherwise.

## Parties

### Sponsor and Seller

Lehman Brothers Holdings Inc. will sell the mortgage loans to the depositor.

### Depositor

Structured Asset Securities Corporation, a Delaware special purpose corporation, will sell the mortgage loans to the issuing entity. The depositor's address is 745 Seventh Avenue, New York, New York 10019, and its telephone number is (212) 526-7000.

### Issuing Entity

Structured Asset Investment Loan Trust 2006-4, a common law trust formed under the laws of the State of New York.

**Trustee**

U.S. Bank National Association.

**Securities Administrator**

Wells Fargo Bank, N.A., will be responsible for preparing monthly distribution statements and certain tax information for investors and certain tax filings for the trust fund.

**Master Servicer**

Aurora Loan Services LLC will oversee the servicing of the mortgage loans by the servicers.

**Primary Servicers**

On the closing date, Option One Mortgage Corporation, Wells Fargo Bank, N.A., Ocwen Loan Servicing, LLC, HomEq Servicing Corporation, Aurora Loan Services LLC and JPMorgan Chase Bank, National Association will service approximately 45.36%, 41.05%, 7.31%, 5.42%, 0.86% and less than 0.01%, respectively, of the mortgage loans included in the trust fund.

*See "The Mortgage Loans—Mortgage Loan Servicing" below.*

S-3

## Credit Risk Manager

Clayton Fixed Income Services Inc. will monitor and advise the servicers with respect to default management of the mortgage loans and also prepare certain loan-level reports for the trust fund which will be available for review by certificateholders.

## Originators

BNC Mortgage, Inc., New Century Mortgage Corporation, Lehman Brother Bank, FSB and Finance America, LLC originated approximately 45.36%, 38.43%, 0.86% and 0.22%, respectively, of the mortgage loans to be included in the trust fund. The remainder of the mortgage loans were originated by various other banks, savings and loans and other mortgage lending institutions, none of which originated more than approximately 7.29% of the mortgage loans.

## Swap Counterparty

ABN AMRO Bank, N.V.

## Cap Counterparty

ABN AMRO Bank, N.V.

## LPMI Insurers

On the closing date, Mortgage Guaranty Insurance Corporation, Republic Mortgage Insurance Company and PMI Mortgage Insurance Co. will provide primary mortgage insurance for certain of the first lien mortgage loans with original loan-to-value ratios in excess of 80%.

**The Certificates**

The certificates offered by this free writing prospectus will be issued with the initial approximate characteristics set forth under "The Offered Certificates" in the table on page S-1.

The offered certificates will be issued in book-entry form. The minimum denominations and the incremental denominations of each class of offered certificates are set forth in the table on page S-2.

The certificates represent ownership interests in a trust fund, the assets of which will consist primarily of conventional, adjustable and fixed rate, fully amortizing and balloon, first and second lien, residential mortgage loans having a total principal balance as of the cut-off date, which is June 1, 2006, of approximately $2,446,422,263. In addition, the supplemental interest trust will hold an interest rate swap agreement and an interest rate cap agreement for the benefit of the certificateholders.

For purposes of allocating payments of interest and principal to certificateholders, the mortgage loans to be included in the trust fund will be divided into three mortgage pools: "pool 1," "pool 2" and "pool 3." Pool 1 will consist of those mortgage loans in the trust fund with original principal balances that do not exceed the applicable Fannie Mae maximum original loan amount limitations for one- to four-family residential mortgaged properties. Pool 2 will consist of those mortgage loans in the trust fund with original principal balances that do not exceed the applicable Freddie Mac maximum original loan amount limitations for one- to four-family residential mortgaged properties. Pool 3 will consist of mortgage loans with original principal balances that may be less than, equal to, or in excess of, Fannie Mae or Freddie Mac original loan amount limitations for one- to four- family residential mortgaged properties.

Payments of principal and interest on the Class A1 Certificates, or the "group 1 certificates," will be based primarily on collections from pool 1 mortgage loans. Payments of principal and interest

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 103 of 428   Document 1-1
Case 09-35931-pp   Doc 85-3   Filed 03/01/11   Page 18 of 20

103

on the Class A2 Certificates, or the "group 2 certificates," will be based primarily on collections from pool 2 mortgage loans. Payments of principal and interest on the Class A3, A4 and A5 Certificates, or the "group 3 certificates," will be based primarily on collections from pool 3 mortgage loans. Payments of principal and interest on the Class M1, M2, M3, M4, M5, M6, M7, M8, B1 and B2 Certificates will be based on collections from all of the mortgage pools as described in this free writing prospectus.

The rights of holders of the Class M1, M2, M3, M4, M5, M6, M7, M8, B1 and B2 Certificates to receive payments of principal and interest will be subordinate to the rights of the holders of certificates having a senior priority of payment, as described in this Summary of Terms under "—Enhancement of Likelihood of Payment on the Certificates—Subordination of Payments" below. We refer to the Class M1, M2, M3, M4, M5, M6, M7, M8, B1 and B2 Certificates collectively as "subordinate" certificates. We refer to the Class A1, A2, A3, A4 and A5 Certificates collectively as "senior" certificates.

The Class P Certificates will be entitled to receive all the cash flow from the mortgage pools solely arising from prepayment premiums paid by the borrowers on certain voluntary, full and partial prepayments of the mortgage loans. Accordingly, these amounts will not be available for payments to the servicers or to holders of other classes of certificates.

S-4

The Class X Certificates will be entitled to receive any monthly excess cashflow remaining after required distributions are made to the offered certificates and the Class B1 and Class B2 Certificates.

The Class B1, Class B2, Class X, Class P, Class LT-R and Class R Certificates are not offered by this free writing prospectus.

The offered certificates will have an approximate total initial principal amount of $2,404,833,000. Any difference between the total principal amount of the offered certificates on the date they are issued and the approximate total principal amount of the offered certificates as reflected in this free writing prospectus will not exceed 5%.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 105 of 428   Document 1-1
Case 09-35931-pp   Doc 85-3   Filed 03/01/11   Page 20 of 20

105

# MERSCORP, INC.
## RULES OF MEMBERSHIP

### TABLE OF CONTENTS

| | | |
|---|---|---|
| RULE 1 | MEMBERSHIP | Page 2 |
| RULE 2 | REGISTRATION ON THE MERS® SYSTEM | Page 8 |
| RULE 3 | OBLIGATIONS OF MERS | Page 15 |
| RULE 4 | RULE CHANGES | Page 18 |
| RULE 5 | FEES | Page 19 |
| RULE 6 | PROCEDURES | Page 22 |
| RULE 7 | DISCIPLINARY ACTIONS | Page 23 |
| RULE 8 | FORECLOSURE | Page 25 |
| RULE 9 | USE AND OWNERSHIP OF INFORMATION | Page 28 |
| RULE 10 | INTERIM SECURITY INTERESTS | Page 31 |
| RULE 11 | SERVICES | Page 32 |
| RULE 12 | WARRANTIES | Page 33 |
| RULE 13 | INDEMNIFICATION | Page 37 |
| RULE 14 | NOTIFICATION TO MERS OF PENDING LAWSUITS | Page 39 |



# RULE 1

## MEMBERSHIP

*Section 1.* MERSCORP, Inc. ("MERS") shall make the services of its mortgage electronic registration system (the "MERS® System") available to any Member of MERS. A Member is defined as an organization or natural person who has signed a Membership Agreement and is not more than 60 days past due as to the payment of any fees due and owing to MERS.

*Section 2.* Actions with respect to approval or disapproval of applications for membership shall be taken on behalf of MERS by such persons as may from time to time be designated by the Board of Directors of MERS. Subject to Section 3 of this Rule, no applicant shall be approved unless it meets each of the standards of financial condition, operational capability and character defined below:

(a) If the applicant anticipates registering transactions on the MERS® System, the applicant has demonstrated to the satisfaction of MERS that it has adequate personnel capable of registering transactions on the MERS® System with necessary promptness and accuracy, that such personnel shall complete the computer-based training program designated by MERS, and that the applicant has internal security procedures in place to conform to any condition and requirement which MERS reasonably deems necessary for its protection and the protection of other Members:

vJune2009

2

(b) MERS has received no information which, in the sole discretion of MERS, would adversely reflect on the applicant, or any person associated with the applicant as defined in Section 3 below, to such extent that access of the applicant to the MERS® System should be denied, and any such applicant may be deemed not to meet the qualifications set forth in this paragraph only if:

(i) MERS shall have reasonable grounds to believe that the applicant, or any person associated with the applicant, has been or is responsible for (A) fraud, fraudulent acts or breach of fiduciary duty, (B) making a misstatement of a material fact or omitting to state a material fact to MERS in connection with its application to become a Member, or thereafter while a Member, or (C) the violation of such statutes, rules and regulations applicable to the applicant.

(ii) the applicant, or any person associated with the applicant, has been convicted prior to the filing of its application to become a Member, or at any time thereafter while a Member, of any crime, felony or misdemeanor which involves the purchase, sale or pledge of a mortgage loan or any interest therein or arose out of conduct of the business of funding, acquiring, lending on the security of, or servicing mortgage loans (or any business ancillary or related to any of the foregoing), or involves robbery, larceny, embezzlement, fraudulent conversion, forgery or misappropriation of funds or other property, or other dishonest acts; or

(iii) the applicant has been, or while a Member is, prohibited from transacting business with one or more of the following:      (A) Fannie Mae, (B) Freddie Mac, (C) Ginnie Mae, (D) the U.S. Department of Housing and Urban Development, or (E) the U.S. Department of Veterans Affairs; provided, however, that such prohibition shall not be the sole basis for denial of membership.

(c)  Eligible organizations and natural persons seeking to become Members shall make application on such form as MERS shall from time to time prescribe.  In connection with its application, an applicant shall submit its audited financial statements for its two most recent fiscal years.  MERS shall review the application to verify that the applicant satisfies all of the standards for membership, and in connection therewith the applicant shall make available to MERS such books and records and shall provide such other information as MERS shall reasonably request for such purpose.  Failure of an applicant to cooperate in providing requested books, records, and information shall be grounds for denial of the application for membership.

*Section 3.*      MERS  may  approve  the  application  of  any  applicant,  either unconditionally or on an appropriate temporary or other conditional basis, if MERS in its sole discretion determines that any standard specified in this Rule, as applied to such applicant, or any person associated with such applicant, is unduly or disproportionately severe or that the conduct of such applicant or person associated with such applicant has been such as not to make it against the interest of MERS, the existing Members, and the public to approve such application.  MERS shall notify each applicant of the action taken with respect to its application and the reasons therefore.  For purposes of this Rule, the term "person associated with" when applied to any person or entity shall mean (i) any partner, senior officer, director or controlling person of such

vJune2009                                                   4

Case 2-11-cv-00893-CNC   Filed 09/22/11   Page 109 of 428   Document 1-1        109
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 4 of 43

person or entity or (ii) any officer or employee of such person or entity who has, or shall have, access to the MERS® System.

Section 4. Notwithstanding the foregoing, MERS may decline to accept the application of any applicant upon a determination by MERS that the MERS® System does not have adequate space, data processing capacity or other operational capability at that time to permit the inclusion of additional Members without impairing the ability of the MERS® System to provide services for existing Members; provided, however, that applicants whose applications are denied solely pursuant to this section shall be approved as promptly as the capabilities of the MERS® System permit, in the reasonable judgment of MERS, in the order in which their applications were filed with MERS or in such other order as may be determined by MERS from time to time in its reasonable judgment.

Section 5. An applicant whose application to become a Member has been approved by MERS shall be considered a Member after signing and delivering to MERS a Member Agreement as approved by the Board of Directors of MERS and paying the initial MERS membership fee.

Section 6. Each Member shall immediately notify MERS if at any time it fails to meet any of the membership criteria specified in this Rule.

Section 7. Any Member may withdraw its membership from MERS by giving 90 days written notice to the President or Secretary of the Corporation. Such withdrawal shall be effective

Case 2-11-cv-00893-CNC    Filed 09/22/11    Page 110 of 428    Document 1-1          110
        Case 09-35931-pp    Doc 85-4    Filed 03/01/11    Page 5 of 43

on the ninetieth day after receipt at which time all rights and obligations of the withdrawing

Member shall cease, except any obligation of such Member to pay fees or assessments assessed

prior to withdrawal to the extent such obligation has not been fulfilled and except for any

conditions the Board of Directors may establish for the de-registration of mortgages from MERS,

including fees to defray the costs of such deregistration.

     (a) Any Member that sells, transfers, or otherwise disposes of all or substantially all of its

assets to any entity that is not a member of MERS, shall be treated as having withdrawn from

membership in MERS as of the effective time of such disposition of assets or combination with

such entity unless the acquiring entity signs a Membership Agreement with MERS and as such

shall be bound by the Rules of Membership and Procedures of MERS.

     (b) If any Member that merges or otherwise combines with any other entity and such

other entity is the surviving entity and is a non-Member of MERS, then the Member Agreement

entered into by the Member shall remain in full force and effect as to the non-Member entity

unless the surviving non-Member withdraws from membership or is removed in accordance with

the Rules of Membership or Procedures.

     (c)Members have an affirmative obligation to notify MERS in writing in the event of (i)

any merger or combination with, or acquisition of, another member or (ii)  merger, combination

or acquisition  by another entity.

vJune2009

6

Case 2-11-cv-00893-CNC   Filed 09/22/11   Page 111 of 428   Document 1-1      111
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 6 of 43

(d) Members acknowledge and agree that the Member's Organization Identification Number (Org ID) and each Mortgage Identification Number (MIN) associated with that Org ID are the property of MERS and the use of such Org ID and MINs are subject to the terms and conditions of these Rules and the other Governing Documents for membership.

(e) If a Member sells the contractual rights to service a loan registered on the MERS® System to another Member, then the selling Member shall reflect such transfer on the MERS® System in accordance with MERS rules and procedures and a Seasoned Servicing Transfer Fee in the amount specified in the MERS Fee Schedule in effect at the time the transfer is effective shall be due to MERS for each loan transferred, provided that the transfer date is more than 270 days from the Note Date for that loan. If (i) a Member initiates a servicing transfer transaction on the MERS® System between two Org IDs issued to that Member or (ii) a Member initiates a servicing transfer transaction on the MERS® System to another Member who is affiliated with that Member, then such transfer transaction shall be subject to a Intracompany Transfer Fee for each loan transferred in the amount specified in the MERS Fee Schedule in effect at the time the transfer is effective, provided that the transfer date is more than 270 days from the Note Date for that loan and further provided that the affiliate relationship between the two Org Ids is shown on the MERS® System (i.e., referred to as a Parent/Child relationship in the MERS Procedures).

*Section 8.*      A Member may change its Membership Profile on the MERS® System at any time. Each Member shall designate one individual within its organization as its contact person for all of such Member's dealings with MERS. It is the Member's responsibility to update the MERS® System if the contact person changes.

## RULE 2

## REGISTRATION ON THE MERS® SYSTEM

*Section 1.*      MERS, in its sole discretion, shall determine the type and level of access to the MERS® System permitted to each Member and the types of transactions that such Member may register on the MERS® System.   No Member may register or attempt to register any transaction not authorized under the Rules of Membership or the Procedures.

*Section 2.*      Subject to Section 1 above, each Member may register any mortgage loan on the MERS® System in accordance with the Procedures.

*Section 3.*      Each Member shall promptly, or as soon as practicable, register on the MERS® System, in accordance with the Rules of Membership and the Procedures, any and all of the following transactions to which such Member is a party which involve a mortgage loan registered on the MERS® System until such time as the mortgage loan is deactivated from the MERS® System:

(a) the pledge of any mortgage loan or security interest therein and the corresponding release of such security interests;

(b) the pledge of any servicing rights or security interest therein and the corresponding release of such servicing rights or security interests;

vJune2009                                                 8

Case 2-11-cv-00893-CNC    Filed 09/22/11    Page 113 of 428    Document 1-1      113
Case 09-35931-pp    Doc 85-4    Filed 03/01/11    Page 8 of 43

(c) the transfer of beneficial ownership of a mortgage loan by a Member to a Member;

(d) the transfer of beneficial ownership of a mortgage loan by a non-Member to a Member;

(e) the transfer of beneficial ownership of a mortgage loan by a Member to a non-Member;

(f) the transfer of servicing rights with respect to a mortgage loan by a Member to a Member;

(g) the registration of servicing rights with respect to a mortgage loan from a non-Member to a Member;

(h) the transfer of servicing rights with respect to a mortgage loan from a Member to a non-Member (requiring deactivation);

(i) the initiation of foreclosure of any mortgage loan registered on the MERS® System;

(j) the release of a lien with respect to a mortgage loan registered on the MERS® System;

(k) the creation of a sub-servicing relationship with respect to a mortgage loan registered on the MERS® System; and

(l) any renewal, extension or modification of a mortgage loan registered on the MERS® System that involves the recording of a new security instrument and does not merely change the rate, principal balance or term.

*Section 4.* (a) The transfer to a non-Member of servicing rights with respect to a mortgage loan registered on the MERS® System shall require the deactivation of such mortgage loan from the MERS® System in accordance with these Rules and the Procedures. Upon the withdrawal or removal of a Member, all mortgage loans for which such Member acts as servicer shall be deactivated from the MERS® System, provided, however, that the mortgage loans shall remain registered with MERS if the substitute servicer is a Member and all MERS fees relating to the servicing transfer to the substitute servicer are paid. The transfer to a non-Member of a beneficial interest in a mortgage loan registered on the MERS® System shall not require the de-registration of such mortgage loan from the MERS® System unless: (i) the servicer is a non-Member of MERS or (ii) such non-Member beneficial owner shall require deactivation.

(b) As long as there are no contrary instructions, when the beneficial ownership of a mortgage loan registered on the MERS® System is vested in a non-Member, MERS and Mortgage Electronic Registration Systems, Inc. shall at all times comply with the instructions of the Member shown on the MERS® System as the servicer of such mortgage loan

with respect to transactions relating to such mortgage loan. Such Member shall indemnify and hold harmless MERS, and any employee, director, officer or affiliate of MERS, for any and all liability incurred as a result of compliance by MERS with instructions given by such Member on behalf of the non-Member beneficial owner.

Section 5. *(a)* Each Member, at its own expense, shall cause Mortgage Electronic Registration Systems, Inc., to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. Mortgage Electronic Registration Systems, Inc. is a wholly owned subsidiary of MERS created for the purpose of serving as the mortgagee of record in the appropriate public records. The Member shall monitor the public records to verify that it has complied with the preceding sentence and shall maintain an adequate quality assurance program to ensure that its verification procedures are effective. The Member hereby warrants to MERS that either (i) an appropriate mortgage, or deed of trust, or other such instrument as may be required under applicable state law, naming Mortgage Electronic Registration Systems, Inc. as mortgagee, or (ii) an appropriate assignment of mortgage, or assignment of deed of trust, or other such instrument as may be required under applicable state law, naming Mortgage Electronic Registration Systems, Inc. as mortgagee, has been or as soon as practicable shall be, properly prepared and delivered to the appropriate recording office and the Member shall promptly register on the MERS® System the date on which such instrument was delivered. As soon as practicable, the Member shall register on the MERS® System the specific recordation information provided by the custodian of public records which evidences that Mortgage Electronic Registration Systems, Inc. is mortgagee of record with respect to such mortgage loan. Upon the Member's becoming aware of any discrepancy between

the information shown on the MERS® System and the information in the public records, the Member shall promptly correct the information on the MERS® System.

(b) At or prior to the time a Member registers a mortgage loan on the MERS® System, such Member shall provide evidence reasonably satisfactory to MERS demonstrating that Mortgage Electronic Registration Systems, Inc. is, or as soon as practicable shall be, properly recorded as mortgagee of record in the appropriate public records with respect to such mortgage loan.

(c) Mortgage Electronic Registration Systems, Inc. shall not act as mortgagee of record for the purpose of procuring borrowers for the Member or making mortgage loans on behalf of the Member.

(d) Reference herein to "mortgage(s)" shall include deed(s) of trust, and any other form of security instrument under applicable state law. References herein to "mortgagee of record" shall include the named beneficiary under a deed of trust in those jurisdictions where deeds of trust are used to secure loans, and any similar status as used in connection with any other form of security instrument under applicable state law.

*Section 6.* MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes. In the absence of contrary instructions from the beneficial owner, MERS and Mortgage Electronic Registration Systems, Inc. may rely on instructions from the servicer shown on the MERS® System in accordance with these Rules and the Procedures

with respect to transfers of beneficial ownership, transfers of servicing rights, and releases of security interests applicable to such mortgage loan. The beneficial owner shall give any such contrary instructions to MERS and Mortgage Electronic Registration Systems, Inc. in writing and they may rely on such instructions until receipt of further written instructions from the beneficial owner.

*Section 7.* Each Member shall review for accuracy and completeness all information shown on the MERS® System with respect to mortgage loans and related transactions registered by such Member, and promptly update any incorrect information.

*Section 8.* Within ten (10) business days of receiving notice from the Member servicing the loan that the mortgage loan has been paid in full, MERS shall give notice to all Members shown on the MERS® System as having interests in such mortgage loan. The Member servicing the mortgage loan shall be responsible, at its own expense, to:

(a) take, or cause to be taken, appropriate action, including delivery to the appropriate recording office of an instrument of satisfaction or release (which may be signed by a certifying officer of Mortgage Electronic Registration Systems, Inc.), to extinguish the lien of such mortgage in the proper manner within the applicable state imposed time frames, and register on the MERS® System the date of such action, or

(b) notify MERS that, in fact, the mortgage loan has not been paid in full. If MERS is notified that a lien release has not been executed in compliance with applicable state

imposed time frames, and the Member fails to take such action or give MERS notice that the mortgage loan has not been paid in full, then MERS reserves the right to release such mortgage. Such Member, upon demand, shall reimburse Mortgage Electronic Registration Systems, Inc. for its out-of-pocket costs in connection with release of the mortgage, including any penalties for failure to release the mortgage or take other action in a timely manner, and shall pay an administrative fee determined by Mortgage Electronic Registration Systems, Inc., and

(c) indemnify MERS and Mortgage Electronic Registration Systems, Inc. with respect to any liability which may arise as a result of the failure of such Member to take such action or give MERS such notice in a timely and accurate manner. Without limiting the generality of the foregoing, such indemnification shall extend to circumstances in which a mortgage is released by Mortgage Electronic Registration Systems, Inc., but the mortgage loan has not been paid in full, or in which such Member wrongfully refuses to authorize Mortgage Electronic Registration Systems, Inc. to release the mortgage.

# RULE 3

## OBLIGATIONS OF MERS

*Section 1.*    MERS shall within two (2) business days forward to the appropriate Member or Members, in the form prescribed by and otherwise in accordance with the Procedures, all properly identified notices, payments, and other correspondence received by MERS with respect to mortgage loans registered on the MERS® System for which Mortgage Electronic Registration Systems, Inc. serves as mortgagee of record.

*Section 2.*    MERS shall provide to Members certain standard reports concerning information contained on the MERS® System, as specified in the Procedures, and such other reports as MERS may determine from time to time.

*Section 3.*    (a)    Upon request from the Member, Mortgage Electronic Registration Systems, Inc. shall promptly furnish to the Member, in accordance with the Procedures, a corporate resolution designating one or more officers of such Member, selected by such Member, as "certifying officers" of Mortgage Electronic Registration Systems, Inc. to permit such Member (i) to release the lien of any mortgage loan registered on the MERS® System to such Member, (ii) assign the lien of any mortgage naming MERS as the mortgagee when the Member is also the current promissory note-holder, or if the mortgage is registered on the MERS® System, is shown to be registered to the Member, (iii) to foreclose upon the property securing any mortgage loan registered on the MERS® System to such Member, (iv) to take any and all actions necessary to protect the interest of the Member or the beneficial owner of a mortgage loan in any bankruptcy

proceeding regarding a loan registered on the MERS® System that is shown to be registered to the Member, (v) to take such actions as may be necessary to fulfill such Member's servicing obligations to the beneficial owner of such mortgage loans (including mortgage loans that are removed from the MERS® System as a result of the transfer thereof to a non-Member), (vi) to take action and execute all documents necessary to refinance, amend or modify any mortgage loan registered on the MERS® System to such Member, (vii) endorse checks made payable to MERS to the Member that are received by the Member in payment on any mortgage loan registered on the MERS® System that is shown to be registered to the Member. In instances where Mortgage Electronic Registration Systems, Inc. designates an officer of a Member as a certifying officer of MERS for the limited purposes described above, such Member shall indemnify MERS and any of its employees, directors, officers, agents or affiliates against all loss, liability and expenses which they may sustain as a result of any and all actions taken by such certifying officer.

(b) Upon request by Mortgage Electronic Registration Systems, Inc. , the Member shall deliver to Mortgage Electronic Registration Systems, Inc. a corporate resolution naming the Corporate Secretary of Mortgage Electronic Registration Systems, Inc. as a "certifying officer" of the Member solely for the purpose of installing Mortgage Electronic Registration Systems, Inc. as mortgagee of record on mortgage loans which have been registered on the MERS® System by the Member.

(c) At the request of the beneficial owner of a mortgage loan, or any designee thereof as shown on the MERS® System, Mortgage Electronic Registration Systems, Inc. shall provide to such beneficial owner or designee a recordable assignment for such mortgage loan to

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 121 of 428   Document 1-1
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 16 of 43

121

another party designated by the beneficial owner or designee; provided, however, that such beneficial owner or designee shall warrant to Mortgage Electronic Registration Systems, Inc. that such assignment shall be promptly recorded. Requests for recordable assignments may be made only for purposes of deactivating a mortgage loan from the MERS® System. The deactivation of a mortgage loan for any reason shall be subject to the payment of all applicable fees and expenses, including, without limitation, the costs of preparing and recording the assignment. All such applicable fees and expenses shall be included in a fee schedule.

*Section 4.* Unless otherwise specifically stated herein, any action required or permitted to be taken by MERS or Mortgage Electronic Registration Systems, Inc. pursuant to these Rules shall be taken on behalf of MERS by such persons as may from time to time be designated by the respective Boards of Directors of MERS and Mortgage Electronic Registration Systems, Inc.

vJune2009

17

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 122 of 428   Document 1-1      122
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 17 of 43

## RULE 4

## RULE CHANGES

*Section 1.*        (a)  MERS shall notify in writing all Members of any proposed changes to the Rules of Membership, and shall provide a copy of such proposed changes to all Members no fewer than ninety (90) days prior to the proposed implementation date of such changes.


(b)  Members may submit to MERS for its consideration their comments with respect to any such proposal, and such comments shall be reviewed by MERS and filed with the records kept by MERS.  Notwithstanding the receipt of any such comments, the Board of Directors of MERS, in its sole discretion, shall have the right to amend, add to or repeal any Rule or part thereof after the expiration of such ninety (90) day comment period, so long as such amendment is not contrary to the Certificate of Incorporation of MERS.


(c)  Each Member shall be bound by any amendment to the Rules with respect to any transaction occurring subsequent to the time such amendment takes effect as fully as though such amendment were now a part of the Rules; provided, however, that no such amendment shall affect the Member's right to withdraw from MERS in accordance with the procedures set forth in these Rules before such amendment or change becomes effective.


(d)        MERS shall provide a ninety (90) day written notice for any changes to the MERS Membership Terms and Conditions.

## RULE 5

## FEES

*Section 1.* (a) Each Member shall pay such fees, charges and assessments to MERS for membership, registrations, transfers, and other transactions on the MERS® System and other services rendered by MERS as shall be determined from time to time by MERS in its sole discretion, and specified in a fees schedule promulgated by MERS which may change from time to time.

(b) MERS shall provide all Members with at least thirty (30) days advance written notice of changes to the fees schedule with the effective date of the new fees.

(c) Transaction fees for the transfer of servicing between MERS Members (including Intra-company Transfers) shall be payable by the transferor. If the transferor fails to pay such transaction fees due to bankruptcy, or because the transferor is no longer in business or cannot otherwise be located or contacted, MERS will invoice the transferee and the immediate payment of those transaction fees shall be the responsibility of the transferee. Any monies received by MERS from the bankruptcy estate of the transferor shall be applied as a credit to the transferee's MERS account. MERS has invoked this provision because the transferee has received the benefit of the service provided by MERS and is in the best position to protect itself by holding back a portion of the purchase price when purchasing the corresponding loans. The transferee will also be responsible for the cost if the servicing transfer transactions have not been initiated on the MERS® System, and the transferor cannot initiate the transactions themselves due to the circumstances listed in the preceding sentence and the transferee requests such transaction to be initiated by MERS. If the transferee fails to pay any transaction fees by the invoice due date,

vJune2009                                          19

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 124 of 428   Document 1-1      124
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 19 of 43

MERS may suspend the transferee's access to the MERS® System pending the payment in full by the transferee of such transaction fees.

(d)     If a Member registers a mortgage loan on the MERS® System pursuant to the Rules of Membership and Procedures, and that Member subsequently transfers the servicing rights to that mortgage loan to another Member without first paying the registration fee to MERS pursuant to Rule 5, Section 1(a), and the transferor fails to pay such transaction fees due to bankruptcy, or because the transferor is no longer in business or cannot otherwise be located or contacted, MERS will invoice the transferee and  the immediate payment of those transaction fees shall be the responsibility of the transferee.   Any monies received by MERS from the bankruptcy estate of the transferor shall be applied as a credit to the transferee's MERS account. MERS has invoked this provision because the transferee has received the benefit of the service provided by MERS and is in the best position to protect itself by holding back a portion of the purchase price when purchasing the corresponding loans.  If the transferor has not registered the mortgage loan on the MERS® System and is unable to register the mortgage loan due to bankruptcy, or because the transferor is no longer in business or cannot otherwise be located or contacted, then the transferee must register the mortgage loan and pay the corresponding registration fee pursuant to Rule 5, Section 1(a).   If the transferee fails to pay any transaction fees by the invoice due date, MERS may suspend the transferee's access to the MERS® System pending the payment in full of such transaction fees.


*Section 2.*     MERS shall have the authority to charge a Member for any unusual expenses caused directly or indirectly by such Member, or incurred at its request, including, without limitation, the cost of producing records pursuant to a court order or other legal process

in any litigation or other legal proceeding to which such Member is a party or in which such records relating to such Member are so required to be produced, whether such production is required at the instance of such Member or of any other person, provided however, that MERS shall give the Member written notice of such Court Order or legal process in advance of producing the records to enable the Member to pursue its legal rights to refuse the request.

*Section 3.* Each Member shall pay interest on any delinquent fee payments at the rate set from time to time by MERS. Said interest rate shall be specified in the fees schedule.

*Section 4.* Whenever a Member receives notice of a foreclosure proceeding, service of process on a lawsuit naming MERS as a defendant, or a code violation notice, that is forwarded to the Member by MERS on a property where MERS holds a lien or held a lien for that Member, the Member has an affirmative duty to MERS to review the document and respond accordingly. This includes retaining counsel to defend MERS against any possibility of a monetary judgment against MERS. If the lawsuit or document involves a foreclosure action with MERS holding a lien on behalf of the Member, and the Member determines not to contest the foreclosure or answer the lawsuit, the Member should inform the foreclosing party to send subsequent documents in the lawsuit or foreclosure to MERS c/o of the Member's address.

If MERS determines that MERS receipt of mail involving a foreclosure proceeding, lawsuit or code violation resulted from a violation of any of the MERS Rules or Procedures, then MERS shall be entitled to charge the Member a fee of $12.00 for each filing or document in the proceeding or for each piece of mail received related to the code violation that MERS forwards to the Member beyond the initial service of process or notification that MERS received on behalf of that Member.

# RULE 6

## PROCEDURES

*Section 1.* (a)   MERS shall prescribe from time to time reasonable Procedures with respect to the business and operation of MERS and Mortgage Electronic Registration Systems, Inc. and the execution of transactions on the MERS® System.  Each Member shall be bound by such Procedures and any amendment thereto in the same manner as it is bound by the provisions of the By-Laws and these Rules.

(b) MERS shall give Members sixty (60) days notice prior to implementation of any amendment to the Procedures.

# RULE 7

## DISCIPLINARY ACTIONS

*Section 1.*  MERS, in its sole reasonable discretion may sanction a Member for one or more violations of these Rules or the Procedures or for errors, delays or other conduct detrimental to the operation of MERS or Mortgage Electronic Registration Systems, Inc., the MERS® System or other Members, including, without limitation, a Member's failure to provide adequate training and supervision to its employees to enable proper use of the MERS® System, by imposing any of the following:

> (a) removal as a Member, but only if the notice requirements of Rule 7, Section 2 below have been met by MERS;

> (b) suspension, for a period and upon terms determined by MERS;

> (c) fines, in an amount determined by MERS;

> (d) censure; or

> (e) any other fitting requirements that may be determined by MERS.

*Section 2.*  MERS shall give written notice to the applicable Member of the terms of any such violation and possible sanction, which shall include a brief description of the basis for the imposition of the sanction.  The Member shall then have fifteen (15) days from the date of receipt of the notice to provide a written response and have an opportunity to be heard.  At the expiration of the fifteen (15) days, if MERS determines that a breach has occurred and that sanctions may be imposed, the Member shall be given thirty (30) days to cure the breach.  If the breach is not cured within the thirty (30) days, MERS may impose such sanctions on the

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 128 of 428   Document 1-1      128
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 23 of 43

Member.  If the Member does not cure the breach during the thirty (30) day curing period, then upon the expiration of the curing period, MERS shall notify any other member of MERS for whom the breaching Member acts as an authorized servicer or sub-servicer of mortgage loans registered on the MERS® System.

*Section 3.*  If the nature of the breach is the same or similar to a breach by the Member that has occurred within the last year, there may not be a curing period.

# RULE 8

## FORECLOSURE

*Section 1.*    (a)    With respect to each mortgage loan for which Mortgage Electronic Registration Systems, Inc. is the mortgagee of record, the beneficial owner of such mortgage loan or its servicer shall determine whether foreclosure proceedings with respect to such mortgage loan shall be conducted in the name of Mortgage Electronic Registration Systems, Inc., the name of the servicer, or the name of a different party to be designated by the beneficial owner.

(b)    The Member servicing a mortgage loan registered on the MERS® System shall be responsible for processing foreclosures in accordance with the applicable agreements between such Member and the beneficial owner of such mortgage loan.

(c)    In the State of Florida, the authority to conduct foreclosures in the name of MERS granted to a Member's Certifying Officers under Paragraph Three of the Member's MERS Corporate Resolution is revoked. Effective June 1, 2006, the Member shall be sanctioned $10,000.00 per violation for commencing a foreclosure in Florida in the name of MERS.

(d)    In the event that the beneficial owner or its designated servicer determines that foreclosure proceedings shall be conducted in the name of a party other than Mortgage Electronic Registration Systems, Inc., the servicer designated on the MERS® System shall cause to be made an assignment of the mortgage from Mortgage Electronic Registration Systems, Inc. to the person designated by the beneficial owner, and such beneficial owner shall pay all recording costs in connection therewith.

*Section 2:*    (a)    If a Member chooses to conduct foreclosures in the name of Mortgage Electronic Registration Systems, Inc., the note must be endorsed in blank and in possession of one of the Member's MERS certifying officers. If the investor so allows, then MERS can be designated as the note-holder.

(i)    The Member shall not plead MERS as the note-owner in any foreclosure document; including but not limited to, the foreclosure complaint.

(ii)    The Member shall not plead MERS as a co-plaintiff in a foreclosure action.

(iii)  If the note is lost or cannot be located, the Member shall not commence a foreclosure action in the name of MERS, but rather must assign the mortgage out of MERS.

(b)  In non-judicial foreclosure states, if the Member chooses to foreclose in MERS name under the power of sale provision in the security instrument and is not seeking a deficiency judgment, then the note does not need to be in the possession of the Member's MERS Certifying Officer when commencing the foreclosure action; provided, however, that under no circumstances may the Member allege that the note is in their possession unless it so possesses.

(c)  If the Member pleads MERS as the note-owner or as a co-plaintiff or commences a foreclosure in the name of MERS when the note is lost or cannot be located, it shall be considered a violation of the MERS Membership Rules and MERS may dismiss such foreclosure action.   Effective June 1, 2006, the Member shall be sanctioned $1,000.00 for the first violation and $5,000.00 for each subsequent violation of this Rule.

(d)  For all foreclosures conducted in the name of MERS, the member shall take all reasonable and necessary steps to avoid having Mortgage Electronic Registration Systems, Inc. take title to the applicable property that is the subject of a mortgage loan. Mortgage Electronic Registration Systems, Inc. shall not be obligated to take title to any property that is the subject of a mortgage loan; provided, however, that if the Member so requests, Mortgage Electronic Registration Systems, Inc. may take title at the conclusion of the foreclosure sale upon prior written consent to the Member from Mortgage Electronic Registration Systems, Inc. If title is taken in the name of Mortgage Electronic Registration Systems, Inc., the Member

shall take all necessary and reasonable steps to remove Mortgage Electronic Registration Systems, Inc. from title as soon as possible.

      (e)  If title is put into Mortgage Electronic Registration Systems, Inc.'s name and there is a violation of state, county or city codes or any other applicable regulation; including, but not limited to, non-payment of tax bills, the Member shall be responsible to promptly take all necessary action to prevent fines or judgments from being entered against MERS. If the Member fails to do so, MERS may take such action and will sanction the member for all costs and expenses; including, but not limited to, attorney fees.

## RULE 9

## USE AND OWNERSHIP OF INFORMATION

*Section 1* (a) Each Member shall at all times keep confidential and shall not sell or otherwise disclose any information contained on the MERS® System that is (i) not owned by such Member, (ii) was not originally provided by Member to MERS, or (iii) not available in public records or otherwise known to the Member. MERS and the Member shall use a reasonable degree of care consistent with the Standards for Safeguarding Customer Information (16 C.F.R. parts 314) (the "Safeguards Rule") to preserve the confidentiality of any such information, and to take all reasonable action by instruction, agreement or otherwise with its directors, officers, employees, affiliates and agents to satisfy its obligation with respect to confidentiality, non-disclosure and limitation of use of any such information. The obligations of MERS and the Member under this Rule 9 shall survive termination of this agreement

(b) MERS shall have no ownership rights whatsoever in or to any information contained on the MERS® System. Notwithstanding the foregoing, MERS is authorized to (i) use the information contained on the MERS® System to compile transaction volume reports to track current or previous usage levels, project future usage and provide the mortgage industry with usage data which may be used to gauge the success of the MERS® System, but excluding any references to a particular borrower name or address other than in reports given to the MERS Board of Directors, (ii) use the information contained on the MERS® System as part of its quality control process to monitor compliance with operational standards and time frames, (iii) furnish any information contained on the MERS® System to any governmental authority pursuant to a subpoena or court order, provided, however, that MERS

shall undertake, to the extent it reasonably can under the circumstances, to notify all Members shown on the MERS® System as having an interest in a mortgage loan which is the subject of such subpoena or court order to allow such Members time to attempt to quash such subpoena or court order, or (iv) provide information and reports (as approved by the Board) regarding mortgage activity and mortgage loans registered on the MERS® System that otherwise could have been obtained through the public land records if not for the implementation of MERS.

(c) Any reports given to third parties shall not identify individual Members or borrower names and addresses as to transaction information without the Member's prior consent.

*Section 2.* (a) MERS acknowledges and agrees that: (a) the Member will be entering customer information into the MERS® System to which MERS has access as a part of the services provided to the Member, and (b) such customer information is subject to Section 1 of Rule 9 of the MERS Rules of Membership – "Use and Ownership of Information".

(b) MERS has implemented and will maintain an information security program consisting of reasonable administrative, physical, and technical safeguards designed to meet the Objectives set forth in 16 C.F.R. 314.3(b) of the Safeguards Rule.

MERS's controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System are generally described in the MERS Integration Handbook (Volumes I and II). MERS believes the controls and procedures so

vJune2009       29

Case 2:11-cv-00893-CNC Filed 09/22/11 Page 134 of 428 Document 1-1    134
Case 09-35931-pp Doc 85-4 Filed 03/01/11 Page 29 of 43

described meet the Objectives specified in the Safeguards Rule. MERS agrees to maintain controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System that are no less stringent than those described in the current version of the MERS Integration Handbook. MERS further agrees that any changes or modifications to such controls and procedures will also be designed to meet the Objectives specified in the Safeguards Rule. Each Member shall inform MERS in writing whenever the Member believes that the controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System fail to meet the Objectives specified in the Safeguards Rule. MERS agrees the Member (or a mutually agreeable third party representative) will be given access to monitor that MERS has satisfied the provisions of this paragraph, including access to any audits, summaries of test results or other equivalent evaluations of the controls and procedures designed to safeguard the confidentiality and security of the information stored on the MERS® System. MERS will promptly report to the Member any actual or suspected breach of the confidentiality or security of any information contained on the MERS® System.

(c) As part of the controls and procedures described in paragraph (b) of this section, MERS maintains, and will continue to maintain, a Disaster Recovery Plan, a summary of which will be supplied to the Member upon request. MERS agrees that the Disaster Recovery Plan will be reviewed at least annually and will include annual testing to ensure that the MERS® System can be restored within 48 hours after the declaration of a disaster under the plan.

# RULE 10

## INTERIM SECURITY INTERESTS

*Section 1.* The pledge of a security interest in any mortgage loan registered on the MERS® System to an interim funding lender, such as a warehouse lender, shall be shown as released on the MERS® System when the security interest has been released in accordance with the methods and procedures established among the interim funding lender, the lender granting the security interest and the subsequent purchaser of such mortgage loan, if any, as specified below.

*Section 2.* An interim funding lender's security interest shall be shown as released on the MERS® System: (i) for investors selecting Option 1 of the Procedures, when the beneficial owner registers its interest on the MERS® System; or (ii) for investors selecting Option 2 of the Procedures, when the beneficial owner registers its ownership of the loan and the interim funding lender registers the release of its security interest on the MERS® System.

*Section 3.* In the event that Member provides to MERS specific wiring instruction information relating to mortgage loans registered on the MERS® System, MERS and Member agree that: (i) such information is for informational purposes only, (ii) Member makes no representations or warranties about the accuracy and completeness of such information, and (iii) Member shall not be liable to MERS, any other member, or any other party based on the provision of, and reliance on, such information.

## RULE 11

## SERVICES

MERS shall provide, either directly or through a third party, all services, resources, software, equipment and facilities (collectively, the "Services") as determined from time to time by the Board of Directors of MERS and described more particularly in the Procedures. MERS shall provide the Services in compliance with reasonable performance standards (the "Performance Standards") as determined from time to time by the Board of Directors of MERS and described more particularly in the Procedures.

vJune2009

32

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 137 of 428   Document 1-1
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 32 of 43

137

# RULE 12

## WARRANTIES

*Section 1.* <u>Work Standards</u>. MERS represents and warrants that the Services shall be rendered with promptness and diligence in accordance with the practices and high professional standards used in well-managed operations performing services similar to the Services and shall be performed in a workmanlike and cost effective manner. MERS represents and warrants that it shall use, and shall require all third-party vendors to use, adequate numbers of qualified personnel with suitable training, education, experience, and skill to perform the Services and satisfy the Performance Standards.

*Section 2.* <u>Maintenance</u>. MERS represents and warrants that the equipment and software used in the performance of the Services shall be maintained so that they operate in accordance with the Performance Standards, including (i) maintaining such equipment in good operating condition, subject to normal wear and tear, (ii) undertaking prudent repairs and preventive maintenance on such equipment, and (iii) performing prudent software maintenance, including timely updating software used in the performance of the Services, including the MERS® System, to meet any applicable legal or regulatory changes.

*Section 3.* <u>Technology.</u> MERS represents and warrants that the Services shall be provided using proven technology which shall take advantage of technological advancements in the industry.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 138 of 428   Document 1-1    138
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 33 of 43

*Section 4.* <u>Non-Infringement.</u>  MERS represents and warrants that it shall, and shall require its Third Party Vendors to, perform its responsibilities in a manner that does not infringe, or constitute an infringement or misappropriation of, any patent, copyright, trademark, trade secret or other propriety rights of any third party.

*Section 5.* <u>Software Ownership or Use.</u>  MERS represents and warrants that, with respect to the software used in the performance of the Services, it either owns, or is authorized to use, the software in the performance of the Services.

*Section 6.* <u>Authorization.</u>  MERS represents and warrants that it has the requisite corporate power and authority to carry out its responsibilities.

*Section 7.* <u>Viruses.</u>  MERS represents and warrants that it and any third-party vendors providing the Services shall not code or introduce any Viruses (defined herein) into the MERS® System and any other systems and software used to provide the Services and it shall take reasonable business precautions to ensure that no Viruses are coded or introduced into the MERS® System and any other systems and software used to provide the Services.  The term "Viruses" shall mean any (i) program code, programming instruction or set of instructions intentionally construed with the ability to damage, interfere with or otherwise adversely affect computer programs, data files or operations; or (ii) other code typically designated to be a virus.

*Section 8.* <u>Disabling Code.</u>  MERS represents and warrants that it and any third-party vendor providing the Services shall not insert into the MERS® System and in any other systems

and software used to provide the Services any code which would have the effect of disabling or otherwise shutting down all or any portion of the MERS® System or Services.

Section 9.   Millennium Compliant.   MERS represents and warrants that the MERS® System shall have the ability to provide all of the following functions:  (a) consistently handle date information before, during and after January 1, 2000, including without limitation accepting date input, providing date output, and performing calculations on dates or portions of dates; (b) function accurately and without interruption before, during and after January 1, 2000, without change in operations associated with the advent of the new century; (c) respond to two-digit year-date input in a way that resolves any ambiguity as to century in a disclosed, defined, and predetermined manner; and (d) store and provide output of date information in ways that are unambiguous as to century.

Section 10.   Licensing and Qualification.  MERS and Mortgage Electronic Registration Systems, Inc. represents and warrants that each has obtained all state licenses and has qualified to conduct business in all fifty states and the District of Columbia where such licensing and/or qualification is required by law for an entity serving as mortgagee of record, solely as nominee, in an administrative capacity, for the beneficial owner thereof.

Section 11.   Disaster Recovery Plan.      MERS represents and warrants to the Member that it has in place and will continue to maintain a fully effective disaster recovery plan. MERS will routinely (no less often than once per year) test its disaster recovery plan to ensure its

continued effectiveness and capability of protecting its Members in the event of a disaster.

MERS will provide the results of such test to the a Member in writing upon request.

# RULE 13

## INDEMNIFICATION

*Section 1.* MERS and Mortgage Electronic Registration Systems, Inc. agree to indemnify the Member and the Member agrees to indemnify MERS and Mortgage Electronic Registration Systems, Inc. in accordance with Section 9 of the MERS Terms and Conditions . In addition to Section 9 of the Terms and Conditions, the following provisions shall apply:

    (a) the indemnified party may but shall not be obligated to participate in the defense at its own expense and using counsel of its own choosing; provided, however, that the indemnifying party has the right to control the defense.

    (b) the indemnified party shall cooperate and provide assistance as the indemnifying party reasonably requests and shall be entitled to recover reasonable costs of providing assistance.

    (c) the indemnifying party shall keep the indemnified party informed on status of claim and litigation.

    (d) the indemnifying party shall not, without indemnified party's written consent, compromise or settle the claim if such compromise or settlement would impose an injunction or other equitable relief upon indemnified party or such compromise or settlement does not include the third party's release of the indemnified party.

(e) if indemnifying party fails to timely defend, contest or otherwise protect against the claim and fails to contest in writing the indemnified party's right to indemnification, the indemnified party may, but shall not be obligated to defend and make any compromise or settlement and recover the costs thereof from the indemnifying party.

(f) If the indemnifying party contests in writing the indemnified party's right to indemnification, then the indemnified party shall defend the claim and may seek to recover all expenses paid by the indemnified party from the indemnifying party, and if successful, shall not be liable to pay the fees and expenses of initiating the mediation or arbitration pursuant to the Member Agreement.

vJune2009

38

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 143 of 428   Document 1-1        143
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 38 of 43

# RULE 14

## NOTIFICATION TO MERS OF PENDING LAWSUITS

## AND ADDITIONAL INDEMNIFICATION PROVISIONS

Section 1. The provisions set forth in this Rule 14 are in addition to those provisions set forth in Rule 13 of the MERS Rules of Membership and Paragraph 9 of the MERS Membership Terms and Conditions. To the extent that any provision of this Rule 14 conflicts with any provision of Rule 13 of the MERS Rules of Membership or Paragraph 9 of the MERS Membership Terms and Conditions, the provisions of this Rule 14 shall control.

Section 2. Without regard to responsibility under Paragraph 9 of the MERS Membership Terms and Conditions:

(a)     It is the Member's affirmative duty to immediately notify MERSCORP, Inc. of any and all lawsuits or written threats to initiate lawsuits that (i) involve a mortgage loan in which the Member has ownership rights, servicing or subservicing rights, secured interests, or any other significant right or interest, and (ii) name (or threaten to name) MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (whether or not the Member is also a named party).

(b)     The Member shall notify MERSCORP, Inc. of any claims that are filed against MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (whether or not the Member is also a named party) in response to a proceeding initiated by such Member (either in its own name or in the name of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc.), including without limitation counterclaims that are filed in response to a

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 144 of 428   Document 1-1          144
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 39 of 43

foreclosure action commenced by the Member in the name of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc.

(c)    If the Member has transferred or otherwise terminated its rights and interests in a mortgage loan, and receives notice of a lawsuit, a written threat to initiate a lawsuit or a claim (as such lawsuits, threatened lawsuits and claims are described in Section 2(a) and (b) of this Rule 14) from the MERSCORP, Inc. mailroom, the Member must notify MERSCORP, Inc. of (i) such lawsuit, threatened lawsuit or claim, and (ii) the transfer or termination of the Member's rights and interests in the subject mortgage loan.

Section 3.  The Member shall notify MERSCORP, Inc. of all lawsuits, threatened lawsuits or claims (as such lawsuits, threatened lawsuits and claims are described in Section 2(a) and (b) of this Rule 14), regardless of the method, person or entity by which the Member receives notice of such lawsuits, threatened lawsuits or claims.

(a)    All notifications required by this Rule 14 shall include (as applicable):

(i)    the name of the lawsuit, and the county, state and court in which the lawsuit is filed;

(ii)    the Mortgage Identification Number (MIN) of the mortgage loan involved;

(iii)    the date the complaint was filed and the date the Answer is due;

(iv)    the name and phone number of the contact person of the Member with respect to the subject lawsuit, threatened lawsuit or claim (which may be in-house counsel);

(v)    the name and telephone number of the attorney and law firm, if any, retained by the Member with respect to the subject lawsuit or claim; and

(vi)    a copy of all pleadings with respect to the subject lawsuit or claim in the possession of the Member or a copy of the written threat to initiate a lawsuit (as applicable).


(b)    All notices required by this Rule 14 shall be sent to the attention of the General Counsel of MERSCORP, Inc. either via fax to (703) 748-0183 (which is confirmed by transmission report or equivalent thereof), via e-mail to mers@mersinc.org  (which is confirmed by delivery report or equivalent thereof), via registered or certified mail (return receipt requested and postage prepaid) to 1818 Library Street, Suite 300, Reston, VA  20190, or via a nationally recognized overnight courier (prepaid and providing proof of delivery) to 1818 Library Street, Suite 300, Reston, VA  20190.


(c)    A Member shall in no way be relieved of its obligations under Paragraph 9 of the MERS Membership Terms and Conditions by (i) the failure of the Member to receive proper notification from a third party with respect to a lawsuit, threatened lawsuit or claim, or (ii) the proper notification, pursuant to this Rule 14, of a lawsuit, threatened lawsuit or claim from the Member to MERSCORP, Inc.

Section 4.  It is the responsibility of the Member to inform its retained counsel of the Member's indemnification obligations under the MERS Membership Terms and Conditions and the MERS Rules of Membership (including without limitation this Rule 14).  With respect to

a Member Indemnified Claim (as that term is defined in Paragraph 9 of the MERS Membership Terms and Conditions), Member and/or its retained counsel shall take all necessary and appropriate actions to assert promptly valid defenses available to MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable), even if such defenses are unavailable to the Member, including without limitation the defense that the claim against MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) should be dismissed as a claim against an inappropriate party.

(a)     If a Member and/or its retained counsel fails to acknowledge in writing its obligations (including its obligation to defend) under Paragraph 9 of the MERS Membership Terms and Conditions with respect to a Member Indemnified Claim, within the earlier date of (i) thirty (30) days after receipt by the Member of notice of the Member Indemnified Claim, either from MERSCORP, Inc., Mortgage Electronic Registration Systems, Inc. or a third party, and (ii) thirty (30) days prior to the deadline for MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) to submit an initial response to the Member Indemnified Claim, then MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) shall have the right (but not the obligation) to hire independent counsel and to undertake the defense, settlement and/or compromise of such Member Indemnified Claim on behalf of, and at the sole expense of, the Member.

(b)     Regardless of whether a Member, MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. defended a Member Indemnified Claim or none of these entities defended such claim, and regardless of whether MERSCORP, Inc. and/or Mortgage

vJune2009                                                    42

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 147 of 428   Document 1-1         147
Case 09-35931-pp   Doc 85-4   Filed 03/01/11   Page 42 of 43

Electronic Registration Systems, Inc. had notice of the Member Indemnified Claim, if a judgment is entered against MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. for such claim, the Member shall immediately post a Surety Bond or Letter of Credit for the amount of the judgment pending any motions to set aside or vacate the judgment; or appeal of the judgment; or any challenges made by either the Member or MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. to the judgment. It is the Member's responsibility to pay the amount of the judgment and any other related Indemnified Payments (as that term is defined in Paragraph 9 of the MERS Membership Terms and Conditions) on behalf of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable), and (ii) if MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. defends against the enforcement of a judgment (which MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. shall have the right to do in its discretion), the Member shall promptly reimburse MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. (as applicable) the amount of the Indemnified Payments related to such defense.

        (c)      With respect to a Member Indemnified Claim, the Member shall provide MERSCORP, Inc. with (i) copies of all public pleadings it receives from third parties (and notice of protected pleadings it receives from third parties), (ii) copies of all public pleadings it files on its own behalf, and (iii) copies of all pleadings it files on behalf of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc.

Section 5. The obligations of the Member under this Rule 14 shall survive the termination of the Member's use of the MERS® System

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: Edward B. Kohler and Patricia L. Kohler, | Chapter 13 |
| Debtor. | Case No. 09-35931-PP |

## BRIEF IN SUPPORT OF OBJECTION TO ORIGINAL AND AMENDED CLAIMS NUMBER 12 AND 13

### INTRODUCTION

The debtors submit this Brief in Support of the Objection to the Claims and Amended Claims 12 and 13 on file in this case by U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2006-4 (hereafter, SAIL Trust). The debtors' objections raise issues of standing and real party in interest as well as dubious documentation attached to the claims. The debtors assert that the claimant does not own or properly possess the notes related to the claims. In addition, the claimant does not hold a valid secured interest in the debtors' real estate because the MERS mortgage assignments are deficient. Mortgage Electronic Registration Systems, Inc. (MERS) lacks any appropriate written authority to assign mortgages under wither New York or Wisconsin law.

**I. The Claimant Presents No Sufficient Or Valid Documentation To Show Ownership Of The Debtors Loans In This Case.**

1. The documentation attached to the claims does not show the SAIL Trust owns the Kohler loans.

2. The claims submitted attach confusing and contradictory allonges and assignments of mortgages. *See,* allonges and AOMs attached to Amended Claim 12 on file which show an

THE LAW OFFICE OF ROLLIE R. HANSON, S.C.
6737 West Washington Street, Suite 1420
West Allis, Wisconsin 53214
(414)321-9733 Fax (414)321-9601
Rollie@hansonlaw.net

allonge purportedly executed after the filing of the bankruptcy petition in this case as well as another undated allonge presented with the Amended Claim months after the filing of the bankruptcy as well as an AOM also signed and executed after the filing of the bankruptcy petition.

3. The allonge dated December 2, 2009 purports to show BNC Mortgage, Inc. assigned the mortgage note to U.S. Bank National Association on December 2, 2009.  The AOM is signed by Whitney K. Cook as Assistant Secretary with a notation that suggests Cook is employed by Chase Home Finance, LLC as Attorney-in-Fact for BNC Mortgage, Inc.  This allonge is dated twenty-nine (29) days after the filing of the bankruptcy petition.  Moreover, there is no Power of Attorney to show that Chase Home Finance, LLC had any authority to sign on behalf of BNC Mortgage, Inc.

4. After initially asserting that the Whitney K. Cook allonge of December 2, 2009 transferred the note to the SAIL Trust, the claimant produced a blank, undated allonge months later, signed by an individual named Eleanora Martino as Vice President of Quality Assurance purporting to transfer the mortgage note directly from BNC Mortgage, Inc. to the Trust. There is a reference to the debtors by name and their address affixed to the allonge but no reference to the date or the amount of the note which the allonge purports to endorse to the SAIL Trust.  There is nothing to show when the allonge was executed by Eleanor Martino basically, no nothing to tie this to the note, or show actual or true delivery of the note to the Trust. There is no way to know when the debtors' names and addresses were pasted to the allonge.

5. The claimant also attaches an Assignment of Mortgage (AOM) executed by Shawn R. Hillman as Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for

BNC Mortgage, Inc.  The AOM occurred twenty-seven (27) days after the filing of the bankruptcy petition.  Further, there is nothing to show that MERS had proper authority to assign any mortgage as a nominee of BNC Mortgage, Inc.  Moreover, Shawn Hillman as staff attorney for the Law Firm of Bass & Moglowsky, S.C. is not an employee of BNC Mortgage, Inc. and there is no documentation to show that Hillman had any proper authority to execute the AOM.  Wis. Stat. Section 706.03(1m) requires written authority for an agent to sign any such conveyance document.

6. Original and amended Claim 13 also contains confusing and contradictory allonges and a deficient AOM.

7. The claimant attaches an allonge purporting to transfer the note for the second mortgage from Lehmann Brothers Bank, FSB n/k/a Aurora Bank, FSB to U.S. Bank National Association on March 8, 2010.  The assignment is signed by Deborah A. Lenhart as Vice President of Aurora Bank, FSB.  The allonge also states that a copy of the mortgage note was attached as an exhibit.  The allonge dated March 8, 2010 was executed one hundred and twenty-five (125) days after the filing of the bankruptcy petition in this case and there is no documentation of any kind to show Deborah A. Lenhart had any authority to sign this allonge.  Moreover, an allonge cannot transfer a note by attaching a copy of the note to the allonge.  The allonge must be made a part of the note and that requires being made a part of the original note.  The Lenhart allonge appears to be a complete fabrication.

8. Amended Claim 13 also includes a blank and undated allonge signed by James Langford as Vice President of Lehmann Brothers Bank, FSB.  There is a reference to the debtors' names and address affixed to the allonge, but does not reference the note in terms of date or the amount of the note.  There is no way to tell when or where this blank allonge was signed and

no documentation to show that James Langford had proper authority to sign the allonge. There is no way to know when the debtors' names and address were pasted to the allonge. There is no documentation to tie the document to the note or show actual or true delivery of the note to the trust at any time prior to or after the filing of the bankruptcy petition.

9. Amended Claim 13 also attaches an Assignment of Mortgage signed by Shawn R. Hillman as Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Lehmann Brothers Bank, FSB with a date of March 2, 2010. It appears that this Assignment of Mortgage was executed one hundred and nineteen (119) days after the filing of the bankruptcy in this case. This AOM has the same problems as identified and addressed in Paragraph 5 above.

10. The allonges referenced in Paragraphs 3 and 7 above and advanced by the claimant as transferring the note to the trust appear to be created solely to provide some type of documentation to support the claims on file. The allonges were not executed for the purpose of transferring the Kohler notes to the SAIL Trust. There is no valid commercial purpose to these allonges and it appears that they were advanced for the purpose of misleading the Court in regard to the transfer of the Kohler notes. The fact that the claimant has now produced blank and undated allonges does not change the fact that the claimant initially filed false documents with the Court.

11. The blank and undated allonges as referenced in Paragraphs 4 and 8 above do not resolve the issue as to whether the Trust owns the Kohler mortgage loans. Although the claimant now asserts the blank and undated allonges as the real or original allonges, there are no documents to show actual delivery of the notes to the Trust as required by its own provisions. The debtors assert that given the circumstances of the misleading and false allonges originally

attached to Claims 12 and 13, the Court should not accept blank undated alloges at face value without requiring proper authentication as well as proof of delivery of the notes to the proper parties including the depositor named in the SAIL Trust.  Under the SAIL Trust, the depositor was the only entity that could transfer the mortgage notes to the Trust.

## II.  The Purpose Of The Trust Is To Pool Mortgage Loans In Order to Sell Certificates To Investors And Must Therefore Comply With Applicable Provisions Of The Internal Revenue Code

12. The SAIL Trust is a "REMIC" Trust created for the purpose of selling certificates to investors.  *See, Exhibit* 1 attached to Objection to Claim. The Preliminary Statement of the SAIL Trust states in part,

> As provided herein, an election shall be made that the Trust fund . . .be treated for Federal Income Tax purposes as comprising for Real Estate Mortgage and Investment Conduits under Section 860D of the code  . . .  The startup day for each REMIC created hereby for purposes of the REMIC Provisions is the Closing Date…"*See, Exhibit 1 to Objection to Claims. See also, Section 1.01 of Exhiibt 1 Definition of Closing Date as June 30, 2006*

13. As shown above, the SAIL Trust and the applicable IRS regulations show that the Closing Date of June 1, 2006 is also the Startup Date for the trust under IRS Code. The Startup Date is significant because the IRS Tax Code places limitations upon which a REMIC Trust may be funded with its assets as of this date.  There are other portions of the IRS Code which address the definition of a REMIC is: <u>26 U.S.C.S. §860D</u>

"§860D.  REMIC defined.

(a) General rule.  For purposes of this title, the terms 'real estate mortgage investment conduit' and 'REMIC' mean any entity—

(1) to which an election to be treated as a REMIC applies for the taxable year and all prior taxable years,

(2) all of the interests in which are regular interests or residual interests,

(3) which has 1 (and only 1) class of residual interests (and all distributions, if any, with respect to such interests are pro rata),

(4) *as of the close of the 3rd month beginning after the startup day* (emphasis supplied) and at all times thereafter, substantially all of the assets of which consist of qualified mortgages and permitted investments,

The IRS Code also provides definitions of prohibited transactions and prohibited contributions. In the context of this case, the relevant statute is the definition of prohibited contributions which is as follows:

26 U.S.C. 860G(d)(1) states that, except as provided in section 860G(d)(2), "if any amount is contributed to a REMIC after the startup day, there is hereby imposed a tax for the taxable year of the REMIC in which the contribution is received equal to 100 percent of the amount of such contribution."

26 U.S.C. 860G(d)(2) states:

(2) Exceptions. Paragraph (1) shall not apply to any contribution which is made in cash and is described in any of the following subparagraphs:

(A) Any contribution to facilitate a clean-up call (as defined in regulations) or a qualified liquidation.

(B) Any payment in the nature of a guarantee.

(C) Any contribution during the 3-month period beginning on the startup day.

(D)   Any contribution to a qualified reserve fund by any holder of a residual interest in the REMIC.

(E)  Any other contribution permitted in regulations.

The Trustee must comply with the requirements of the Trust to establish and maintain the REMIC provisions which also means obtaining possession and ownership of the note and the mortgage pursuant to the conveyance requirements of the SAIL Trust.

### III. The SAIL Trust Is A New York Common Law Trust And Governed Under The Laws Of The State Of New York.

14. The SAIL Trust is a common law Trust created and governed under New York Law.  This is shown by the Prospectus attached to the Objection to Claim as Exhibit Number 3.  In identifying the parties, the Prospectus states the issuing entity is the "Structured Asset Investment Loan Trust 2006-4, a common law trust formed under the laws of the State of New York."  Further, Section 1.06 of the SAIL Trust titled "Governing Law" states in applicable part, "this Agreement shall be governed by and construed in accordance with the laws of the State of New York, . . . and the obligations, rights, and remedies of the parties hereunder shall be determined in accordance with such laws.".

15. The SAIL Trust's ability to transact is determined and restricted by the actions authorized by the Trust's provisions.  In this case, the provisions permit one specific method of transfer of mortgage loans to the Trust.  That method is set forth in Section 2.01 of the SAIL Trust.

16. Section 2.01 of the SAIL Trust states in applicable part:

"Creation and Declaration of Trust Fund' Conveyance of Mortgage Loans.

(a)
Concurrently with the execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over, deposit with and otherwise convey to the Trustee, without recourse,

subject to Sections 2.02, 2.04, 2.05 and 2.06, in trust, all the right, title and interest of the Depositor in and to the Mortgage Loans. . .

(b)

In connection with such transfer and assignment, the Depositor does hereby deliver Section 2.01 to, and deposit with, or cause to be delivered to and deposited with, the Trustee, and/or the Custodian acting on the Trustee's behalf, the following documents or instruments with respect to teach Mortgage Loan (each a "Mortgage File") so transferred and assigned:

(i)

with respect to each Mortgage Loan, the original Mortgage Note endorsed without recourse in proper form to the order of the Trustee, or in blank **(in each case, with all necessary intervening endorsements, as applicable)** or with respect to any lost Mortgage Note, a lost note affidavit stating that the original Mortgage Note was lost, misplaced, or destroyed, together with a copy of the related Mortgage Note;" (emphasis added)

The language of 2.01(a) clearly shows that the Depositor transfers or assigns the mortgage loans to the trustee concurrently with the execution and delivery of the SAIL Trust agreement. In addition, Section 2.01(b) requires the Depositor to actually deliver the original mortgage note to the Trustee. The mortgage note may be endorsed without recourse in proper form to the order of the Trustee or in blank but it must be endorsed by the Depositor. The Depositor is the only entity that has the authority to transfer the note to the Trustee. In addition, the Depositor is required to deliver to the Trustee all necessary intervening endorsements to show that the Depositor appropriately purchased and obtained the mortgage note from the Seller/Sponsor and prior to that the Seller/Sponsor obtained the note from the Originator. Under the terms of the SAIL Trust, the Trustee can only take delivery and ownership of the note from the depositor and in accordance with the provisions set forth in Section 2.01.

17. Section 2.02(b) also imposes a duty on the Trustee or the applicable custodian on behalf of the Trustee to

"review each Mortgage File to ascertain that all required documents set forth in Section 2.01 have been received and appear on their face to contain the requisite signatures by or on

behalf of the respective parties thereto, and shall deliver to the Trustee, the Depositor, the Master Servicer and any NIMS Insurer an Interim Certification in the form annexed hereto as Exhibit B-2 (or in the form annexed to the Custodial Agreement as Exhibit B-2 as applicable) to the effect that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan prepaid in full or any Mortgage Loan specifically identified in such certification as not covered by such certification), (i) all of applicable documents specified in Section 2.01(b) are in its possession and (ii) such documents have been reviewed by it and appear to relate to such Mortgage Loan."

18. The Kohler loans were not transferred to the Trust prior to the Closing Date as required by the SAIL Trust provisions. Furthermore, the claimant has no documentation to show proper endorsement from the Depositor, Asset Securities Corporation to the Trustee, U.S. Bank National Association or the necessary intervening endorsements starting with the originator.

19. The Mortgage Loan Sale and Assignment Agreement dated June 1, 2006 (hereafter, MLSA) referenced in the SAIL Trust also indicates the sale of mortgage loans from the Seller/Sponsor, Lehmann Brothers Holdings, Inc. to the Purchaser/ Depositor Structured Asset Securities Corporation. *See, MLSA at Section 1.01* attached to Objection to Claim as Exhibit 2.

20. The provisions of the SAIL Trust show two (2) mandatory requirements in regard to the delivery to constitute a "true sale" of the mortgage notes to the Trustee. First, all notes sold to the Trust were required to have an unbroken chain of trust from the Payee to the person or entity endorsing it to the Trustee.

21. The second requirement under Section 2.02 of the SAIL Trust is to make sure that within forty-five (45) days of the Trust closing date the actual Promissory Note was properly endorsed over to the Trustee for the specific Trust named to effectively transfer the asset into the trust. This requirement is supported in law and logic and is in fact the settled law of New York on this issue.

## IV. New York Law Governs The Mandatory Requirements To Effectively Transfer An Asset To A Trust.

It is clear that securitization trusts, such as the SAIL Trust are subject to the common law of New York.[1] New York's trust law is ancient and settled. It is the well settled law of New York that the authority of a trustee is established by the provisions of the Trust. This principle is codified at NY CLS EPTL § 7-2.4, Act of trustee in contravention of Trust, which reads:

> If the Trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the Trust, except as authorized by this article and by any other provision of law, is void.[2]

22. Further, the actual contracts of the parties, which include the custodial agreements, the mortgage loan purchase agreements, and the trust instrument itself prescribe a very specific method of transfer of the notes and mortgages to the Trust. Because the method of transfer is set forth in the Trust instrument, it is not subject to any variance or exception. The Trust documents require that the promissory notes and mortgages be transferred to the Trustee.

## V. The MERS Assignments Are Not Effective To Assign The Kohler Mortgages Because MERS Lacks the Authority To Assign Mortgages To Any Third Party.

23. There is no documentation to show that MERS has any valid legal authority to assign a mortgage. The mortgages attached to Claims 12 and 13 contain similar language in regard to MERS. Each mortgage states that MERS is acting solely as a nominee for the lender and the lender's successors and assigns. Each mortgage also names MERS as the mortgagee. Therefore, for Claim Number 12 MERS is the nominee of BNC Mortgage, Inc. and for Claim

---

[1] As early as 1935, in <u>Burgoyne v. James, 282 N.Y.S. 18, 21 (1935),</u> the New York Supreme Court recognized that business trusts, also known as ""Massachusetts trusts""are deemed to be common law trusts. *See also In re Estate of Plotkin,* 290 N.Y.S.2d, 46, 49 (N.Y. Sur. 1938) (characterizing common stock trust funds as ""common law trust[s]""). Other jurisdictions are in accord. *See, e.g., Mayfield v. First 'Nat'l Bank of Chattanooga,* 137 F.2d 1013 (6th Cir. 1943) applying common law trust principles to a pool of mortgage participation certificate holders).

[2] *See also, United States Trust Co. v. First Natl. City Bank,* 57 A.D.2d 285, 295-296, Aff. D. 45NY2d 869 (it is settled that the duties and powers of the trustee are defined by the terms of the trust agreement and are tempered only by the fiduciary obligation of the loyalty to the beneficiaries); Restatement[2nd] of trusts Section 186, Comments A, D. The debtors further assert that NYCLSEPTL Section 7-2.4 codifies long-standing principles under New York Common Law governing trusts.

Number 13 MERS is the nominee of Lehmann Brothers Bank, FSB.  As the Court noted in,

*In re Agard,* __B.R.__, 2011 WL 499959 *at*, 16 (Bankr.E.D.N.Y.); 2011 Bankr.LEXIS 488,

at, 46 "MERS's 'nominee' status and the rights bestowed upon MERS within the mortgage

itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage."  This

is because there is no provision in the mortgage that gives MERS the right or authority to

execute an assignment of mortgage as a "nominee" or "mortgagee of record".  "MERS may

not validly assign a mortgage based on its nominee status, absent some evidence of specific

authority to assign the mortgage."  *Id. at, 16.*  MERS must provide adequate documentation

under either New York or Wisconsin law to show authority to assign a mortgage."

24. In *LaSalle Bank, N.A. v Bouloute* the Court concluded that MERS must have some evidence

of authority to assign the mortgage in order for an assignment of a mortgage by MERS to be

effective.  Evidence of MERS's authority to assign could be by way of a power of attorney or

some other document executed by the original lender.  *Id. at, 1 citing LaSalle Bank, N.A. v.*

*Bouloute* 2010 WL 3359552, *at*, 1.  The *Agard* Court notes that a nominee is "[a] person

designated to act in place of another, usually in a very limited way" *Id at, 17 citing Bank of*

*New York v. Alderazi,* 28 Misc.3d 376, 900 N.Y.S.2d 821, 823 (N.Y.Sup.Ct.2010) (quoting

Black's Law Dictionary). Therefore, "to have a proper assignment of the mortgage by an

authorized agent, a power of attorney is necessary to demonstrate how the agent is vested

with the authority to assign the mortgage."  *Id. at, 17 citing Alderazi* 100 N.Y.S.2d at 823

(quoting *HSBC Bank USA, N.A. v. Yeasmin,* 866 N.Y.S.2d 92 (N.Y.Sup.Ct.2008)).

25. As noted above, the subject mortgages show MERS as a nominee for BNC and Lehmann

Brothers.  The AOMs signed by Attorney Shawn Hillman purporting to assign the mortgages

subject to Claims 12 and 13 were both executed years after the Kohlers signed the mortgages.

It appears that the AOMs were executed for purposes of assigning the mortgages to the Trustee of the SAIL Trust. The *Agard* Court found no agency relationship to support MERS' authority to assign the mortgage noting that "the alleged agency relationship must be committed to writing by application of the Statute of Frauds." *Id. at, 19* and further noted that Section 5-703(2) required the written authorization to show the lawful agent. *Id. at, 19.* In Wisconsin Wis. Stat. Section 706.03 Agents, Officers, and Guardians states "a conveyance signed by one purporting to act as agent for another shall be ineffective as against the purported principal unless such agent was expressly authorized, and unless the authorizing principal is identified as such in the conveyance or in the form of signature or acknowledgement. The burden of proving the authority of such agent shall be upon the person asserting the same." Wis. Stat. Section 706.03(1m).

26. There is nothing in the record to show that MERS has the express authority to execute any assignment of mortgage under either New York or Wisconsin law. In this case, the Claimants put forth AOMs signed by a staff attorney of the Law Office of Bass & Moglowsky after the filing of the bankruptcy petition. However, the Assignments are ineffective absent proper authority on the part of MERS or any of its members to assign the mortgages on behalf of the original lenders. The claimant recognizes the need to assign the mortgages to the proper party in order to file a valid secured claim. However, they have failed to do so and at this point, even if the Court finds the endorsements or allonges to the notes to properly transfer the notes to the SAIL Trust, the Trust has never obtained valid liens to claim the status of a secured creditor in this bankruptcy proceeding. Instead, the use of the MERS system as a Mortgage Electronic Registration System has effectively separated the notes and mortgages prior to the filing of this bankruptcy proceeding.

27. In addition, there is nothing in the Merscorp, Inc. Rules of Membership for MERS members that provides any basis to infer MERS has the authority to assign the Kohler mortgages. *See,* Merscorp, Inc. Rules of Membership attached as Exhibit 4 to Objection to Claims. Further, even if the Court were to make a determination that the Kohler mortgages along with the MERS Membership Rules provide some kind of authority to allow for the execution of the Assignment of Mortgage, an examination of the Membership Rules shows that the Shawn Hillman AOMs were not done in compliance with MERS own rules. This also points out the confusing surrounding role and authority of MERS to act as the agents for lenders. "The parties appear to have defined the word [nominee] in much the same way that the blind men of Indian legend described an elephant—their description depended on what part they were touching at any given time." *Landmark National Bank v. Kessler,* 289 Kan. 528, 2116 P.3d 158, 166-167 (Kan. 2010)

28. Rule 3 titled "Obligations of MERS" states MERS' requirements and procedures to give proper authority for execution of an Assignment of Mortgage that is registered on the MERS System. Rule 3 shows the following process must be followed under MERS' own rules.

    1. The originating lender must hold a mortgage on the MERS system.

    2. The originating Lender must request, pursuant to a Corporate Resolution of the originating lender that MERS issue a Corporate Resolution naming an officer of the originating lender Member of MERS as a MERS Certifying Officer in order to sign releases, discharges or assignments on behalf of MERS. The provisions of his rule are clear: only employees of MERS lender, which hold loans on the MERS system are allowed to make such application and to receive such authorizations.

3. Upon receipt of the resolution obtained pursuant to the Rules of

MERS**,** the employee of the originating lender member of MERS is allowed

to sign an assignment of mortgage on behalf of MERS as nominee for the

authorizing lender.

In this case Shawn Hillman did not have any authority to execute the Assignment of

Mortgage either under New York or Wisconsin law or under the MERS Rules of

Membership. At this point, there is no credible evidence to show a proper corporate

resolution was ever done to give Attorneys Teske and Hillman authority to act as certifying

officers for MERS. However, had MERS and its members even followed their own rules and

agreements for establishing authority, the AOMs still fail because MERS itself never

obtained proper authority under the law to execute and Assignment of Mortgage.

29. Under the facts and circumstances of this case, Amended Claims 12 and 13 should be

disallowed by this Court or in the alternative, at best may only be allowed as Unsecured

Claims.

Dated this 1st day of March, 2011 at West Allis, Wisconsin.


/s/Rollie R. Hanson
Rollie R. Hanson, Attorney for Debtors
State Bar No. 1011293

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| EDWARD BLAINE KOHLER and | ) | Case No. 09-35931-pp |
| PATRICIA LYNN KOHLER, | ) | |
| | ) | |
| Debtors. | ) | |
| ———————————————— | ) | |

MOTION BY U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE
FOR A PROTECTIVE ORDER PURSUANT TO RULES 7026(c)
AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Creditor U.S. Bank National Association, as Trustee for Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4 ("U.S. Bank"), by its attorneys hereby moves this Court for entry of a protective order pursuant to Federal Rule of Civil Procedure 26(c), made applicable by Federal Rule of Bankruptcy Procedure 7026, to bar certain requested discovery, in support of which U.S. Bank states the following:

I. INTRODUCTION

In a status hearing conducted before this Court on January 31, 2011, U.S. Bank appeared in person by counsel who was in the possession of the two original promissory notes and two original mortgages upon which U.S. Bank bases its motions for relief from the automatic stay and its amended proofs of claim herein. Counsel for U.S. Bank made it clear to the Court that, with respect to its standing to pursue motions for relief and its amended proofs of claim, U.S. Bank is relying on the two original promissory notes endorsed in blank and the two original mortgages in its possession, together with applicable Wisconsin law to the effect that: (1) a note may be endorsed in blank and negotiated by transfer of possession; (2) the mortgage automatically transfers to the transferee of the note as an incident of the indebtedness without

formal written assignment; and (3) the holder of the note endorsed in blank is entitled to enforce it and the accompanying mortgage.

In light of this position, counsel for the Debtors asserted the need for additional discovery limited to the deposition of persons who had information about custody of the notes and mortgages. (Exhibit A, Court Minutes 1/31/11, p. 2.) The Court directed counsel for U.S. Bank to disclose to counsel for the Debtors the contact information for the person at Chase Home Finance, LLC who had recent possession of the loan documents, and the custodian for U.S. Bank (i.e. Deutsche Bank) by February 4, 2011. *Id.* On February 3, 2011, counsel for U.S. Bank fully complied with the Court's Order by making the disclosure attached hereto as Exhibit B. The Court allowed the Debtor until March 14, 2011 to take these depositions. (Exhibit A, p.2)

However, counsel for the Debtors has not noticed the deposition of the Chase Home Finance, LLC representative or the Deutsche Bank representative to address his inquiry as to the physical custody of the original loan documents. Rather, counsel for the Debtors has set off in an entirely different direction by serving U.S. Bank with a Rule 30(b)(6) notice of deposition containing thirty-seven areas of inquiry, virtually all of which relate to generic policies and procedures of a trustee and almost none of which even remotely relate specifically to the notes and mortgages in issue in this case. Not even one of the areas of inquiry specifically mentions the Kohler notes or mortgages, or relates to the chain of physical custody of the original notes and mortgages. A copy of the Notice of Deposition for U. S. Bank is attached hereto as Exhibit C. The documents rider attached to the Notice of Deposition contains twenty-five categories and requests documents that have already been produced, are in the public domain, or are far beyond the scope of the matter in issue. Document No. 24 appears to have no relation whatsoever to these proceedings.

In addition, the Debtors have served additional interrogatories, document requests and requests to admit that seek information that has either already been produced or that improperly asks U.S. Bank to explain its legal theory regarding the meaning of certain documents, or that goes far beyond the scope of the issue regarding physical custody of the original loan documents, or that asks U.S. Bank to state legal conclusions. (For example, Request to Admit No. 4 asks for admission that the laws of the State of Delaware require a Board of Directors meeting to pass any corporate resolutions.) A copy of the Second Set of Interrogatories, Third Request for Documents, and Second Request to Admit is attached hereto as Exhibit D.

The Debtors' additional discovery requests, particularly in light of what was represented to be the remaining issues for which discovery was needed, are immaterial and burdensome, unrelated to the issues before the Court with respect to the pending Motions for Relief, and far beyond the scope of what had been stated as the remaining necessary discovery. They should be stricken pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

## II. FACTUAL BACKGROUND

In their Schedule D, Debtors acknowledge the existence of two mortgage liens on their property located at 5310 S. Skyline Drive, New Berlin, Wisconsin, for which Debtors identify Chase Manhattan Mortgage as the creditor.[1] (Schedule D, Docket No. 1.)

As to the first mortgage, U.S. Bank has filed an amended proof of claim for a total of $232,568.20 ("Claim No. 12"). Along with the standard proof of claim form, U.S. Bank filed documents that set out the historic ownership of the note and mortgage. First, U.S. Bank attached a copy of the Mortgage dated April 6, 2006 and recorded with the Register of Waukesha County on May 1, 2006 as Document No. 3382190 ("First Mortgage"). The First Mortgage

---

[1]     Chase Manhattan Mortgage Corporation is no longer in existence, but rather has been merged into and is succeeded by Chase Home Finance LLC.

identifies BNC Mortgage Inc., a Delaware corporation, as the lender, and it clearly identifies Mortgage Electronic Registration Systems, Inc. ("MERS") as the nominee for BNC Mortgage, Inc. Also, attached to Claim No. 12 is an Assignment of Mortgage dated November 30, 2009 and recorded with the Register of Deeds of Waukesha County as Document No. 3710217 on December 3, 2009. The Assignment provides that MERS, as nominee for BNC Mortgage, Inc. (the mortgagee under the First Mortgage) assigns all of its interest in the Mortgage to U.S. Bank.

Similarly, Claim No. 12 includes the Adjustable Rate Note that is secured by the First Mortgage. It is dated April 6, 2006, and it identifies BNC Mortgage, Inc. as the payee ("First Note"). Attached to the First Note is an Allonge in which BNC Mortgage, Inc., through its stated attorney-in-fact, Chase Home Finance LLC, assigns all of its interest in the First Note to U.S. Bank. Claim No. 12 is supplemented with a complete copy made from the original Note (with allonge executed pre-petition) showing the original Note endorsed in blank by BNC Mortgage, Inc.

U.S. Bank has also filed an amended proof of claim related to the second mortgage in the amount of $57,077.36 ("Claim No. 13"). Attached to the standard proof of claim form is a copy of the Mortgage dated April 6, 2006 and recorded with the Register of Waukesha County on May 1, 2006 as Document No. 3382191 ("Second Mortgage"). The mortgagee of the Second Mortgage is stated to be Lehman Brothers Bank, FSB. MERS is stated to be the nominee for Lehman Brothers Bank, FSB. Also attached to Claim No. 13 is an Assignment of Mortgage dated March 2, 2010 from MERS as nominee for Lehman Brothers Bank, FSB, to U.S. Bank.

Similarly, Claim No. 13 includes a Balloon Note that is secured by the Second Mortgage. It is dated April 6, 2006 and Lehman Brothers Bank is the payee ("Second Note"). Also attached to the Second Note is an Allonge whereby Lehman Brothers Bank, FSB assigns its entire interest

in the Note to U.S. Bank. Amended Claim No. 13 is supplemented with a complete copy made from the original Note (with allonge executed pre-petition) showing the original Note endorsed in blank by Lehman Brothers Bank, FSB.

On December 9, 2009, U.S. Bank filed a Motion for Relief from Stay as to the First Mortgage. (Docket No. 5.) Debtors filed their Objection thereto on December 23, 2009 wherein they raised the exact same issues regarding U.S. Bank's standing to enforce the First Mortgage that are raised in the Complaint. (Docket No. 7.) On March 1, 2010, the parties entered into a Stipulation to resolve the initial Motion for Relief from Stay (Docket No. 28), but on March 22, 2010, U.S. Bank renewed its Motion for Relief from Stay as to the First Mortgage. (Docket No. 39.) Debtors then restated their initial objection to U.S. Bank's standing on April 15, 2010. (Docket No. 47.)

On March 12, 2010, U.S. Bank filed its Motion for Relief from Automatic Stay as to the Second Mortgage. (Docket No. 37.) Debtors filed their Objection thereto on March 26, 2010. (Docket No. 40.) Again, in their Objection, the Debtors raised the exact same issues regarding U.S. Bank's standing to enforce the Second Mortgage that are raised in the Complaint. U.S. Bank's Motions for Relief from Automatic Stay as to both the First Mortgage and Second Mortgage remain pending and unresolved.

On January 31, 2011, in a status conference, the Court addressed the status of the pending Motions for Relief. Counsel for U.S. Bank stated that U.S. Bank was relying on the two original promissory notes both endorsed in blank, the two original mortgages, and applicable Wisconsin law.[2] Counsel for the Debtors acknowledged that he has reviewed the original notes and

---

[2]     A note endorsed in blank is payable to the bearer of the instrument. W.S.A. 403.205(2). Moreover, an instrument payable to bearer may be negotiated by the transfer of possession alone. W.S.A. 403.201. When a mortgage note, endorsed in blank, is transferred, the underlying mortgage is automatically transferred with it, as an

5

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 167 of 428   Document 1-1          167
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 5 of 40

mortgages. He asserted that he needed additional discovery to address the custody of the notes and mortgages. (Exhibit A, Court Minutes, p. 2.)

The Court directed U.S. Bank's counsel to provide Debtor's counsel with the contact information for the Chase Home Finance LLC representative who previously had received the documents from the custodian, together with the custodian for U.S. Bank, who had had physical custody of the loan documents. *Id.* Counsel for U.S. Bank complied with the Court's directive on February 3, 2011. (Exhibit B.)

Instead of then providing a notice for the deposition of Chase's representative or a subpoena for Deutsche Bank, Debtors served U.S. Bank with a Rule 30(b)(6) deposition request. The request states thirty-seven areas of inquiry, virtually all generic policies and procedures that bear no relationship to the actual loan documents on which U.S. Bank bases its Motions for Relief and its Amended Proofs of Claim. For example, Debtors request the U.S. Bank to testify about the "terms, policies and procedures of the original Prospectus" or "all policies, rules and procedures regarding the due affixing of a notary stamp." (Exhibit C, Items 3 and 17, pp. 2-3.) Not one of the areas of inquiry relates specifically to the custody of the Debtors' loan documents, the only remaining area for inquiry as discussed in open court on January 31, 2011. The list of twenty-five categories of documents requested is equally inappropriate. Most of the documents are in the public record (e.g., Exhibit C, Item 3, p. 6), have already been requested and produced (e.g., Exhibit C, Item 8, p. 6), or are overly broad (Exhibit C, Item 23, p. 7) or request a legal opinion (Exhibit C, Item 21, p. 7). Not one of the documents requested is specifically limited to the notes and mortgages in issue in this case.

---

incident to the debt, without any further action by the transferor or transferee. Fred Miller Brewing Co. v. Manasse, 74 N.W. 535, 99 Wis. 99 (1898); Franke v. Neisler, 72 N.W. 887, 97 Wis. 364 (1897).

Debtors have also served additional interrogatories, document requests and request to admit at the same time as the Notice of Deposition. (Exhibit D.) Again, not one of the requests relates to custody of the specific notes and mortgages are discussed with the Court on January 31, 2011. Several of the interrogatories and requests to admit do not seek information but rather ask U.S. Bank to explain a legal position or state a legal conclusion (e.g. Interrogatories No. 4 and 5, Requests to Admit 1, 2, 4, 7 and 8; Exhibit D, pp. 6-7). Many of the requests are unrelated to the Debtor's loan (e.g. Interrogatory Nos. 2 and 8, Document Request Nos. 2 and 4, Requests to Admit 3, 4 and 5; Exhibit D, pp. 5-7).

III. <u>LEGAL STANDARD AND ARGUMENT</u>

On March 2, 2011, in compliance with Rule 26(c), counsel for U.S. Bank, Edward J. Lesniak, and counsel for the Debtor, Rollie Hanson, conferred by telephone regarding the scope of the discovery requested by Debtors but were unable to reach a resolution of the disagreement. Federal Rule of Civil Procedure 26(c), made applicable by Federal Rule of Bankruptcy Procedure 7026, permits a party to seek a protective order for good cause, and to protect a party from annoyance, embarrassment, oppression or undue burden or expense, including forbidding the disclosure or discovery, or limiting the scope of discovery.

In deciding whether good cause exists sufficient to issue a protective order limiting discovery, the court must balance the interests involved. In other words, the court must weigh the "harm to the party seeking the protective order" against "the importance of the disclosure to the non-moving party." <u>Beloit Liquidating Trust v. Century Indem. Co.</u>, No 02 C 50037, 2003 WL 355743, at *3 (N.D. Ill. Feb. 13, 2003). Even the potential for harm can be sufficient to support a finding of good cause warranting a protective order. See <u>Excobar v. Foster</u>, No 99 C 4812, 2000 U.S. Dist. LEXIS 6764, at *5 (N.D. 111, May 15, 2000) ("The court … must balance

the requesting party's need for information against the injury that <u>might</u> result if uncontrolled disclosure is compelled." (Emphasis added.)

The Court may deny discovery where the information sought is simply too remote to any matter involved in the case: "[T]he standard of relevancy is not so liberal as to allow a party to … explore matter which does not presently appear germane on the theory that it might conceivably become so." <u>Food Lion, Inc. v. United Food & Comm'l Workers Int'l Union</u>, *AFL-CIO-CLC* (DC Cir. 1997) 103 F.3d 1007, 1012-1013 (internal quotes omitted). When requests approach outer bounds of relevance and information requested may only marginally enhance objectives of providing information to parties or narrowing issues, court must then weigh that request with hardship to party from whom discovery is sought. <u>Carlson Cos. v. Sperry & Hutchinson Co.</u>, 374 F.Supp. 1080 (D. Minn. 1973). Thus, discovery is constrained by relevance. While the standard of relevance in the context of discovery is certainly broader than in the context of admissibility, it "should not be misapplied so as to allow fishing expeditions in discovery." <u>Hofer v. Mack Trucks, Inc.</u>, 981 F.2d 377, 380 (9th Cir. 1992) (citing <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 98 S.Ct. 2380 (1978). A "threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case."

In this instance, the Court only need look at what Debtor's counsel acknowledged was still necessary on January 31, 2011 and compare it to the discovery Debtors' counsel subsequently served on U.S. Bank to reach the conclusion that a protective order is necessary. If the only remaining issue for discovery relates to the custody of the loan documents by U.S. Bank's servicing agent and custodian, then those are the persons or entities who should be deposed, not U.S. Bank which has been in physical custody of the loan documents only through

8

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 170 of 428   Document 1-1     170
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 8 of 40

its agents and would not have personal knowledge. Moreover, the discovery requested in Exhibits C and D does not include information as to the physical custody of the loan documents. Rather, it seeks information about, among other areas, policies and procedures that have no relationship to the Debtor's notes and mortgages. This creates an undue hardship on U.S. Bank that is expected to determine, prepare and provide one or more witnesses on thirty-seven categories of irrelevant information. When this hardship is balanced against the ability of the Debtors to depose persons who actually have the information regarding possession of the loan documents, the propriety of a protective order is evident.

<u>CONCLUSION AND PRAYER FOR RELIEF</u>

On January 31, 2011, as indicated in the Court's minutes, the pertinent issues as to the pending Motions for Relief were crystallized. U.S. Bank made clear it is relying, for purposes of the pending motions, solely on the original notes, endorsed in blank, and the attendant original mortgages. It is not relying on the specific endorsements to the promissory notes or the written assignments of mortgage. It is not relying upon the operative transfer language in any trust related securitization document. With the issues thus focused solely on the original loan documents, Debtors were given the opportunity to depose the persons who have knowledge about the chain of possession of the original loan documents, but they have failed to do so. Instead, they have proposed to move in an entirely different direction from which U.S. Bank requires this Court's protection in the form of a protective order.

WHEREFORE, U.S. Bank, as Trustee aforesaid, pays that this Court enter an order barring Debtors from any further discovery in this case, or for such other relief as is just and

9

proper in the circumstances.

U.S. BANK NATIONAL ASSOCIATION, as
Trustee for Structured Asset Investment Loan
Trust Mortgage Pass-Through Certificates, Series
2006-4, CHASE HOME FINANCE LLC and
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., Defendants

By: ___/s/___ Edward J. Lesniak
(Illinois ARDC #1624261, Admitted to District
Court for the Eastern District of Wisconsin on
January 23, 2006)
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash Avenue, 22nd Floor
Chicago, IL 60611-3607
Telephone: (312) 840-7000
Facsimile: (312) 840-7900
E-mail: elesniak@burkelaw.com

/Penny Gentges
Co-Counsel for Defendants
Bass & Maglowsky, S.C.
7020 N. Port Washington Road
Suite 206
Milwaukee, WI 53217
Telephone: (414) 228-6700
Facsimile: (414) 228-6506
E-mail: penny@basmog.com
09135\00600\827634.1

10

Case 2-11-cv-00893-CNC   Filed 09/22/11   Page 172 of 428   Document 1-1          172
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 10 of 40

## CERTIFICATE OF SERVICE

Edward J. Lesniak, one of the attorneys for certain Defendants, certifies that a true and correct copy of the Motion by U.S. Bank National Association, as Trustee, for a Protective Order Pursuant to Rule 7026(c) and 9014 of the Federal Rules of Bankruptcy Procedure was served by the Court's CM/ECF filing system on March 3, 2011, at the time the Motion was filed, on the following parties:

> Rollie R. Hanson
> Penny Gentges
> Mary Grosman (Chapter 13 Trustee)
> Office of the United States Trustee

> /s/      Edward J. Lesniak
> Edward J. Lesniak
> Attorney for Certain Defendants
> (Illinois ARDC #1624261, Admitted to District
> Court for the Eastern District of Wisconsin on
> January 23, 2006)
> Burke, Warren, MacKay & Serritella, P.C.
> 330 N. Wabash Avenue, 22nd Floor
> Chicago, IL  60611-3607
> Telephone:  (312) 840-7000
> Facsimile:  (312) 840-7900
> E-mail:  elesniak@burkelaw.com

11

Case 2-11-cv-00893-CNC   Filed 09/22/11   Page 173 of 428   Document 1-1      173
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 11 of 40

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF WISCONSIN

#### Court Minutes

| | |
|---|---|
| CHAPTER: | 13 |
| DATE: | January 31, 2011 |
| JUDGE: | Pamela Pepper |
| CASE NO.: | 2009-35931 |
| DEBTORS: | Edward and Patricia Kohler |
| ADV. NO.: | |
| ADV.: | |

| | |
|---|---|
| NATURE OF HEARING: | Status RE: |
| | (1) Motion for relief from stay by US Bank |
| | (2) Objection to confirmation of Chapter 13 Plan by U.S. Bank |
| APPEARANCES: | Rollie Hanson - Attorney for the debtors |
| | Penny Gentges - Attorney for U.S. Bank |
| | Edward Lesniak - Attorney for U.S. Bank, by telephone |
| | Rebecca Garcia - Chapter 13 Trustee, by telephone |
| | Debra Schneider - Attorney for the U.S. Trustee |
| LAW CLERK: | Camille Bent |
| TIME: | 11:27 a.m. - 12:09 p.m. |
| ADJOURNED DATE: | Evidentiary Hearing: Wednesday, March 30, 2010 at 1:30 p.m. in Room 149 |

The Court first noted that counsel for the debtors had filed an adversary complaint against U.S. Bank, Chase Bank, and others, and that it understood that the issues in that adversary might be the same as the issues in the motion for relief from stay and the objection to confirmation of plan. The Court also noted that it had adjourned the last hearing to allow the parties to obtain certain original documents from Louisiana, and to review those documents.

Counsel for the debtors reported that the documents had arrived from Louisiana, but that his clients had not been able to see the originals. He explained that his clients had reviewed a copy of the documents, but wanted to review either a color copy of the documents, or the originals. Counsel for the debtors reported that they made this request because the debtor/husband believed that he had signed the original document in blue ink, while the documents that had come from Louisiana showed a signature in black ink. Attorney Gentges explained that she had made the originals available to the debtors on more than one occasion, and that they had not come to review them. She also indicated that she had brought the originals to court for today's hearing, and had hoped the debtors would appear, so that they could finally review the documents. Counsel for the debtors indicated that he did not have his clients appear at today's hearing because he understood that it was to be a status conference, not an evidentiary hearing.

1

Case 09-35931-pp    Doc 81    Filed 02/01/11    Page 1 of 3
Case 2:11-cv-00893-CNC    Filed 09/22/11    Page 175 of 428    Document 1-1
Case 09-35931-pp    Doc 90    Filed 03/03/11    Page 13 of 40

175

Attorney Lesniak noted that he had sent counsel for the debtors all of the documents that the debtors had requested back in September. He stated that this was the first he'd heard that the debtor/husband believed there was an issue as to the color of the ink for his signature. He pointed out that the motion and the objection had been pending for an inordinately long period of time, and stated that if the Court put the motion and the objection on the same timetable as the adversary, it would result in even further delay. He reported that the creditor had not received a payment on the loan for some fourteen to fifteen months, and that the creditor had offered the debtors a loan modification, which they had rejected.

The Court expressed concern that the creditor had filed the renewed motion for relief and the objection to confirmation in March 2010, over ten months ago. It stated that, contrary to its original thoughts, it was not comfortable delaying this matter for another four or more months by placing these motions on the same timetable as the adversary. Counsel for the debtor stated that he needed to depose the custodian of records who had supplied the documents that came from Louisiana. The Court asked how long the parties needed to schedule such a deposition. Attorney Lesniak responded that it depended on who, exactly, counsel wanted to depose. He stated that indicated that a Reynaldo Reyes from San Francisco was likely the custodian for Deutsche Bank, the entity which had the logs indicating when it received the loan documents. He stated that a Brian Tucker was likely the person at Chase in Louisiana who had received the documents from Deutsche Bank. Attorney Lesniak indicated that counsel for the debtors would need a subpoena for Reyes, because Deutsche Bank was not a client of either Mr. Lesniak or Ms. Gentges. The Court asked Attorney Lesniak to confirm the identities of anyone in the chain of custody of these documents by Friday, February 4, 2011. The Court ordered that counsel for the debtors was to have completed the depositions of any of the individuals in that chain of custody whom he wished to depose by March 14, 2011. The Court scheduled an evidentiary hearing for Wednesday, March 30, 2011 at 1:30 p.m. in Room 149. The Court indicated that it would leave the initial pretrial conference scheduled for Monday, March 7, 2011 in the adversary proceeding on the calendar, to make sure that the parties stayed on track. That hearing will be by telephone.

Counsel for the debtors stated that he needed to use the original documents to depose the custodians. Attorney Gengtes expressed concern about this request. She noted that the note and endorsements constituted bearer paper, and that if she sent them to someone in San Francisco or someone in Louisiana, they could get lost. She offered to allow counsel for the debtors to come to her office and watch her make copies of the documents, so that he could use those copies in the deposition. Counsel for the debtors stated that he did not see how he could conduct the depositions with copies. The Court informed counsel that he could not eat his cake and still have it; either he insisted on having the originals at the depositions, and

2

Case 09-35931-pp    Doc 81    Filed 02/01/11    Page 2 of 3
Case 2:11-cv-00893-CNC    Filed 09/22/11    Page 176 of 428    Document 1-1    176
Case 09-35931-pp    Doc 90    Filed 03/03/11    Page 14 of 40

thus ran the risk of losing them for the evidentiary hearing, or he agreed to use copies at the depositions, thus guaranteeing that the originals would be available for the evidentiary hearing. Counsel for the debtors indicated that he would make a decision and inform Attorney Gengtes.

3

Case 09-35931-pp    Doc 81    Filed 02/01/11      Page 3 of 3

Case 2-11-cv-00893-CNC    Filed 09/22/11    Page 177 of 428    Document 1-1        177
Case 09-35931-pp    Doc 90    Filed 03/03/11      Page 15 of 40

# EXHIBIT B

# Lesniak, Edward J

**From:** Lesniak, Edward J
**Sent:** Thursday, February 03, 2011 4:12 PM
**To:** 'Rollie Hanson'
**Cc:** 'Penny Gentges'
**Subject:** In re Kohler

Mr. Hanson,

Here is the information for the two depositions that you requested.

Our contact at Chase who was responsible for sending the original loan documents to Penny Gentges is Brian Tucker, a litigation support liaison for Chase Home Finance, LLC. His office is at 350 South Cleveland Ave., Westerville, Ohio 43081. If you desire to take Mr. Tucker's deposition in Westerville, Ohio, please first send to me and Penny an appropriate notice of deposition. Alternatively, because my understanding of your interest in Mr. Tucker, as expressed in the court hearing on January 31, is only to account for possession of the original loan documents while in Chase's possession, as loan servicer, we are willing to provide an affidavit from Mr. Tucker as to what Chase's records show regarding receipt, retention, and delivery to Penny of the original loan documents, in lieu of taking Mr. Tucker's deposition. This could save you and your clients the fees and expenses for traveling to Westerville, Ohio to take a deposition of such limited scope. Please let me know at your earliest convenience how you would like to proceed.

Prior to delivery of the loan documents to Chase, the loan documents were in the possession of Deutsche Bank, as custodian for the U.S.Bank Trust that owns the notes and mortgages. Here is the contact information for Deutsche Bank:

Deutsche Bank National Trust Company
Global Transaction Banking
Trust & Securities Services
Alternative & Structured Finance Services
1761 East St. Andrew Place
Santa Ana, CA 92705-4934
I remind you that neither I nor Penny represent Deutsche Bank, and Deutsche Bank is not a party to the proceedings. Accordingly, you will need to proceed by way of a subpoena issued by the appropriate California federal court pursuant to Rule 45. Rather than provide you with a specific name of a potential deponent, who may or may not be the appropriate person, please provide the requisite statement of the matters for examination pursuant to Rule 30(b)(6) when you issue and serve the subpoena on Deutsche Bank. That way you will be assured of being able to depose the person who has information on all of the matters that you specify for examination, without having to go back a second time in the event that the person I would name does not have all of the information about the matters of interest to you.

Sincerely,

Ed Lesniak

**Edward J. Lesniak**
**Burke, Warren, MacKay & Serritella, P.C.**
330 N. Wabash, 22nd Floor | Chicago, IL 60611
Phone 312.840.7007 | Fax 312.840.7900

elesniak@burkelaw.com | www.burkelaw.com | my profile

Confidentiality Note: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, contact the sender via reply email and destroy all copies of the original message.

Circular 230 Disclosure: Any tax advice contained in this message was not intended or written to be used, and cannot be used (i) by any taxpayer for the purpose of avoiding any penalties that may be imposed on the taxpayer, or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.

2/28/2011

Case 2-11-cv-00893-CNC   Filed 09/22/11   Page 180 of 428   Document 1-1        180
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 18 of 40

# EXHIBIT C

In re: Edward and Patricia Kohler        Chapter 7

       Debtor.            Case No. 09-35931-{{

## NOTICE FOR A RULE 30(b)(6) DEPOSITION
## OF A CORPORATE OFFICER OR EMPLOYEE AND REQUEST FOR DOCUMENTS

**TO:**     **US Bank National Association as**
          **Trustee for Structured Asset Investment Loan Trust**
          **c/o Attorney Edward J. Lesniak**
          **Burke, Warren, MacKay & Serritella, PC**
          **330 N. Wabash Ave., 22nd Floor**
          **Chicago, IL 60611-3607**
          **Email: elesniak@burkelaw.com**

**TAKE NOTICE** that pursuant to Rule 7030 of the Bankruptcy Rules and Federal Rule of Civil Procedure 30(b)(6) that the Plaintiffs will take the deposition of a designated officer, director, managing agent or other party designated by **US Bank National Association, as Trustee for Structured Asset Investment Loan Trust.** as to the matters and things designated herein and reasonably known and available to **U.S. Bank National Association as Trustee for Structured Asset Investment Loan Trust.** Said deposition will be taken before an officer duly authorized by law to administer oaths and take testimony by stenographic means and another party designated to video-tape the proceeding.

**TAKE FURTHER NOTICE** that the deposition of the designated person shall take place on **March 24, 2011 at 9:00 a.m. at The Corporate Office of US Bank National Association located at 1 Federal Street, Boston Massachusetts 02110** or at such other time and place as counsel for the parties shall agree.

**FURTHER, YOU ARE REQUIRED** pursuant to Federal FRBP and Rule 44 of the Federal Rules of Civil Procedure to produce for inspection and copying all documents listed in the attached Exhibit A.

**TAKE FURTHER NOTICE** that the following are the topics for examination of the person so designated to be deposed by the Plaintiffs. This person should have actual and personal knowledge of the following in regard to the Structured Asset Investment Loan Trust Mortgage Pass Through Certificates, Series 2006-4 (hereafter, SAIL Trust) and the original Prospectus and any supplement to the Prospectus.

1.     The original and Amended Claims 12 and 13 on file in this Bankruptcy, Case No. 09-35931 as well as all attached documents to said claims and Amended Claims.

THE LAW OFFICE OF ROLLIE R. HANSON, S.C.
6737 West Washington Street, Suite 1420
West Allis, Wisconsin 53214
(414)321-9733 Fax (414)321-9601
Rollie@hansonlaw.net

2. The definitions and any terms or provisions for the conveyance of Mortgage Loans and issuance of certificates provided for in the SAIL Trust.

3. The terms, policies, and procedures of the original Prospectus and any Supplement to the Prospectus issued for the SAIL Trust.

4. All policies and procedures regarding recording of the original deed of trust and/or mortgage and by the original mortgagee of record.

5. All policies and procedures regarding the assignments of the original deeds of trust and/or mortgages after the recording.

6. The complete chain of transfers and assignments of the original deed of trust and/or mortgage as provided for by the SAIL Trust and the Document Custodial Agreement.

7. The complete chain or sequence of transfers of the original note as provided for by the Pooling and Servicing Agreement, including but not limited to the Mortgage Loan Sale and Assignment Agreement as well as the Original Prospectus and any supplement to the original Prospectus.

8. The complete chain or sequence of transfers of the original note as provided for Document Custodial Agreement and the Original Prospectus and any supplement to the original Prospectus.

9. The rules and procedures as to who must sign or execute the original assignment of the deed of trust and/or mortgage and each and every subsequent assignment and the Prospectus or any supplement to the Prospectus.

10. The identification of the officer of any transferring institution that must sign any of the assignments of the deeds of trust and/or mortgages.

11. The policies and procedures for verification that there are no breaks in the chain of assignments of the original deed of trust and/or mortgage from the original mortgagee of record to the Custodian for the Residential Mortgage-Backed Securitized Trust that actually owns the loan instruments in this case (hereinafter "The Trust").

12. The policies and procedures regarding the obligations of the Document Custodian for the Trust with respect to holding and maintaining all assignments of deeds of trust and/or mortgages with their related mortgage notes.

13. All polices and rules regarding the assignments of deeds of trust and/or mortgages in blank (e.g., an assignment to no designated assignee).

2

14. All policies, rules and procedures regarding any requirements that any assignment of a deed of trust and/or mortgage must include the legal name of the entity to which the beneficial interest is being assigned.

15. All policies, rules and procedures regarding the acceptance of blanket assignments of deeds of trust and/or mortgages to any party in the chain of assignments from the original mortgage to the Custodian for the Trust.

16. All polices rules and procedures regarding the acceptance or rejection of unrecorded assignments of deeds of trust and/or mortgages by the Custodian for the Trust.

17. All polices, rules and procedures regarding the due affixing of a notary stamp and seal to all executed assignments of deeds of trust and/or mortgages.

18. All polices rules and procedures regarding any requirements that the assigned deeds of trust and/or mortgages must contain original signatures in lieu of stamped signatures.

19. All polices rules and procedures regarding any requirements that all recorded assignments of deeds of trust and/or mortgages must include the official date of recording by the local office of land records for the jurisdiction in which the real property is situated.

20. All policies, rules and procedures that prohibit the direct assignment of deeds of trust and/or mortgages from the original mortgagee of record to the Trust.

21. All policies, rules and procedures that would prohibit any servicer of the mortgage loans for the Trust from assigning the rights of the Trust in a deed of trust and/or mortgage to a new lender or third party.

22. All policies, rules and procedures regarding the form and the custodial requirements for all intervening assignments of deeds of trust and/or mortgages that are executed by parties other than the original mortgagee of record.

23. All policies, rules and procedures regarding how the original note must be endorsed by the original lender.

24. All policies, rules and procedures regarding how original notes endorsed in blank are transferred from the originator to the intervening parties and finally to the Trust.

25. All policies, rules and procedures regarding the endorsement of notes with respect to the use of an allonge.

26. All policies, rules and procedures regarding endorsements on notes and the name of the institution making the endorsement as the seller-endorser.

27. All polices, rules and procedures regarding whether or not the name of institution endorsing a note as the seller-endorser must be clearly typed or printed.

28. All policies, rules and procedures regarding the name and title of the individual authorized to endorse a note for the seller-endorser and proof of such title and authority.

29. All policies, rules and procedures as to the whether or not a third-party can act as an attorney-in-fact or pursuant to corporate power of attorney to endorse a note for the seller-endorser.

30. All policies, rules and procedures regarding the form of an endorsement in blank on a note by a seller-endorser.

31. Al policies, rules and procedures for the endorsement of a note by a seller-endorser that is "doing business as" some entity under an assumed name, including the formal corporate name of the entity and the proof of the legal status of the "doing business as" entity.

32. All polices, rules and procedures regarding a complete and unbroken chain of transfers and receipts of the note from the original mortgagee to all intervening parties and finally to the Trustee for the Trust.

33. All rules, regulations and policies that allow or deny a mortgage servicer from making any changes to a note or an allonge to a note.

34. All rules, policies and procedures related to a seller-endorsement that is missing a signature where the institution that should have endorsed the note is no longer in business or is a debtor in a case under Title 11 of the Bankruptcy Code.

35. All rules, policies and regulations related to the Mortgage Loan Sale and Assignment Agreement for the sale of the original note by the originator and by all intervening sellers up to and including the final sale to the Trust.

36. All rules, polices and regulations related to the True Sale Legal Opinions for the sale of the original note by the originator and by all intervening sellers up to and including the final sale to the Trust.

37. All reports that must be filed by the Custodian for the Trust with respect to the due receipt of the original of all notes, deeds of trust and/or mortgages for all loans acquired by the Trust including but not limited to all such reports related to an unbroken chain of assignments for the deeds of trust and/or mortgages from originators to all interveners and to the Trust and for the endorsements, transfers

and delivery of all original mortgage notes from the original mortgagee to all interveners and finally to the Trust.

Dated this 18th day of February, 2011 at West Allis, Wisconsin _____

Rollie R. Hanson, Attorney for Debtors

5

Case 2-11-cv-00893-CNC   Filed 09/22/11   Page 186 of 428   Document 1-1          186
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 24 of 40

## EXHIBIT A FOR PRODUCTION OF DOCUMENTS

1. Your current resume or curriculum vitae.

2. All documents related to and showing the transfer of the plaintiffs' note and mortgage from the originator of the mortgage loan including the underlying mortgage note and mortgage to the depositor for the conveyance of the mortgage loan to the SAIL Trust ("the Trust") so as to show a complete chain of transfers and assignments from the originator to the person or entity so endorsing to the trustee for the Trust as provided for in the Pooling and Servicing Agreement and Prospectus or any amended prospectus for said Trust.

3. A true and correct copy of the for the SAIL Trust.

4. A true and correct copy of any Prospectus or Amended Prospectus for the SAIL Trust.

5. All documents relating to the endorsement and delivery of the mortgage note from the originator to the depositor so as to show a complete chain of endorsements and signed delivery receipts from the originator to the person so endorsing to the trustee for the trust.

6. All documents relating to the endorsement and delivery of the mortgage note from the depositor for the Trust to the trustee for the Trust so as to show a complete chain of endorsements and signed delivery receipts from the depositor to for the Trust to the trustee for the Trust.

7. All documents related to the transfer of all rights of the Depositor under the provisions of the SAIL Trust or for any Mortgage Loan Sale and Assignment Agreement to the Trust, if any including any such agreement.

8. All written acknowledgements for the receipt of all documents executed by the trustee for the Trust.

9. A copy of the original Note unless already provided through written discovery.

10. All endorsements to the original note including all such endorsements from the date of the origination to the date of production, so as to show a complete chain of endorsements from the persons or entities so endorsing to the trustee for the Trust.

11. All Powers of Attorney for any persons signing any of the documents requested herein.

12. All original intervening Assignments showing a complete chain of assignments from the originator to the person assigning the mortgage to the trustee for the Trust.

6

13. All original intervening endorsements showing a complete chain of endorsements from the originator to the person or entity endorsing the note to the trustee for the Trust.

14. All original intervening receipts of delivery and acceptance of each assignment showing a complete chain of such receipts pertaining to the debtors' mortgage loan from the originator to the person accepting the document for the trustee of the Trust.

16. All original intervening receipts of delivery and acceptance of the Note for the debtors' mortgage loan showing a complete chain of such receipts from the originator to the person accepting the document for the trustee for the Trust.

17. The original of each assumption, modification, written assurance or substitution of any or related to any document requested herein.

18. All documents or records maintained by any duly appointed custodian for accepted delivery or acknowledged receipt of any document referred to herein on behalf of the trustee for the Trust.

19. All documents in the "mortgage file" for this loan in the possession of the trustee for the Trust or any designated custodian.

20. Any and all documents referred to herein that have been executed by the Master Servicer in its capacity as seller for the plaintiffs' mortgage loan in this case.

21. Any rating agency opinion on whether or not each assignment of the mortgages must be recorded in any jurisdiction where the real property is located.

22. Any procedures of the holders of any designated percentage of the outstanding certificates issued to the investors in this Trust may direct the Master Servicer to record any or all assignments related to the mortgages.

23. Any procedure providing for the recording of assignments of mortgages in the event of a bankruptcy proceeding involving the originator or the depositor.

24. All documents to show the authority of Duncan C. Delhey to sign the assignment of mortgage dated July 27, 2009 and attached to the file on file in this case by the or on behalf of the trustee.

25. Any electronically stored information pursuant to Rule 34(a)(1)(a) that pertain to any of the above requests in Paragraphs 1 through 28 above that is not readily available or only available with electronically stored information. This includes any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and

7

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 188 of 428   Document 1-1      188
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 26 of 40

other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

# EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WISCONSIN

In re:  Edward Blaine Kohler, and
       Patricia Lynn Kohler,

            Debtors.

Chapter 7

Case No. 09-35931 PP

---

## DEBTORS' SECOND SET OF INTERROGATORIES , THIRD REQUEST FOR PRODUCTION OF DOCUMENTS AND SECOND REQUEST TO ADMIT TO THE CREDITOR, U.S. BANK NATIONAL ASSOCIATION

---

TO:    Attorney Edward Lesniak
        Burke, Warren, MacKay & Serritella, P.C.
        330 N. Wabash Ave., 22nd Floor
        Chicago, IL 60611-3607

        Attorney Penny Gentges
        Bass & Moglowsky
        501 W. Northshore Dr., Suite 300
        Milwaukee, WI 53217

     COME NOW the above-named Debtors herein, by and through their attorney of record, and herewith serve upon the above-named Creditor in this case the following written interrogatories pursuant to the provisions of Rule 7033 of the Rules of Bankruptcy Procedure and Rule 33 of the Federal Rules of Civil Procedure and the following request for the production and inspection of documents pursuant to Rule 7034 of the Rules of Bankruptcy Procedure and Rule 34 of the Federal Rules of Civil Procedure as provided for and set forth in the foregoing rules. Answers to these Interrogatories and Request for Production of Documents must be furnished within forty-five (45) days of the service of the Summons and Complaint or within thirty (30) days of the service of these Interrogatories, whichever is later.

## DEFINITIONS AND INSTRUCTIONS

1. If there is insufficient space after each interrogatory for you to provide a full and complete answer, then you should state your full and complete answer on a separate page, identify the page, and attach the page to your response as a properly identified and marked exhibit thereto.

2. The term "act" as used herein includes acts of every kind and description.

THE LAW OFFICE OF ROLLIE R. HANSON, S.C.
6737 West Washington Street, Suite 1420
West Allis, Wisconsin 53214
(414)321-9733 Fax (414)321-9601
Rollie@hansonlaw.net

3. All requests shall be deemed to include any documents made by, held by, or maintained in the files of any predecessor, successor, employee, agent or assignee of either one or all of the Creditors.

4. The term "plaintiff" or "plaintiffs" means the party identified as such in this pleading.

5. The term "defendant or defendants" means any or all of the parties to this litigation who are delineated as defendants in these pleadings and their subsidiaries, affiliates, any successors and assigns, and predecessors, and includes every officer, director, partner, agent, employee, attorney, servant, or any other person presently or formerly acting for or on behalf of said entity.

6. The term "communication" means any contact, oral or written, formal or informal, at any time or place, under any circumstances, in any manner, whereby a statement of any nature is transmitted or transferred, and shall include, without limitation, any documents containing, constituting reflecting, memorializing, referring or relating to any such contact.

7. The word "or" means and/or and should be read both ways so as to encompass both constructions and calls for documents to be produced responsive to both constructions.

8. The term "representative" refers to any employee, agent, attorney or accountant.

9. The term "person" means natural person, proprietorships, partnerships, groups, corporations, associations, societies, organizations, or government bodies or any other individual or entity.

10. The term "individual" means a natural person.

11. The term "identify" when used in connection with a natural person means to set forth the full name, title, present business address and present business affiliation of said person.

12. The term "identify" when used in connection with a person which is a proprietorship, partnership, corporation, or other organization means to set forth the full name and present business address of that dealership, proprietorship, partnership, corporation, or other organization.

13. The term "identify" when used with reference to a document means to state the date and author (and, if different, the signer or signers), the addresses of the author(s), signer(s), or any individual(s) receiving copies, the type of document (e.g., letter, memorandum, chart), and its present or last known location or custodian.

14. The term "identify" when used with reference to an agreement, contract, understanding or communication means, in addition to Definition 9 above: (a) to state whether it was written or oral, to identify the parties thereto, the place where it was made or occurred,

2

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 192 of 428   Document 1-1          192
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 30 of 40

and the date or dates thereof; (b) to identify the parties thereto, the place where it was made or occurred, and the date or dates thereof; (c) to identify the persons who negotiated or had any role in suggesting, framing or drafting the terms of the agreement, contract or understanding or who participated therein; and (d) to state the substance of the communication, agreement, contract or understanding.

15. The term "identify" when used with reference to a meeting, incident, occurrence or conversation means to state its date, place and subjects covered, to identify its participants and to identify all documents reporting upon or otherwise recording or referring to anything that transpired at such meetings.

16. The term "the transaction" or "the transactions" or "account" or "accounts" when used herein without qualifications means the transactions and accounts between and among the Debtors and the named defendants in all related activities and agents or assigns of either party.

17. The term "Note" shall refer to the Mortgage Promissory Note executed by the Movant in connection with the mortgage loan transaction that is the subject of this litigation.

18. The term "Mortgage" shall refer to the Document filed in the Register of Deeds Office for the County in which the Real Property that is the subject of this litigation is located which is alleged to secure one of the defendants' alleged lien against the Real Property.

19. The term "Real Property" shall refer to the Real Property and improvements that is the subject of this litigation.

20. The term "present" means up to and including the date of your final response to these interrogatories and requests for production of documents.

21. The term "relating to" or "relates to" means regarding, reflecting, discussing, describing, containing, identifying, analyzing, studying, reporting, commenting, evidencing, constituting, revealing, setting forth, considering, recommending, questioning, disputing contesting, correcting, construing, mentioning, associated with, referring to, alluding to, or pertaining to, in whole or in part.

22. The singular shall be construed to include the plural, and the plural shall be construed to include the singular.

23. The masculine includes the feminine, and the feminine includes the masculine.

24. The word "and" shall be construed to include the word "or", and the word "or" shall be construed to include the word "and."

25. The word "each" shall be construed to include the word "every", and the word "every" shall be construed to include the word "each".

3

26. The word "any" shall be construed to include the word "all", and the word "all" shall be construed to include the word "any".

## INSTRUCTIONS

1. The time period for which production of documents and things requested shall be from the date of origination of the mortgage loan that is the subject of this litigation until the date of your responses unless otherwise specified.

2. Each of the following requests is continuing, and in the event that at any later date you obtain or discover any additional document responsive to any request, you shall submit such document promptly.

3. If an objection is made to any request herein, all documents covered by the request not subject to the objection should be produced. Similarly, if an objection is made to production of a document, the portion(s) of that document not subject to objection should be produced with the portion(s) objected to deleted and indicated clearly.

4. Each document is to be produced in its entirety even if only a portion of the document is related to the identified subject matter and without abbreviation, editing, or expurgation and including all appendices, tables, or other attachments. If an appendix, table, or other attachment is not presented with the original but is attached to a copy thereof or is otherwise available, it should be submitted and clearly marked to indicate the document to which it corresponds. With the exception of privileged material, no document or portion thereof should be masked or deleted in any manner. To the extent possible, documents should be produced in the same order and arrangement as in the file form which they are taken.

5. Unless otherwise requested, in lieu of producing original documents, you may produce photocopies, provided that you shall retain the original documents and produce them to the plaintiffs upon request. Further, copies of original documents may be submitted in lieu of originals only if they are true, correct, and complete copies of the original documents, and their submission constitutes a waiver of any claim as to the authenticity of the copy should it be necessary to introduce such copy into evidence in any legal proceeding. *Please provide color copies of any document originally produced in color or containing type, writing, or other marks in any color other than black.*

6. Documents that may be responsive to more than one request need not be submitted more than once; however, such documents should be so identified.

7. All headings herein are included only for organization purposes and should not be construed as being part of any request, or as limiting any request in any manner.

## PRIVILEGE

4

Case 2-11-cv-00893-CNC    Filed 09/22/11    Page 194 of 428    Document 1-1        194
Case 09-35931-pp    Doc 90    Filed 03/03/11    Page 32 of 40

If any document would be required to be produced in response to any request except for the fact that a privilege against production is claimed, set forth for each such document:

1. Its date, title, type of document (memorandum, letter, e-mail, electronic communication, data file, data image, etc.), and length;

2. Its preparer, sender, addressee, recipient and anyone who received a copy of that document when it was originally disseminated;

3. A general description of its subject matter (without revealing the information as to which any privilege is claimed);

4. The exact grounds upon which the objection to production is based;

5. The identity of all persons, in addition to those identified as required by section 2 herein, known to you who have seen or had access to the document;

6. The identity of all parties who have had custody or possession of the document and at what periods of time; and

7. The identity of the person now in possession of the document.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Explain how the Agreement for Signing Authority attached to this Interrogatory as Exhibit 1 allows Chase Home Finance, LLC to provide authority to Attorney Shawn R. Hillman to execute the Assignment of Mortgage dated March 2, 2010 and attached to this Interrogatory as Exhibit 2.

**INTERROGATORY NO. 2:** In regard to the mortgage referenced in Exhibit 2, explain the circumstances as to how Chase Home Finance, LLC came to be assigned the mortgage on the MERS System.

**INTERROGATORY NO. 3:** State when any such assignment on the MERS system , as referenced in Interrogatory 2 took place.

**INTERROGATORY NO. 4:** Explain how Chase Home Finance, LLC could provide authority to Attorney Shawn R. Hillman to execute the Assignment of Mortgage attached as Exhibit Number 2 when the Assignment of Mortgage indicates that Mortgage Electronic Registration Systems was acting as nominee for BNC Mortgage, Inc.

**INTERROGATORY NO. 5:** Explain how the Agreement for Signing Authority attached to this Interrogatory as Exhibit 1 allows Chase Home Finance, LLC to provide authority to Attorney Shawn R. Hillman to execute the Assignment of Mortgage dated March 2, 2010 and attached to this Interrogatory as Exhibit 3.

5

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 195 of 428   Document 1-1       195
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 33 of 40

**INTERROGATORY NO. 6:** In regard to the mortgage referenced in Exhibit 3, explain the circumstances as to how Chase Home Finance, LLC came to be assigned the mortgage on the MERS System.

**INTERROGATORY NO. 7:** State when any such assignment on the MERS system , as referenced in Interrogatory 6 took place.

**INTERROGATORY NO. 8:** Explain how Chase Home Finance, LLC could provide authority to Attorney Shawn R. Hillman to execute the Assignment of Mortgage attached as Exhibit Number 3 when the Assignment of Mortgage indicates that Mortgage Electronic Registration Systems was acting as nominee for Lehmann Brothers Bank, FSB.

## REQUEST
## FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Please produce the MERS MIN Summary for the first and second mortgage pertaining to Claims and Amended Claims 12 and 13.

**REQUEST NO. 2:** Please produce the actual Corporate Resolution to appoint employees of Bass and Moglowsky as Assistant Secretaries or Vice-Presidents of Mortgage Electronic Registration Systems, Inc.

**REQUEST NO. 3:** Please produce all documents to show how and when Chase Home Finance, LLC became a mortgagee of record for either of the mortgages pertaining to Claims and Amended Claims 12 and 13 on file with the Bankruptcy Court in this case.

**REQUEST NO. 4:** Produce the Corporate Minutes for the Board of Directors Meeting approving any Corporate Resolution to appoint any employees of Bass and Moglowsky as Assistant Secretaries or Vice Presidents of Mortgage Electronic Registration Systems, Inc.

## REQUEST TO ADMIT

**REQUEST NO. 1:** Admit that the document attached hereto as Exhibit 4 is not an actual Corporate Resolution.

**REQUEST NO. 2:** Admit that the document attached as Exhibit 4 is a certification of the existence of a Corporate Resolution.

**REQUEST NO. 3:** Admit that Mortgage Electronic Registration Systems, Inc. was incorporated under the laws of the State of Delaware.

**REQUEST NO. 4:** Admit that the laws of the State of Delaware require a Board of Directors meeting to pass any Corporate Resolution.

6

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 196 of 428   Document 1-1          196
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 34 of 40

**REQUEST NO. 5:** Admit that the defendants do not have Board of Director minutes to show the Board of Directors of Mortgage Electronic Registration Systems, Inc. approved a corporate resolution to appoint any employees of Bass & Moglowsky as Assistant Secretaries or Vice-Presidents of Mortgage Electronic Registration Systems, Inc.

**REQUEST NO. 6:** Admit that Section 11.06 of the SAIL Trust titled "Governing Law" states as follows:

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

**REQUEST NO. 7:** Admit that all provisions of the SAIL Trust are governed by and construed in accordance with the State of New York.

**REQUEST NO. 8:** Admit that the transfer of the mortgage notes pertaining to Claims and Amended Claims 12 and 13 are governed under the New York Uniform Commercial Code.

Dated this _18th_ day of _February_, 2011 at West Allis, Wisconsin.

Rollie R. Hanson, Attorney for Debtors

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 197 of 428   Document 1-1      197
Case 09-35931-pp   Doc 90   Filed 03/03/11   Page 35 of 40

7

# AGREEMENT FOR SIGNING AUTHORITY

**MERSCORP, INC.** ("MERS") and its subsidiary, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., CHASE HOME FINANCE, LLC** ("MEMBER") and **BASS & MOGLOWSKY** ("VENDOR") hereby agree as follows:

1. The purpose of this agreement for signing authority (the "Agreement") is to define the rights and obligations of the parties when Vendor performs certain duties, as described in the attached corporate resolution (the "Resolution"), relating to mortgage loans that are registered on the MERS® System and shown on the MERS® System to be serviced by Member.

2. CHASE HOME FINANCE, LLC is a member of MERS, and has signed an agreement of membership that is incorporated herein by reference. Member has entered into a separate contract with Vendor to perform certain services for Member. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust, respectively, and any other form of security instrument under applicable state law.

3. The parties acknowledge that Mortgage Electronic Registration Systems, Inc. may be the mortgagee of record on Member's mortgages. Therefore, in order for Vender to perform its contractual duties to Member, MERS, by corporate resolution, will grant employees of Vender the limited authority to act on behalf of MERS to perform certain duties. Such authority is set forth in the Resolution, which is made a part of this Agreement.

4. The parties agree that Member will provide all necessary information and instructions to Vender to perform certain duties where Mortgage Electronic Registration Systems, Inc. acts as the mortgagee of record. All parties agree that MERS and Mortgage Electronic Registration Systems, Inc. are not responsible for the accuracy of any information provided by Member to Vender, or any information entered into the MERS® System by or on behalf of Member. Any problems regarding the information or instructions between Member and Vender must be resolved between those two parties.

5. Member and Vender agree to indemnify and hold harmless MERS, Mortgage Electronic Registration Systems, Inc. and any employee, director, officer, agent or affiliate of MERS or Mortgage Electronic Registration Systems, Inc. ("MERS Party") from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses that result from the negligence, errors and omissions, breach of confidentiality or willful misconduct of Vender in performing certain duties where Mortgage Electronic Registration Systems, Inc. is the mortgagee of record.

6. Vender shall maintain appropriate insurance coverage that shall include coverage for any negligence, errors and omissions or willful misconduct of all employees authorized to sign as officers of Mortgage Electronic Registration Systems, Inc.

7. Upon termination of the contract between Member and Vender, this agreement shall concurrently terminate and the corporate resolution shall be revoked at such time.

8. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

The parties have executed this Agreement intending to be bound as of the dates indicated below.

**MERSCORP, INC.**

By: _Sharon Horstkamp_

Title: _Vice President_

Dated: _10-22-07_

**MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.**

By: _____

Title: _Secretary/Treasurer_

Dated: _10-22-07_

**CHASE HOME FINANCE, LLC**

By: _____

Title: _Vice President_

Dated: _10/1/2007_

**BASS & MOGLOWSKY**

By: _____

Title: _Vice President_

Dated: _10/3/07_

## ASSIGNMENT OF MORTGAGE

3710217
REGISTER OF DEEDS
WAUKESHA COUNTY, WI
RECORDED ON
December 03, 2009  08:36 AM
James R Behrend
Register of Deeds
1 PG
TOTAL FEE: $11.00
TRANS FEE: $0.00
Book    Page -

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc., as nominee for BNC Mortgage, Inc. Assignor, hereby grants, assigns, and transfers to, A U.S. Bank National Association, as trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2006-4 assignee, all of its right, title, and interest in and to that certain mortgage executed by Edward B. Kohler and Patricia L. Kohler, as mortgagors, to Mortgage Electronic Registration Systems, Inc., as nominee for BNC Mortgage, Inc., as mortgagee, on April 6, 2006, and recorded in the office of the Register of Deeds of Waukesha County, Wisconsin, on May 1, 2006, as Document Number 3382190, together with the note and indebtedness that it secures:

Lot 15, Block 4 Maryknoll Heights Addition No. 1, being a subdivision of a part of the West ½ of the Southeast 1/4 of Section 25, Township 6 North, Range 20 East, in the City of New Berlin, Waukesha County, Wisconsin.

PD 11/1

RETURN TO:
Attn: Greg L. Perry
Bass & Moglowsky, S.C.
7020 N. Port Washington Road
Milwaukee, WI 53217

Tax Key Number: NBC 1251152

Dated this 30th day of November, 2009.

Mortgage Electronic Registration Systems, Inc., as nominee for BNC Mortgage, Inc.

BY: _____ (SEAL)

* _____ Shawn R. Hillmann, VP _____

_____ (SEAL)

* _____

### AUTHENTICATION

Signature(s) _____

authenticated this ___ day of _____, 2009

_____

TITLE: MEMBER STATE BAR OF WISCONSIN
(if not,
authorized by §706.06, Wis. Stats.)

THIS INSTRUMENT WAS DRAFTED BY

_____ Jennifer J. Collins _____

(Signatures may be authenticated or acknowledged. Both are not necessary.)

### ACKNOWLEDGEMENT

STATE OF WISCONSIN        )
                          ) ss.
MILWAUKEE COUNTY          )

Personally came before me this 30th day of November, 2009, the above-named:

_____ Shawn R. Hillmann _____ to me known to be the persons who executed the foregoing instrument and acknowledge the same.

_____

_____ Gregory L. Perry II _____
Notary Public, Milwaukee County,    State of Wisconsin
State of My Commission expires: 2/6/2011



Exhibit 2

Case 09-35931-pp    Claim 12    Filed 09/21/10    Desc Main Document    Page 3 of 30


Case 2:11-cv-00893-CNC    Filed 09/22/11    Page 200 of 428    Document 1-1    200
Case 09-35931-pp    Doc 90    Filed 03/03/11    Page 38 of 40

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc., as nominee for Lehman Brothers Bank, FSB Assignor, hereby grants, assigns, and transfers to, U.S. Bank National Association, as trustee for Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2006-4, assignee, all of its right, title, and interest in and to that certain mortgage executed by Edward B. Kohler and Patricia L. Kohler, as mortgagors, to Mortgage Electronic Registration Systems, Inc., as nominee for Lehman Brothers Bank, FSB as mortgagee, on April 5, 2006, and recorded in the office of the Register of Deeds of Waukesha County, Wisconsin, on May 1, 2006, as Document Number 3382191, together with the note and indebtedness that it secures:

Lot 15, Block 4 Maryknoll Heights Addition No. 1, being a subdivision of a part of the West ½ of the SE 1/4 of Section 25, Township 6 North, Range 20 East, in the City of New Berlin, Waukesha County, Wisconsin.

RETURN TO:
Attn: Greg L. Perry
Bass & Moglowsky, S.C.
7020 N. Port Washington Road
Milwaukee, WI 53217

Tax Key Number: NBC 1251-152

Dated this 2nd day of March, 2010.

Mortgage Electronic Registration Systems, Inc., as nominee for Lehman Brothers Bank, FSB

_____(SEAL)

BY: _____(SEAL)
        Shawn R. Hillmann, VP

### AUTHENTICATION

Signature(s)_____

authenticated this ___ day of _____, 2010

_____

TITLE: MEMBER STATE BAR OF WISCONSIN
(If not,
authorized by §706.06, Wis. Stats.)

THIS INSTRUMENT WAS DRAFTED BY
Jennifer J. Collins

(Signatures may be authenticated or acknowledged.
Both are not necessary.)

### ACKNOWLEDGEMENT

STATE OF WISCONSIN          )
                                                  ) ss.
MILWAUKEE COUNTY          )

Personally came before me this 2nd day of March, 2010, the above-named:

Shawn R. Hillmann          to me known to be the persons who executed the foregoing instrument and acknowledge the same.

_____
Gregory L. Perry II
Notary Public, Milwaukee County, State of Wisconsin
State of My Commission expires: 2/6/2011



Case 09-35931-pp     Claim 13-1     Filed 03/16/10     Desc Main Document     Page 3 of 14

Exhibit 3

Case 09-35931-pp     Claim 13     Filed 09/21/10     Desc Main Document     Page 3 of 15

Case 2:11-cv-00893-CNC     Filed 09/22/11     Page 201 of 428     Document 1-1          201
Case 09-35931-pp     Doc 90     Filed 03/03/11     Page 39 of 40

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

## CORPORATE RESOLUTION

Be it Resolved that the attached list of candidates are employee(s) of Bass & Moglowsky, and are hereby appointed as assistant secretaries and vice presidents of Mortgage Electronic Registration Systems, Inc., and as such, are authorized to:

Assign the lien of any mortgage loan registered on the MERS® System that is shown to be registered to Chase Home Finance, L.L.C. or its designee.

Release the lien of any mortgage loan registered on the MERS® System that is shown to be registered to Chase Home Finance, L.L.C. or its designee.

Execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to Chase Home Finance, L.L.C. , including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process.

I, William C. Hultman, being the Corporate Secretary of Mortgage Electronic Registration Systems, Inc., hereby certify that the foregoing is a true copy of a Resolution duly adopted by the Board of Directors of said corporation effective as of the 22 day of Oct. , 2007, which is in full force and effect on this date and does not conflict with the Certificate of Incorporation or By-Laws of said corporation.

William C. Hultman,  Secretary

Exhibit 4

# BASS & MOGLOWSKY, S.C.
## ATTORNEYS AT LAW

Arthur M. Moglowsky
Steven W. Moglowsky
Penny G. Gentges
Shawn R. Hillmann
Jennifer J. Collins
Joshua J. Brady

501 WEST NORTHSHORE DRIVE, SUITE 300
MILWAUKEE, WISCONSIN 53217

TEL: (414) 228-6700
FAX: (414) 228-6620

*Associates*

Linnea A. DeBraal
David M. Potteiger
Eric S. Teske

June 2, 2011

Hon. Pamela Pepper
U.S. Bankruptcy Court
Eastern District of Wisconsin
by CM/ECF

RE: Kohler, Edward B. and Patricia
     Case no. 09-35931

Dear Judge Pepper:

On May 25, 2011, an evidentiary hearing was held with regard to the Motion for Relief from Automatic Stay of U.S. Bank, National Association, as Trustee for S.A.I.L., Mortgage Pass-Through Certificates, Series 2006-4. The court also heard the oral arguments of counsel. After the hearing, counsel for the movant learned of a relevant decision from the United States Circuit Court of Appeals, Fourth Circuit, dated only a few days prior to the May 25 hearing. The published opinion concerns a note holder's right to foreclose a mortgage under state law (particularly, the negotiable instrument provisions of the Uniform Commercial Code.) The case is <u>Horvath V. Bank of New York, N.A.</u>, No. 10-1528, ___ F.3d __, 2011 WL 1892110 (4th Cir. 5/19/2011.)

A copy of the opinion is enclosed for the court's reference. By copy of this letter, Mr. Hanson will be provided a copy of the opinion as well. Thank you.

Very truly yours,

BASS & MOGLOWSKY, S.C.

Penny G. Gentges

cc: Attorney Rollie R. Hanson

2011 WL 1892110
Only the Westlaw citation is currently available.
United States Court of Appeals,
Fourth Circuit.

John A. **HORVATH**, Plaintiff–Appellant,
v.
BANK OF NEW YORK, N.A.; Cwalt, Incorporated,
Alternative Loan Trust 2006–45TI; Countrywide
Home Loans Servicing, LP; Mortgage Electronic
Registration Systems, Incorporated; Equity
Trustees, LLC; America's Wholesale Lender,
Defendants–Appellees,
and
John Doe; Jane Doe; Jack Doe; Jill Doe; Qui Doe;
Chi Doe; Samuel I. White, PC, Defendants.

No. 10–1528.Argued March 22, 2011.Decided May
19, 2011.

## Synopsis

**Background:** Borrower filed action in state court after
note holder foreclosed on his property alleging violations
of federal Fair Debt Collection Practices Act (FDCPA),
Due Process Clause, and various Virginia laws. Action
was removed on federal question grounds. The United
States District Court for the Eastern District of Virginia,
Anthony J. Trenga, J., 2010 WL 538039, dismissed
action. Borrower appealed.

**Holdings:** The Court of Appeals, Wilkinson, Circuit
Judge, held that:
1 transferee note holder had authority to enforce note by
appointing substitute trustee and foreclosing on property;
2 transfer of borrower's note necessarily involved transfer
of deed of trust, as underlying security; and
3 term, "lender," under deed of trust applied not only to
original lender but to any subsequent purchaser of deed of
trust.

Affirmed.

West Headnotes (10)

1    **Bills and Notes**⇐Instruments Indorsed in Blank
     **Bills and Notes**⇐Indorsees and Assignees in
     General

Under Virginia law, negotiable instruments like
mortgage notes that are endorsed in blank may
be freely transferred; whoever possesses an
instrument endorsed in blank has full power to
enforce it. West's V.C.A. §§ 8.3A–104,
8.3A–201(b), 8.3A–203(b), 8.3A–205(b).

2    **Mortgages**⇐Rights as to Property Mortgaged
     **Mortgages**⇐Rights as to Debt or Obligation
     Secured

Transferee note holder had authority under
Virginia law to enforce note by appointing
substitute trustee and foreclosing on property,
since note had been endorsed in blank, meaning
it was bearer paper and enforceable by whoever
possessed it, note and deed of trust demonstrated
that parties intended to allow documents to be
freely transferred and there was no alteration to
note or deed of trust at any time, there was no
change in its terms of payment, borrower was in
default on his obligations, and note was in
holder's hands when foreclosure sale took place.
West's V.C.A. §§ 8.3A–104, 8.3A–201(b),
8.3A–203(b), 8.3A–205(b), 8.1A–302(a).

3    **Quieting Title**⇐Nature and Scope of Remedy

Under Virginia law, an action to quiet title is
based on the premise that a person with good
title to certain real or personal property should
not be subjected to various future claims against
that title.

4    **Mortgages**⇐Transfer of Debt or Obligation
     Secured

Under Virginia law, transfer of borrower's note
necessarily involved transfer of deed of trust, as
underlying security, where deed of trust did not
contradict note in any meaningful way, and,
instead, like note, suggested that it may be freely
transferred. West's V.C.A. § 55–59.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 204 of 428   Document 1-1
Case 09-35931-pp    Doc 103    Filed 08/02/11    Page 2 of 9

**5**  **Mortgages**⬅Transfer of Debt or Obligation Secured

Under Virginia law, interests in deeds of trust accompany the promissory notes that they secure; deeds of trust and mortgages are regarded in equity as mere securities for the debt, and whenever the debt is assigned the deed of trust or mortgage is assigned or transferred with it.

**6**  **Mortgages**⬅Transfer of Debt or Obligation Secured

Under Virginia law, the "merger doctrine," which deals with extinguishing a previous contract by an instrument of higher dignity, has little applicability where a note and a deed of trust are contemporaneous documents that reflect a singular understanding between the parties.

**7**  **Bills and Notes**⬅Collateral Agreements

Although deeds of trust and their underlying notes are separate and distinct documents under Virginia law, notes and contemporaneous written agreements executed as part of the same transaction will be construed together as forming one contract; where neither document varies or contradicts the terms of the other, the terms of one document which clearly contemplate the application of terms in the other may be viewed together as representing the complete agreement of the parties.

**8**  **Mortgages**⬅Parties Secured

Under Virginia law, term "lender" under deed of trust applied not only to original lender but to any subsequent purchaser of deed of trust.

**9**  **Mortgages**⬅Necessity

While Virginia allows parties to transfer securities like the deed of trust, it does not require them to record such transfers in the land records; in other words, parties may elect to record the transfer in the land records, but their failure to do so does not undermine the transaction in any way. West's V.C.A. § 55–66.01.

**10**  **Mortgages**⬅Defenses

While Virginia law does recognize a limited "double recovery" defense to foreclosure proceedings, that defense does not allow individuals in default on a mortgage to offset their outstanding obligations by pointing to the mortgagee's unrelated investment income.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, District Judge. (1:09–cv–01 129–AJT–TCB).

**Attorneys and Law Firms**

**ARGUED:**Christopher Edwin Brown, Brown, Brown & Brown, PC, Alexandria, Virginia, for Appellant. George Peter Sibley, III, Hunton & Williams, LLP, Richmond, Virginia, for Appellees. **ON BRIEF:**R. Michael Smith, Brown, Brown & Brown, PC, Alexandria, Virginia, for Appellant. Mark B. Bierbower, Hunton & Williams, LLP, Washington, D.C., for Appellees Bank of New York, N.A., Cwalt, Incorporated, Alternative Loan Trust 2006–45TI, Countrywide Home Loans Servicing, LP, Mortgage Electronic Registration Systems, Incorporated, and America's Wholesale Lender; Allison Melton, Bierman, Geesing, Ward & Wood, LLC, Arlington, Virginia, Robert Ryan Michael, Bierman, Geesing, Ward & Wood, LLC, Richmond, Virginia, for Appellee Equity Trustees, LLC.

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

Case 2:11-cv-00893-CNC   Filed 09/22/11   Page 205 of 428   Document 1-1       205
Case 09-35931-pp   Doc 103   Filed 08/02/11   Page 3 of 9

Opinion

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge KEENAN and Judge DIAZ joined.

**OPINION**

WILKINSON, Circuit Judge:

*\*1* In October 2006, America's Wholesale Lender ("AWL") agreed to loan John **Horvath** $650,000. The loan was reflected in an interest-only fixed-rate note and was secured by a deed of trust on **Horvath's** home. In exchange for the $650,000, **Horvath** agreed to repay AWL in monthly installments ranging from $3,791.67 to $5,039.44.

The note allowed AWL (and any subsequent holder) to freely transfer the note. In fact, the note provided for "anyone who takes this Note by transfer" to inherit the powers of the "Note Holder," including the right to accelerate payment in the event **Horvath** defaulted. Moreover, AWL endorsed the note in blank, meaning that, under Virginia law, any party who took possession of the note would have the authority to enforce it.

In 2009, the note ended up in the hands of the Bank of New York ("BNY"). After **Horvath** failed to make payments for over half a year, BNY foreclosed on the property. In response, **Horvath** filed suit, alleging that BNY lacked authority to carry out that sale. On **Horvath's** theory, only AWL—the original lender—had authority to foreclose on the property. This theory, however, runs counter to centuries of Virginia law. We therefore affirm the district court's dismissal of **Horvath's** lawsuit.

**I.**

The facts of the case are largely undisputed; the parties primarily disagree on their meaning. On October 23, 2006, America's Wholesale Lender ("AWL") and John **Horvath** agreed to terms on a loan secured by a deed of trust on **Horvath's** property at 11599 Water Oak Court in Woodbridge, VA. Under the loan, **Horvath** received $650,000 and agreed to pay it back in monthly installments starting on December 1, 2006. Samuel I.

White agreed to serve as the trustee for the loan and Mortgage Electronic Registration Systems, Inc. ("MERS") became the beneficiary.

The terms of the note and the deed of trust clarified that AWL could freely transfer the note at any time, stating, "the Lender may transfer this note." To drive that point home, the note clarified that "The Lender *or anyone who takes this Note by transfer* and who is entitled to receive payments under this Note is called the 'Note Holder.' " (emphasis added). Nor was the term "Note Holder" merely a meaningless title; whoever filled that role had the right to decide whether excess payments would be counted towards interest or principal, to receive late charges, and to accelerate the payment of the loan in the event of default.

The deed of trust contained similarly straightforward language regarding transferability. As Section 20 explained, "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." In the event of such a sale, the deed of trust clarified that "[t]he covenants and agreements of this Security Instrument shall bind ... and benefit the successors and assigns of Lender." Finally, the deed of trust named MERS as the beneficiary "for Lender and Lender's successors and assigns," establishing a consistent beneficiary and thereby further enhancing the ease with which the deed of trust could be transferred.

*\*2* After making the loan, AWL included it in a real estate mortgage investment conduit known as the CWALT Trust. In other words, AWL pooled **Horvath's** loan with others and then sold shares in the pool to investors. Countrywide Servicing subsequently agreed to service **Horvath's** loan. Insofar as Countrywide agreed to accept all of **Horvath's** payments, send him any notices, and answer all of his questions about the loan, it became **Horvath's** single point of contact.

As a natural consequence of the securitization process, **Horvath's** note changed hands. As of 2009, the Bank of New York ("BNY") possessed **Horvath's** loan note. The deed of trust, however, remained unchanged in Virginia's real estate records. By that point, **Horvath** had failed to make payments on the loan for several months. The changing ownership of the note provided him no excuse: despite the transfers, Countrywide had remained as the servicer and **Horvath** had dealt exclusively with that company. Accordingly, a lawyer at the law firm of Bierman Geesing & Ward (acting on BNY's behalf) appointed Equity Trustees as a substitute trustee for Samuel I. White. Equity Trustees then conducted a foreclosure sale on the property on August 14, 2009.

That same month, **Horvath** filed his complaint in

Virginia state court. The complaint alleged violations of the federal Fair Debt Collection Practices Act ("FDCPA"), the Due Process Clause, and various Virginia laws, and it named as defendants BNY, Countrywide, MERS, AWL, Equity Trustees, Samuel I. White, the CWALT Trust, and all holders of certificates in that trust. The defendants removed the case to federal court based on the FDCPA and constitutional claims, and Equity Trustees moved to dismiss the complaint in October 2009.

That motion was granted in part and denied in part on November 13, 2009, which led **Horvath** to file an amended complaint later that month. That complaint alleged several claims, the most salient of which was **Horvath's** claim to quiet title under Virginia law on the theory that the "splitting, selling, trading, and insuring of the pieces of" his mortgage had caused "the Deeds of Trust [to] split from the Notes and [become] unenforceable." On **Horvath's** view, the securitization of his mortgage note had voided anyone else's claim to title over the property, meaning that he now owned the property free and clear despite having defaulted on the loan.

All of the defendants except Samuel I. White moved to dismiss that complaint, and their motion was granted on January 29, 2010. The court concluded that **Horvath's** quiet title claim must fail because AWL's decision to transfer **Horvath's** note to the CWALT Trust and ultimately to BNY was proper under both the note and Virginia law. The district court further reasoned that these transfers had not changed **Horvath's** repayment obligations in any way. After **Horvath** filed several unsuccessful motions to reconsider, the parties agreed to voluntarily dismiss the remaining claims against Samuel I. White in an order the court labeled "final."1 This appeal followed.

## II.

*3 For several centuries, Virginia has attempted to enhance commerce within the state by ensuring that negotiable instruments—broadly defined under Virginia law as "unconditional promise[s] or order[s] to pay a fixed amount of money," *see* Va.Code Ann. § 8.3A–104(a)—are freely transferable. Indeed, the state's policy dating back to at least 1827 has been to allow the bearer of a negotiable instrument (that is, the person to whom funds are owed) to endorse the instrument "in blank." *Whitworth v. Adams*, 26 Va. (5 Rand.) 333, 1827 WL 1200, at *45 (1827) (Cabell, J.). Such an endorsement allows the bearer to transfer the instrument freely, insofar as it makes possession the sole

precondition to enforcement of the instrument. *Id.* ("[H]aving been endorsed in blank, every bearer or holder, be he agent, trustee, finder or thief, has a right to sell [the instrument], and to transfer it, by delivery."). This approach allows the parties to avoid thorny disputes about who has to pay whom, and when, in favor of a simple rule: possession permits enforcement. After all, as the *Whitworth* court observed, "[t]o compel the purchaser to go into enquiries as to the consideration, or to permit the parties to the bill to object to its payment, on any of the grounds stated, would greatly impair the negotiability of bills and notes; their most distinguishing, most useful, and most valued feature." *Id.*

Since then, Virginia law has hewed to this basic approach in a variety of ways. Principally, the state has ensured that notes remain easy to transfer by adopting the provisions of the Uniform Commercial Code governing negotiable instruments. Those provisions set forth a relatively simple set of rules. Instruments may still be endorsed in blank, *see* Va.Code Ann. § 8.3A–201(b), and once they are so endorsed, they may be negotiated (that is, transferred) "by transfer of possession alone," *see id.; see also id.* § 8.3A–205(b) ("If an [e]ndorsement is made by the holder of an instrument and it is not a special [e]ndorsement, it is a 'blank [e]ndorsement.' When [e]ndorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially [e]ndorsed."). After a transfer, the recipient of an instrument obtains whatever rights the transferor had, which in the case of an instrument endorsed in blank amounts to plenary power to enforce the instrument. *See id.* § 8.3A–203(b) ("Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument."). In other words, just as before, possession of a negotiable instrument endorsed in blank permits the holder to enforce it. *Id.; see id.* § 8.3A–205(b) (establishing that the holder of an instrument endorsed in blank has the right to demand payment).

1 The upshot of these provisions is clear. Negotiable instruments like mortgage notes that are endorsed in blank may be freely transferred. And once transferred, the old adage about possession being nine-tenths of the law is, if anything, an understatement. Whoever possesses an instrument endorsed in blank has full power to enforce it. With these principles in mind, we turn to evaluating **Horvath's** claims.

## III.

*4 2 3 **Horvath's** principal argument on appeal stems from his quiet title claim.2 "[A]n action to quiet title is

based on the premise that a person with good title to certain real or personal property should not be subjected to various future claims against that title." *Maine v. Adams*, 277 Va. 230, 672 S.E.2d 862, 866 (Va.2009). In **Horvath's** view, under the note, the deed of trust, and Virginia law, only AWL (as the originating lender) had the authority to foreclose on his home. Thus, the foreclosure was illegitimate, because BNY (and its substitute trustee, Equity Trustees) had no authority to carry it out.

It is difficult to see how **Horvath's** arguments could possibly be correct. **Horvath's** note plainly constitutes a negotiable instrument under Va.Code Ann. § 8.3A–104. That note was endorsed in blank, meaning it was bearer paper and enforceable by whoever possessed it. *See* Va.Code Ann. § 8.3A–205(b). And BNY possessed the note at the time it attempted to foreclose on the property. Therefore, once **Horvath** defaulted on the property, Virginia law straightforwardly allowed BNY to take the actions that it did.

There is no evidence that the note or deed of trust sought to curb these generally applicable provisions of Virginia law. While parties may contract around the baseline rules applicable to negotiable instruments, *see id.* § 8.1A–302(a), both the note and the deed of trust demonstrate that the parties intended to allow the documents to be freely transferred. The note, for example, established that "the Lender may transfer this Note," declared that "[t]he Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is ... the 'Note Holder,' " and granted the note holder the right to make various decisions about the administration of **Horvath's** obligations and about how to deal with default. The deed of trust took similar steps, asserting that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower," and clarifying that "[t]he covenants and agreements of this Security Instrument shall bind ... and benefit the successors and assigns of Lender." Taken together, these provisions do little to suggest that the parties intended to depart from the Virginia code's permissive approach to transfers. In fact, they suggest precisely the opposite.

In short, it is undisputed that there was no alteration to the note or deed of trust at any time, that there was no change in its terms of payment, that **Horvath** was in default on his obligations, and that the note was endorsed in blank and in BNY's hands when the foreclosure sale took place. Based on these facts, it seems difficult to debate that BNY had the authority to enforce the note by appointing a substitute trustee and foreclosing on the property.

## IV.

**Horvath,** however, makes a number of arguments in response to this straightforward reasoning.[3]

### A.

*\*5 4* We first address the argument **Horvath** presses most forcefully: that the note and deed of trust are "separate agreements" that are "governed by separate rules of enforcement." Appellant's Br. at 18. Sometimes **Horvath** argues that this differential treatment is a feature of Virginia law; other times he suggests that it is a product of "the securitization of the Note." Reply Br. at 11. Either way, his contention boils down to a basic principle: while BNY "*potentially* could sue on the Note pursuant to the UCC," *id.* at 8, 672 S.E.2d 862, it has no claim under the deed of trust. According to **Horvath,** the deed of trust is governed by the law of real property and by equitable principles, and those sources suggest that AWL is the only party that can foreclose on the property. *See* Appellant's Br. at 19–23.

But this argument is seriously flawed. For starters, both the deed of trust and the case law suggest that there is no reason to treat the note and deed of trust as governed by separate forms of law. The text of the deed of trust envisions that it will be conjoined with the note, clarifying that "[t]he Note or a partial interest in the Note *(together with this Security Instrument)* can be sold one or more times without prior notice to Borrower." (emphasis added). This provision belies any contention that the note is somehow walled off from the deed of trust.

5 The cases reinforce this perspective. For over a century, it has been settled that under Virginia law, interests in deeds of trust accompany the promissory notes that they secure. In other words, "deeds of trust and mortgages are regarded in equity as mere securities for the debt, and whenever the debt is assigned the deed of trust or mortgage is assigned or transferred with it." *Williams v. Gifford,* 139 Va. 779, 124 S.E. 403, 404 (Va. Special Ct.App.1924) (citing *McClintic v. Wise's Adm'rs,* 66 Va. (25 Gratt.) 448, 1874 WL 5664 (1874)); *see Stimpson v. Bishop,* 82 Va. 190, 1886 WL 2987, at \*7 (Va.1886) ("It is undoubtedly true that a transfer of a secured debt carries with it the security without formal assignment or delivery."). The transfer of **Horvath's** note thus necessarily involved a transfer of the underlying security.

6 The cases **Horvath** cites in response do not undermine this longstanding principle or suggest that the note and deed of trust should receive different legal treatment. **Horvath** relies on *Empire Management & Development Co., Inc. v. Greenville Associates,* 255 Va. 49, 496 S.E.2d

440 (Va.1998) and *Beck v. Smith*, 260 Va. 452, 538 S.E.2d 312 (Va.2000), for the proposition that the "Deed of Trust is 'of higher dignity' and better evidence of the understanding of the parties" than the note. Appellant's Br. at 18 (quoting *Empire Mgmt.*, 496 S.E.2d at 443). But these cases involve the "merger doctrine," which "deals with extinguishing a previous contract by an instrument of higher dignity." *Empire Mgmt.*, 496 S.E.2d at 442. In other words, these cases focus on situations where a later-executed deed of trust contradicts an earlier agreement. But that doctrine has little applicability where, as here, the note and the deed of trust are *contemporaneous* documents that reflect a singular understanding between the parties. And even if the doctrine did apply, the deed of trust does not contradict the note in any meaningful way. To the contrary, it, like the note, suggests that it may be freely transferred.

*\*6 7* Of course **Horvath** is right that "deeds of trust and their underlying notes are 'separate and distinct' documents." *Va. Hous. Dev. Auth. v. Fox Run Ltd. P'ship*, 255 Va. 356, 497 S.E.2d 747, 752 (Va.1998) (quoting *Jim Carpenter Co. v. Potts*, 255 Va. 147, 495 S.E.2d 828, 833 n. 5 (Va.1998)). But it is equally clear that "notes and contemporaneous written agreements executed as part of the *same transaction* will be construed together as forming one contract." *Id.* (quoting *Richmond Postal Credit Union v. Booker*, 170 Va. 129, 195 S.E. 663, 665 (Va.1938)) (emphasis added). Where "neither document varies or contradicts the terms of the other, [the] terms of one document which clearly contemplate the application of terms in the other may be viewed together as representing the complete agreement of the parties." *Id.* at 752–53. Here, that "agreement" is that the note and deed of trust form part of one transaction, that the note may be transferred freely with the purchaser or recipient inheriting full rights to enforce, and that the deed of trust follows the note.

Indeed, common sense suggests that things could not be any other way. If **Horvath** were correct in asserting that the transfer of a note splits it from the deed of trust, *see* Reply Br. at 11, there would be little reason for notes to exist in the first place. One of the defining features of notes is their transferability, *see Whitworth*, 26 Va. 333, 1827 WL 1200, at \*45, but on **Horvath's** view, transferring a note would strip it from the security that gives it value and render the note largely worthless. This cannot be—and is not—the law.

Finally, even were we to assume that deeds of trust are governed by different law than notes, the Virginia code confirms that BNY had the authority to take the steps it took. Section 55–59 of the code discusses the construction of deeds of trust and quite plainly states that "[t]he party secured by the deed of trust, or the holders of greater than fifty percent of the monetary obligations secured thereby,

shall have the right and power to appoint a substitute trustee or trustees for any reason." Va.Code Ann. § 55–59(9). At the very least, at the time it appointed Equity Trustees to carry out the foreclosure, BNY held 100 percent of the monetary obligations due from **Horvath** by virtue of being the holder of the note **Horvath** signed, bringing its actions squarely within the scope of § 55–59(9).

## B.

**8 Horvath** mounts one other argument for why the deed of trust trumps the note: according to him, the deed of trust's plain text *forbids* anyone but AWL from appointing a substitute trustee and foreclosing on the property. **Horvath's** argument here is a bit complicated, and rests on the interpretive canon that "expressing one item of a commonly associated group or series excludes another left unmentioned." *United States v. Vonn*, 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002).

As **Horvath** points out, the deed of trust defines the term "Lender" as AWL and quite clearly specifies when actors *besides* the Lender may take actions to administer the deed of trust. For example, Section 7 allows the "Lender or its agent" to make "reasonable entries and inspections of the Property," and Section 22 requires the "Lender or Trustee" to give notice to the borrower if the Lender decides to sell the property. But the deed of trust allows only the "Lender" to "invoke[ ] the power of sale" (in Section 22) and "appoint a successor trustee" (in Section 24). Thus, argues **Horvath**, while the parties allowed the Lender's agents and trustees to stand in the Lender's shoes for some purposes, "the parties ... did not see fit to extend" the powers of sale and appointment "beyond the Lender." Appellant's Br. at 14. Therefore, only AWL can enforce the deed of trust.

*\*7* This argument runs aground on other provisions of the deed of trust. Section 20 allows for the "Note or a partial interest in the Note (together with this Security Instrument) [to] be sold one or more times without prior notice to" **Horvath**. This provision establishes that AWL—the Lender—may sell its entire interest in the deed of trust to another party. But if **Horvath's** reading of the deed of trust is correct, the purchaser would be paying for a worthless document, as the purchaser would have absolutely no power to administer or enforce the deed of trust. After all, to the extent **Horvath** argues that AWL is the *only* party who can fulfill the role of the "Lender" under the deed of trust, the purchaser would be entirely beholden to AWL—a party who, post sale, has no remaining financial stake in the deed of trust—to manage the deed of trust after the sale.

The better reading—and the one that avoids bringing about such an absurd result—is to read the term "Lender" as applying not only to AWL but to any subsequent purchaser of the deed of trust. *See Chi. Ry. Equip. Co. v. Merchants' Bank,* 136 U.S. 268, 281, 10 S.Ct. 999, 34 L.Ed. 349 (1890) (provisions of a contract should "be construed in connection with the other provisions, so that if possible, or so far as is possible, they may all harmonize"); *Ward's Equip., Inc. v. New Holland N. Am., Inc.,* 254 Va. 379, 493 S.E.2d 516, 519 (Va.1997) ("A contract must be construed as written and as a whole with all parts being harmonized whenever possible."); *Paramount Termite Control Co., Inc. v. Rector,* 238 Va. 171, 380 S.E.2d 922, 925 (Va.1989) (same). This approach comports as well with the text of the deed of trust, for Section 13 provides that "[t]he covenants and agreements of this Security Instrument shall bind ... and benefit the *successors and assigns* of Lender." (emphasis added).

It is worth noting in closing that this reading has the additional benefit of making good sense. If AWL were to sell its interest in the deed of trust, it would no longer be the "Lender" in any meaningful sense: at that point, **Horvath's** financial obligations would run to the purchaser, not to AWL, and AWL would not be entitled to recover any funds from **Horvath**. On **Horvath's** view, by contrast, even after the point of sale, AWL—not the purchaser—would be the "Lender" and would have the right to receive monthly payments and foreclose on the property. Stating this proposition is sufficient to refute it.

### C.

Perhaps recognizing the flaws with his textual argument, **Horvath** comes close to conceding that any "successor in interest to AWL" can enforce the deed of trust. Reply Br. at 13. Nevertheless, **Horvath** mounts one final argument for why BNY is not truly the "Lender." On **Horvath's** view, the transfer of the note and deed of trust was invalid because it was never recorded in the land records relating to **Horvath's** property. According to **Horvath**, the land records do not reflect any "assignment ... evidencing a transfer of interest in the Deed of Trust from AWL to any other entity," meaning there is a "break in the chain of title" on the property. Appellant's Br. at 21. Thus, "BNY's possession of the physical note is meaningless"; as the transfer was not recorded, "equitable principles" suggest that BNY had no right to enforce the deed of trust. Reply Br. at 16.

*8 9 The principal problem with this argument is that it is inconsistent with Virginia law. While Virginia allows parties to transfer securities like the deed of trust, it does not require them to record such transfers in the land records. Indeed, Va.Code Ann. § 55–66.01 suggests that the assignor of a deed of trust "at its option, *may* cause the instrument of assignment to be recorded," but goes on to make clear that "[n]othing in this statute shall imply that recordation of the instrument of assignment or a certificate of transfer is necessary in order to transfer to an assignee the benefit of the security provided by the deed of trust." Va.Code Ann. § 55–66.01 (emphasis added). In other words, parties may elect to record the transfer in the land records, but their failure to do so does not undermine the transaction in any way.

10 At bottom, **Horvath's** arguments on this score stem more from his views of what the law ought to be than from what it actually is. But even if **Horvath** were correct in arguing that recordation would help avoid the "fraud" that has allegedly beset the mortgage industry "at all levels," Appellant's Br. at 22, and would preserve the "sanctity of the land records," *id.* at 20, 380 S.E.2d 922, we would nevertheless still decline to accept his invitation to rewrite Virginia law. The Virginia legislature has decided to allow parties free rein to assign and transfer notes and the deeds of trust accompanying them, and if **Horvath** thinks the legislature struck that balance wrong, it is for the legislature to correct it.4

### V.

**Horvath's** briefs are filled with allegations of fraud in the mortgage industry and discussions of the financial crisis that has plagued the country of late. But these seem interposed mainly to distract attention from what in reality is a straightforward commercial case. The court cannot ignore the myriad sources that confirm BNY's authority to take the steps that it did—from the text of the note and deed of trust, to the provisions of the Virginia code, to the centuries of Virginia case law protecting the negotiability of commercial instruments. None of these permits us to grant **Horvath** undisputed title over his property in return for his default. We thus affirm the judgment of the district court.

### *AFFIRMED*

Footnotes

1    Throughout the litigation, there has been some confusion as to whether the order being appealed is a final order within the meaning of 28 U.S.C. § 1291. After hearing argument and reviewing the district court's designation of its order as final, we think it appropriate to construe that order as final and appealable. *See* JA 469.

2    **Horvath** also appeals the district court's decision to dismiss Count 2 of his complaint. That count involved a second loan in the amount of $111,000 that **Horvath** secured from the First Magnus Financial Corporation ("FMFC") in February 2006. Count 2 sought a declaratory judgment stating that FMFC cannot foreclose on the note, even though **Horvath** is in default and even though the current noteholder has made no attempt to foreclose. Having reviewed the parties' submissions, we conclude that this claim is unripe for adjudication. Insofar as no foreclosure has even been threatened, **Horvath** cannot yet show a "controversy ... presented in [a] clean-cut and concrete form." *Ostergren v. Cuccinelli,* 615 F.3d 263, 288 (4th Cir.2010) (quoting *Miller v. Brown,* 462 F.3d 312, 316 (4th Cir.2006)).

3    In addition to the arguments discussed below, **Horvath** hints that BNY should have had to prove that it had standing to enforce the note before appointing Equity Trustees to conduct a foreclosure. *See* Appellant's Br. at 16. We reject this argument. Virginia is a non-judicial foreclosure state. As Virginia law provides, in the event of default on a deed of trust, the trustee "shall forthwith declare all the debts and obligations secured by the deed of trust at once due and payable and may take possession of the property and proceed to sell the same at auction" without any need to first seek a court decree. *See* Va.Code Ann. § 55–59(7).

4    As a last resort, **Horvath** argues that the appellees should not have been able to foreclose on his property because they did not suffer any losses from his default. In his view, the profits from the securitization of his mortgage must have offset any losses the appellees incurred from his default. We reject this claim as well. While Virginia law does recognize a limited "double recovery" defense to foreclosure proceedings, *see Nizan v. Wells Fargo Bank Minn. Nat'l Ass'n,* 274 Va. 481, 650 S.E.2d 497 (Va.2007), that defense does not allow individuals in default on a mortgage to offset their outstanding obligations by pointing to the mortgagee's unrelated investment income.

---

**End of Document**          © 2011 Thomson Reuters. No claim to original U.S. Government Works.

THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: July 06, 2011

Honorable Pamela Pepper
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
------------------------------------------------------------
In Re: Kohler, Edward B. and Patricia L.

                              Case No.   09-35931-pp
                              Chapter   13
                Debtors.
------------------------------------------------------------
     U.S. Bank National Association, as Trustee for
     Structured Asset Investment Loan Trust,
     Mortgage Pass-Through Certificates, Series 2006-4

                Plaintiff,

vs.

     Edward B. and Patricia L. Kohler
     and Mary B. Grossman, Trustee,

                Defendants.
------------------------------------------------------------
          ORDER GRANTING RELIEF FROM STAY
------------------------------------------------------------
     Plaintiff having filed two Motions for Relief from Automatic
Stay with regard to two separate mortgages encumbering the
Debtors' homestead, and the Debtors having objected thereto, and
said motions having come on for evidentiary hearing before the
Court on May 25, 2011, the Honorable Pamela Pepper, U.S.
Bankruptcy Judge, presiding, and the debtor, Edward B. Kohler,
having appeared personally and by Attorney Rollie R. Hanson, and
the Plaintiff having appeared by its attorneys, Edward J. Lesniak
and Penny G. Gentges, and the Trustee having filed no objection
herein, and the Court having heard the testimony of Christopher
P. Corcoran and having reviewed the parties' written submissions,
and being duly and sufficiently advised in the premises;
     IT IS ORDERED that the stay imposed pursuant to 11 U.S.C.
362 of the Bankruptcy Code be, and the same is hereby,

terminated, to permit plaintiff to foreclose the real estate mortgages on the debtors' property located at 5310 S Skyline Dr; New Berlin, Wisconsin.

IT IS FURTHER ORDERED that this Order shall not be stayed after entry pursuant to Rule 4001(a)(3), and plaintiff may immediately enforce this Order Granting Relief from Stay.

#####

2

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WISCONSIN

```
----------------------------
IN RE:                       :   Case No.  09-35931
                             :
  EDWARD BLAINE KOHLER &     :   517 East Wisconsin Avenue
  PATRICIA LYNN KOHLER,      :   Milwaukee, Wisconsin  53202
                             :
             Debtors.        :
----------------------------
EDWARD and PATRICIA KOHLER   :   Adversary No. 2010-2694
             Plaintiffs,     :
         vs.                 :
                             :
U.S. BANK, et. al.           :   June 27, 2011
             Defendants.     :   3:08 p.m.
----------------------------
```

       TRANSCRIPT OF TELEPHONE CONFERENCE - ORAL DECISION
          HEARD BEFORE THE HONORABLE PAMELA PEPPER
             UNITED STATES CHIEF BANKRUPTCY JUDGE


TRANSCRIPT ORDERED BY:

       ROLLIE R. HANSON, ESQ.
       Law Office of Rollie R. Hanson, S.C.
       6737 West Washington Street
       Suite 1420
       West Allis, WI  53214


A P P E A R A N C E S:

       ROLLIE R. HANSON, ESQ.
       Attorney for Edward and Patricia Kohler

       EDWARD LESNIAK, ESQ.
       PENNY JENSIS, ESQ.
       Attorneys for U.S. Bank, N.A.

       AMY GINSBERG, ESQ.
       Attorney for the United States Trustee

       JACK ZAFIROPOULOS, ESQ.
       Chapter 13 Trustee


                 AudioEdge Transcription, LLC
              425 Eagle Rock Avenue - Suite 201
                 Roseland, New Jersey  07068
                      (973) 618-2310
                 www.audioedgetranscription.com

1        (Proceedings commence at 3:08 p.m.)

2        THE COURT:  The Court calls case 2009-35931, Edward

3   Kohler and Patricia Kohler and Adversary Proceeding 2010-2694,

4   Edward and Patricia Kohler versus Structured Asset Investment

5   Loan Mortgage, et. al. and U.S. Bank, et. al.  Please state

6   your appearances for the record beginning with counsel for the

7   debtor.

8        MR. HANSON:  Attorney Rollie Hanson appearing for

9   the debtor.

10        MS. JENSIS:  Penny Jensis for the defendants.

11        MR. LESNIAK:  Edward Lesniak also for the defendant,

12   U.S. Bank.

13        MS. GINSBERG:  Amy Ginsberg for the United States

14   Trustee.

15        MR. ZAFIROPOULOS:  Attorney Jack Zafiropoulos

16   (phonetic) for the Chapter 13 trustee..

17        THE COURT:  Good afternoon to everyone.  We had

18   scheduled this hearing this afternoon after the evidentiary

19   hearing that we conducted a little while ago now, I think in

20   March.  And I had scheduled the hearing to give you all an

21   oral ruling on the issues that came up at that hearing.

22        Let me first just note as an administrative matter,

23   and I do apologize for this, back in April of 2010 before a

24   lot of this litigation got advanced somewhat, Mr. Hanson had

25   filed a request to consolidate the issues and the motion for

1   relief from stay, the objection to confirmation, the

2   objections to claim -- claims, plural, and the motion to

3   dismiss the adversary.  I don't think I ever officially ruled

4   on that.  I'm assuming that we all realized that functionally

5   speaking I have been operating as if all of those items were

6   consolidated since then.  But I don't think I actually ever

7   order granting that motion and consolidating those issues.

8   And so as an initial matter, I am -- I have granted the April

9   21, 2010 motion to consolidate these matter.  Because as we've

10  all discussed, kind of ad nauseam by now, they all involve the

11  same legal issues and the same factual basis.

12          Now with regard to those legal issues and those

13  factual basis at bottom, the debtor's arguments, the

14  plaintiff's argument and the adversary, relate to the question

15  of whether or not the various movants or claimants in the

16  motions from relief from stay and the persons filing claims

17  and objections to confirmation, have standing to prosecute

18  those matters.

19          I should tell you at the outset that I relied to a

20  great extent in making my decision on a very recent case from

21  the 9th Circuit bankruptcy appellate panel, which some of you

22  may be familiar with, but I will give you the cite.  The cite

23  is <u>Veal</u>, V-e-a-l, as in baby cow, <u>v. American Home Mortgage</u>

24  <u>Servicing, Inc. and Wells Fargo</u>.  The West Law cite for that

25  case is 2011, West Law, 2304200.

1          As I indicated, it is a decision out of the

2     bankruptcy appellate panel for the 9th Circuit.  Judge

3     Markell, Judge Kirscher and Judge Jury sitting on that panel.

4     It is a very extensive and workmanlike, I think, discussion of

5     the concepts of standing as they relate to mortgage litigation

6     such as that which we've been engaged.  And the decision

7     starts out by noting that there are a couple of different

8     elements to standing.  The first is what we think as

9     constitutional standing.  And that is the requirement that

10    whatever party is seeking redress or relief has to have

11    sustained some injury in fact that is fairly traceable by the

12    party against whom, or from whom they're seeking that redress.

13

14         The panel indicates that this is a relatively

15    minimal requirement.  You basically have to show injury,

16    causation and redressability.  And in cases involving standing

17    -- I'm sorry, in cases involving motion for relief from stay,

18    basically the party for relief from stay has to show that it

19    has rights and remedies, that it has been prevented from

20    pursuing.  And if stay were -- if relief from stay were

21    granted, the party would have the ability to pursue those

22    rights.

23         With regard to standing and the context of filing a

24    claim and objection to that claim, the parties simply have to

25    show that it's entitled to payment of some sort from the

1    bankruptcy estate.

2         Now with regard to standing to object to

3    confirmation of the plan, again, the party has to show that it

4    is somehow damaged in some way or another by failure to treat

5    its claims or its entitlements in the plan.

6         With regard to constitutional standing, that most

7    minimal level of standing that the Veal case, and others by

8    the way, address and discuss I don't have any question here

9    that U.S. Bank as trustee for the, I'm going to call it sale,

10   has standing.  Has constitutional standing.

11        It has alleged, U.S. Bank has as trustee, that with

12   regard to the motion for relief from stay that it has rights

13   that the stay prohibits it from pursuing.  If it were granted

14   relief from stay it would have the ability to go to state

15   court and pursue those rights.

16        With regard to the proofs of claim, it has alleged

17   that it believes that it is -- has a claim that it is entitled

18   to be paid.  And with regard to the objection to confirmation,

19   that it has been prevented from pursuing its rights in the

20   bankruptcy case through the way the plan treats it.

21        The second element, or piece I should say I guess,

22   of standing that the Veal case discusses is this notion of

23   prudential standing.  And that is going beyond the minimum

24   requirements of standing for a constitutional basis looking at

25   perhaps the more practical limitations of standing that judges

1    and other parties look to, sort of from a manageability

2    standpoint, even if somebody could claim that they had an

3    injury, in fact, and there was causation and redressability,

4    is there enough of an indication that this party in court is

5    the party who suffered that injury.  And that this party is

6    asserting its own rights to allow that party to proceed.  And

7    in particular, and I think most relevant to the discussions

8    that we've been having in this case, is the element that the

9    Veal panel talks about, the doctrine that a plaintiff must

10   assert its own legal right and may not assert the legal rights

11   of others.  That's one of the facets of Prudential's standing.

12   And that is one of the facets that comes up frequently in the

13   sorts of cases that we're seeing now I think in this

14   litigation.  That facet relates to Rule 77 requirement that

15   whoever it is in court who is seeking redress has to be a

16   party in interest.  And it has to be a real party in interest.

17   It has to be the party that is entitled to the relief.

18         So those are some of the underlying doctrines that I

19   have been looking at in reviewing the issues that have been

20   raised here.  Let me also share with you the findings of fact

21   that I have made based on the evidence that was presented at

22   the evidentiary hearing.

23         First, I find that on April 6, 2006 BNC lent

24   $220,800 to the Kohlers.  There's a note that was presented

25   both in court as part of Deutsche Bank's loan file of which it

1    was a custodian on the primary mortgage loan.  And also a

2    note, a copy of that note at any rate, was attached to the

3    proofs of claims in these cases.  BNC was the payee, the

4    original payee on that note.  On that same date, on April 6,

5    2006, Lehman lent $55,200 to the Kohlers.  Similar situation,

6    Lehman was the payee on the note.  The note -- a copy of the

7    note was attached to the proofs of claim for the second

8    mortgage loan and also presented in court.

9            I also find pursuant to the testimony of Mr.

10   Corcoran, who testified on behalf of Deutsche Bank, the

11   custodian of the records in this case, that on April 20, 2006

12   Deutsche Bank received both -- I should say files for both of

13   these loans.  That's about two weeks after the loans were

14   issued to the Kohlers.  Each of those files contained,

15   pursuant to Mr. Corcoran's testimony, the original note.  Each

16   of those files also contained, as of April 20, 2006, an

17   allonge payable in blank.  Each of those allonges reflected

18   the loan number.  The -- I think it was 8336 and 8338 loan

19   numbers for the first and second mortgage loans, the address

20   and name of the Kohlers as borrowers.  And that also was the

21   address of the house in question.

22           There was, according to Mr. Corcoran, a particular

23   order in which each of those documents was in the file.  He, I

24   think, specifically referred to it as the stacking order.

25   That each of those documents appeared in the files that

1   Deutsche Bank maintained.  He also indicated that with regard

2   to the allonge and the note in each of the files that the

3   documents had been separated at various points in time.

4   Individual pieces of paper in the file had been separated

5   throughout the course of the time that Deutsche Bank had had

6   them.  Whether it was by servicers who had requested the file

7   to proceed with foreclosure or whatever else, but that the

8   mortgage, I'm sorry, the loan, note and the allonge had staple

9   holes in the upper lefthand corners indicating that at some

10  point there had been attachment to other documents.  He also

11  indicated at the time he first saw the files the documents

12  were all clipped together at the top.  Hole punched and then

13  clipped together at the top.

14          I also find, based on his testimony in the courtroom

15  during the evidentiary hearing that Mr. Corcoran was a

16  credible witness.  That he was truthful in his testimony, that

17  he provided full and accurate testimony with regard to

18  Deutsche Bank's role as custodian of these files.  And I do

19  rely on his testimony in these findings.

20          I find that the debtor's filed their bankruptcy

21  petition on November 3, 2009, about three and a half years

22  after these files came into the possession of Deutsche Bank as

23  custodian.  I also find, although I'll discuss a little bit

24  later my conclusions with regard to the relevance of these

25  issues, that pursuant to documentation that was attached to

1  the proofs of claim filed in this case, it appears that on

2  November 30, 2009 Mortgage Electronic Registration Systems

3  reporting to act as nominee for BNC comported a document which

4  purported to be an assignment of the mortgage in the -- with

5  regard to the first mortgage to the trust.  And on December 2,

6  2009 it appears that BNC signed an allonge payable to the

7  trust.  And that was attached to the first proofs of claim

8  that was filed.

9          On December 9, 2009 the first motion for relief from

10  stay was filed by U.S. Bank.  And I note that that was about a

11  week after that allonge was signed.  I also find that on March

12  2, 2010 it appears that MERS, as nominee for Lehman, assigned

13  the second mortgage to the trust.  And on March 8, 2010 there

14  is an allonge that seems to be signed but made payable to

15  Lehman.  Several days after that on March 12, 2010 U.S. Bank

16  filed a motion for relief from stay with regard to the second

17  mortgage.

18          In September of 2010, September 21, 2010, after U.S.

19  Bank had renewed its motions for relief from stay, which it

20  did after this case converted, the new amended proofs of claim

21  that U.S. Bank filed bore attached to them the blank allonges

22  that Mr. Corcoran testified were in the file at the time that

23  Deutsche Bank received files.  I should say at the time that

24  Deutsche Bank received them.

25          Finally I note that Mr. Corcoran testified that

1    Deutsche Bank has a contract, a custodial contract, with the

2    trust, the sale trust.  And that Deutsche Bank's role pursuant

3    to that contract is to hold and maintain the files that he

4    testified about in court.  And that he was, in fact, holding

5    and maintaining those two files on behalf of the sale as the

6    client.

7            Against the backdrop of those facts, it seems clear

8    to me that the next thing that we have to look at is -- we

9    have to look at Section 3-301 of the U.C.C.  The _Veal_ case

10   discusses in great, and I think clear detail, that the

11   starting point for the issue of standing and whether or not a

12   party has standing to move for relief from stay, whether or

13   not the party has standing to file a proofs of claim, all

14   arise from the initial question of whether or not that party

15   is the person entitled to enforce the note.  And Section 3-301

16   makes it fairly clear that while there are several ways one

17   can become a person entitled to enforce a note, perhaps one of

18   the clearest and most straightforward ways is to be the holder

19   of the note.

20           3-301 defines a holder of the note as an entity or

21   person who, number one, is in possession of the note and

22   number two, that note is either payable to that person or is

23   payable to bearer.  If the entity seeking relief is the holder

24   of the note, in other words is in possession of the note and

25   either is the payee or its payable to bearer, then that person

1    is the entity entitled to enforce the note.  That's the person

2    who is the entity who is entitled to seek payment.  And that

3    entitlement provides that entity withstanding to pursue the

4    sorts of relief that we've been talking about in this case.

5          I believe that the evidence in this case clearly

6    demonstrates that U.S. Bank as trustee for the sale is the

7    person, and I use that term in its universal sense, entitled

8    to enforce the note.  Mr. Corcoran presented in court the

9    original note, both on the first and the second mortgage.  And

10   I made reference to that earlier.   Mr. Corcoran also

11   testified in court that there were allonges in the file with

12   regard to each of these loans and that they were endorsed in

13   blank which constitutes an endorsement or payment payable to

14   bearer.

15         Mr. Lesniak made a comment, a couple of times I

16   believe during the evidentiary hearing in which he stated for

17   all intents and purposes, U.S. Bank was relying directly on

18   U.C.C. 3-301.  They brought in proof indicating that they were

19   the possessors of the original note and they brought in proof

20   indicating that there was an endorsement in blank which made

21   the note payable to bearer.  And in point of fact, that is

22   exactly what was contained in each of those files, the

23   original note and the endorsement in blank.

24         Now Mr. Hanson raised concerns about the fact that

25   while those documents, according to Mr. Corcoran's testimony,

1    were in the loan files at the time that Deutsche received the

2    loan files as custodian, other documents appear to either have

3    been created or surfaced far subsequent to the date that

4    Deutsche Bank received the files.

5         We have appearing, pretty late in the game, what

6    appear to be attempts by MERS to assign mortgages.  We also

7    have appearing fairly late in the game allonges that rather

8    than being endorsed in blank are endorsed specifically to the

9    trust.  And given the timing of those documents, it appears

10   that somebody at the trust may have become concerned that

11   whatever documentation was in the file wasn't sufficient to

12   provide it with the standing that it needed and so these

13   documents were created later on in the game.  That certainly

14   is worrisome and of concern because that's the sort of thing

15   that we don't want creditors doing, and lenders doing, and

16   servicers doing and nominees doing is going out and trying to

17   somehow or another create after the fact rights and

18   entitlements that they may not have had earlier in the case or

19   even at the time the case was filed.

20        Were it not for the fact that Mr. Corcoran, the

21   witness from Deutsche Bank, came in and testified that he --

22   that Deutsche Bank received back in April of 2006 the original

23   note and the blank allonges in each case, were it not for that

24   testimony I think that U.S. Bank would find itself in

25   something -- an awkward and uncomfortable position.  It still

1   might have been able to argue that there was a note and an

2   allonge and that it was in possession of it.  But it would be

3   left with the impression that the only reason that there were

4   notes and allonges, or allonges at any rate, payable to it was

5   because they were created for purposes for litigation.  And

6   that's problematic in some of the cases that Mr. Hanson cited

7   in his moving papers were cases in which that was, in fact,

8   all that the Court had was documentation that appeared to be

9   created for the purposes of litigation.  And Judge Hollowell,

10  particularly out in Arizona, was somewhat disgusted with that

11  practice.  It seems clear in some of the cases which she

12  decided.

13          It is simply odd in this case to me that when there

14  already was an original note, and already way a blank allonge

15  or allonge made payable to a blank payee, in the file in both

16  the first and second mortgages in this case and those

17  documents were in the file back in 2006 at the time that

18  Deutsche Bank received them, it is particularly odd that

19  nonetheless the trust apparently felt the need, one way or

20  another, to scramble to create these later created documents.

21  But I do not think that these later created documents impact

22  or affect the fact that as we sit here right now, the party in

23  court that is seeking relief, U.S. Bank as trustee for the

24  sale, that party is in possession of the original note and

25  allonge endorsed in blank for both the first and second

1   mortgages and therefore is the party entitle to enforce the

2   note in both of those instances.

3           So this is not a case like some of the ones that

4   show up in the various decisions that some of the parties have

5   cited where, for example, U.S. Bank came into court and it

6   didn't have the note.  And because it didn't have the note it

7   then was forced to try to rely on other arguments to

8   demonstrate that it had some sort of standing.  This is not a

9   case where there was a note made payable to somebody other

10  than U.S. Bank as trustee and there was no allonge or

11  endorsement.  This is not a circumstance in which we have no

12  note and no allonge and endorsement and all we have is a

13  mortgage and then we're forced to take a look at how the

14  mortgage got assigned and whether or not the assignments

15  tracked Article 9 requirements as those assignments ought to

16  have done.

17          This is, in fact, a situation in which as we sit

18  here the custodian for Deutsche Bank testified that he was

19  holding on behalf of his client the sale trust, original note

20  and a blank allonge made payable to blank with regard to each

21  of these files.  And that, I believe, is sufficient under 3-

22  301 to demonstrate that U.S. Bank as trustee is the entity

23  entitled to enforce the note.  Therefore, U.S. Bank is the

24  entity entitled to expect payment under that note and it has

25  already asserted in the motions for relief from stay that it

1   has not received payment under either the first or second

2   mortgage.  And indeed I think the Kohlers conceded that at the

3   hearing.

4        In addition, because U.S. Bank as trustee is

5   entitled payment under the note, it is also a party

6   withstanding to file claims in this bankruptcy case.  And so

7   the objections to the proofs of claim that U.S. Bank as

8   trustee filed do not have merit.  And finally because it has

9   valid claims in the bankruptcy case, it is entitled to expect

10  that those claims be treated under the Chapter 13 plan.  And

11  therefore, the objections that it has raised to confirmation

12  of the Chapter 13 plan are valid and it does have standing to

13  raise those objections to the proofs of claim.

14       So, that is basically the legal basis for the

15  decision.  I also want to address a couple of other brief

16  topics that -- briefly address a couple of other topics that

17  came up, just for clarity sake to make a record.  There was

18  some discussion, more extensive in the moving papers than at

19  the evidentiary hearing, with regard to choice of law.  Mr.

20  Hanson raised in the moving papers the fact that the trust

21  documents that created the terms of the trust contained a

22  choice of law prevision that indicated that New York law

23  governed the trust.  That may very well be, but that does not

24  necessarily mean that New York law governs the basic question

25  here which I just indicated is the question of who the person

1    is who was entitled to enforce the note.

2         I note that the note itself does not have a choice

3    of law provision in it.  The mortgage does, but I don't think

4    that is necessarily relevant and I'll get to that in a moment.

5    The note -- neither the note on the first mortgage nor the

6    blue note on the second mortgage, contained choice of law

7    provisions and so there's nothing there that would dictate the

8    choice of law.  However, I will note that there's precedent in

9    this district in J.P. Morgan Trust v. U.S. Bank, 444 F. Supp.

10   2nd, 956.  A decision of Judge Adelman from 1996 for the

11   Eastern District of Wisconsin District Court which indicates

12   that under Wisconsin Choice of Law Rules, the law of the forum

13   presumptively applies unless they're non-forum contacts that

14   are of greater significance.  And I think the contacts here

15   are relatively significant.  The property is located here, the

16   bankruptcy is filed here.  It makes sense that Wisconsin

17   Choice of Law Statute should apply.

18        I said it wasn't relevant but I'll note in an aside

19   that the mortgage also provides that the mortgages is governed

20   by the state in which the property is located, which again is

21   Wisconsin.  So with regard to  Choice of Law questions that

22   we're discussing I do not think it relevant that the trust

23   documents dictate that New York Law governs the trust because

24   I think the main issue here, the real issue that we're talking

25   about, is what law should govern the question of who is

1   entitled to hold the note.  And there I think it is Wisconsin

2   law.

3          To that end, Wisconsin Statute Section 403.201(2)

4   says that in order to negotiate an instrument payable to an

5   identified person negotiation requires transfer of possession

6   and endorsement by the holder.  If it's payable to bearer it

7   can be negotiated by transfer alone.  We have here two

8   original notes, both of which were payable to identified

9   entities.  And both of those were transferred by endorsement.

10  They were endorsed by the holder, although they were endorsed

11  in blank.  I think that it is sufficient.  And so I think

12  under Wisconsin law it is pretty clear that U.S. Bank as

13  trustee is the holder of the note.

14          I also think that the trust documents are not

15  relevant for reasons that were articulated to some extent by

16  U.S. Bank.  Mr. Hanson went into extensive detail about the

17  fact that the trust agreement between the depositor and the

18  buyer and the seller had specific provisions -- has specific

19  provisions in it dictating how the transfer of interest should

20  take place.  That I believe is a contract between the buyer

21  and the seller.  And while it may provide a cause of action

22  for one of the other of those parties to argue that transfers

23  occurred in means and methods that were not foreseen by the

24  contract or were not allowed under the contract, I don't think

25  that that contract governs whether or not under Wisconsin law

1    and Wisconsin's version of the U.C.C., U.S. Bank as trustee is

2    now the entity that's entitled to enforce the note.  It is

3    Wisconsin's version of the U.C.C. that governs that issue.

4    And again, you know what my conclusions are there.

5            Finally, there were several references made in some

6    of the debtor's and plaintiff's moving papers.  With regard to

7    the fact that U.S. Bank had not necessarily proven that it

8    owned the mortgage.  Wisconsin law seems fairly clear that the

9    mortgage follows the note.  I realize that issues have come up

10   with regard to what happens to that settled doctrine when one

11   injects MERS into the mix.  And whether or not injecting MERS

12   into the mix results in a divorce between the note and the

13   mortgage.  Those are certainly issues that if U.S. Bank as

14   trustee chooses to purse its rights in state court that the

15   debtors may well raise and the state court may be concerned

16   about those issues with regard with whether or not U.S. Bank

17   may foreclose on the mortgage.  But that's not the issue that

18   I'm dealing with here.

19           The issue here was whether or not U.S. Bank as

20   trustee was a real party and interest such that it had

21   prudential standing able to file the motion for relief, file

22   its proofs of claim and object to confirmation of the plan.

23   And with regard to those issues, I do not think that ownership

24   of the mortgage whether or not the mortgage was appropriately

25   assigned or transferred is relevant.  Again, the issue is

1   who's entitled to enforce the note.

2            I do find that that is U.S. Bank as trustee.  And

3   accordingly I am granting the motions for relief from stay.  I

4   am overruling the objections to the proofs of claim.  I am

5   sustaining the objection to confirmation.  And I am dismissing

6   the adversary proceeding.

7            I realize that these decisions will have some direct

8   and obvious and maybe even immediate impact on the Chapter 13

9   case itself.  And if the parties think it appropriate, I am

10  happy to schedule a status conference to see where the case is

11  headed or whether the case is headed anywhere.

12           With regard to objections to confirmation, Mr.

13  Hanson, I guess the most specific and most time related

14  question to you is, how much time would you like to file an

15  amended plan?

16           MR. HANSON:  Let's see.  Well if it would be too

17  much I'd like to have August 1st, or I don't know what August

18  1st falls on actually.  About 30 days.

19           THE COURT:  Okay.  Just a second.  I'm sorry.  I

20  didn't have my calendar.  Okay.  August the 1st is a Monday.

21           MR. HANSON:  It's a Monday.

22           THE COURT:  I can give you until Monday, August 1st

23  to file an amended plan.  Mr. Lesniak, Ms. Jensis, can I look

24  to one of you for the orders with regard to the motions for

25  relief?

1          MR. LESNIAK:  Yes, Judge.  Do you want us to deliver

2     those to chambers?

3          THE COURT:  Oh, no, I really like them filed

4     electronically.

5          MR. LESNIAK:  Oh, excuse me.  So you're asking about

6     with respect to the orders?

7          THE COURT:  Yes.  Yes.  What did you think I was

8     asking about?

9          MR. LESNIAK:  No, no, I didn't know if you wanted --

10    you're talking about your orders today?

11         THE COURT:  You would file motions asking for relief

12    from the stay?

13         MR. LESNIAK:  Yes.

14         THE COURT:  I just granted them.

15         MR. LESNIAK:  Yes.  Ms. Jensis and I will get

16    together and work to do that, Judge.

17         THE COURT:  Okay.

18         MR. LESNIAK:  How soon do you want that?

19         THE COURT:  I think a lot of the times we get them

20    within a week.  But --

21         MR. LESNIAK:  Well, Judge, given the holiday and the

22    fact that I'm not going to be in the office on Friday, I'm

23    hoping we can get to those to you, and I'll ask Ms. Jensis on

24    the phone now, if we can get those to you by the close of

25    business this Thursday.

1        MS. JENSIS:  Yeah, I think we can.

2        MR. LESNIAK:  I don't see any reason why we

3   couldn't.

4        MS. JENSIS:  Yes, we can.

5        THE COURT:  That's fine.  With regard to the

6   overruling of the objection to the proofs of claim, we'll do

7   minute orders on those.  And then also overruling --

8   sustaining the objection to confirmation, we'll do a minute

9   order on that.  And again, giving Mr. Hanson until August 1st

10  to file an amended plan.  Mr. Zafiropoulos, anything with

11  regard to the case itself and the plan?

12       MR. ZAFIROPOULOS:  No, Your Honor.  The plan is fine

13  so far.  There was a lapse in payments for a couple of months

14  but it looks like the debtors made that up.

15       THE COURT:  Okay.  So we're not anticipating a

16  motion to dismiss any time soon?

17       MR. ZAFIROPOULOS:  No, Your Honor.

18       THE COURT:  Okay.

19       MR. LESNIAK:  Your Honor, should we also deliver to

20  you an order with respect to our motion to dismiss the

21  adversary proceeding?

22       THE COURT:  Yes, please.

23       MR. LESNIAK:  Okay.  We'll do those.

24       THE COURT:  Great.  All right.  Anything else today,

25  Mr. Lesniak?  Ms. Jensis?

1          MR. LESNIAK:  No from me, Judge.

2          MS. JENSIS:  No.

3          THE COURT:  Mr. Hanson?

4          MR. HANSON:  No, not from me, Judge.

5          THE COURT:  Thank you.  And, Mr. Zafiropoulos?

6          MR. ZAFIROPOULOS:  Nothing from me, Your Honor.

7          THE COURT:  All right.  Thank you, everyone.

8                          (Conclusion)

9                          * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I, GINA M. CERMAK, the assigned transcriber, do hereby certify that the foregoing transcript of the proceedings before the United States Bankruptcy Court, Eastern District of Wisconsin, on June 27, 2011, is prepared in full compliance with the current transcription format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.


___S/ Gina M. Cermak_____        __July 18, 2011__

GINA M. CERMAK                         Date

AudioEdge Transcription, L.L.C.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WISCONSIN


```
----------------------------
IN RE:                       :    Case No.  09-35931
                             :
  EDWARD BLAINE KOHLER &     :    517 East Wisconsin Avenue
  PATRICIA LYNN KOHLER,      :    Milwaukee, Wisconsin  53202
                             :
          Debtors.           :
----------------------------
EDWARD and PATRICIA KOHLER   :    Adversary No. 2010-2694
            Plaintiffs,      :
        vs.                  :
                             :
U.S. BANK, et. al.           :    May 25th, 2011
            Defendants.  :       3:11 p.m.
----------------------------
```


                    TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE PAMELA PEPPER
            UNITED STATES CHIEF BANKRUPTCY JUDGE


TRANSCRIPT ORDERED BY:

        ROLLIE R. HANSON, ESQ.
        Law Office of Rollie R. Hanson, S.C.
        6737 West Washington Street
        Suite 1420
        West Allis, WI  53214


A P P E A R A N C E S:

        ROLLIE R. HANSON, ESQ.
        Attorney for Edward and Patricia Kohler

        EDWARD LESNIAK, ESQ.
        PENNY JENSIS, ESQ.
        Attorneys for U.S. Bank, N.A.

                    AudioEdge Transcription, LLC
               425 Eagle Rock Avenue - Suite 201
                  Roseland, New Jersey  07068
                       (973) 618-2310
                  www.audioedgetranscription.com

I N D E X
5/25/11

OPENING STATEMENT:                                          PAGE

        By Mr. Lesniak                                         4

        By Mr. Hanson                                          6


WITNESS:

CHRISTOPHER CORCORAN

        Direct Examination by Mr. Lesniak                      9

        Cross Examination by Mr. Hanson                       37

        Redirect Examination by Mr. Lesniak                   70


EXHIBITS                                            I.D.    EVD.

Trust A    Log                                        24      25

Trust B    loan file information                      33      34


C          First mortgage                             73      75

D          Second mortgage                            73      75


SUMMATION:

        By Mr. Lesniak                                        77

        By Mr. Hanson                                         84


RESPONSE:

        By Mr. Lesniak                                        91

1       (Proceedings commence at 3:11 p.m.)

2            THE COURT:  The Court calls case 2009-35931, Edward

3    Blain Kohler and Patricia Lynn Kohler and Adversary Proceeding

4    2010-2694, Edward and Patricia Kohler versus U.S. Bank, et.

5    al.  Please state your appearances for the record.

6            MR. HANSON:  Attorney Rollie Hanson appearing on

7    behalf of Mr. and Mrs. Kohler.  And for the record, Mr. Kohler

8    is here in person.

9            MR. LESNIAK:  Good afternoon, Your Honor.  Edward

10   Lesniak and Penny Jensis (phonetic).  We are representing U.S.

11   Bank National Association as trustee for structured asset

12   investment loan trust, mortgage passed through certificate

13   series 2006-4.

14           THE COURT:  Well done, Mr. Lesniak.

15           MR. LESNIAK:  And if it pleases the Court, Your

16   Honor, I'd rather not try to say that again.

17           THE COURT:  No, no, no.  You're done.

18           MR. LESNIAK:  So if, as we move forward, I would

19   refer to the Series 2006-4 trust and hopefully we can all

20   agree that that's the entity we're referring to.

21           THE COURT:  I'll assume if we're talking about a

22   trust that's the trust that we're talking about.

23           MR. LESNIAK:  Thank you, Judge.

24           THE COURT:  All right.  Thank you, all.  We had

25   scheduled this afternoon for an evidentiary hearing on the

1  various issues raised and the objection to confirmation,

2  objections to claim.  And let me first just double check and

3  make sure each of you should have in front of you an exhibit

4  list.  So I would ask that as we go through the afternoon if

5  you all will keep up with what gets introduced and what comes

6  in I'll do the same.  We can compare notes when we're done and

7  make sure we all land on the same square when we're finished.

8  Any preliminary matters that we need to take up before we

9  begin with the evidence?  Mr. Hanson?

10             MR. HANSON:  I don't believe so, Your Honor.  Unless

11  the Court would want any kind of brief statement, other wise -

12  -

13             THE COURT:  We can there but I just -- Okay.  Mr.

14  Lesniak, Ms. Jensis, anything?

15             MR. LESNIAK:  No preliminary matters, Judge.

16             THE COURT:  Okay.  Thank you.  All right.  Well with

17  regard to the evidence then, I'll give each of you an

18  opportunity, if you'd like to do so, to make a brief statement

19  about what you think the evidence will show.  You don't have

20  to do that, of course.  And then we will proceed with the

21  presentation of the evidence.  So this is the trust motion for

22  relief and stay and objection.  The Kohler's objections to the

23  claims.  I'll start with Mr. Lesniak.  Any opening statements

24  you'd like to make?

25             MR. LESNIAK:  Yes, Your Honor.  Briefly.  I just

1   want to put the entire proceeding today into context from the

2   perspective of the trust.

3           In the objection to the amended proofs of claims

4   that the debtor filed, they admitted that they signed two

5   notes and I'm referring specifically to Docket Number 85,

6   Paragraph 8 and Paragraph 11.  And similarly, there was a

7   stipulation to modify the stay that was entered as Docket

8   Number 68.  And in Paragraph 2 of that stipulation the debtors

9   acknowledged that they executed two promissory notes and

10  mortgages.  And they, in fact, acknowledged that they are the

11  very ones that attached to the proofs of claim.  So from our

12  perspective there is really no issue as to the execution of

13  the notes by the borrowers.  No issue as to the fact that

14  there is a mortgage lien on their property.

15          In addition, Your Honor, in terms of the overall

16  motion for relief, a supplemental affidavit was filed in this

17  case.  And it was filed on March 22nd.  And there's been no

18  objection.  So from our perspective there is no issue at this

19  point as to the fact that the loan is in arrears and is past

20  due for a significant amount of time.

21          In addition, Your Honor, in the debtor's schedules

22  they indicate that there is no equity in the property.  They

23  indicate that the value of the property is less than the

24  amount of the outstanding debt.  And we are not contesting

25  that today.  So in our view there's no issue as to an equity

1    cushion or there being any equity in the property.

2           From our perspective the sole issue to be addressed

3    today is whether the Series 2006-4 trust is the holder of the

4    two promissory notes that the debtors have acknowledged they

5    signed.  And our evidence will go to that.  It will go to

6    showing Your Honor the notes.  Identifying how they've been

7    held.  We have with us Mr. Chris Corcoran from Deutsche Bank

8    which is the custodian for these documents and he will testify

9    as to what Deutsche Bank's records are, as to what was in the

10   file when it received it, where the file moved from Deutsche

11   Bank and what instance when it came back and when it went out

12   again so that we can trace for the Court the custody of these

13   documents and also identify what was in the file.  And from

14   that point after that we will argue from that evidence.  Thank

15   you.

16          THE COURT:  Thank you, Mr. Lesniak.  Ms. Jensis?

17          MS. JENSIS:  No, Judge.  Thank you.  Mr. Hanson,

18   would you like to make an opening remark?

19          MR. HANSON:  Just a couple of brief comments, Your

20   Honor.  This case does involve a first and second mortgage.

21   And so we have two claims.  We have Claim 12 for the first

22   mortgage.  An amended Claim 12.  And Claim 13.  An amended

23   Claim 13 for the second mortgage.  There are a number of

24   documents attached to the claims.  And I think that the

25   documents are basically the same on each original and amended

1   claim except for the addition of an undated blank allonge, or

2   what purports to be an undated Bank allonge.  And given the

3   time period that elapsed from the time the bankruptcy was

4   filed and from the time the 2004 or 2006-4 trust submitted

5   what they -- what is now being claimed as proof or evidence

6   that they own the loans which my clients took out with BNC

7   Mortgage.  There's some real questions as to whether those

8   documents are what they say they are.  And whether they do

9   what they purport they want them to do in terms of

10  transferring or negotiating the note.

11          In terms of the trust, we've also got a document

12  that's been filed by the creator's of the trust with the

13  securities and exchange commission.  And just briefly I think

14  what we would be able to show with the trust is that for Claim

15  Number 12, the first mortgage, it required a specific sequence

16  of conveyances in order for U.S. Bank Financial Association as

17  the trustee to obtain possession and ownership of a trust.

18  And that sequence of conveyances was for BNC Mortgage as the

19  originator of the loan to transfer the mortgage loan to Lehman

20  Brothers Holding, Inc.  Or maybe it's Holdings, Inc.  Lehman

21  Brothers Holdings, Inc. would then as a seller of the loan

22  transfer the mortgage note or negotiate the loan to Structured

23  Assets Securities Corporation which is named as the purchaser

24  in the trust documents.  This company or this entity would in

25  turn transfer the mortgage loan, which would mean transferring

1    the note and assigning the mortgage to U.S. Bank National

2    Association as a trustee for the trust.  And  U.S. Bank

3    National Association would take possession and control of the

4    note and the mortgage on behalf of the trust.  That's how the

5    whole arrangement was set up for the transfer of the mortgage

6    loan from the originator -- from the original lender to the

7    trust.  And I don't believe the documents we have here today

8    will show that.

9            There's a similar sequence of conveyances on the

10   second mortgage and I'll just quickly, for the record, Lehman

11   Brothers Bank, FSB, was the originator on the second mortgage

12   which is my understanding from the documents.  That Lehman

13   Brothers Holdings, Inc. would obtain that mortgage note and

14   mortgage.  And one transfer in turn to Structured Assets

15   Securities Corporation.  Again as a purchaser of the loans and

16   as the depositor of the trust.  And this entity would then in

17   turn negotiate the note to U.S. Bank National Association as

18   the trustee.  And I would say that the same issues and we have

19   the same concerns for the second mortgage which has been

20   submitted as Claim Number 13 in terms of whether or not the

21   trust owns the loan.

22           The only other thing I would say is that I believe

23   that there is an issue as to whether or not the 2006-4 trust

24   has any valid lien rights on my client's house.  My client's

25   real estate.  And we are challenging the claim as a secured

 1   claim.  We're also challenging whether they have any claim

 2   here.  So that's what -- that's the context that I would say

 3   that my clients are coming from.

 4         THE COURT:  Thank you, Mr. Hanson.  All right.  Mr.

 5   Lesniak, you've got a witness to call?

 6         MR. LESNIAK:  Yes, I do, Your Honor.  I would like

 7   to call Mr. Christopher Corcoran.

 8         THE COURT:  Mr. Corcoran, if you'll step up there

 9   between the tables and Ms. Bent will swear you in.

10         THE CLERK:  Please raise your right hand.

11            CHRISTOPHER CORCORAN, WITNESS, SWORN

12         THE CLERK:  Thank you.

13         THE COURT:  Come on up and have a seat, Mr.

14   Corcoran.  And when you get settled, just try to make sure

15   that that microphone is directly in front of you so we can

16   pick up what you say.

17         MR. LESNIAK:  Your Honor, as a matter of protocol,

18   would you prefer that I examine Mr. Corcoran from here or am I

19   allowed to move closer to the witness?

20         THE COURT:  You can do whatever you're comfortable

21   with.

22         MR. LESNIAK:  Okay.

23         THE COURT:  As long as if you're going to show Mr.

24   Corcoran a document you make sure Mr. Hanson has seen it.

25         MR. LESNIAK:  Will do, Your Honor.

1                          DIRECT EXAMINATION

2     BY MR. LESNIAK:

3     Q      Would you please state your name.

4     A      Christopher Corcoran.

5     Q      And, Christopher, would you please spell your name.

6     A      C-h-r-i-s-t-o-p-h-e-r.  Last name, C-o-r-c-o-r-a-n.

7     Q      And what is your address?

8     A      My home address?

9     Q      Yes.  Your home address.

10    A      My home address is 27282 Los Nieves, Mission Viejo,

11    California.

12    Q      Are you employed?

13    A      Yes.

14    Q      By whom are you employed?

15    A      Deutsche Bank.

16    Q      Okay.  And where is Deutsche Bank's office where you

17    work?  The address, please.

18    A      The address is 1761 East St. Andrew Place, Santa Ana,

19    California.

20    Q      How long have you been employed by Deutsche Bank?

21    A      A little over 13 years.

22    Q      Okay.  And what was your entry position with Deutsche

23    Bank?

24    A      I was a custody administrator.

25    Q      And what does that mean?  What were your duties?

1   A    I worked with mortgage companies and warehouse lenders

2   issuing reports, taking in files and data, coordinating review

3   of files and reports.

4   Q    And how long were you a custody administrator?

5   A    Probably about two years.

6   Q    Okay.  And how long were you a custody administrator?

7   A    Probably about two years.

8   Q    Okay.  And what is -- what was your next position?

9   A    I was a team leader, manager of custody administrators.

10  Q    And what does that position entail, what are your duties?

11  A    Oversee a team of custody administrators, reviewing

12  agreements, relationship management, you know, personnel

13  issues and things like that.

14  Q    Now you mentioned custody a couple of times.  Does

15  Deutsche Bank ask -- act as a custodian?

16  A    Yes.

17  Q    Okay.  What does that mean, a custodian of what?

18  A    Of loan documents.

19  Q    Okay.  And for whom does it perform this service?

20  A    Various clients, trusts and mortgage clients, clients

21  things like that.

22  Q    Is Deutsche Bank a custodian for the Series 2004-6 trust?

23  A    Two thousand --

24  Q    2006-4 trust.  Excuse me.

25  A    Yes.

1   Q    Okay.  And what are -- what services does it perform as

2   custodian for the 2006-4 trust?

3   A    We review and hold and safe keep mortgage loan documents.

4

5   Q    Okay.  And how long have you been a manager?

6   A    For?

7   Q    Deutsche Bank.

8   A    For approximately 11 years.

9   Q    Okay.  And that's your current position, is that correct?

10  A    Correct.

11  Q    Okay.  Now in your employment in Deutsche Bank over the

12  past 13 years, have you had occasion to look at the type of

13  loan files for which Deutsche Bank is custodian?

14  A    Yes.

15  Q    Okay.  Are you able to estimate how many files Deutsche

16  Bank is currently -- for which Deutsche Bank currently acts as

17  custodian?

18  A    Deutsche Bank, we're holding approximately -- almost

19  three million files.

20  Q    And where are those files physically maintained?

21  A    They're held in our file room facility at 1761 East St.

22  Andrew Place in Santa Ana.

23  Q    Okay.  And how large is that facility?

24  A    The file room itself is probably 45,000 square feet.

25  It's located -- you know then there's an office part as well.

1    Q    Okay.  And you've indicated you've looked at some of

2    these files.  Over the course of your employment at Deutsche

3    Bank, can you estimate how many files you've looked at?

4    A    I'd probably looked at hundreds of files.

5    Q    Okay.  And what occasion would you have in your

6    employment to look at a file?

7    A    If, you know, there was an issue that arised or if I had

8    to -- if I had an employee who had a question or somebody who

9    had a question I'd look at a file.  Or if a file just came

10   into me through the mail from a client and it was one file and

11   I didn't feel like having someone else review it I could just

12   review it myself and I've done that I still do that just for

13   ease of doing things.

14   Q    Did you ever receive any files at Deutsche Bank from

15   Lehman Brothers?

16   A    Yes.

17   Q    And for which Deutsche Bank acts as a custodian?

18   A    Yes.

19   Q    Okay.  Do you know how many?

20   A    We're probably holding -- you know, we're holding

21   thousands of files.  You know, thousands of files have come

22   through for Lehman Brothers.

23   Q    Okay.  And have you ever examined any loan files that

24   were received from BNC Mortgage?

25   A    Yes.

1  Q    Okay.  Any idea how many of those files you would've

2  looked at?

3  A    I don't know.  It was -- you know, it was -- we're

4  holding many files for them so I've probably looked at a lot

5  of files.  Hundred, you know, files.  Hundreds of files

6  possibly for them.  Q    And generally speaking did -- are

7  Lehman Brothers and BNC Mortgage linked in some fashion?

8  A    Yeah, I believe Lehman -- Lehman owns BNC in some sort of

9  fashion.  Some sort of way.

10  Q    Is there a certain manner in which Lehman or BNC would

11  deliver files?  In other words, would they be in a certain

12  form or order?  I mean, is it the customary process, a

13  standard process?

14         MR. HANSON:  Your Honor, I'm going to object.  I

15  think we're getting into leading the witness and providing a

16  lot of testimony in the form of a question.  There's

17  procedure.

18         THE COURT:  I think the question was is there a

19  certain form or order in which the files were received.  So

20  overruled.

21  A    Most companies have kind of -- what they call stacking

22  order.  That they're going to stack documents.  You know,

23  stacking order.  So it's consistent from file to file.

24  Q    Okay.  And was that true for BNC and Lehman Brothers?

25  A    Correct.  Yes.

1    Q    Okay.

2              MR. LESNIAK:  Your Honor, if please the Court, I'm

3    going to show Mr. Corcoran a copy of the file.  And we have --

4    it's a loan file.  And we have a copy for the Court.

5              THE COURT:  Okay.

6              MR. LESNIAK:  However, we neglected to copy the

7    outside jacket which does have significance.  And we can

8    provide Your Honor with a copy later on.

9              THE COURT:  That's fine.

10             MR. LESNIAK:  But if you want to follow along, this

11   copy is available.

12             THE COURT:  Okay.  Thank you.

13             MR. LESNIAK:  I'm going to move up there so that I

14   can be looking at the file at the same time.

15   BY MR. LESNIAK:

16   Q    Can you tell looking at this if this was the file that

17   was in the custody of Deutsche Bank?

18   A    Yes.

19   Q    And how can you tell that?

20   A    This label on the file.

21             THE COURT:  That's the --

22   A    Right here.  I can tell because it has a Deutsche Bank

23   symbol on the file.

24   Q    And, Chris, look at the other -- that particular sticker,

25   look at the other items on there, do you see the one that says

1   LH06PC?

2   A    Yes.

3   Q    What -- does that have a meaning?

4   A    It's an internal Deutsche Bank code for a deal.  A

5   transaction.

6   Q    Okay.  And do you know which transaction it relates to?

7   A    The sale 2006-4.

8   Q    So it's the 2006-4 trust that we're speaking of today,

9   right?

10  A    Correct.

11  Q    Okay.  And this other item here, MIL008338, do you that

12  means?

13  A    It's 8336.

14  Q    336, excuse me.

15  A    Yeah.  I'm sorry.  That's the loan number that's

16  associated with the loan that was given to us from BNC.

17  Q    Okay.  And the name, Kohler, Edward.  What is that?

18  A    That's the borrower name.

19  Q    Okay.  Could you please look at the tab that is on the

20  file jacket.

21       MR. LESNIAK:  Your Honor, we have another tab here.

22  I'll remove the documents for a moment so Mr. --

23       THE COURT:  And for the record, Mr. Lesniak is

24  referring to the backside of the folder.

25       MR. LESNIAK:  Actually, Your Honor, I'm -- not the

1   backside at this point, we're referring to a tab that is --

2            THE COURT:  Right.  I'm sorry.  What I'm describing

3   --

4            THE WITNESS:  The inside jacket.

5            THE COURT:  I'm not describing it correctly.  But

6   it's a jacket that if you're holding it with the front cover

7   you're now talking about the back half of the folder where the

8   sticker is.

9            MR. LESNIAK:  Right.  And the reason for the

10  clarification, Judge, is there's another sticker on the back -

11  -

12           THE COURT:  On the -- Thank you.

13           MR. LESNIAK:  -- on the very back -- we're going to

14  talk about.  So we're talking about the tab on the second half

15  of the file.

16           THE COURT:  Thank you.

17  BY MR. LESNIAK:

18  Q    Could you tell me if you recognize that sticker?

19  A    It would be a sticker that BNC would put on the file.

20  Q    So is that something that Deutsche Bank put on the file?

21  A    No.

22  Q    How would it have gotten there?

23  A    BNC would've put it on the file.

24  Q    So it would have arrived at Deutsche Bank with it on the

25  file?

1    A    Correct.

2    Q    Okay.  And what does that sticker say?

3    A    It has a loan number, MIL008338, borrower name, co-

4    borrower name, the address of the property.  It's -- the

5    borrower name, I'm sorry, is Kohler, Edward B., co-borrower

6    name is Kohler, Patricia L.  Address 5130 S. Skyline Drive,

7    New Berlin, Wisconsin 53151.

8    Q    Okay.  And could you also flip it over and refer to the

9    very back of the folder.  Is there another label on that

10   folder?

11   A    Yes.

12   Q    And what is that?

13   A    It's a label that has -- it says Deutsche Bank on it.  It

14   has -- it says sale 2006-4, it has a loan number, or number,

15   23305501.  The borrower name Kohler, Edward.  And it looks

16   like it has something, it says Deutsche Bank but it's kind of

17   an abbreviation.  And then it has another thing it says CHKE

18   and please mail to Brian Tucker.

19   Q    Is that the sticker that Deutsche Bank would've put on

20   the file?

21   A    No.  We would not have put that on the file.

22   Q    Do you know if that sticker would've typically been on

23   this type of file when it arrived into the custody of Deutsche

24   Bank?

25   A    I don't believe so.

1    Q    Okay.  Do you know what the loan number refers to?

2    A    I believe that's the Chase loan number to the file.

3    Q    The servicer's --

4    A    The servicer's loan number.

5    Q    Okay.  What I'd like you to do now is put the documents

6    back in.  And just describe for the Court if you would what is

7    in the file, on a document by document basis?

8    A    Okay.  The first thing I see is a checklist.  The next

9    thing I see is the original note.  And an endorsement in the

10   form of allonge from BNC to blank.

11   Q    Before you leave the endorsement on the allonge, is there

12   a sticker on that endorsement?

13   A    Yes, there is.

14   Q    And what was -- what does that say?

15   A    It says -- the sticker says MIL00838.  It has the

16   borrower's name, Kohler, Edward B., co-borrower name Kohler,

17   Patricia L.  The property address at 5130 S. Skyline Drive,

18   New Berlin, Wisconsin 53151.

19   Q    Is that sticker something that Deutsche Bank put on the

20   allonge?

21   A    No.

22   Q    Would it -- do you know would it have been put on that

23   allonge, can you tell?

24   A    I wouldn't -- I wouldn't know.  It would be put on prior

25   to us getting the file.

1   Q     It's nothing something that Deutsche Bank added up?

2   A     No, it is not.

3   Q     Okay.  Next in the file?

4   A     There's also an addendum to the note as well for interest

5   only payment period.  The next document I see is the recorded

6   mortgage.  And then I see a title policy.  Going through page

7   by page.  And then there is an original loan modification

8   agreement.  And the last page of a title policy.  There are

9   some documents.  It looks like some sort of title letter that

10  might have come with the title policy.  And then, I'm not

11  familiar with this but it's some sort of monthly income

12  expenses, modification -- it looks like some records maybe

13  that the servicer put in the file.  And a 4506-T.  It some

14  sort of transcript for tax return.  I'm not familiar with

15  that.  A couple of those.  Some sort of check from Chase, or

16  is it to Chase?  To Chase it looks like.  A (indiscernible)

17  print with the borrower's information on it.  A certified copy

18  of the unrecorded mortgage.  It looks like some sort of

19  closing statement.  And a title commitment.  And that is it.

20  Q     Now these documents are obviously loose in the file.

21  Based upon your experience you've had with hundreds of files

22  with Lehman Brothers and BNC, do you believe that the file --

23  the present condition of the file is the same as it would've

24  been when it was received by Deutsche Bank?

25  A     No.

1    Q    What, based upon your experience, would the condition of

2    the file be like when it was received by Deutsche Bank?

3    A    I believe it would've been fastened by that -- by this

4    metal fastener with the two hold punches at the top.

5    Q    And is there a typical manner in which the documents were

6    placed into the file?

7    A    Yeah, it's probably a stacking order and it would most

8    likely be in the form of this check off sheet that BNC puts in

9    the file.

10   Q    And based upon the checkoff sheet, what would be the

11   stacking order for this particular file?

12   A    The original note with the allonge, followed by the

13   addendum to the note, the certified copy of the mortgage/deed

14   of trust and -- with any riders, the closing letter and the

15   title commitment.

16   Q    Now did you bring this file with you to court today?

17   A    I did not, no.

18   Q    Did not.  Do you know when the last time this file was in

19   Deutsche Bank's possession?

20   A    I don't know off the type of my head.  No, I do not.

21   Q    Is there a record that you could refer to that would

22   disclose when the last time Deutsche Bank had possession of

23   this file?

24   A    Yes.

25   Q    Does Deutsche Bank have a process or a procedure for

1    logging in these types of files?

2    A    Yes, we do.

3    Q    Okay.  Could you describe that process or procedure,

4    please?

5    A    When we get a file we typically -- we -- sorry.  We'll

6    typically receive data and then followup a few days after with

7    getting the documents in the form of a folder like this.  And

8    the file is then reviewed against the data and the documents

9    are checked in.  And once they're checked in they're put on

10   our shelf in the file room.

11   Q    And as this process proceeds, is there a record made or

12   log kept of what -- of these steps being taken?

13   A    Yes.

14   Q    Okay.  Is it the practice of Deutsche Bank to make a

15   record or compile a report of what it finds in examining these

16   files?

17   A    Yes.

18   Q    And is this record or report as to what's in the files

19   received by Deutsche Bank as a custodian made as a regular

20   part of Deutsche Bank's business practice?

21   A    Yes.

22   Q    Okay.  And the persons who make entries into this log or

23   record, are they persons who make entries with actual

24   knowledge of those items that they're putting into the record?

25            MR. HANSON:  I'm going to object, Your Honor.  I

 1   don't think there's anything in the evidence that -- I mean,

 2   Mr. Lesniak is now testifying persons make entries into a

 3   computer.  Again, I think --

 4           THE COURT:  I understood that he was asking about

 5   the log that they keep of the documents that are coming in and

 6   asking -- he's laying a business record foundation, Mr.

 7   Hanson, for the law is what I understand him to be doing.

 8           MR. LESNIAK:  And this is the last prong of it,

 9   Judge.

10           MR. HANSON:  But there hasn't been any testimony of

11   the persons who do this or is this done -- I guess, I guess --

12           THE COURT:  Maybe ask how the entries get made into

13   the law?

14           MR. HANSON:  I guess if Mr. Corcoran has all this

15   knowledge -- well, it seems to me that he could describe what

16   happened without all of the prompting that Mr. Lesniak is

17   giving him.  It seems that --

18           THE COURT:  I'm sorry, Mr. Hanson, I'm not hearing

19   prompting.  I'm hearing him go through the drill out a Mali

20   (phonetic) book about laying a business record foundation.  I

21   mean that's -- there's certain question you have to ask in

22   order to lay the foundation and I think he's asking those, so

23   overruled.  If you could repeat your last question, please,

24   Mr. Lesniak.

25   BY MR. LESNIAK:

1    Q    The last question is, persons at Deutsche Bank make these

2    records into the -- make entries into the record regarding

3    these loan -- this particular loan file, is that correct?

4    A    Correct.

5    Q    And are they persons with knowledge?

6    A    Correct.

7    Q    Of the actual entries they're making?

8    A    Correct.  Yes.

9    Q    Okay.  Chris, I'm going to show you what's been marked as

10   Exhibit A.  This is Trust Exhibit A.  Would you pleas take a

11   second to look it over.  Now I've asked you questions about

12   whether Deutsche Bank keeps a record of the file coming in and

13   out, whether it keeps a record of what's in the file or any

14   other activities related to the file, is this that record for

15   Loan Number 8336?

16   A    Yes.

17            MR. LESNIAK:  Your Honor, I would move that Exhibit

18   A be admitted into evidence as a business record.  I would --

19            THE COURT:  Six.  Mr. Hanson?

20            MR. HANSON:  Your Honor, I would object.  I don't

21   think there's been a sufficient foundation to admit this as

22   what Mr. Lesniak purports it to be.

23            THE COURT:  Can you give me a little more

24   information about the basis for your objection?

25            MR. HANSON:  Well it's some kind of computer

1   printout with a lot of codes on it.  And so it's not clear

2   from, as I look at it here, what it is.

3           THE COURT:  I think Mr. Corcoran just testified to

4   what it was.

5           MR. HANSON:  Pardon?

6           THE COURT:  Mr. Corcoran just said it was the log in

7   which they log in these files when they come in.

8           MR. HANSON:  All right.  In terms of admitting it as

9   a log --

10          THE COURT:  He's asked -- Mr. Lesniak has asked to

11  admit it as a business record under 803-6.  And as far as

12  laying a foundation for a business record, I'm certainly going

13  to find that he's done that, so --

14          MR. HANSON:  I'll withdraw the objection, Your

15  Honor.

16          THE COURT:  So, admitted then.

17          MR. LESNIAK:  Your Honor, I'd like to ask Mr.

18  Corcoran some questions about this particular business record

19  so that the Court can understand what it shows.

20          THE COURT:  Thank you.

21  BY MR. LESNIAK:

22  Q    Chris, let's talk first about the file's movement coming

23  in and out of Deutsche Bank.  Could you please direct the

24  Court to any information that shows when the file was

25  withdrawn.  And if withdrawn, when it might have come back

1    into Deutsche Bank's possession?

2    A      There's a few areas.  The loan file withdrawal

3    information and then --

4    Q      Would it be Page 1 of the exhibit?

5    A      Page 1.  Yes.

6    Q      Thank you.

7    A      And then right below that on the same page, loan file

8    withdrawal history.  And then if you turn to Page 2, at the

9    very top it says loan file transactions.  You'll see some

10   information.  The fourth, fifth and sixth lines down have

11   information of the file going in and out.

12   Q      Okay.  So could you explain to the Court specifically

13   when did the file go, to whom did it go out and when did it

14   come back in based upon your review of this record?

15   A      The file was first released on 11/9/2009 to Chase.  The

16   file was returned to Deutsche Bank on or about 11/19/2009.

17   And it was then again shipped out to Chase on 5/13/2010.

18   Q      And do you know -- can you explain why the file would've

19   been shipped to Chase?

20   A      From our records it was like Chase requested it twice,

21   both times, for foreclosure.

22   Q      Okay.  And what is the relationship of Chase to the loan

23   that it would have the ability to request the file?

24   A      They are the montage loan servicer.

25   Q      Okay.  Does this exhibit, and specifically calling your

1    attention to the third page, does it identify what the

2    condition of the file was with respect to the documents the

3    last time it was in Deutsche Bank's possession?

4    A     The third page is an inventory of what we had in the file

5    when we last had the file in Deutsche Bank's possession.

6    Q     Okay.  And would it also reflect what was in the file

7    when Deutsche Bank first obtained possession of the file?

8    A     You'd have to look at -- this is a current picture of

9    what was in the file.  You know, you'd have to look at all

10   three pages to find out what might have been in the file

11   previously.

12   Q     Okay.

13   A     What would've been in the file previously.

14   Q     Looking at those pages are you able to tell what was in

15   the loan file when it was first delivered to Deutsche Bank?

16   A     Yes.

17   Q     Okay.  And could you describe what was in the file in

18   terms of specifically the loan documents?  I'm more concerned

19   about the note and the mortgage.

20   A     When the file was first delivered to us on 4/20/2006 I

21   could tell that the file was reviewed on that day by -- if you

22   go to the top of the second page it's the first -- the first

23   transaction.  It shows initial loan review.  The original note

24   was in the file endorsed and blank.  A certified copy of the

25   mortgage, a title commitment and I believe that is it.

1    Q    And just so the Court can see specifically, where does it

2    show that you have an original note?

3    A    If you go to the third page it's the ninth item down, it

4    says note under item.  And then if go next to that it says

5    item status there's an O there, the O stands for original.

6    Q    Okay.  Could you please describe where it would show in

7    that list that there's an original mortgage in the file?

8    A    The line below that it says mortgage/deed of trust.  And

9    there's an O next to that.

10   Q    Okay.  And two lines below that it says endorsement.  And

11   then it says to the right of that item status, BLK.  Could you

12   explain to the Court what that means?

13   A    That means we have an original endorsement in blank from

14   BNC to -- BNC mortgage to blank.

15   Q    Okay.  And could you also please describe what takes

16   place in the initial loan review.  You made mention of an

17   initial loan review.  What takes place when Deutsche Bank, as

18   custodian, obtains the file and conducts an initial loan

19   review?

20   A    What happens is we're given a date assess.  It's going to

21   be different date appoints such as borrower name, address,

22   city, state, zip.  Things you can read on the face of the

23   note.  And so what the reviewer does is they open up the file

24   and they take a look at the documents and then comparing the

25   documents to the data to make sure that we have the right

1    note, does the borrower's name match, does the address --

2    property address, city, state, zip, amount, various things

3    such as that.  And then they will go through and check each

4    document to make sure the pages are all there, make sure

5    they're signed and then they'll input the status of the

6    document.  Is it an original, it is a certified copy, is it a

7    title commitment, et cetera.  Things like that.  And they'll

8    go through an inventory of the file putting statuses down for

9    each document.

10   Q    And then are those findings reflected in either the loan

11   inventory or somewhere else on the three page document,

12   Exhibit A?

13   A    The findings would be -- the initial findings would be

14   logged in and it would show up on this filing, this loan

15   inventory which is Page 3.  But that gets updated if

16   subsequent documentation comes in to change of status.

17   Q    Okay.  And could you give me an example of changing a

18   status?

19   A    So when we first received this file I can show, if you

20   look at the bottom of Page 1 we received -- we received the

21   file, the mortgage was -- the status was CS, which is a

22   certified copy of the mortgage.  And then on 8/10/2007 it was

23   updated to O for original.  So we received the original

24   recorded mortgage.  So that loan inventory status now reflects

25   the current status of O for original recorded.

 1          MR. LESNIAK:  Your Honor, if I may approach the

 2   witness.  I'm going to show him, as soon as Mr. Hanson looks

 3   over the file, I will hand up to Your Honor another copy of

 4   the loan file, 8338.

 5   BY MR. LESNIAK:

 6   Q    Chris, I'm going to show you another loan file and ask

 7   you if you've seen that file before?

 8   A    I've seen it.  Yes, I have.

 9   Q    Okay.  When is the first time you remember seeing it?

10   A    Today.

11   Q    Okay.  In looking at it, can you tell that it's a

12   Deutsche Bank file?

13   A    Yes.  It has the label with the Deutsche Bank symbol on

14   it.

15          MR. LESNIAK:  Your Honor, for the record the witness

16   is referring to the label on the face of the jacket.

17   BY MR. LESNIAK:

18   Q    And as we did before, Chris, can you identify what are

19   those letters, the alpha-numeric, LH06PC?

20   A    That is an internal code at Deutsche Bank for the deal --

21   the transaction that the loan is in which is the sale 2006-4

22   transaction.

23   Q    Transaction.  And then what about the next -- the numbers

24   and letters below that, MIL00838, what is that?

25   A    That would be the loan number that was given to us by BNC

1    for the loan.

2    Q    Okay.  And below that is what?

3    A    Kohler, Edward, the borrower name.

4    Q    Okay.  Let's take a look and just review the documents

5    for a moment.

6            MR. LESNIAK:  Again, Your Honor, we are, as with the

7    last file, we are looking at the tab that extends out from the

8    second or the back page -- the second page of the file.

9    BY MR. LESNIAK:

10   Q    And could you please read what's on that label?

11   A    It's MIL00838, the loan number.  The borrower name, co-

12   borrower name, which would be Kohler, Edward B., and Kohler,

13   Patricia L.  And the property address of 5310 S. Skyline

14   Drive, New Berlin, Wisconsin, 53151.

15   Q    Is that a label that would've been on the file when

16   received by Deutsche Bank?

17   A    Yes.

18   Q    Okay.  And would you look at the very back.  Flip over

19   the back of the second page of the file.  There's another

20   sticker on there, would you please state what's on that

21   sticker?

22   A    Information that says PMSR/Ed-Deutsche Bank, 670-Sale

23   2006-4, Loan Number 23305519, borrower name, Edward -- Kohler,

24   Edward.  And then again there's a code for Deutsche Bank, it's

25   a short DEUBNK and then there's something below that that says

1  CHKE, please mail to Brian Tucker.

2  Q    And from who did Deutsche Bank receive this file?

3  A    This file was sent to us from BNC.

4  Q    Now would you please, as you did with the previous file,

5  take a look through the file and describe for the Court what

6  documents are in the file.

7  A    Okay.  First page is this copy request log sheet which I

8  believe is a Deutsche Bank copy request log sheet, a

9  collateral checkoff sheet, the original note with an

10  endorsement from Lehman Brothers Bank, FSB to blank.

11  Q    And before you leave the allonge, the endorsement,

12  there's a sticker put on that allonge, is that correct?

13  A    Correct.

14  Q    And what does that sticker say?

15  A    MIL00838 which is the loan number and then it has the

16  borrower name and co-borrower name, Kohler, Edward B and

17  Kohler, Patricia L.  The address 5310 S. Skyline Drive, New

18  Berlin, Wisconsin, 53151.

19  Q    And is that something that Deutsche Bank would've put on

20  the document?

21  A    No, it is not.

22  Q    Okay.  What's next on the pile?

23  A    The next document is the original recorded mortgage.  And

24  a rider to that mortgage.  There's an original modification

25  agreement and document correction agreement, a title policy

1    and jacket.  There's some sort of closing documentation.

2    There is a title commitment and a certified copy of the

3    mortgage.  That's it.

4    Q    Now those documents are all loose in the file.  They're

5    not bound together in any significant way.  Is that how, based

6    upon your experience, you would expect that that file could be

7    received by Deutsche Bank?

8    A    No, it is not.

9    Q    What would you expect the condition of the file to be

10   when received by Deutsche Bank?

11   A    I would expect it to be fastened in these metal fasteners

12   with the two hole punch papers in there.

13   Q    And in any particular order?

14   A    By this check sheet.

15   Q    And again you would expect it to be in the order in the

16   check sheet?

17   A    Yes.  Correct.

18   Q    Now is there any information available that would tell

19   you when was the last time Deutsche Bank had possession of

20   this file?

21   A    Our -- Deutsche Bank's records.

22   Q    Would Deutsche Bank have kept the same records for loan

23   number 8338 as it would have for 8336?

24   A    Yes.

25             MR. LESNIAK:  Your Honor, what I'm handing up to the

1   Court is a copy of the Trust Exhibit B.  I'm going to ask Mr.

2   Corcoran to take a look at this.

3                      (Pause)

4   BY MR. LESNIAK:

5   Q    Could you tell me, what is Exhibit B?

6   A    Exhibit B is a loan -- loan file information screen shot

7   from our system showing the ins and outs, when the file was

8   reviewed, information like that.  And then the loan inventory

9   report for the inventory of the file that was at Deutsche

10  Bank.

11  Q    And is that Deutsche Bank's custodial record for the loan

12  file Number 8338 that you just took a look at?

13  A    Yes.

14          MR. LESNIAK:  Okay.  Your Honor, I'm going to move

15  that Exhibit B be admitted into evidence.  If you need me to

16  do the foundation again for this document I'll be glad to do

17  it.

18          THE COURT:  Mr. Hanson?

19          MR. HANSON:  I don't have any objection, Judge.

20          THE COURT:  Exhibit B will be admitted.

21  BY MR. LESNIAK:

22  Q    And then, Chris, I'd ask you to explain to the Court some

23  of the information on this particular document.  First of all,

24  can you tell from this document when the file was withdrawn

25  from Deutsche Bank, left Deutsche Bank's possession?

1    A    Yes.

2    Q    And where would you find that information?

3    A    You would find it under the loan file withdraw

4    information which is the first section.  And you'd also see

5    the -- down on the last entry on the first page that has that

6    record as well.

7    Q    Okay.  And what is the date when the file was withdrawn

8    from Deutsche Bank?

9    A    5/13/2010.

10   Q    And can you tell from the record to whom it was sent?

11   A    Yes.

12   Q    And who is that, please?

13   A    It was sent to Georgette Gordon at Chase.

14   Q    Okay.  And is this loan also serviced by Chase to your

15   knowledge?

16   A    Yes.

17   Q    Okay.  What's the information show on the second page?

18   A    Page 2.  Page 2 also has the date -- has the date of the

19   withdrawal information.  It also has a couple of transactions

20   showing that copies was requested of the mortgage and of the

21   note on 8/17/2006.

22   Q    Is that typical for Deutsche Bank to put into the records

23   when someone requests a copy of the loan document?

24   A    Yes.

25   Q    Okay.  Can you please tell the Court when Deutsche Bank

1   received this file based upon the information in the

2   transaction records?

3   A    When we initially received the file?

4   Q    Yes.

5   A    We initially received the file on 4/20/2006.

6   Q    Okay.  And what did Deutsche Bank do with the file when

7   it received it?

8   A    The file was reviewed and put on the shelf.

9   Q    And where is that review -- a record of that review

10  reflected?

11  A    On the third page.  The date of the record of the review

12  is actually, I'm sorry, on the first page, the last section.

13  It says loan file transaction.  You can see 4/20/2006.  And

14  then the documents were logged in via this loan inventory.

15  This loan inventory report.  You can tell what -- you know,

16  some of the original documents that were sent to us.  Sent to

17  Deutsche Bank.

18  Q    Okay.  And based upon the loan inventory at Page 3, could

19  you please tell the Court what original loan documents were in

20  the file?

21  A    I'll have to use the Page 3 and the Page 1 --

22  Q    Please.

23  A    -- to do that.  The original note was in the file and --

24  with the endorsement to blank, a certified copy of the

25  mortgage and a title commitment.

1   Q    And does it also show which entity executed the

2   endorsement in blank?

3   A    Yes.

4   Q    Which entity would that be?

5   A    Lehman Brothers Banks, FSB.

6            MR. LESNIAK:  Your Honor, I have no more questions.

7   Excuse me, one second.

8            THE COURT:  Sure.

9                      (Pause)

10           MR. LESNIAK:  Your Honor, I have no more questions

11  for the witness at this time.  When we're done with the cross

12  examination I will at some point ask to admit the original

13  loan documents into the record.  Thank you.

14           THE COURT:  Thank you.  Mr. Hanson, questions for

15  Mr. Corcoran?

16           MR. HANSON:  Thank you, Your Honor.  Maybe just a

17  little housekeeping.  I'm sure what we have -- where the

18  documents are.  I just want to verify, does the witness have

19  the original documents?

20           THE WITNESS:  Yes.

21           MR. HANSON:  Okay.

22                  CROSS EXAMINATION

23  BY MR. HANSON:

24  Q    Mr. Corbon or Carbon?

25  A    It's Corcoran.

1    Q    Corpron?

2    A    Corcoran.  C-o-r-c-o-r-a-n.

3    Q    I'm sorry.

4    A    It's okay.

5    Q    I didn't get that straight.  Okay.  Corcoran.  Now just

6    to clarify, the loan files you have in front of you, before

7    today's hearing have you -- do you recall ever seeing them

8    before?

9    A    I do not recall seeing before.

10   Q    And can you tell me, did anyone have any conversations

11   with you about what you'd be testifying about today before

12   today's date?

13   A    Yes.  I talked to counsel before today's date.

14   Q    Anyone else?

15   A    Not that I recall, no.

16   Q    How did you know you were supposed to come here today?

17   A    Through conversations with counsel.

18   Q    So besides Mr. Lesniak you didn't discuss these documents

19   with anyone else before today's date?

20   A    We had a call, I don't recall the date, maybe a month

21   ago, and on that was Mr. Lesniak.  I had Deutsche Bank's

22   outside counsel on the phone as well, as well as a paralegal

23   for Deutsche Bank.

24              MR. LESNIAK:  Your Honor, we would also stipulate

25   that Ms. Jensis was in the room when Mr. Corcoran and I spoke.

 1           THE COURT:  Spoke as well.  Okay.  Thank you.

 2    BY MR. HANSON:

 3    Q    So you did not actually pull these documents out of

 4    storage at Deutsche Bank?

 5    A    No, I did not.

 6    Q    Okay.  Now correct me if I'm mistaken but I believe you

 7    indicated a little while ago that when you were looking at the

 8    -- some of the documents in the file you indicated, for

 9    instance, that you saw the original note in the file, is that

10    correct?

11    A    That is correct.

12    Q    Okay.  And do you know whether or not those are the

13    signatures of Edward and Patricia Kohler?

14    A    I do not know that?

15    Q    Because you don't have any personal knowledge as to

16    whether they signed it or not, is that right?

17    A    That is correct.

18    Q    Now if I could have you turn to the loan file for the

19    first mortgage.  I believe that would've been the loan file

20    that you looked at first.

21    A    Okay.

22    Q    And could I have you turn to the allonge?

23    A    Okay.

24    Q    Now there is no date on that allonge, is that correct?

25    A    That is correct.

1    Q    Okay.  And there's no reference on that allonge to any

2    kind of note, is that right?

3    A    It has a loan number and a name and an address, but

4    that's it.

5    Q    Does it reference any -- a day -- such and such a date

6    and a particular amount?

7    A    No, it does not.

8    Q    So it does not reference any note that would've been

9    signed by Mr. and Mrs. Kohler on April 6th of 2006, is that

10   correct?

11   A    It has the same loan number, but that's it.

12   Q    Okay.  The same loan number as well?

13   A    The loan number on the allonge is the same loan number

14   that's printed on the note.

15          MR. HANSON:  May I approach the witness, Your Honor?

16          THE COURT:  Certainly.  Does Mr. Lesniak know what

17   you're going to --

18          MR. LESNIAK:  Yes.  It's fine, Judge.

19          THE COURT:  Okay.

20   BY MR. HANSON:

21   Q    Can you point to where it has the loan number?

22   A    That loan number right there is the same as that loan

23   number right there.

24   Q    I see.  There's no date, there's -- it doesn't reference

25   any date of loan or note, does it?

1    A    No, it does not.

2    Q    And there's no amount in that allonge, is there?

3    A    No, there is not.

4    Q    And you do not have any personal knowledge as to when

5    that allonge was signed, do you?

6    A    I do not.

7         THE COURT:  Mr. Hanson, could I ask you a favor.

8    When you're standing up there you have to talk a little bit

9    louder because that mike is set up to pick up --

10        MR. HANSON:  Oh, I can do that, Judge.  I didn't

11   want to yell.

12        THE COURT:  Sure.

13        MR. HANSON:  Okay.  Thank you.

14   BY MR. HANSON:

15   Q    And can you tell me, looking at the allonge, I'd like to

16   stay with that please.  There's a person's name on that.  Can

17   you tell us what that person's name is?

18   A    This right here?  This name or this name?  Okay.  That

19   person's name is Eleanora Martino.

20   Q    Okay.  And that appears to be the person that signed that

21   allonge, is that correct?

22   A    Correct.

23   Q    And you don't know Eleanora Martino, do you?

24   A    I do not.

25   Q    So you don't have any personal knowledge as to when this

1  person signed that allonge, do you?

2  A    I do not.

3  Q    Okay.  Now you mentioned that you saw the borrower's name

4  on the allonge and a loan number, is that right?

5  A    Correct.

6  Q    And can you, just to clarify, are -- what else is on --

7  is in that area?  You mentioned a loan number and the

8  borrower's names?

9  A    Uh-huh.

10 Q    And what other information is --

11 A    Property address.

12 Q    All right.  Now that information is not typed or printed

13 on the allonge itself, is it?

14 A    No, it is on a sticker.

15 Q    And so the names, address and this loan number, that's

16 all on a sticker that would've been placed on the allonge, is

17 that correct?

18 A    Correct.

19 Q    So that information was not originally on that allonge,

20 is that correct?

21 A    Correct.

22 Q    Or at least you --

23 A    When we got it that was -- I would -- believe that would

24 be on the allonge when we received it.

25 Q    But you wouldn't have any personal knowledge as to

1   whether that was on that allonge, is that correct?

2   A    When?  I'm not following.  Sorry.

3   Q    When you say you received it.

4   A    When we received it, that sticker would've been on that

5   allonge.

6   Q    How do you know that?

7   A    I should -- Okay.  I believe it would've been on the

8   allonge.

9   Q    But you don't have any personal knowledge whether that

10   sticker was on the allonge.  When you say we received you mean

11   when Deutsche Bank received it?

12   A    Correct.

13   Q    Would you agree with me that at some point that

14   information was attached or glued onto the allonge?

15   A    Correct.

16   Q    Now, excuse me, this allonge is signed in blank, is that

17   correct?

18   A    Pay to the order of blank.

19   Q    And can you tell me what that means to you?

20   A    It's -- pay to the order of blank meaning for ease of

21   transactions.  It can be moved from company to company and

22   then, you know, it's in blank.

23   Q    So would that blank endorsement -- or would that -- where

24   it says pay to the order of blank, there's nothing on that

25   allonge in itself that would tell you who that note was

1   supposed to be assigned to, is that correct?

2   A    Correct.

3   Q    And you don't have any personal knowledge of who the

4   intended recipient of the note was, do you?

5   A    I do not, correct.

6            MR. HANSON:  Your Honor, if we could have the

7   checklist for a moment.  There is one little housekeeping

8   matter, I believe, and that is I'd like to review the amended

9   claim 12 with the witness.  I did speak with Attorney Lesniak

10  about this just before the hearing.  And neither of us have

11  any strong feeling that needs to be marked as an exhibit since

12  it's already part of the record.

13           THE COURT:  Right.  I don't think we --

14           MR. LESNIAK:  Your Honor, if I may, I agreed that it

15  doesn't have to be marked as an exhibit, but I did not agree

16  that it would be the proper subject of cross examination since

17  we never asked Mr. Corcoran on direct anything about a proof

18  of claim.  I'm preserving that objection.

19           MR. HANSON:  (indiscernible).

20           MR. LESNIAK:  Mr. Hanson can ask the question, I

21  just want to make it clear what we agreed to.

22           THE COURT:  Mr. Hanson, let Mr. Lesniak finish.

23           MR. LESNIAK:  I just want to make it clear about

24  what we agreed to.

25           THE COURT:  Okay.  Mr. Hanson?

1    MR. HANSON:  Thank you.  Well, the objection goes to

2    the heart of the claim, of this amended claim.  This is put

3    forth by the --

4    THE COURT:  I think the objection is beyond the

5    scope but he's reserving it because you haven't asked any

6    questions yet.  So he's saying you dive in and if he thinks

7    you're going beyond the scope, he'll tell me.

8    BY MR. HANSON:

9    Q    I would like to show you another document.

10   A    Can I --

11   Q    Have you ever seen that document before?

12   A    I have not seen this particular document.  But, you know,

13   it looks like the recorded mortgage which I've seen before.

14   It's in there.

15   Q    Now just for the record, at the bottom do you see some --

16   a line at the very bottom of the page which starts with Case

17   Number 09-39531-PP?

18   A    Yes.

19   Q    Okay.  And does that indicate that this is Claim 12?

20   A    Yes, it does.

21   Q    And does it indicate that this document was filed?  Is

22   there a file date on that?

23   A    Yes.

24   Q    And what's the file date, please?

25   A    The file date is 9/21/2010.

1    Q    All right.  And can you also tell me, does this document

2    indicate how many pages it has?

3    A    30.

4    Q    Okay.  And right now you're looking at Page 1 of 30, is

5    that correct?

6    A    Yes.

7    Q    Okay.  Could you turn to Page 27 of the claim.

8    A    Okay.

9    Q    In looking at that, can you tell me if this is -- is this

10   a copy of the allonge that you were just looking at in the

11   loan file with the original documents?

12   A    It looks like it.

13   Q    And it's an allonge and it's signed in blank, is that

14   correct?

15   A    Correct.

16   Q    And it's -- appears to be signed by an Eleanora Martino,

17   is that correct?

18   A    Correct.

19   Q    Okay.  And it's not dated, right?

20   A    Correct.

21   Q    And the original allonge was not dated, was it?

22   A    Correct.

23   Q    And this is signed -- can you tell me, who does it appear

24   to be signed by?

25   A    Eleanora Martino, Vice President of Quality Assurance.

1   Q    And do you know what company she was signing on behalf

2   of?

3   A    It's from BNC Mortgage.

4   Q    BNC Mortgage.  Okay.  Thank you.  And could you take a

5   look at Page 28, please.  And can you tell me, have you ever

6   seen this document before?

7   A    No, I'm not familiar with this document?

8   Q    And can you tell me, what is this document titled as?

9   A    Allonge.

10  Q    And is this document dated?

11  A    Yes, it is.

12  Q    And the date is what date, please?

13  A    The 2nd day of December 2009.

14  Q    Okay.  And can you tell me, who signed this allonge?  Who

15  appears to have signed it?

16  A    It looks like Whitney K. Cooke (phonetic), Assistant

17  Secretary.

18  Q    And does it indicate -- can you tell at all who Ms. Cook

19  would've been employed by or signed on behalf of?

20  A    It looks like she signed on behalf of BNC Mortgage, but

21  as Chase Home Finance as attorney in fact.

22  Q    Do you have any idea of what that means, attorney in

23  fact?

24  A    She can sign for BNC Mortgage.  I, you know, again I'm

25  guessing, but, you know.

1    Q    Okay.  And is this allonge signed in blank?

2    A    No, it is not.

3    Q    Okay.  Can you tell me who this allonge would show, who

4    is signing it from who, you know, from what entity to what

5    entity?

6    A    It's BNC Mortgage, Inc. to U.S. Bank National Association

7    as trustee for Structured Asset Investment Loan Trust.

8    Mortgage pass through certificate series 2006-A -- I'm sorry,

9    dash 4.

10    Q    Okay.  And that would be the same trust that you were

11    discussing with Attorney Lesniak a little while ago?

12    A    Correct.

13    Q    Now just jumping back to that other allonge for a moment.

14    Do you have any idea if that blank allonge would've been

15    signed before this allonge?

16    A    Since this one was dated December 2, 2009 and this one

17    was in our file -- I'm sorry -- the allonge from Page 28 dated

18    December 2, 2009 versus the allonge from Page 27 which was

19    undated.  I believe the one on Page 27 which is undated

20    would've been done first.

21    Q    Okay.  And you mentioned earlier that Deutsche Bank is

22    the custodian.  And it's custodian for various banks and

23    entities?

24    A    We're custodian for various -- you know, we're holding

25    various loan files for different trusts, banks, mortgage

1    companies, asset investment companies.  Just all sorts of

2    different companies and we're holding all sorts of different

3    asset files.

4    Q    I see.  And just to clarify, then your understanding is -

5    - let me ask you this, you said earlier that BNC -- that BNC

6    sent the note and that blank allonge to Deutsche Bank?

7    A    Yes.

8    Q    Okay.  So then did Deutsche Bank own that loan?

9    A    No, we did not.

10   Q    Why not, do you know?

11   A    It was sent to us per agreements that we had as being a

12   document custodian.

13   Q    Okay.  And it's your understanding that you're a document

14   custodian of that 2006-4 trust?

15   A    Yes.  We are a custodian for the 2006-4 trust.

16   Q    Well, let me ask you this, do you have any personal

17   knowledge as to whether the 2006-4 trust actually ever owned

18   that note before your company came the custodian?

19   A    I do not have any personal knowledge of that, no.

20   Q    Is it possible then that the 2004 -- excuse me, the 2006-

21   4 trust did not come into ownership or possession of the note

22   when Deutsche Bank received this from BNC Mortgage?

23   A    When Deutsche Bank received this file from BNC Mortgage -

24   - Deutsche Bank does not determine ownership.  As custodian we

25   do not determine ownership of a mortgage.

1   Q    Okay.  So you don't know whether the 2006-4 trust owns

2   this note or not?

3   A    I do not know that.

4   Q    So is it possible that the 2006-4 trust did not own the

5   note when your company first came into possession of that

6   file?

7   A    It did not own the note when we first came into

8   possession of the file.

9   Q    The trust did not own that note?

10  A    It wasn't delivered to Deutsche Bank for the trust when

11  it was first delivered to Deutsche Bank.

12  Q    Okay.  So then it was delivered -- All right.  So then if

13  the trust did not own the note when it was delivered to

14  Deutsche Bank, according to your log sheets, who owned it, do

15  you know?

16  A    Again, Deutsche Bank does not determine ownership.  I can

17  only tell why we're holding it or, you know, who we're hold it

18  for.  We wouldn't determine ownership of a file or property or

19  note or anything like that.

20  Q    Well if you don't know who owns it, how do you know who

21  you're holding the note for?

22  A    We -- the files and the data fall under, as I explained

23  it before, the six digit alphanumeric codes.  You can see on

24  Exhibit A.

25  Q    Yes.

1   A    If you look at the very top, almost at the middle of the

2   page, it says issue and it says LH06PC.

3   Q    Yes.

4   A    And that would determine we're holding it for the sale

5   2006-4 transaction.  Currently, you know, with the file in our

6   possession we would be holding it for that transaction.

7   Q    Okay.  So then you wouldn't be able to testify as to when

8   you started holding this file for the 2006-4 trust?

9   A    I don't have the date of the trust agreement, no.  I

10  don't have the date of that particular -- you know, I don't

11  have the date of the trust so I don't know.

12  Q    I see.  So is it your understanding that you would hold

13  it for the trust as of the date of the trust?

14  A    Yes.  As of the date of the close of the trust.

15  Q    I see.  And that because the trust determines the date?

16  A    I don't know who determines the date, but it's -- yeah

17  it's on the documentation or something.

18  Q    I see.  Well let me ask you then, is it your

19  understanding that Deutsche Bank would rely upon the trust

20  document to help determine ownership?

21  A    Well, again, you know, we wouldn't -- we wouldn't be in a

22  position to determine ownership at all.  It would be -- you

23  know, that's out -- as document custodian that's out of our

24  realm.

25  Q    I see.  So what you understand is that with that code on

1   this -- these -- this log information, which is printed out of

2   a computer, that what tells you that you're holding it for the

3   trust, is that correct?

4   A    Correct.

5   Q    Okay.  Could you just go back for a moment to Page 28 on

6   that document in the claim.

7   A    Yes.

8   Q    Okay.  So now we're looking at that allonge date of

9   December 2nd of 2009, is that right?

10  A    That is correct.

11  Q    Well is it possible that this allonge would have

12  transferred ownership or at least, at the very least,

13  attempted to transfer ownership of the note to the trust on

14  December 2, 2009?

15  A    It is possible, but you know again we don't determine the

16  ownership or anything.

17  Q    So you really don't know?

18  A    I really don't know, correct.

19  Q    So going back to Exhibit A.  A moment ago you said that

20  this Code LH06PC, that tells you that Deutsche Bank is holding

21  -- that they're acting as a custodian for the trust?

22  A    Correct.

23  Q    That would be correct.  And so then it would be holding a

24  file for that 2006-4 trust?

25  A    Correct.

1    Q    Do you know who would've put that code in the computer

2    system?

3    A    It would've been -- the code -- the code is assigned to

4    my group by a salesperson at Deutsche Bank.  They give us the

5    codes.  So for every transaction trust, you know, stuff like

6    that, it's given a six digit alphanumeric code.  So it

7    would've been assigned by the salesperson to someone on my

8    team.  And someone on my team would've imputed this code.

9    Q    Okay.  A salesperson.  What do they sell?

10   A    Mortgage products.  You know, they go out and sell our

11   document custody services, our trustee services, things like

12   that.

13   Q    Okay.  So it's a Deutsche Bank employee?

14   A    Correct.

15   Q    So you don't have any personal knowledge as to when that

16   code would've been put into the document you have in front of

17   you as Exhibit A, is that correct?

18   A    I do not.

19   Q    Let me see.  Now -- I'm sorry we're jumping around like

20   this.  But if you could go back to your loan file for a

21   moment.

22   A    The first mortgage loan?

23   Q    Yes.  The one we were just looking at.

24   A    Yeah.

25   Q    Now can you tell me, I'd like you to take a quick look

1    and examine that note that's in the file that you had -- you

2    referred to as the original note a little while ago.  And also

3    the allonge.

4    A    Okay.

5    Q    Is that allonge attached to the note?

6    A    Right now, no, it is not.  It's -- it was paper clipped.

7    I think I actually pulled this out when I was looking through

8    it.  So it was paper clipped.

9    Q    Other than a paper clip, do you have any personal

10   knowledge as to whether that allonge was ever affixed to that

11   note in any manner with a staple or anything besides a paper

12   clip?

13   A    I never saw it.  This is how I saw it when I viewed it,

14   but there are holes in the paper.

15   Q    Okay.  When you say there are holes in the paper, can you

16   describe those holes?

17   A    Yeah, they are holes at the top of the paper with the

18   hole punched paper.  And then there's little holes on the left

19   hand side top corner that look like staple holes.

20   Q    Okay.  But as you sit here today you don't know whether

21   that allonge was ever attached to that note by stapling, do

22   you?

23   A    I do not know that, no.

24   Q    Mr. Corcoran, could you please get the other loan file in

25   front of you and put this one aside for a minute?

1   A    Yes.

2   Q    I'd like you to take another quick look at that note in

3   that file, please.

4   A    Okay.  I have it.

5   Q    And I believe that a little while ago you had referred to

6   that as an original note, is that correct?

7   A    That is correct.

8   Q    And this is a note that has signatures on it, is that

9   right?

10  A    Correct.

11  Q    But you don't know whether those signatures are Edward

12  and Patricia Kohler, is that true?

13  A    That is correct, I do not know that.

14  Q    Okay.  And if I could then have -- direct your attention

15  to the allonge in that file, please.  Now is -- this is a

16  blank allonge as well, is that correct?

17  A    That is correct.

18  Q    So there's no date on that allonge, is there?

19  A    That is correct.

20  Q    And there's no reference to any note dated April 6th in

21  any particular amount, is there?

22  A    No, there is not.

23  Q    And can you tell me who signed that?  Who does it appear

24  signed that allonge?

25  A    It looks like Jamie Langford (phonetic), Vice President

1    of Lehman Brothers Bank, FSB.

2    Q    And do you know this person?

3    A    I do not.

4    Q    And so you wouldn't know when this person would've signed

5    that allonge, is that correct?

6    A    That is correct.

7    Q    And you wouldn't know whether the person on the face of

8    that document had the authority -- proper authority to sign

9    that allonge, is that correct?

10   A    That is correct.

11   Q    Now can you tell me, does this allonge have other

12   information on it like names, addresses and that sort of

13   thing?

14   A    Yes, it does.

15   Q    Okay.  And the names on that would be Edward and Patricia

16   Kohler, is that correct?

17   A    That is correct.

18   Q    And it has an address on it too.  And can you tell me

19   what that address is?

20   A    It's 5130 S. Skyline Drive, New Berlin, Wisconsin, 53151.

21   Q    And do you know whether that's the address for the real

22   estate that's the subject for the mortgage?

23   A    Yes.  It's the same address that is on the mortgage.

24   Q    Now that -- is there anything else on the note, or excuse

25   me, on the allonge, any kind of loan number or anything?

1   A    Yes.  There's a loan number.

2   Q    And what's that loan number, please?

3   A    MIL00838.

4   Q    And that information, the loan, the names and the

5   address, those were not originally typed or printed on that

6   allonge, is that correct?

7   A    That is correct.

8   Q    And, in fact, those -- that information is on a separate

9   piece of paper, isn't that true?

10  A    It's on a sticker.

11  Q    On a sticker.  And so now that sticker is stuck on that

12  allonge, is that right?

13  A    That is correct.

14  Q    And you don't know when that sticker would've been placed

15  on that allonge, do you?

16  A    That is correct.

17  Q    And just to clarify, if I can ask you, this is allonge

18  isn't blank, is that correct?

19  A    That is correct.

20  Q    So there's no party showing on the allonge under the

21  words paid to the order of, is that right?

22  A    That is correct.

23  Q    And you don't have any personal knowledge of who the

24  intended recipient was for the note, do you?

25  A    That's correct.

1   Q    So you don't have any personal knowledge as to who --

2   what -- when this allonge was signed, who the note was

3   supposed to go to, is that right?

4   A    Correct.

5   Q    But the person that signed that allonge, can you tell me

6   who it appears they worked for or who they would've been

7   signing for?

8   A    It looks like Lehman Brothers Bank, FSB.

9          MR. HANSON:  Your Honor, I would like to approach

10  the witness.

11  BY MR. HANSON:

12  Q    Now I'd like you to identify this.  It's a document

13  similar to the other one I showed you.  And if I could direct

14  your attention to the bottom, the bottom line, it's -- again

15  it has a case number.  Can you state for the Court what that

16  is?

17  A    It's Case Number 09-35931-PP.

18  Q    And what's the claim number, please.

19  A    Claim 13.

20  Q    And if I can have you look -- have you just quickly look

21  way up in the right hand corner, this isn't -- it's indicated

22  that it's an amended claim -- amended proof of claim?

23  A    Yes.

24  Q    And what does it show the date of filing was, please?

25  A    Filed on 9/21/2010.

1    Q    Okay.  And how many pages is this document?

2    A    It says 15.

3    Q    And I could -- if I could have you turn to Page 14 of 15,

4    please.

5    A    Uh-huh.

6    Q    Does this appear to be a copy of the blank allonge that

7    you were just looking at in your loan file from Deutsche Bank?

8    A    Yes.

9    Q    Okay.  And it's signed by Jamie Langford (phonetic), Vice

10   President, is that right?

11   A    Yes.

12   Q    Now I'd like you to turn to Page 15, please.

13   A    Uh-huh.

14   Q    Can you identify what this document is?

15   A    It's an allonge.

16   Q    And can you tell me the date of this allonge?

17   A    March 8, 2010.

18   Q    Okay.  And can you tell me who's it signed by?

19   A    It's signed by Deborah A. Lehard (phonetic), Vice

20   President.

21   Q    And can you tell me who Deborah A. Lehard was -- who she

22   was working for as Vice President?

23   A    Lehman Brothers Bank, FSB, now known as Aurora Bank, FSB.

24   Q    Okay.  And do you know that Lehman Brothers Bank is no

25   longer in existence?

1    A    I believe Lehman Brothers Bank is now Aurora Bank so, you

2    know, they're in business as Aurora Bank.

3    Q    Now can you tell us if this is a blank allonge?

4    A    No, it is not.

5    Q    And can you tell me what it shows?  That it's assigning a

6    note and -- just tell the Court what this -- what the

7    endorsement indicates.

8    A    It indicates that Lehman Brothers Bank, FSB, now known as

9    Aurora Bank, FSB, assigns the note to U.S. Bank, National

10   Association, as trustee for structured asset investment loan

11   trust, mortgage passed through certificate series 2006-4.

12   Q    All right.  And it also indicates what note it's

13   assigning, is that correct?

14   A    Yes, it does.

15   Q    And what note is that, please?

16   A    It says note -- mortgage note executed by Edward B.

17   Kohler and Patricia L. Kohler as borrowers to Lehman Brothers

18   Bank, FSB, now known as Aurora Bank, FSB, as lender dated

19   April 6, 2006.  And the original sum -- the original stated

20   sum of $55,200.

21   Q    Does this appear to be the same note that you have in

22   your loan file from Deutsche Bank?

23   A    Yes.

24   Q    And looking at Page 14 and 15, a copy of these allonges,

25   do you know or have any idea which of these would've been

1    signed first?

2    A    I would think the one -- the blank endorsement from Page

3    14 would've been signed first because that would've been in

4    our possession when we first received the file and this was

5    dated -- I'm sorry, the second one on Page 15 is dated March

6    8, 2006 -- 2010.

7    Q    And so would that blank allonge, that blank endorsement,

8    would you have any personal knowledge as to who -- who the

9    recipient was for the note?

10   A    I would not.

11   Q    And a little while ago I asked you questions about

12   whether you had personal knowledge on the -- on the other note

13   and allonge, would your answers be the same?

14   A    Yes, they would.

15   Q    And so you wouldn't have any personal knowledge as to

16   whether the 2006-4 trust owns this note, is that correct?

17   A    That is correct.

18   Q    So is it -- and would you know why there would be an

19   additional allonge signed on March 8th of 2010?

20   A    I do not know why.

21   Q    Now if I could once again direct your attention back to

22   your loan file.

23   A    Uh-huh.

24   Q    And if you can please take another look at the note and

25   the allonge?

1    A     Okay.  I have them.

2    Q     And is that allonge attached to the note?

3    A     There was a staple, I'm sorry, a paper clip I took off

4    and I put back on.

5    Q     And you don't know when that paper clip would've been

6    placed on it?

7    A     No, I do not.

8    Q     Let me ask you this, do you know whether it's a legal

9    requirement for an allonge to be attached to a note in order

10   for it to be a valid endorsement?

11          MR. LESNIAK:  Objection, Your Honor.  It calls for

12   legal testimony.

13          THE COURT:  Sustained.

14   BY MR. HANSON:

15   Q   Can you take a little bit closer look at that note and

16   allonge.  And other than the paper clip, is there anything

17   about the documents that would show that they have ever been

18   attached to one another?

19   A     There are holes in the top of the page, you know, for

20   fastening into a metal binder clip.

21   Q     Okay.  So those holes would be to fasten all the

22   documents to the file, is that right?

23   A     To fasten the documents into that fastener metal binder.

24   Q     And that would hold them in the folder, is that correct?

25   A     Correct.

 1    Q     Okay.  Is there -- do you see any holes that would show

 2    that that note and allonge had ever been stapled together?

 3    A     I do not.

 4    Q     In fact, that particular note and that allonge, those

 5    documents, other than those two holes at the top to fasten it

 6    to your folder, those are in pristine condition, aren't they?

 7    A     They look in good condition.

 8    Q     No staple holes anywhere, is that correct?

 9    A     I do not see any staple holes anywhere.

10    Q     Let me ask you this, would that lead you to believe that

11    that allonge was never attached to that note?

12    A     I don't believe it was stapled.

13          MR. HANSON:  Your Honor, I do have a couple of more

14    exhibits.  I didn't actually mark these because I wasn't sure

15    how the -- but for the record I did have -- it is marked as

16    Exhibit 1 but it's not the original sticker.

17          THE COURT:  I don't care about the original sticker

18    so long as it's marked so we can identify it.

19          MR. LESNIAK:  You can have my copy if you want,

20    Judge.

21          MR. HANSON:  Oh.  Thank you.

22          MR. LESNIAK:  Excuse me, Your Honor.  Do you have a

23    copy of this yet?

24          THE COURT:  I don't.  Thank you.

25          MR. HANSON:  It is attached to --

1    BY MR. HANSON:

2    Q    Mr. Corcoran, can you identify that document for the

3    record?

4                MR. LESNIAK:  Your Honor, I'm going to object to any

5    questions about this document.  We did not ask Mr. Corcoran

6    any questions about the trust agreement or trust document.

7    Mr. Corcoran is here as a custodian for the trustee for

8    purposes of testifying about the records.  He has not

9    testified -- he's not here to testify about, nor has he

10   testified about any provisions under the trust agreement so I

11   believe this is outside the bounds of cross examination.

12               MR. HANSON:  Your Honor, actually he did.  He

13   referenced the trust in his direct.  And then a little while

14   ago he stated that the code on his Exhibit A or the document

15   record, that that was determined, I believe, by the date of

16   the trust.  He referenced that Deutsche would become custodian

17   but couldn't tell when because he didn't know what the date --

18   what the trust was.  And he referenced having some familiarity

19   with the trust.  I asked him if there were provisions that the

20   trust would have in it that would determine whether Deutsche

21   was supposed to be the custodian for the trust.  I believe.

22   And he couldn't answer those questions because he didn't have

23   a document in front of him.  But he did bring up the fact that

24   the trust would have a date in it that would show when

25   Deutsche was supposed to become the custodian for the trust.

1   So I believe that I should have a little leeway here.

2          THE COURT:  Yes, I recall that testimony somewhat

3   differently.  I'll give you a little leeway, Mr. Hanson, but I

4   think you ought to start with whether he's ever seen this

5   before and knows what it is.

6          MR. HANSON:  Yes.

7          THE COURT:  Because as Mr. Lesniak indicates, he's

8   here because he's the custodian of certain records.  And I'm

9   guessing this is not one of them.

10         MR. LESNIAK:  That would be a good guess, Your

11  Honor.

12         MR. HANSON:  I think that's correct, that this would

13  name possibly Deutsche as custodian.  If I can ask some

14  preliminary questions.

15         THE COURT:  Yes.  Why don't you try that.

16         MR. HANSON:  And if it doesn't look like it's going

17  to go anywhere I'll --

18         THE COURT:  We'll see where we go.

19  BY MR. HANSON:

20  Q    Mr. Corcoran, do you have an understanding that -- what

21  the 2006-4 trust is?

22  A    It's a mortgage backed security trust.

23  Q    And can you tell the Court what that is, what is a

24  mortgage backed security trust?

25  A    Loans that are pooled together.  Bonds are sold to

1    investors backed by the borrower's payments.

2    Q    Okay.  And if I could have you --

3         MR. HANSON:  Your Honor, if I can approach.

4    Q    If I could have you take another look at the document I'm

5    showing you, Claim Number 13.  Can you tell me what the name

6    of the creditor is here?

7    A    The name of the creditor is U.S. Bank National

8    Association as trustee for structured asset investment loan

9    trust, mortgage passed through certificate series 2006-4.

10   Q    Okay.  Now if I have you take a look at the document that

11   I just placed in front of you.  Can you tell me do you

12   recognize it?  Do you know what it is?

13   A    I'm not familiar with the documents, no.  But it says

14   trust agreement.

15   Q    Have you ever seen any of these trust agreements or

16   servicing things before?

17   A    I have seen them, yes.

18   Q    So you're generally familiar with them?

19   A    I wouldn't say I was familiar with them, I've seen them.

20   I don't -- my duties usually don't involve me reading the

21   whole document or anything like that.

22   Q    I see.  Do you know whether the trust document would

23   define the responsibilities and duties of the various parties

24   to the trust?

25   A    I do not know that.

1    Q     Let me ask you this, you indicated before you know that

2    Deutsche Bank is the custodian for the trust?

3    A     We are the custodian for the trust.

4    Q     Okay.  And how do you know that again?

5    A     We're holding files.  This -- there must be some --

6    there's an agreement that states we're the custodian for the

7    trust.

8    Q     I'm sorry?

9    A     An -- there's some sort of custodian agreement.

10   Q     I see.  So somebody has told you that Deutsche Bank is

11   the custodian, is that -- would that be a fair statement?

12   A     Yes.  But there's some sort of documentation that would

13   state that we're the custodian.

14   Q     Okay.  Have you ever seen that documentation?

15   A     I would -- I've seen -- you know, I don't know -- I'm

16   sure that I have seen the custodial agreement for Deutsche

17   Bank acting as custodian for the transaction, but I don't

18   recall, you know, when or where, you know.

19   Q     Do you know who the trustee is for the trust?

20   A     Looking at this it says U.S. Bank National Association.

21   Q     Pursuant to your custodian agreement can you tell me

22   what's the relationship between U.S. Bank and Deutsche Bank

23   then?

24         THE COURT:  I'm sorry, Mr. Hanson, I'm probably

25   getting old and going deaf.

1           MR. HANSON:  Oh, I'm sorry.

2           THE COURT:  Can you talk just a little bit more

3    loudly?

4    BY MR. HANSON:

5    Q    For the record could you state, based on the custodial

6    agreement, what's the relationship between U.S. Bank and

7    Deutsche Bank?

8    A    I don't have the custodial agreements so I don't know for

9    sure.  I'd have to -- you know, I don't have this.

10   Q    Do you have any idea or do you know what other

11   institutional actors would be party to this trust?

12   A    Just, you know, the ones that are listed on this document

13   that you've given me.

14   Q    and who are those?

15   A    Structured Assets Securities Corporation as depositor,

16   Aurora Loan Services, LLC as master servicer, Wells Fargo

17   Bank, N.A. as securities administrator, Clayton Fixed Income

18   Services, Inc. as credit risk manager and U.S. Bank National

19   Association as trustee.

20   Q    And would you know what the -- with that particular

21   document would you know, for instance, what Structured Assets

22   Securities Corporation is for the trust?

23   A    It says as depositor.

24   Q    But do you know what a depositor does?

25   A    I really -- I do not.

 1          MR. HANSON:  Your Honor, I'll just take the document

 2     back.

 3          THE COURT:  While Mr. Hanson is walking around, does

 4     anyone need to take a break?  Anybody?  We've been going for a

 5     couple of hours, I just want to make sure nobody has to use

 6     the facilities or anything.

 7          MR. HANSON:  I would be open for -- I just have

 8     maybe another -- several more questions and I can finish.

 9          THE COURT:  Okay.  I'm perfectly happy to keep

10     going, but I just don't want anybody to be sitting here

11     starting to get --

12          MR. LESNIAK:  Your Honor, I don't know how long Mr.

13     Hanson is going to be.  If I have an opportunity to redirect

14     it would be very short.

15          THE COURT:  Okay.  Mr. Hanson says he's got a

16     handful more questions, so --

17          MR. HANSON:  Yeah.

18     BY MR. HANSON:

19     Q    Do you know whether BNC Mortgage is still in existence?

20     A    I do not believe they are still in existence.

21     Q    And what makes you believe that?

22     A    I believe they were purchased by Lehman, you know, Lehman

23     Entity, and Lehman is no longer in existence.  I believe

24     they're bankrupt.

25     Q    Mr. Corcoran, can you briefly take another look at Claim

1    12, please.

2    A    Okay.

3    Q    And keep -- right hand corner that indicates it's an

4    amended claim?

5    A    It says amended proof of claim, yes.

6    Q    And turn to Page 3 of 30.

7    A    Okay.

8    Q    Can you identify what this document is?

9    A    It's an assignment of mortgage.

10   Q    Do you know what an assignment of mortgage is?

11   A    It assigns the interest of the mortgage from one party to

12   another party.

13   Q    Okay.  And can you tell the Court, what is -- first of

14   all, who signed this assignment of mortgage?

15   A    Shawn R. Hillman, Vice President.

16   Q    And does it indicate that -- who he's vice president for?

17   A    He's signing as Mortgage Electronic Registration Systems,

18   Inc. as nominee for BNC Mortgage.

19   Q    All right.  And so then it -- and what's the date of this

20   assignment?

21   A    November 30, 2009.

22   Q    And does this indicate that Mortgage Electronic Systems -

23   - well I'm going to ask you, who is Mortgage Electronic

24   Systems, what does this show -- who are they assigning the

25   mortgage to?  What does this document show that MERS is doing?

1          MR. LESNIAK:  Your Honor, excuse me.  I'm going to

2     object to this line of questioning.  I've waited to see if

3     it's tied up to any direct examination and it's not.  We

4     didn't ask Mr. Corcoran any questions about an assignment of

5     mortgage.  He didn't testify that there was any assignment of

6     mortgage in either of those original loan files.  This is

7     wholly outside of the scope of the direct examination.

8          THE COURT:  It is.  It's also on the record, Mr.

9     Hanson.  I mean, I can look at it, you can look at it, Mr.

10    Lesniak can look at it, frankly, the cleaning service can look

11    at it and figure out who it says it's assigning to.

12    Sustained.

13         MR. HANSON:  Fine.  I don't have any other questions

14    at this point.

15         THE COURT:  Okay.  Thank you.  Mr. Lesniak?

16         MR. LESNIAK:  Just a few more questions, Your Honor.

17         THE COURT:  Sure.

18                    REDIRECT EXAMINATION

19    BY MR. LESNIAK:

20    Q    Excuse me.  Are Exhibits A and B still up there?

21    A    Yes, they are.

22    Q    Okay.  Can you please open up Loan Number 8336 loan file

23    and take a look at the allonge for a second?

24    A    8336.  Okay.

25    Q    Okay.  Now Mr. Hanson asked you some questions about this

1    sticker that's on the allonge and when it might have been on

2    there and when it might not have been on there.  Now if you

3    look at Exhibit A, which is the loan file information, you

4    testified that it shows a note endorsed --

5    A    Yes.

6    Q    Now have you done -- have you reviewed these loan -- loan

7    files like this before?

8    A    Yes.

9    Q    And would it be your practice to log into the file and

10   allonge that had no apparent relationship to the loan?

11   A    We would log it in but with a different status.  It would

12   probably be inc for incomplete because we wouldn't know what

13   file the allonge belonged to because there would've been no

14   indicating information.

15   Q    So based upon your experience and the fact that was

16   logged in as an original allonge without any indication that

17   it was incomplete, would that lead you to believe that in fact

18   the information on the sticker that relates to the loan

19   number, the borrower's name and the address was on there at

20   the time the allonge was delivered to Deutsche Bank?

21   A    Yes.  I believe that's correct, yes.

22   Q    Okay.  And would your testimony be the same with respect

23   to the allonge and loan number 8338?

24   A    Yes.

25   Q    Okay.  And only one more question.  You've -- you work in

 1   Deutsche Bank in the custodial department.  Is it clear to you

 2   that Deutsche Bank is acting as custodian for trust 2006-4?

 3   A     Yes.

 4              MR. LESNIAK:  Thank you.  No further questions,

 5   Judge.

 6              THE COURT:  Mr. Hanson, anything else?

 7              MR. HANSON:  I don't have any other questions.

 8              THE COURT:  Okay.  I have a question.  Boston?

 9              THE WITNESS:  Yes.

10              THE COURT:  Okay.  That's why I was saying Cochran.

11              THE WITNESS:  Yes.

12              THE COURT:  Because you first said Cochran.

13              THE WITNESS:  I do.  I did.

14              THE COURT:  Then you said Corcoran.

15              THE WITNESS:  I was trying to make it easier for

16   everybody.  I do say Cochran.

17              THE COURT:  I was just trying to make sure you were

18   parking your car.

19              THE WITNESS:  I confuse everybody.

20              THE COURT:  That's okay.  I'm good.  I just feel

21   badly sometimes about mispronouncing people's names.  If I

22   pronounce it the way you pronounce it as opposed to -- All

23   right.

24              THE WITNESS:  It's a very difficult situation.

25              THE COURT:  Well, you know, by way of California --

1      THE WITNESS:  And I lived in Louisiana for years

2  too.

3      THE COURT:  We won't go there.  I'm glad you didn't

4  take any of that accent with you.  Okay.  So everyone is

5  finished questioning Mr. Corcoran?

6      MR. LESNIAK:  Your Honor, as I indicated earlier at

7  the close of our testimony -- of Mr. Corcoran's testimony we

8  would ask to admit the original loan files into evidence.

9      THE COURT:  Before I turn to Mr. Hanson, I'd like to

10  ask if we could mark them some kind of way, Mr. Lesniak, so

11  that we have a clear reflection if we want to call them 8336

12  and 8338 or something.  But right now I just have two loan

13  files that don't have exhibit numbers or --

14      MR. LESNIAK:  Whatever would be your preference,

15  Judge.  We could put a sticker on the outside of the folder

16  that marks them as Exhibits C and D and leave them as that.

17      THE COURT:  Why don't we do that.

18      MR. LESNIAK:  I'll be glad to do that.  I can do

19  that right now.

20      THE COURT:  That would be helpful.  Thank you.  So

21  if we call the first mortgage 8336, Exhibit C and the second

22  mortgage 8338, Exhibit D.

23      MR. LESNIAK:  Here's your copies, Your Honor.

24      THE COURT:  Thank you.  This is 8336.  And I think

25  this is 8338.  Thank you.

1          MR. LESNIAK:  Your Honor, we can supplement the

2    record with providing you with photocopies of the outside

3    jackets.

4          THE COURT:  Okay.  That's fine.  Mr. Hanson?

5          MR. LESNIAK:  Your Honor, is Mr. Corcoran excused?

6          THE COURT:  I guess so, yes, if we don't need him

7    for the purposes of discussion of admissibility issues.  Yes.

8    So you're done, Mr. Corcoran.  Thank you.

9          MR. CORCORAN:  Thank you.

10          MR. LESNIAK:  Thank you.

11          MR. HANSON:  Well, Your Honor, as I was thinking

12    about this, Mr. Corcoran testified as to the note and the

13    allonge in the file and he did a quick run through of some of

14    the other documents.  I think there's a loan modification in

15    there.  I don't think that has any relevance to the hearing

16    today.  I didn't hear any testimony that showed that that has

17    anything to do with why we're here.  I think it would be

18    appropriate to admit the note, the allonge and the mortgage.

19          THE COURT:  Well the issue that raises then, Mr.

20    Hanson, is what -- what has been tendered today is the full

21    loan file and I assume what eventually will go back to

22    Deutsche Bank is the full loan file.  And --

23          MR. HANSON:  You know what, Your Honor, then I'm not

24    going -- I won't object to the admission and the Court can

25    decide what weight and credibility to give the documents.

 1          THE COURT:  Because what I was going to suggest --

 2          MR. HANSON:  That would make sense.

 3          THE COURT:  -- is that what gets docketed with the

 4   Court be copies because if we're going to start pulling things

 5   out of the original loan file I don't think we think we ought

 6   to pull original documents out of a loan file.  The file ought

 7   to stay as the file.

 8          MR. HANSON:  That makes more sense.  Actually when I

 9   think about it I think they should be admitted and based on

10   the testimony the Court can certainly decide what's important

11   and what's not important.

12          THE COURT:  Okay.  So I will admit Exhibits C and D,

13   the files, and then permit the parties to argue with regard to

14   the relevance of particular documents within those files.  All

15   right.  Mr. Lesniak, any other witnesses?

16          MR. LESNIAK:  We have no other witness, Your Honor.

17          THE COURT:  All right.  Mr. Hanson, any witnesses?

18          MR. HANSON:  I don't think I'll call any witnesses,

19   Judge.

20          THE COURT:  All right.  Then what I would suggest is

21   let's take a five minute break, let people run down the hall

22   if they need to and we'll come back and talk about where we're

23   next going.

24          MR. LESNIAK:  Your Honor, just for your information,

25   Mr. Corcoran does have a flight out of O'Hare airport in

1    Chicago.  It's not until 8:15 I believe.  And I'll be giving

2    him a ride back there.  I don't know how long you intend to

3    go.  I presume that won't be a problem.  But I just thought

4    you should be aware of it in terms of scheduling.

5             THE COURT:  Driving back where, Mr. Lesniak?

6             MR. LESNIAK:  I'm driving him from here to O'Hare

7    airport in Chicago.

8             THE COURT:  Okay.  To O'Hare because you're going

9    home?

10            MR. LESNIAK:  Yes.

11            THE COURT:  Okay.  I was intending to go as long as

12   you all were intending to argue.  So to some extent you all

13   have a little bit of control over it.  Mr. Kohler and I are

14   just along for the ride.

15            MR. LESNIAK:  Okay.  Fine, Judge.

16            THE COURT:  We'll keep that in mind.

17            MR. LESNIAK:  That will keep us brief.

18            THE COURT:  Okay.

19            MR. LESNIAK:  At least me anyway.

20            THE COURT:  But well let's take five minutes just so

21   that the Diet Coke issue for me can be resolved.

22            MR. LESNIAK:  Absolutely.

23            THE CLERK:  All rise.

24            MR. KOHLER:  I've got to go, parking meter.

25            THE COURT:  Oh, parking meter?  Okay.  So why don't

1    we take 10 minutes so Mr. Kohler has time to go to the parking

2    meter.

3              MR. HANSON:  Thank you.

4              THE CLERK:  Court is in recess.

5                        (Recess)

6              THE CLERK:  All rise.  Court is in session.

7              THE COURT:  Have a seat, everyone.  All right.  So

8    it sounds like we have completed the testimony.  Mr. Lesniak?

9              MR. LESNIAK:  Yes, Your Honor.  I'd like to make a

10   couple of points.  As we mentioned earlier, what's at issue

11   here is the standing issue, does the trust have the right to

12   enforce these notes.  The first thing I'd like to point out to

13   the Court is that there is case law to indicate that the

14   debtor ironically has no standing to even raise this argument.

15   The debtor is not a party to the allonge or the endorsement.

16   The debtor is not a third party beneficiary named anywhere on

17   the endorsement or the allonge as being a party to benefit

18   from that document.  Courts that have considered this before

19   have, in fact, found that the debtor had no standing to

20   question the assignment of the note and the mortgage.  I would

21   call the Court's attention to <u>In Re: Almedia</u>, A-l-m-e-d-i-a, a

22   July 24, 2009 decision of the United States Bankruptcy Court

23   for the District of Massachusetts.  The citation is 417 BR

24   140.  And the court in a footnote said the Court notes that

25   Dessin, D-e-s-s-i-n, was an interested person, is not a third

1    party beneficiary of the PSA, which was the pooling and

2    service agreement.  And ironically he would appear to lack

3    standing to object to any breaches of the term of the PSA.

4            Similarly, in the more recent case, L-i-v-o-n-i-a,

5    Livonia, Property Holdings, LLC, a decision of the United

6    States District Court for the Eastern District of Michigan,

7    717 F. Supp. 2nd 724.  The Court said, the borrower disputes

8    the validity of the assignment documents on several grounds

9    outlined above.  But as a non-party to those documents, it

10   lacks standing to attack them.  The Court further went on to

11   say, in fact, for over a century state and federal courts

12   around the country have applied similar reasoning to hold that

13   a litigant who is not a party to an assignment lacks standing

14   to challenge that assignment.

15           So our first point is that the Kohlers in this case

16   lack standing to question, raise a question, to the

17   endorsement.  But even if they could, they would fail for

18   these reasons.  Under the Wisconsin Uniform Commercial Code,

19   I'm citing Wisconsin Statute 403.201(2).  If an instrument is

20   payable to bearer, it may be negotiated by transfer of

21   possession alone.  And in connection with that, 403.205(2)

22   says, if an endorsement is made by the holder of an instrument

23   and it is not a special endorsement, it is an endorsement in

24   blank, such as in this case.  Going down the statute says, if

25   endorsed in blank, an instrument becomes payable to bearer and

1    may be negotiated by transfer of possession alone until

2    specially endorsed.

3            Trust 2006-4 stands before Your Honor as the bearer

4    of the note and mortgage.  The originals are in the files,

5    they're here on counsel's table.  And they are, as the bearer

6    of a note endorsed in blank, the trust is entitled to enforce

7    them.

8            Following on just a little further, Wisconsin law

9    also provides that the mortgage passes with the note as an

10   incident as the indebtedness.  And this is old law that hasn't

11   been challenged in a long time, Your Honor.  I'm citing from

12   the Supreme Court of Wisconsin case named <u>Fred Miller Brewing</u>

13   <u>Company v. Manasse</u>, M-a-n-a-s-s-e, 74 NW 535.  The court said,

14   in the later case Mr. Justice Cole said that in effect that it

15   settled law of the state that the transfer of a note before

16   maturity secured by a mortgage vests in the transferee the

17   note, discharge of all equities of the former holder and

18   carries with it as an incident thereto the mortgage as well

19   discharge of equities and the -- that is if the note has been

20   assigned and has been endorsed in blank, there is no separate

21   written assignment of mortgage that needs to take place to

22   effectuate a transfer of the mortgage.  In a sense it tags

23   along, if you will, on the coattails of the note and moves

24   along as an incidence of the transfer of the debt.

25           So we stand before you, the trust stands before you,

1    as the holder of the note endorsed in blank, and also the

2    holder of the mortgage without any need for any written

3    assignment.  And that's the basis upon which we are asking the

4    Court to grant the motion for relief.  Now there's one other

5    point I want to address.

6            THE COURT:  I'm sorry, we're going to be switching

7    phone systems at some point in time, AT&T has been in here in

8    the last couple of days.  Always a bad thing.  Things start

9    ringing, things start buzzing.  It's never a good thing.  So

10   sorry, I apologize.

11           MR. LESNIAK:  No, need, Judge.  That was a good

12   break.  I was getting my cases organized, so that's fine.

13           The Wisconsin Statute also provides, Your Honor,

14   that, and I'll get the citation for you in one moment, this is

15   Wisconsin Statue 403.204(1) which states, for purposes of

16   determining whether a signature is made on an instrument, a

17   paper affixed to the instrument is a part of the instrument.

18   Now the law used to be that it had to be so permanently

19   affixed to become permanent.  That was changed a number of

20   years ago to now read, and Wisconsin adopted this change to

21   the uniform commercial code, a paper affixed to the instrument

22   is a part of the instrument.  So the question arises is what

23   does it mean to be affixed?  Does it have to be a staple, does

24   it have to be a paper clip?  I think what the courts have said

25   most recently is, and there's not a lot of law on this, Your

1   Honor, but the courts have said most recently is what's the

2   intention of the parties?  What do the documents show to be

3   the parties' intention and we're going to follow through with

4   that intention.

5          Now in terms of what these documents show, Mr.

6   Corcoran testified that although he had never seen this file,

7   he had seen it numerous, hundreds of other files like it, from

8   the same entity and that he would've expected that this file

9   would've shown up with the documents in the order that they

10  are in the checklist, which is first the note, then the

11  allonge, then the mortgage, bound by a metal clip in the same

12  file.  Okay.  The fact that they've been torn apart, copied,

13  Mr. Hanson has seen them, we've had the client copy them,

14  we've copied them, doesn't really affect that intention.

15  Okay.

16         The note is in the same file as the mortgage.  And

17  the file specifically with the allonge, excuse me, is in the

18  same file as the note and the mortgage and the file that

19  relates to the specific note.  There were holes punched in it

20  as I've indicated that show that at some point it was probably

21  bound by a clip somewhere near or close to the note.

22         The allonge itself refers to the loan number.  It

23  refers to the borrower.  It refers to the property address.

24  Clearly tying it to the note which has the exact same

25  identical information.  It is endorsed by the payee of the

1   note.  And it was signed at the creation of the note.  And we

2   know this from Mr. Corcoran's testimony that when the file

3   came in in April of 2004, according to the records, this

4   allonge was part of those documents.  And as he indicated, if

5   it had not been properly identified as being tied to the note,

6   there would've been incomplete mark in the file and there was

7   not.  So his testimony is that that allonge was there in that

8   form when the document came in.

9        Now what have the Courts said about this type of

10  thing.  Okay.  I'd like to read to Your Honor from the United

11  States Bankruptcy Court of the District of Arizona in a case

12  called In Re: Nash, N-a-s-h, 49 B.R. 254.  This is a May 14,

13  1985 case.  And at the time Arizona UCC provision was the

14  stricter standard that it had to be permanently affixed to the

15  instrument.  And the court said of the allonge, it

16  specifically references the Nash paloverde escrow number.  It

17  identifies where properties as the maker of as the assigned

18  noted and its date.  It recites that the note is to be

19  attached to the assignment.

20       Vice President Russell Riggs (phonetic) of the

21  escrow company could not specifically recall if the note and

22  assignment had originally been stapled together.  The

23  company's file had been pulled apart, copied and put back

24  together.  There was no set file policy as to the order in

25  which the documents are kept.  Their present order in which

1    the note and the assignment are physically separated.  There

2    are no significance to their original receipt.  Given the

3    clear intent that the note and assignment were to be

4    physically attached, the evidence is insufficient to establish

5    an invalid endorsement under the Arizona statute.  Okay.  I

6    don't know why the Court phrased the negative, but it said

7    it's insufficient to establish an invalid endorsement.  So

8    what did the Court do, the Court looked at the intent.

9         The same thing happened in the Levonia Properties

10   Holding (phonetic) case that I cited to Your Honor a little

11   bit earlier.  And this is a more recent case in which the

12   decision was made under the Michigan Uniform Commercial Code

13   which reads exactly the same as the Wisconsin Commercial Code.

14   In this case, the allonges presented to the Court were

15   attached to the note.  The first allonge states that it forms

16   part of the promissory note dated December 30, 2004 made by

17   borrower to Lehman Brothers.  And the second allonge states

18   that it is to be attached to modify and be a part of that

19   certain promissory note dated effective December 30, 2004 made

20   by the borrower paid to the order of Lehman Brothers.  In

21   these circumstances, given the clear intent that the note and

22   allonges were to be physically attached, the evidence is

23   insufficient to invalidate the endorsements.

24        Now admittedly, all allonge did not state its to be

25   physically attached to the note.  But the point is what the

1    Court is doing is not tying its decision or hanging its

2    decision upon a staple or a paper clip or a piece of tape.

3    But what it's saying is, what was the intention.  And I think,

4    Your Honor, our position is, I know our position is but I

5    think you can easily reach the conclusion from the evidence we

6    provided that that allonge was intended to be part of that

7    note, attached to that note, and part of that transaction.

8    And with that we rest.

9              THE COURT:  Thank you, Mr. Lesniak.

10             MR. HANSON:  Thank you, Your Honor.  Well first of

11   all I would like to pick up on that note of the intention.

12   And one thing I would like to state, of course, for the record

13   is that Mr. Corcoran testified that the note did not come from

14   the trust, it came from BNC Mortgage.  So we have a blank

15   endorsement from BNC Mortgage to Deutsche.  And then we have

16   some testimony that there is some type of custodial agreement

17   between Deutsche and the trust.  But there's nothing in the

18   record that shows that when the persons who were purporting to

19   sign those allonges were, one, intended to transfer the note

20   to the trust.  And second, there's nothing to show that the

21   note and the allonge have come into the possession of U.S.

22   Bank as the trustee or to the trust.  So the intention, of

23   course, from the testimony we have today is not clear at all.

24   The witness is not able to provide any testimony whatsoever as

25   to who owns the note.

1          But now going to some of the U.C.C. issues, Mr.

2    Lesniak did note Wisconsin Statute Section 403.204 which does

3    indicate that for purposes -- for the purpose to determine

4    whether a signature is made on an instrument a paper affixed

5    to the instrument is part of the instrument.  And basically

6    what I'm hearing is that affixed doesn't mean affixed, it

7    means that it's just -- if we have an allonge, if we can

8    produce an allonge at some point, then that's -- that answers

9    all the questions and it doesn't even have to be attached.

10   And that's wrong, that's not -- I don't believe that that's

11   the law in Wisconsin.  I don't believe that's what the

12   majority of courts have held.  And I would cite -- and this is

13   a case that I had

14   -- I believe I had submitted with the memorandum.  HSBC Bank

15   U.S., NA v. Thompson.  It's an Ohio case, Lexis -- an Ohio

16   appellate court decision, Lexis 3525 from 2010.

17          THE COURT:  You did cite that in your moving papers,

18   Mr. Hanson?

19          MR. HANSON:  Yes, Judge, in the memorandum of

20   issues.  I cited the Kemp case.

21          THE COURT:  Right.  Hayes.

22          MR. HANSON:  And the HSBC Bank.

23          THE COURT:  Right.  And Hayes.

24          MR. HANSON:  And I might have butchered up that

25   citation when I stated it.  It should be 2010 Ohio Appellate,

1   Lexis 3525.  This is a case that does a very detailed and a

2   very reasonable analysis of what the U.C.C. requires.  Now

3   there has been a question in my mind as to whether the Uniform

4   Commercial Code under the laws of New York should apply

5   because the trust itself says that the laws of New York for

6   purposes of the trustee coming into possession of the note, or

7   if the Wisconsin Uniform Commercial Code applies.  I don't

8   think it makes a lot of difference because they're very

9   similar.  I believe that the New York U.C.C. would be more

10  restrictive.  It does state -- I do believe that the note is

11  supposed to -- allonge must become a permanent part of the

12  note where Wisconsin says that it has to be affixed to the

13  note.  But the bottom line here is that it has to be affixed.

14          Now if there's absolutely no question perhaps the

15  Court could draw conclusions on -- draw reasonable inferences

16  that this note or this allonge is part of this note.  But here

17  we've got two notes and we've got two allonges.  And neither

18  attached to the note.  The witness cannot state whether they

19  were ever attached to the note.  He indicates that Deutsche

20  Bank got the file from BNC Mortgage with a blank endorsement.

21          So, one, it doesn't show that the trust owns the

22  note.  And secondly, I believe that under Wisconsin law, since

23  the Wisconsin U.C.C. requires that paper -- that allonge to be

24  affixed to the note, that -- the fact that they were not never

25  attached that would defeat any legitimate transfer.

1          In terms of the argument that Mr. and Mrs. Kohler

2     have no standing to challenge whether or not the trust owns

3     the note, the decisions that have ruled that way -- first of

4     all, the first decision cited by Mr. Lesniak was a decision

5     that apparently seemed to indicate that the Kohlers would not

6     have any standing to challenge the trust itself, or the

7     provisions of the trust.  Whether the provisions of the trust

8     were adhered to because he's talking about the PSA.  The

9     pooling and servicing agreements, the instrument that creates

10    the trust generally.

11         There are other cases that go the other way which I

12    have cited in briefs I've submitted to the Court in the past.

13    And so I would assert that any decision that says a person

14    owns a home in Wisconsin does not have the right to challenge

15    who owns the note if it's not clear.  That they don't have the

16    right to do that.  That that's just flat out plain wrong as a

17    matter of law.  And I think that in the Eastern District of

18    Wisconsin and in the State of Wisconsin, any court that would

19    make a ruling that says Mr. and Mrs. Kohler don't have a right

20    to question or challenge whether or not this trust owns the

21    note given the questionable allonges we have here, that that

22    would just simply be going down the wrong path and be clearly

23    an incorrect ruling as a matter of law.

24         Now, in this case what we have is a history of the

25    claims that are filed.  We have an original Claim 12 that had

1    an allonge that was signed months, actually years after the

2    Kohlers did the loan.  The original Claim 12 had an allonge

3    dated December 2, 2009 signed by a person named Whitney Cooke

4    who apparently worked for Chase Home Finance, LLC as attorney

5    and fact for BNC Mortgage.  Well BNC Mortgage is no longer in

6    existence.  And I think it went out of existence in 2007.  So

7    now we have -- we have originally this allonge which the

8    claimant purported or stated this shows we own this mortgage

9    loan.

10         Now we have a blank allonge that cannot be

11   authenticated or verified by the witness today to clearly show

12   that the trust ever owned this mortgage note.  We have that

13   attached to the amended claim along with the allonge of

14   December 2nd of 2009.  So the documents attached to the claim

15   themselves have some inconsistency.  They would appear, one,

16   the blank allonge doesn't show who this note was assigned to

17   by BNC.  The other allonge, which was put together and

18   executed after my clients actually filed their bankruptcy now

19   comes in and shows a specific endorsement from Chase Home

20   Finance as attorney in fact for BNC to the trust.

21         What this seems to indicate, and of course there's

22   no power of attorney attached to that allonge to show that

23   Chase Home Finance, LLC was actually the attorney in fact had

24   the authority to actually sign that last allonge.  So if we

25   take that 2009 allonge out and say well put it aside because

1    it doesn't seem to really make sense.  The testimony today and

2    what we have in the record doesn't show that the movant here

3    has the right to -- relief from stay.  Doesn't show that they

4    own this mortgage loan.  They have not established that.  If

5    we bring that 2009 allonge back then it would seem to indicate

6    that BNC Mortgage transferred this note to Deutsche Bank.  If

7    the note was transferred with that blank allonge the witness

8    said that it came from BNC Mortgage to Deutsche Bank.  It did

9    not come from the trustee or the 2006-4 trust.  So it would

10   appear that whether Deutsche Bank wanted or meant to but they

11   either owned or they held the note.  And then perhaps in 2009

12   this other allonge attempted to do a transfer from BNC when it

13   no longer exists to the trust.

14          So the documentation just doesn't -- it doesn't

15   establish that the trust owns the note.  And I can say

16   basically the same thing about Claim Number 13.  We have a

17   very similar situation, a blank allonge.  Again the witness

18   testifies that the BNC Mortgage signed a blank endorsement and

19   then transferred that note to Deutsche Bank.  There's nothing

20   to show that the note was ever -- has ever come into

21   possession or was ever properly transferred to the trust

22   contrary to the conclusions that Mr. Lesniak has come to.  The

23   facts don't actually bear that out.

24          In terms of cases that clearly allow homeowners like

25   Mr. and Mrs. Kohler to question these transfer into challenge

1    standing they're <u>In Re: Wang</u>, 396 B.R. 757.  That's one of the

2    -- that's from 2008.  And that's a pretty well reasoned case.

3    An earlier case.  And a most recent case, the <u>Matter of Kemp</u>,

4    2010 bankruptcy Lexis 4085.  And again these are cases that

5    are in my memorandum of issues that I submitted to the Court

6    in March.  The <u>Matter of Kemp</u> the Court found that the trust

7    did not own the note.  And in <u>Kemp</u>, the court actually looked

8    at the trust agreement and it noted the agreement expressly

9    provided that in connection with the transfer of each loan

10   that the depositor was to deliver the original mortgage note

11   endorsed by manual or facsimile signature in blank in the

12   following form.  Pay to the order of blank without recourse

13   with all intervening endorsements that show a complete chain

14   of endorsement from the originator to the person endorsing the

15   mortgage note and then cites the pooling and servicing

16   agreement.  Most significantly for purposes of this

17   discussion, the note in question was never indorsed in blank

18   or delivered to the Bank of New York, as required by the

19   Pooling and Servicing Agreement.

20            In the <u>Matter of Kemp</u> the Court found that the

21   movant, the claimant, did not have standing to file for a

22   relief of stay motion or to maintain a claim.  And I believe

23   in <u>Kemp</u> the claim was disallowed.  That's a correct

24   interpretation -- that's a correct interpretation of the law.

25   It does take into account what the evidence showed in front of

1    the court that day.  And we have a similar situation here.

2            Now in this case we do have the endorsement of

3    blank, but there's nothing showing that it was ever delivered

4    to the trustee or to the trust.  And in fact the testimony is

5    pretty much the opposite, that BNC signed a blank endorsement

6    and then delivered the note, according to Mr. Corcoran, to

7    Deutsche Bank.

8            So given the law under the U.C.C., given the

9    testimony today, we would assert that the claim -- first of

10   all, the Court should not grant relief from stay to the trust.

11   It hasn't shown that it's outstanding to bring that motion or

12   that's a party interest.  And finally, secondly, there hasn't

13   been any documentation or testimony to show that the trust

14   owns this note or can maintain a claim.  So the claim either

15   should be excluded or we would want to go through with the

16   adversary proceeding that's on file to expunge the claim.  But

17   I think with the testimony given today unless the trust can

18   provide some other information or some other evidence that

19   clearly actually shows that it owns this loan the Court should

20   disallow the claim.

21           THE COURT:  Thank you, Mr. Hanson.  Mr. Lesniak,

22   before I comment on any of this, any response?

23           MR. LESNIAK:  Yes.  Very quickly, Your Honor.  I

24   don't know if you're familiar with the book Freakonomics, but

25   the authors have a premise in there that starts the book.  And

1    they say there are two ways to view the world; the world as it

2    is and the world as you would like it to be.  What we are

3    doing is presenting to you the world as it is in the sense

4    that we are relying on, solely on the note endorsed in blank

5    that has been kept by the custodian, the records for the

6    trust, and is presented to you today.  We are not relying on

7    the world as Mr. Hanson would like it to be.  We are not

8    relying on the trust agreement which he referred to several

9    times.  We are not relying on producing evidence of ownership

10   transfer or assignment pursuant to the various trust documents

11   as was the issue in the Kemp case.  We're not relying on any

12   of that.

13          Let me point out by example a quote from the Court's

14   decision in Tarantola, T-a-r-a-n-t-o-l-a, the United States

15   bankruptcy court for Arizona, 2010 W. 302L3022038.

16          THE COURT:  Repeat it.  I'm sorry.

17          MR. LESNIAK:  I'm sorry, Your Honor.  2010 W.L.

18   3022038.

19          THE COURT:  Thank you.

20          MR. LESNIAK:  In that case, almost as Mr. Hanson is

21   arguing now, the debtor argues that any assignment of the note

22   after the cut off date of the PSA would be ineffective because

23   it would violate REMIC and the PSA terms.  However, an

24   assignment to the pool is not necessarily ineffective after

25   the cutoff date.  As noted by the Court in Samuels, even if

1   this direct assignment were somehow volatile of the PSA giving

2   rise to unfavorable tax, regulatory, contractual and tort

3   consequences, neither the PSA nor those consequences would

4   render the assignment invalid.  We are not moving under those

5   documents.  We are not showing you that we are complying with

6   those documents.  Those documents, for purposes of our

7   discussion, are not relevant.  What we are relying on is the

8   holder status that we have as the holder of the original notes

9   endorsed in blank under Wisconsin law.

10         Mr. Hanson repeatedly referred to showing ownership.

11  I don't know what he means by ownership.  He didn't say what

12  would prove ownership.  All I know is that we're not looking

13  for ownership status, it's holder.  Are we holders of the note

14  under Wisconsin law.  And I think we've clearly proven that

15  here today.  Thank you.

16         THE COURT:  Mr. Hanson, at the very beginning of the

17  hearing Mr. Lesniak made reference to the fact that the motion

18  from relief from stay started this down this road by alleging

19  that Mr. and Mrs. Kohler had not been making payments on their

20  mortgage.  This case was filed back in 2009, converted to a

21  Chapter 13 thereafter.  Is it your position that Mr. and Mrs.

22  Kohler had been making payments on the mortgage?

23         MR. HANSON:  No.

24         THE COURT:  Okay.  To anybody?  I'm not asking about

25  the sale or BNC or whoever.  They have not been making

1  payments to anybody, correct?

2          MR. HANSON:  That is correct.

3          THE COURT:  Okay.  We have three, four, but I think

4  the fourth issue is a separate issue and I'll tell you in a

5  second.  We have three matters that we -- that I wanted to

6  hear evidence about relating to the debt.  One was a motion

7  for a relief from stay, one was U.S. Bank as trustee for the

8  sales objection to confirmation of the Chapter 13 claim, and

9  one was U.S. Bank's claim to which -- to amended claims to

10 which the Kohlers have objected.  I think the way you analyze

11 those issues is different.

12          A motion from relief from stay is a party coming in

13 to court and saying we believe we have state law rights to

14 proceed against collateral.  There's a stay in place that

15 keeps us from investigating whether we do.  We would like you,

16 Judge, to lift that stay so we can go investigate whether we

17 do.  One of the basis in Chapter 13 for a party to come in and

18 ask for relief from stay is a party saying we don't believe

19 our rights are adequately protected because we're not getting

20 payments.

21          It appears that there is no question that whether or

22 not they would be making them to U.S. Bank or to the sale or

23 anybody else.  The Kohlers are not making payments on this

24 mortgage and this property.  Whoever is, in fact, the true,

25 I'll use the word owner of the collateral, they're not being

1    adequately protected.  So there is not adequate protection

2    being provided.

3          If I lift the stay, presumably U.S. Bank as trustee,

4    or anybody else, is going to have to go into state court and

5    take some sort of action.  And for all I know, the Kohlers

6    will raise these same issues in state court.  And the state

7    court will make decisions about that.  What I'm in a position

8    to decide is whether or not a party ought to be able to go

9    into state court and try to enforce its rights.

10          Given the fact that there's no question that

11   mortgage payments are not being made I guess my first

12   question, Mr. Hanson, with regard solely to the motion to

13   relief and stay is what basis do I have for denying anybody,

14   whether it's U.S. Bank, whether it's BNC, whether it's my

15   cousin Vinny, from going to state court and trying to prove

16   that it has the right to foreclose on the collateral because

17   payments are not getting made.  There is no adequate

18   protection being provided to whoever it may be.

19          MR. HANSON:  In other words -- well, with that

20   analysis then -- analysis, that anyone, whether they own the

21   mortgage or not would be able to come in and have the stay

22   lifted.

23          THE COURT:  It has to be able to go and enforce

24   their right.

25          MR. HANSON:  Right.  And the -- well the answer to

1    that, I think, you know, we find in cases like in <u>In Re: Wang</u>

2    (phonetic) --

3          THE COURT:  Which, by the way, the decision you keep

4    citing was overturned on appeal.

5          MR. HANSON:  But some of the facts -- the analysis -

6    - there are parts of that analysis that are still good in

7    terms of whether or not a party can come in and ask the stay

8    to be lifted if they don't own the note and mortgage.

9          Another case that I meant to cite was <u>In Re:</u>

10   <u>Weisband</u>, 427 BR 13.  And this is another case that does an

11   analysis of ownership under U.C.C.  If -- the answer to that

12   question is that if the movant can't show that they own the

13   note and mortgage, they don't have a right to request relief.

14   It's -- you can't -- it's mainly -- to some extent it's a bit

15   of a chicken and egg situation.  But you're getting out ahead

16   of yourself if you say, well, if the Kohlers have not made

17   payments to the trust or other parties then regardless of

18   whether the trust even owns this or regardless of whether they

19   can show they own the note or ever owned the note, or they

20   owned the note today or they hold it, which based on the

21   testimony and the documents to date they haven't shown, but

22   then they're entitled to lift the stay anyway and amount.

23         THE COURT:  But, Mr. Hanson, it seems -- I mean is

24   it your position then that because, theoretically, I'm not

25   agreeing with you, but theoretically the wrong person came in

1    and moved for relief that Mr. and Mrs. Kohler, no offense, Mr.

2    Kohler, but that Mr. and Mrs. Kohler can just live in their

3    house basically for the entirety of the Chapter 13 case

4    without paying anybody?  No, Mr. Kohler, I think you want Mr.

5    Hanson to answer this.

6            MR. HANSON:  No.  But they should not be making

7    payments unless somebody can show them and tell them we own

8    your mortgage and we're entitled to those payments.  I mean

9    that's one of the reasons that you have the law under the

10   U.C.C. for negotiation of instruments such as a mortgage note

11   so the proper parties do get paid.

12           THE COURT:  Yes.  But in this case nobody is getting

13   paid.

14           MR. HANSON:  Well, nobody has come forward to show

15   they own the note.

16           THE COURT:  So Mr. and Mrs. Kohler just lucked out?

17   I mean, I have to pay my mortgage.  Other people have to pay

18   their mortgages.  I presume you do.  And we require that in

19   the 13 --

20           MR. HANSON:  Well it's not clear -- if the claim is

21   disallowed -- if the motion is denied and the claim is

22   disallowed because this particular claimant has not showed

23   that they own that note or they hold that note or they ever

24   held that note.  Then Mr. and Mrs. Kohler -- I mean, they're

25   willing to make payments and I believe they're willing to make

1    adequate protection payments, but they have to know who

2    they're supposed to pay.

3         THE COURT:  To whom were they making payments the

4    last time they made them?

5         MR. HANSON:  I believe the last time they made

6    payments it was to a servicer for the mortgage which would've

7    been Chase.

8         THE COURT:  All right.  Now let me turn around and

9    put Mr. Lesniak on the hot seat since I just put you on the

10   hot seat.  Mr. Lesniak, Mr. Corcoran told us today that these

11   documents came into Deutsche's possession from -- one from BNC

12   I think and one from Lehman.  I think the two files came from

13   different locations.  And he understands that they weren't

14   transferred to Deutsche to give Deutsche ownership.  They were

15   transferred to Deutsche under a contractual agreement that

16   Deutsche had with those two entities to uphold these documents

17   as a custodian.  He also testified that he knows that Deutsche

18   has a similar contractual agreement with the sale, with the

19   trust.  And that by looking at those labels that you talked

20   him through on the covers of the file he sees indicia of

21   ownership by the trust on those cover labels.  Is that the

22   evidence upon which you rely to indicate that the trust is now

23   the holder of these notes?

24        MR. LESNIAK:  The fact that we actually have

25   possession of the notes endorsed in blank.  That's what the

1    uniform commercial code --

2              THE COURT:  Well actually Deutsche has possession of

3    the notes endorsed in blank.

4              MR. LESNIAK:  But Deutsche is acting as an agent.

5              THE COURT:  Right.

6              MR. LESNIAK:  Actually right now Deutsche doesn't

7    have it.

8              THE COURT:  Well right now --

9              MR. LESNIAK:  Counsel has it as the attorney for

10   moving trust.  So, yes, that's what we're relying on.  I think

11   what Mr. Corcoran's testimony went to is that the trust

12   probably had closed before they got the documents.  So it came

13   in from BNC --

14             THE COURT:  That's the question I --

15             MR. LESNIAK:  But then the trust closed.  Okay.

16             THE COURT:  How do I know that?  There was no

17   testimony about that today.

18             MR. LESNIAK:  Well because --

19             THE COURT:  Mr. Corcoran, in fact --

20             MR. LESNIAK:  Yes.

21             THE COURT:  -- quite honestly said I don't know.

22             MR. LESNIAK:  Right.  Because now he's saying that

23   he's holding them for trust.

24             THE COURT:  And so that's the evidence --

25             MR. LESNIAK:  That's the transfer.

1           THE COURT:  -- that gets me back to my question.

2           MR. LESNIAK:  Yes.  Yes.  That's -- he's holding

3    them now for the trust.

4           THE COURT:  Do you have any comment, Mr. Hanson,

5    raised briefly -- question of choice of law?

6           MR. LESNIAK:  Oh, no, Judge.  The trust agreement --

7    the trust agreement -- I've looked at the trust agreement.

8    Okay.  If you actually look at the mortgage document which is

9    the relevant document, it says that these issues are to be

10   determined in accordance with the law of the state where the

11   mortgage is -- where the property is located.  So I have no

12   questions.  It's Wisconsin law.  It's clearly Wisconsin law.

13   And I think that what I would add, Your Honor, is that as I

14   view this, as Judge Schmetterer use this analogy in his

15   courtroom, under the 7th circuit cases, the automatic stay

16   essentially operates as a stop light.  And Judge Schmetterer

17   has described his function as determining where there --

18   whether there was sufficient evidence to allow for that stop

19   light to go from red to green.  It doesn't have to decide all

20   of the issues.  And as you yourself indicated, this will

21   probably be raised again in state court.  We'll be fighting

22   this all over again.  But the point is is there is sufficient

23   evidence there to show that this entity should be able to move

24   forward to foreclose on the mortgage.  I think we've clearly

25   established that.  There's no one else.

1          Counsel hasn't come in with some other entity that

2     claims ownership of the note.  It's admitted they have not

3     been making payments.  The property is under water.  We're

4     clearly not adequately protected.  So I think we've more than

5     met our burden to show that we have the right to turn that

6     stop light from red to green to proceed to take this fight to

7     state court.

8          THE COURT:  All right.  Let me tell you all, and I'm

9     not just saying this because I know Mr. Corcoran that he's got

10    to catch.  But I'm not going to give you a final decision

11    today because I want to look at some of the issues that you've

12    raised, except on one point.  I've not reviewed the cases to

13    which Mr. Lesniak referred.  The Almedia case or Levonia with

14    regard to standing.  I will go back and look at those.  And I

15    have no doubt that they're decided by people whom I greatly

16    respect.  However, I think there's a difference between saying

17    that, and I have had parties come into court before and say

18    that a post-petition assignment somehow violates the automatic

19    stay.

20         I think there's a difference in arguing standing in

21    that respect and saying we -- the post-petition assignment

22    somehow violated either the PSA or the trust agreement.  And

23    because it violated the PSA or the trust agreement or whatever

24    I would agree that the debtor is not a party to those

25    agreements and therefore doesn't have standing.

1       But with regard to a homeowner's right to say does

2    this person who is in court claiming that I owe them money

3    really have standing to have a claim?  I don't think there's

4    any question in my mind that the Kohlers had standing to raise

5    that issue.  And so at least in that regard to the extent that

6    that argument would kind of put a halt to any further

7    discussion, I don't think there's any question that the

8    Kohlers have a right to challenge whether or not the trust has

9    standing to file a claim in the case.

10      Whether the trust has standing to object to

11   confirmation.  I think the world is a little iffier in terms

12   of motions for relief from stay.  Maybe because Judge Weidock

13   has been talking to me too much about his theory that there's

14   a question there.  But be that as it may, I'm not going to,

15   just so you all know, address a whole lot of time and

16   attention to whether or not the Kohlers have standing.  I

17   think they do.  I don't think there's any question.  And so I

18   don't think the issue is whether or not the evidence that has

19   been presented today through Mr. Corcoran is sufficient to

20   prove that the trust is in fact the holder of the note.  And I

21   agree with Mr. Lesniak that that's kind of where we all end up

22   at the end of the day.

23      So I would like to go back and take a look at some

24   of the cases that you all have cited today.  I have looked at

25   the materials that were in the pleadings, but I'd like to look

1    at those and also go back over the evidence and then give you

2    all a decision.  And what I think I'm probably going to do,

3    and the reason I don't want to do it now is because I need to

4    look at my schedule, what I'd probably like to do is at a

5    later date ask Ms. Bent in the next week or so to call you all

6    and see if we can't find a date that we all can be on the

7    telephone for me to give you a decision.  And we'll look at

8    the schedule and look at the calendar and find a date for that

9    for me to give you an oral decision.  But I think that takes

10   care of things for today.

11           Mr. Lesniak, anything else that we need to do today

12   that we --

13           MR. LESNIAK:  My only question, Judge, would be is

14   do you need anything else from us?  Would you like us to send

15   you copies of cases that we've cited?

16           THE COURT:  No, you've given me the cites.  I can --

17           MR. LESNIAK:  Thank you.

18           THE COURT:  We can pull them up.  There's no reason

19   for you all to send them to me.

20           MR. LESNIAK:  Okay.

21           THE COURT:  So I think we're -- I think we're fine

22   with that.  Mr. Hanson, anything else?

23           MR. HANSON:  Well, just going back to that question,

24   what would happen if the claims excluded --

25           THE COURT:  I wasn't actually asking for more

1    argument, Mr. Hanson, but okay.

2              MR. HANSON:  Okay.  Well, no, I don't have anything

3    else.

4              THE COURT:  Okay.  Let me just briefly make sure --

5    what we're going to docket today I have admitted A and B.  I

6    assume that these are copies that we can docket with the

7    Court.  And then C and D are photocopies not the originals

8    which we will put on the docket.  And because I'm assuming

9    that the originals we'll need at some point in time to go back

10   to Deutsche whether it's through Mr. Corcoran or whoever else.

11             MR. LESNIAK:  Your Honor, should we submit to you

12   copies of the original file folder since there was testimony

13   about that?

14             THE COURT:  I would like for you, if you would

15   please, to xerox the outside of the file folders since there

16   was testimony about those.  And we can docket those.  Maybe

17   what we'll do is hold off on docketing these items until we

18   get those.

19             UNIDENTIFIED SPEAKER:  Do you want paper copies of

20   those, Judge, or should I upload them through --

21             THE COURT:  Why don't -- I know this is -- but why

22   don't you bring us paper copies because then we can include

23   them.  I mean they are a part of C and D.  That's where they

24   more appropriately belong.

25             MR. LESNIAK:  Your Honor, Ms. Jensis has those

1   original files and I expect her to retain them so she'll take

2   care of that.

3           THE COURT:  Okay.

4

5           MS. JENSIS:  I'll do that.  Yes.

6           MR. LESNIAK:  Thank you.

7           THE COURT:  All right.  Anything else that we need

8   to do this afternoon?  Oh yes, I said there were three issues

9   and then there was a fourth that was sort of not related.  And

10  the fourth was a motion to dismiss the adversary proceeding.

11  I think I perceive that to be a legal question where the

12  defendant is arguing that this is not the appropriate venue

13  through which to ask to dismiss.  And so my earlier comment

14  about I think this evidence relates to three issues.  I don't

15  really think the evidence today related to the motion to

16  dismiss the adversary.  And I plan to decide that based on the

17  documents that had been filed.  All right.  Anything else?

18          MR. LESNIAK:  Thank you, Your Honor.

19          MR. HANSON:  Thank you, Your Honor.

20          THE COURT:  Thank you, all.

21          THE CLERK:  All rise.  Court is adjourned.

22                          (Conclusion)

23                      *  *  *  *  *

24

25

# C E R T I F I C A T I O N

I, GINA M. CERMAK, the assigned transcriber, do hereby certify that the foregoing transcript of the proceedings before the United States Bankruptcy Court, Eastern District of Wisconsin, on May 25, 2011, is prepared in full compliance with the current transcription format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.


  S/ Gina M. Cermak                    July 18, 2011

GINA M. CERMAK                         Date

AudioEdge Transcription, L.L.C.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

```
-----------------------------
EDWARD AND PATRICIA KOHLER, :   Docket No.: 09-35931-PP
                            :
            Plaintiffs,     :   Milwaukee, Wisconsin
                            :
    vs.                     :   November 22, 2010
                            :
U.S. BANK, N.A.,            :
                            :
            Defendants.     :
-----------------------------
```

TRANSCRIPT OF STATUS HEARING (RE:[5] MOTION FOR RELIEF FROM
AUTOMATIC STAY)(RE:[42] OBJECTION TO CONFIRMATION OF PLAN)
HEARD BEFORE THE HONORABLE JUDGE PEPPER U.S.M.J.


TRANSCRIPT ORDERED BY:

     ROLLIE R. HANSON, S.C.
     (LAW OFFICE OF ROLLIE R. HANSON, S.C.,
     6737 W. Washington Street, Suite 1420, West Allis, WI
     53214)


A P P E A R A N C E S:

     ROLLIE R. HANSON, S.C.
     Attorney for Plaintiffs

     REBECCA GARCIA, ESQ.
     Attorney for Chapter 13 Trustee

     PENNY GENGES, ESQ.
     Attorney for Defendants, U.S. Bank

     EDWARD LESNIAK, ESQ.
     Attorney for Defendants, U.S. Bank

     AMY SALSBERG, ESQ.
     Attorney for Defendants, Aurora

                AudioEdge Transcription, LLC
            425 Eagle Rock Avenue - Suite 201
                Roseland, New Jersey  07068
                    (973) 618-2310
             www.audioedgetranscription.com

<u>I N D E X</u>

11/22/2010

<u>ARGUMENT</u>:                                              <u>PAGE</u>

      BY:  MR. HANSON                                      13

      BY:  MR. LESNIAK                                     24


<u>THE COURT</u>:

Decision                                               16, 24

1          MR. HANSON:  -- U.S. Bank, National Association, as

2    Trustee, Chase Home Finance and Mortgage Electronic

3    Registrations Systems, Inc.

4          MS. GENGES:  Penny Genges appearing for the same

5    defendants.

6          MS. SALSBERG:  Amy Salsberg appearing for Aurora

7    Bank, F.S.B. and Aurora Loan Services, LLC.

8          THE COURT:  Good morning to everyone.  I -- I think

9    before we sort of get to the meat of things, the one detail we

10   probably ought to address is, as I recall, at the last hearing

11   the parties indicated that Trustee Grossman was incorrectly

12   listed as a plaintiff -- among the plaintiffs in this case.  Is

13   that correct, Ms. Garcia?

14         MS. GARCIA:  That is correct, Your Honor.

15         THE COURT:  All right.  And so, I know we're still

16   calling it -- calling the case as if Ms. Grossman, was

17   plaintiff, but -- but she's not.  It's the Kohlers who are the

18   plaintiffs in the case.

19         MR. HANSON:  Thank you, Your Honor.  And actually we

20   amended the complaint pretty early in the case to simply name

21   the Chapter 13 Trustee as a -- as an additional party.

22         THE COURT:  Yeah.  So, it could just be that, for

23   whatever reason, our cover sheets still haven't been updated.

24   So, we'll -- we'll make a note of that.

25         All right.  As you will recall, the last time we were

1   together was the initial pre-trial, I suppose, that had been

2   scheduled after the Kohlers filed their amended complaint.  --

3   the objection to confirmation of the plan that was filed by

4   U.S. Bank because it's connected to the cause of action in the

5   adversary.  And there had been motions to dismiss filed by the

6   defendants with regard to the second complaint.

7       We had some rather extensive discussions at our

8   previous hearing, which took place back in September with

9   regard to some of the concerns that were raised in the motion

10  to dismiss and the responses to those concerns.

11      And so, in particular, I -- I asked the parties to

12  take a look prior to us going any further -- I asked the

13  parties to look at two specific issues.  One was the question

14  of whether or not an adversary complaint or an adversary

15  proceeding was the right procedural mechanism for pursuing the

16  concerns that the plaintiffs had raised and, in particular, the

17  standing concerns and the concerns with regard to the proofs of

18  claim.

19      And in addition, I asked that the parties provide

20  further information on allegations regarding whether or not

21  transfer of the claims and, in particular, the transfers that

22  happened here and the way the plaintiffs alleged that they

23  happened here, constituted violations of the automatic stay.

24      And I gave the parties an opportunity to provide

25  briefs with regard to those issues and the parties did so.

1        Let me -- let me just sort of work backwards in a

2    sense, if I may.  The -- the amended complaint, as I think

3    everybody's noted by now, the second amended complaint, I

4    should say, has six specific causes of action alleged in it.

5    And I think they, for all intents and purposes, all into three

6    categories.

7        The first couple of causes of action relates to the

8    question of standing.  In particular the -- the claimants

9    standing to file proofs of claim, number 12 and number 13.

10       The second two causes of action relate to a violation

11   or alleged violations of a stay.

12       And then the third set or third pair of causes of

13   action, I could say, argue that proofs of claim 12 and 13 are

14   false.  And that's the basis for those causes of action.

15       Paragraph 74 of the second amended complaint is the

16   plaintiffs' prayer for relief.  And there are a number of

17   sections to that paragraph asking for various kinds of relief,

18   some of them declaratory.  In particular, subparagraph L of

19   paragraph 74, which appears on page 27 of the second amended

20   complaint indicates that one of the forms of relief the

21   plaintiffs are requesting is that the Court declare the

22   mortgages on the relevant property to be void.  And I wanted to

23   make a note of that because I'm going to -- I'm going to come

24   back to it.

25       At the -- at the last hearing, I indicated that with

1  -- with regard to standing to file the proofs of claim, or to

2  object to confirmation for that matter, I -- I indicated to Mr.

3  Hanson that I wasn't quite sure why an adversary complaint was

4  -- was the way to go to allege that.  That if he didn't feel

5  like the claimants had standing to file either their proofs of

6  claim or their objection to confirmation that the way to raise

7  that would be to object to the proofs of claim or to raise it

8  as a defense with regard to the objection to confirmation.

9      And -- and in the briefs that he filed and also, I

10  think, to some degree, orally at the last hearing, and Mr.

11  Hanson indicated well, that he thought that Rule 3007 said,

12  yes.  You can object to a proof of claim via an adversary.

13      I didn't see it quite the same way, because I think

14  that all that 3007B does is refer you to Rule 7001, which

15  enumerates various and a sundry kinds of claims that can be

16  raised by means of an adversary.

17      But, be that as it may, the -- the other issue that

18  the defendants raise was whether or not there is, in fact, a

19  private right of action for lack of standing under these

20  circumstances.  And there was an argument made that that there

21  wasn't one.

22      Those arguments were persuasive to me but I gave them

23  -- Mr. Hanson an opportunity to -- to brief that issue.

24      The second issue was this question of violation of

25  the stay and whether or not the transfers and assignments and

1   various other movement, if you will, movements, of the mortgage

2   documents here constituted violations of the automatic stay,

3   and so whether or not there was a cause of action there.

4   And -- and again, I -- I expressed come bewilderment

5   as to how that -- how those actions could constitute a

6   violation to stay.  But I gave Mr. Hanson an opportunity to

7   brief that.

8   And then finally, there were the allegations with

9   regard to the proofs of claim.

10   The reason that I brought up, just now, subparagraph

11   11 of paragraph 74, which requests as part of the relief here

12   that the Court declare the mortgages here to be void, is

13   because in going back and reviewing the second amended

14   complaint and in reviewing all the case law that the parties

15   have provided, that request for relief seems to me to be the

16   one that most clearly and logically, if there's a basis for it,

17   falls within the ambit of Rule 7001 and Rule 3007, although it

18   -- more tangentially.

19   That, to me, an action to avoid a mortgage is a

20   classic adversary complaint type action.  Now, whether or not

21   the mortgage ought to be avoided or not, in other words,

22   whether or not there's a substantive basis for ruling in the

23   plaintiffs' favor, I don't know.  We're not there yet.  But --

24   but of all the things that are alleged in the 28 pages of this

25   complaint, that, to me, is -- is the item that most clearly

1   seems susceptible to resolution to an adversary and it is the

2   kind of allegation that we see raised most commonly in an

3   adversary.

4          I think that the standing issues that Mr. Hanson has

5   alleged here, again, most certainly are properly raised in

6   response to an objection to confirmation.  You can say, you

7   know, they -- they don't have standing to object.

8          They're properly raised, maybe, depending on the

9   circumstances, in response to a motion for relief from stay.

10  They're certainly properly raised if one wants to object to a

11  proof of claim.  But I don't see what the independent cause of

12  action here is for lack of standing except as it may relate to

13  that subparagraph L.

14         If -- if -- and, again, we're sort of getting into

15  delicately shaded semantics, but -- but if the argument is

16  these folks don't have a valid lien, and part of the reason for

17  that argument is that -- that they're not the holders of the

18  note, or they're not the holders of the mortgage or they're not

19  the appropriate transferees or assignees, then I can see it

20  relating in that way.

21         But I don't see a free standing separate cause of

22  action simply for lack of standing to file a proof of claim or

23  lack of standing to object to confirmation.

24         I think I indicated that earlier.  I've reviewed all

25  the -- the briefs that the parties have filed and I still don't

1    -- still don't see it.

2            With regard to the second pair of causes of action,

3    the argument that these transfers violated the automatic stay,

4    I -- I could not find among all the case law that had been

5    cited anything that supported that contention.  And I realize,

6    and Mr. Hanson was very careful during the last hearing to

7    clarify and specify that he wasn't just talking about the fact

8    that there had been an assignment.

9            That -- that he viewed or that the plaintiffs viewed

10   these assignments as some sort of effort to perfect liens that

11   otherwise would not have been valid or perfected.  I -- I

12   understand that.  I hear that.  Even if that's true, and I am -

13   - I'm not entirely sure that is, I just cannot find anything

14   that would support a contention that that constitutes a

15   violation of stay as the defendants have pointed out and a

16   number of cases have pointed out, as well.

17           The -- the property was being transferred, the claim

18   itself is owned by somebody but isn't the debtor.  It may not

19   be these defendants, I don't know, but it isn't the debtor.

20   And so the transfer of that property from what entity to

21   another, be it pre-petition or post-petition, via assignment or

22   some other mechanism is not -- I simply don't see how that can

23   be characterized as a violation of that provision of the code

24   that prohibits a party from taking action against the debtor.

25           Even if it's an attempt to perfect a lien, that still

1    does not show that it's an action against a debtor and that is

2    -- or property of the debtor.  And that's what 362 prohibits.

3           So, I -- I don't -- there simply isn't, as far as I

4    can tell, and -- and -- and the case that I found most

5    persuasive was Judge Bailey's (phonetic) case and Samuels, out

6    of the District of Massachusetts covered very similar facts

7    here, although in a different procedural setting.  But, I -- I

8    simply do not see that there is a cause of action there.

9           And finally with regards to the alleged false proofs

10   of claim or fraudulent proofs of claim, again, I certainly

11   think that there's information in those proofs that is -- that

12   was -- that is false or -- or wrong or incorrect and was

13   knowingly put there, there are remedies for that.  And one

14   remedy might be a motion for a contempt of court because I

15   guess there's an implicit understanding that one is to tell the

16   truth in anything that one files in front of the Court.

17          Again, I don't see any support for a freestanding

18   cause of action and adversary here.  The

19   -- the only piece of this document, and by this document, I

20   mean the second amended complaint, that I see that -- that

21   appears to suggest a cause of action, even though there's not a

22   statutory section cited in support of it.

23          Is the sentence and prayer for relief that asks the

24   Court to declare the mortgages void?  Because if it's an action

25   to avoid a mortgage, then whether it has merit or not, I don't

1    think we need get into a discussion of whether there's a cause

2    of action for that.  There is.  The Code provides for it.  We -

3    - we all know the Code provides for it.

4            The motions to dismiss, particularly the motion of

5    Sale and U.S. Bank and Chase were couched in terms of <u>Ikball</u>

6    (phonetic) and <u>Twomley</u> (phonetic) and -- and were couched in

7    terms of failure to plead specifically.

8            Again, it's a delicate semantic difference but, first

9    of all, it's hard to argue that if -- if Mr. Hanson was able to

10   come up with 28 pages of a second amended complaint that he

11   didn't allege something specifically.  It's pretty darn

12   specific.

13           I think that the more relevant question is whether or

14   not the allegations in the complaint survive 12(b)(6) because I

15   think in reading the second amended complaint, it is clear to

16   me what it is that the plaintiff's are arguing.  It's clear

17   what they think was done incorrectly or, in some cases, not

18   done.

19           The question is whether any of those things, even if

20   accepted as entirely true, give rise to a cause of action.  And

21   I think the comments that I've just made about the fact that

22   there is no independent cause of action for lack of standing in

23   and of itself, that a transfer via assignment of a mortgage,

24   whether it be pre or post petition, does not violate the

25   automatic stay.  And there's no free standing cause of action

1    for allegedly fraudulently submitting proofs of claim,

2     answers that question.  Those are 12(b)(6) issues.

3          I think the question here that -- that is left

4    remaining that I'll direct to you, Mr. Hanson, is I know you've

5    asked for declaratory relief on a lot of these other issues.  I

6    think I've just answered the question with regard to whether or

7    not I'd be in a position to grant that -- that declaratory

8    relief, and the answer is no.  But are you seeking to avoid the

9    mortgage?

10         MR. HANSON:  Well, Your Honor, that is -- that is

11   part of the complaint, so the answer to that would be yes.

12   That was part of the adversary proceeding.

13         And -- and the -- the reason is well, this case is,

14   of course, growing.

15         THE COURT:  Yes, quite --

16         MR. HANSON:  And at -- at the end of the day it seems

17   to me that this Court would have the jurisdiction to provide

18   that kind of declaratory relief upon finding that the claimants

19   here do not own the notes and mortgage.

20         And they can't show who owns the note or properly

21   holds the mortgage, then this Court would have the jurisdiction

22   to provide that declaratory relief.

23         Now, as I was working on this it -- it also occurred

24   to me that there's the potential to more specifically plead a

25   cause of action the debtors could take under the strong arm

1   powers of the Trustee in representing the estate.  And perhaps

2   that kind of -- those kinds of allegations would have been --

3   or including those allegations would have been more

4   appropriate.

5       But that has been part and parcel of this adversary

6   proceeding -- request.  If they don't show that they actually

7   own this loan, nobody else is going to step forward to show

8   that they own this loan, then the Court would have the

9   jurisdiction and the authority to void those mortgages.

10      THE COURT:  Well, here -- here's what I'm going to

11  do.  First of all, not first of all, I've been talking for

12  awhile.  But as sort of an aside, I am dismissing the complaint

13  with regard to Aurora.

14      I -- I -- I expressed some real concerns couple times

15  early on about what Aurora was doing in this litigation.  It

16  had transferred its interest.  I read several times, Mr.

17  Hanson, your -- your explanation of what I perceived to be sort

18  of a facilitation claim that -- that somehow by signing off on

19  the paperwork transferring it's interests, whatever those may

20  have been, Aurora somehow, to go back to my former life, aided

21  and abetted these other defendants in accomplishing what they

22  accomplished.

23      And then Aurora made the additional objection this

24  time around that the concerns that the plaintiffs have with

25  regard to Aurora seem to be somewhat speculative.  That the

1    argument is if you let us do some discovery, we may be able to

2    figure out that there's some more that's there.

3        And Aurora's argument is, nope.  That's not the way

4    this works.  And -- and I agree with that.  I -- I don't think

5    particularly if where we're going to come out and I think this

6    is where we're going to come out is -- is an avoidance action.

7    I don't Aurora has any place in the lawsuit.

8        So, I'm -- I'm dismissing the complaint with the

9    lawsuit -- I'm dismissing the complaint with regard to Aurora

10   with prejudice.

11       With regard to the other defendants, I guess this is

12   my way of giving you one last kick at the cat, Mr. Hanson.  The

13   -- the causes of action that are alleged in this complaint, as

14   I understand them, I do not believe and -- and I'm just going

15   to tell you, will survive 12(b)(6).

16       However --

17       MR. HANSON:  I'm sorry.  Don't survive what again?

18       THE COURT:  12(b)(6).

19       MR. HANSON:  Okay.

20       THE COURT:  Rule 12(b)(6).  They don't state a cause

21   of action upon which relief can be granted, or causes, plural,

22   of action upon which relief can be granted.

23       I do believe that a motion -- a -- a complaint

24   seeking to avoid the mortgage would survive 12(b)(6) and would

25   have an appropriate home in the adversary context.  That's not

1    to comment on the, again, the merits of it because I don't

2    know.  But it

3    -- but it does -- it certainly would be an appropriate cause of

4    action to -- to an adversary and is -- is the type -- there is

5    a cause of action that exists there.

6         And so, I'm going to give you an opportunity, if you

7    chose to do so, to amend the complaint with regard to the other

8    defendants, not Aurora, but with regard to the other

9    defendants, if you believe that you have a cause of action to

10   allege to avoid the mortgage, but I'm not -- I -- I am

11   dismissing for failure to state a claim any cause of action

12   that relies solely on lack of standing, any cause of action for

13   violation of the automatic stay and any cause of action that

14   relies solely on alleged fraudulent proofs of claim.

15        Now, I should be clear.  That is all with regard to

16   the adversary.  Some of those issues you may be raising and I

17   understand you probably will raise are to the objection to

18   confirmation and whatever else.

19        I've -- I've said that that may be where they better

20   reside.  These -- these dis-- these rulings relate specifically

21   to the allegations in the second amended complaint, the causes

22   of action raised in the second amended complaint.

23        So, I -- I am going to grant the motions to dismiss.

24   Aurora's is granted with prejudice in its entirety.  The other

25   motions to dismiss by the other defendants are granted with

 1    leave to amend in 30 days, Mr. Hanson.

 2           This will be the last amendment that I'm going to

 3    allow.  So, if we don't -- if we don't get at something at this

 4    point that, in my mind, states a cause of action, I think we're

 5    done from an adversary standpoint.

 6           MR. HANSON:  An adversary, I understand.

 7           THE COURT:  All right.  Any -- any questions, Mr.

 8    Hanson?

 9           MR. HANSON:  I guess I have some questions floating

10    around in my head.  I'm not sure that -- perhaps I should think

11    about them.  But I -- if I may, and -- and -- and perhaps from

12    a procedural prospective or a housekeeping perspective, if the

13    Court could answer this and that would be it -- it seems to me,

14    well, one that two of the claims that were filed it looks like

15    some of the paperwork was just made up and now we have what are

16    purported to be, you know, the real -- that were done sometime

17    before the filing of the bankruptcy.

18           And, of course, that raises more questions to me then

19    it answers.  But I -- I sort of feel like I'm hearing that if

20    the debtors did not want to pursue the adversary proceeding

21    that they'd still could file appropriate other pleadings --

22    other papers to challenge the claims on file, as well as bring

23    any other -- ask for any other relief that -- that the -- with

24    the dismissal of -- of the standing issue in the adversary

25    proceeding, and the stay violation and the false claims

1    allegations, that that does not -- that that would not preclude

2    the debtors from raising these by objection or by motion.

3            THE COURT:  I think that's what I just said.  I'm not

4    saying whether or not any of these people have standing or

5    don't have standing.  And I think that there are -- and I said

6    this at the last hearing, context in which those issues may be

7    very relevant.

8            But as an independent cause of action, as it has been

9    asserted here, I don't find one.

10           So, your -- your clients may very well want to raise

11   these issues other places.  I'm saying that they don't have any

12   independent standing here.

13           MR. HANSON:  Fine.

14           THE COURT:  Any independent legal basis here.

15       MR. HANSON:  All right.  Then, the only other question I

16   would have would be if my clients pursue, let's say, my clients

17   decided to pursue challenges to the standing and be-- any cause

18   of action or allegations of filing false claims and so forth

19   with the Court, if we do that, I'm just trying to think ahead a

20   little bit, there would be some -- some discovery.

21           I can't see any way to resolve issues that are this

22   complex without discovery, whether it's in an adversary

23   proceeding or a contested matter.  And if my clients decide to

24   do a -- do the challenges --

25           THE COURT:  Are you trying to find out if you can get

1    discovery?

2              MR. HANSON:  -- without an adversary proceeding,

3    pardon?

4              THE COURT:  Are you trying to find out if you're

5    going to be allowed to get -- take discovery, Mr. Hanson?

6              MR. HANSON:  I'm sorry.  Once more.

7              THE COURT:  Are you trying to find out if I'm going

8    to allow you to take discovery if you do it outside of an

9    adversary?

10             MR. HANSON:  Well, actually, I was assuming that

11   would be the case since this is pretty complex.  I guess, where

12   I was going with that is if my clients found through discovery

13   like by -- by challenging by objection or by motion, that there

14   would, indeed, be the basis for bringing an adversary

15   proceeding, if it would be perhaps more appropriate to do that

16   if the complaint against the defendants is dismissed without

17   prejudice if my clients decided to bring an action upon with a

18   firm factual basis for avoiding the mortgage if they could do

19   that later.

20             Or if -- if the Court is saying that if in the next

21   30 days we don't challenge -- if we don't -- if we don't seek a

22   declaratory relief to avoid the mortgage that then we could be

23   precluded from doing that?

24             If I obtain other information, what I'm thinking is

25   that -- that perhaps it would be better for me to follow the

1    Court's direction or, you know, the guidance and challenge the

2    -- these papers that are on file, challenge the claims using

3    the appropriate vehicle.  But not necessarily giving up the

4    opportunity to challenge the validity of that mortgage at the

5    end of the day.

6          And the reason I guess I'm thinking along those lines

7    is -- is that if I bring challenges as a contested matter while

8    I'm doing the adversary proceeding, well, maybe it works out --

9          THE COURT:  All right.  Mr. Hanson, I'm going to give

10   you 30 days to file an amended complaint.  If you believe that

11   the mortgage is subject to void -- voiding.

12         MR. HANSON:  Uh-huh.

13         THE COURT:  File it.

14         MR. HANSON:  Got you.  I'll do it that way.

15         THE COURT:  And -- and -- because I -- I think

16   otherwise I understand where you're headed, but to sort of have

17   an indefinite blank check that says, well, depending on what

18   you may or may not find, maybe, you know, a year from now, a

19   year and half from now, we -- we've -- we've kind of been

20   through a couple of iterations here.  And I think if -- if you

21   believe --

22         MR. HANSON:  And --

23         THE COURT:  -- you have grounds to avoid the

24   mortgage, let's do it.

25         MR. HANSON:  All right.  And that is going to --

1    okay.

2              THE COURT:  And that's independent of whatever you

3    may decide to do in the underlying case.  Because there's

4    different time lines, as you well know, with regard to those

5    issues.

6              And that may lead us to the next question, which is,

7    we do have this objection to confirmation that -- that U.S.

8    Bank filed that we've been kind of drafting behind the phases

9    we've gone through with the complaint.

10             That -- that's still sitting out there.  And I know

11   that your clients have, if this is possible procedurally,

12   objected to the objection to confirmation, and do not --

13             MR. HANSON:  A motion to dismiss the objection, I

14   think is what --

15             THE COURT:  -- right.  Right.  Don't concede to the

16   objection.  And so, I don't know at this point if it makes

17   sense to go ahead and schedule a hearing on that objection and

18   give the parties an opportunity to present whatever they're

19   going to present.

20             MR. HANSON:  Well, Your Honor, from my perspective, I

21   would -- I will likely file a motion to dismiss that objection

22   confirmation based on standing issues.  And that would be an

23   appropriate vehicle to do that.

24             And I guess that's where it comes to perhaps it would

25   be -- well, I guess I'll leave it at -- given the paperwork

1    that's been submitted to the Court now, I -- there's

2    appropriate grounds for my clients to object to the relief from

3    stay and the objection to confirmation.

4           Then the issues is going to come up as to an

5    appropriate timetable for discovery on -- on those issues, I

6    guess.  So, I -- I would much rather have the opportunity to

7    file an appropriate motion.  I request that the Court -- I

8    would likely request the Court to declare it as a contested

9    matter and allow the Rule 7 discovery procedures to come into

10   play, which would require -- probably require some depositions.

11

12          It would require depositions anyway, and also

13   probably some written discovery or I guess it would require

14   written discovery, Judge.  In fact, I'm quite sure it would.

15          THE COURT:  The objection to confirmation and the

16   motion for relief were filed within a couple of weeks of each

17   other.

18          MR. HANSON:  Right.  And then the parties all

19   stipulated that they should be heard with the adversary --

20          THE COURT:  Right.  Right.  I'm sorry, the objection

21   to confirmation and your clients objection to the motion for

22   relief were both filed within a couple of weeks of each other.

23   And then we consolidated everything.

24          MR. HANSON:  Yes.

25          THE COURT:  All right.  Thank you, Mr. Hanson.  Mr.

1    Lesniak, Ms. Genges, I think I've probably made it clear that

2    I'm granting your motion to dismiss giving Mr. Hanson leave to

3    try one more time to amend.  Any questions in that regard?

4              MR. LESNIAK:  This is Ed Lesniak, Your Honor.  No

5    questions in that regard.  But I would like the opportunity to

6    address a couple of the matters that Mr. Hanson has been

7    discussing when you're free to allow me to do that.

8              THE COURT:  Okay.  Ms. Salsberg, I think this pretty

9    much makes you finished.

10             MS. SALSBERG:  Thank you, Your Honor.

11             THE COURT:  Thank you.  All right, Mr. Lesniak.

12             MR. LESNIAK:  Your Honor, I just wanted to point out

13   a couple of things.  There has been discovery conducted in this

14   case.  We've responded to Mr. Hanson's request to admit.  We've

15   responded to his written interrogatories.  We've responded to

16   his document request.

17             As I indicated in our reply brief, we have provided

18   Mr. Hanson with the custodians record of the receipt of the

19   various notes and mortgages involved in this case.  We have

20   demonstrated that notwithstanding the -- the lack of relevancy

21   to his arguments about what needed to be done pursuant to the

22   trust agreements, etcetera, that, in fact, the time lines that

23   Mr. Hanson suggest are part of these trust documents were, in

24   fact met, substantially met, well in advance of the closing

25   dates.

1          So, we've demonstrated to Mr. Hanson, I think,

2     everything we have to show that U.S. Bank is the owner of these

3     notes and mortgages.  We've located the original notes that

4     were held by -- that were in the possession of U.S. Bank

5     servicing agent.  We've amended our -- our claim to provide

6     those to show that they were endorsed in blank and are being

7     held.  And under Wisconsin law, that's clearly ownership, and

8     the mortgage moves with this notes.

9          So, we've provided all of the evidence that we have

10    to establish that U.S. Bank is the owner of these mortgages.

11         With respect to a proceeding to possibly void the

12    mortgage, there's been no indication indicated in any of the

13    three complaints now that Mr. Hanson has filed that there's

14    anything wrong with these mortgage documents.

15         There's no allegation this party -- his clients

16    didn't sign them.  There's no allegation that there's something

17    wrong with the legal descriptions.  That they weren't properly

18    recorded.  There's nothing alleged to be improper about these

19    documents.

20         So, while I understand and very much appreciate the

21    Court's willingness to give Mr. Hanson another bite at the

22    apple, I just want to make sure that Your Honor understands

23    that we have cooperated fully.  And, in our view, have provided

24    Mr. Hanson with all the information he needs and all the

25    information he has requested to demonstrate without a doubt

 1    that our clients, that the U.S. Bank is the owner of this -- of

 2    these loan documents and certainly has standing to object to

 3    the plan and to file the proofs of claim.

 4            THE COURT:  And, Mr. Lesniak, I'm -- I don't mean in

 5    any way, shape, or form, by any ruling I have made to indicate

 6    that you all have not been cooperative.

 7            And -- and I'm not, again, I'm not making any

 8    statement with regard to whether or not any claim that Mr.

 9    Hanson might bring that -- that the mortgage is void or

10    voidable has merit.

11            But there's a difference between 12(b)(6) sort of

12    motion, which says even if everything you say is true, there's

13    just not any basis here for a cause of action.  Or what you're

14    arguing now, which is from a substantive standpoint, and that -

15    - that may be a summary judgment issue, you know, the mortgage

16    is valid and whatever cause of action he may choose to bring

17    would not be supported.

18            MR. LESNIAK:  Your Honor, I did not mean in any way

19    to suggest that you were -- that you were suggesting that our

20    clients were being uncooperative.  I just wanted the Court to

21    be fully informed and place it of record now before -- as Mr.

22    Hanson contemplates filing yet another possible objection.

23            I wanted to make it clear to the Court that we have

24    provided all of the information that he needs.  And I was not

25    in any way suggesting that you were accusing our client of

1    being uncooperative or unresponsive.  And I apologize if that

2    was the -- if that was how it came across.

3         THE COURT:  Okay.  Well, we've all got our fannies

4    covered in that regard.

5                              (Laughter)

6         THE COURT:  Mr. Hanson, what -- what else -- what

7    else do you -- you mentioned depositions.

8         MR. HANSON:  Uh-huh.

9         THE COURT:  And -- and I know that Mr. Lesniak's

10   clients have asserted a couple of times that they believe that

11   they have given you an awful lot of stuff, if not everything

12   they've got.  What -- what -- what else is it that you believe

13   you do not have that you are going to be requesting.

14        MR. HANSON:  Okay.  Well, first of all, I -- I feel

15   that I must state for the record that I do not have all of the

16   information that shows that this particular trust owns the note

17   -- notes and mortgage at play here.

18        THE COURT:  Well, I assumed you didn't agree or you

19   wouldn't still be having this discussion.

20        MR. HANSON:  I just -- because --

21        THE COURT:  So, what else is --

22        MR. HANSON:  I've got questions -- well, if we --

23        THE COURT:  I mean, I'm not asking for document by

24   document.  But what general categories of information do you --

25   you think you don't have that you need?

 1              MR. HANSON:  Well, so far -- well, Judge, I'd like to

 2      be able to explore the voracity of the documents that I've been

 3      provided.  A lot of information has been didacted (sic) from

 4      them?

 5              THE COURT:  Redacted you mean, like taken out?

 6              MR. HANSON:  Or redacted, excuse me, blacked out.

 7      They purport to be certain things.  I don't know if they're

 8      valid documents.  I know that, at this point, we had two post

 9      filing assignments of mortgage and two post filing -- that

10      apparently were prepared just so that they could put a proof of

11      claim in here.

12              THE COURT:  And so those are probably things that

13      you're going to need to talk to somebody about; right?  You're

14      going to need to depose here.

15              MR. HANSON:  That's correct, as well as these

16      purported allonges that were -- the allonges the say were done

17      years ago and they're claiming -- and, of course, then we get

18      into we -- we have kind of a mix of -- of facts and laws then

19      because what you start looking at the trust, well, there's

20      going to be a question as to whether Wisconsin law applies or

21      New York law applies.

22              The trust says the New York UCC applies.  That's a

23      little different.  That has different requirements for the --

24      for the transfer of a note, and -- and different requirements

25      for the allonges.

1          In addition, to that though, I don't know who signed

2    these allonges and they're undated.  So, I have questions as to

3    whether or not these -- these allonges that are now being

4    produced, you know, somewhat late in the game perhaps, if

5    they're valid.  And if the person who signed them had valid

6    authority to sign them.

7          Same thing goes with these -- any mortgage assignment

8    that's done by Mortgage Electronic Registration Systems.

9          THE COURT:  So, again, I'm sorry to interrupt you,

10   but it sounds like you need to conduct some depositions --

11         MR. HANSON:  Yeah.

12         THE COURT:  -- is what I'm hearing.  Okay.  And how

13   much time --

14         MR. HANSON:  And also, Judge, I held off on pushing

15   for any further discovery because of the motions to dismiss.

16         THE COURT:  I understand.

17         MR. HANSON:  I wouldn't want the Court to think that

18   I'm satisfied with -- with what I've gotten because Mr. Lesniak

19   thinks that I have everything I -- I need.

20         THE COURT:  Well, I -- I know that Mr. Lesniak is

21   going to say he -- you're fine.  And you're going to say you're

22   not fine.  That's sort of the nature of the football game.

23         MR. HANSON:  Right.

24         THE COURT:  So, what I'm trying to find out is how

25   much time do you think you need to conduct whatever depositions

1    you're looking to take?

2              MR. HANSON:  That's a very --

3              MR. LESNIAK:  Your Honor, this is -- this is Ed

4    Lesniak.  Can I interrupt for one second here?  I think we need

5    to see a pleading before we could figure out what discovery

6    would be involved because the items that Mr. Hanson is

7    referring to have nothing to do with the validity of the

8    mortgages.  What they had to do with is the validity of the

9    assignments, the transfer.

10             THE COURT:  I -- I understand that, Mr. Lesniak.  But

11   Mr. Hanson has asked me to declare the motion for relief to

12   stay and the objection to confirmation as a contested matter.

13   And he's asking to take discovery, as I understand it, in the

14   context of that.

15             MR. LESNIAK:  I understand that, Judge.  But all I'm

16   saying is I think we need to see a pleading first.  Because

17   right now, there's no pleading of record.

18             MR. HANSON:  Well, it's an objection.

19             THE COURT:  There's a -- there's an objection to the

20   motion for relief from stay.

21             MR. LESNIAK:  Okay.

22             THE COURT:  I think.  Isn't there, Mr. Hanson?

23             MR. HANSON:  Yes.  Yes, Your Honor.  And I did raise

24   the standing issues in that objection, I believe.  And I can

25   amend the objection if I needed to clarify that.

1          One, generally speaking, in with written discovery,

2    what I always do is I contact opposing counsel and I say, you

3    didn't give me these documents or you didn't answer this

4    interrogatory.

5          Here's why I think it's important.  Here's why it's

6    relevant.  Here's why you should answer it to see if we can

7    come to an agreement before I would file a motion to compel

8    discovery.

9          So, if for written discovery if we use the discovery

10   that's been turned over as part of the relief from stay, then I

11   can address those issues with Mr. Lesniak.

12         Given the holidays that are coming up, January --

13   what I would much prefer, and I don't know what Mr. Lesniak's

14   schedule is but to have until at least March 1st if I have to

15   travel to a corporate office and do a 30 (b) (6) deposition or

16   two.

17         Those generally take time and I also like to try and

18   cooperate with opposing counsel in setting up dates.  Although

19   I believe that I can notice it and go out there and they would

20   need to provide somebody.  But I -- I would prefer to be able

21   to schedule things so it's going to work for both of us.

22         THE COURT:  Well --

23         MR. HANSON:  Or if Mr. Lesniak wants to produce the

24   witnesses here in Milwaukee, that's fine, too.

25         THE COURT:  Well --

1           MR. LESNIAK:  I -- I don't know who he wants to

2     depose, Judge.  So until I know that, I couldn't possibly

3     contemplate --

4           THE COURT:  I'm not -- I'm not asking you to respond

5     to it, Mr. Lesniak.

6           MR. LESNIAK:  Okay.

7           THE COURT:  Because I know you don't know that.  And

8     I also -- I agree, Mr. Hanson, that we got a couple sets of

9     holidays coming up but -- but March puts us pretty far beyond

10    those.

11          Here's what -- here's what I am going to do.  I'm

12    going to set a status hearing on the motion for relief from

13    stay and the objection to confirmation.  And I am looking at

14    and -- and this is going to be by telephone.  I'm looking at

15    the morning of Monday, December 13th at 10:45 a.m. by phone.

16          MR. HANSON:  Your Honor, may I call my office to

17    check my calendar?

18          MR. LESNIAK:  Your Honor, I'm going to be in court at

19    nine o'clock in the outlying suburbs.  I'll tell you what -- I

20    could just -- I could just make that call from -- well, I'd

21    have to give you another phone

22    -- phone number to call in.

23          THE COURT:  That's -- we can take, Mr. Lesniak.

24          MR. LESNIAK:  Yeah.

25          THE COURT:  We can always get another phone number.

 1              MR. LESNIAK:   Okay.  But I can work with 10:45,

 2     Judge.

 3              MS. GENGES:  Judge, okay, 10:45, Judge?

 4              THE COURT:  Yeah, Ms. Genges.  You don't have a

 5     calendar with you, Mr. --

 6              MS. GENGES:  I've got it.

 7              THE COURT:  No, Ms. -- I'm sorry, Ms. Genges.  I'm

 8     talking to Mr. Hanson.

 9              MS. GENGES:  Oh.

10              MR. HANSON:  Your Honor, my phone is supposed to have

11     downloaded my calendar.  But I checked a minute ago and it's

12     not.

13              THE COURT:  Okay.

14              MR. HANSON:  It didn't -- it didn't work.  It didn't

15     come across.

16              THE COURT:  Okay.  All right.

17              MR. HANSON:  Thank you.

18              THE COURT:  Just one second, Mr. Hanson's checking

19     with his office.

20              MR. HANSON:  --

21              THE COURT:  Ms. Garcia, while he's doing that

22     anything from your perspective?

23              MS. GARCIA:  No, Your Honor.  We've obviously are

24     holding the plan up because we've got the objection to

25     confirmation pending.  The debtors are continuing to make plan

1   payments.  So, at this point, they are received from and we are

2   continuing to hold them.

3          THE COURT:  Okay.  Thanks, Ms. Garcia.  Just one

4   second.

5          MR. HANSON:  Uh -- something.  Just one moment,

6   Judge.  Uh -- okay.  I'll try once more.  I think it'll work

7   now.  Oh.  I'm sorry, Judge.  Now, my phones are on automatic.

8          THE COURT:  Okay.  Well, what we're going to do, Mr.

9   Hanson, is we're going to set it for 10:45 a.m. by telephone on

10  December 13th.  Mr. Lesniak, you can either give us the

11  alternate number now or you can contact us before the 13th and

12  give it to us, whatever.

13         MR. LESNIAK:  Your Honor, I'll try to catch you

14  before the 13th --

15         THE COURT:  That's fine.

16         MR. LESNIAK:  -- all right?  Because I'll have a

17  better idea, I think, of where I'll -- I'll be.

18         THE COURT:  That's fine.  And what I anticipate

19  happening between now and the 13th is Mr. Hanson, I anticipate

20  that you'll do what you indicated you would do.  You'll get in

21  touch with Mr. Lesniak.  You'll discuss with him what it is

22  you're looking for.  The two of you will talk about scheduling.

23  When we come back on the 13th if you've got any disputes about

24  what Mr. Hanson's seeking or -- or any of the other discovery

25  related matters, we'll deal with those at that point in time.

1

2                          (End of proceeding)

## Certification

I, Lisa M. Wilbur, the assigned transcriber, do hereby certify the foregoing transcript of proceedings in the U.S. District Court on November 22, 2010, Index Nos. 12:38:02 pm to 1:27:06 pm is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.


 S/ Lisa M. Wilbur
LISA M. WILBUR, AOC NO. 585
AudioEdge Transcription, LLC


Date:  August 21, 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

```
----------------------------
EDWARD AND PATRICIA KOHLER, :   Docket No.: 09-35931-PP
                            :
              Plaintiffs,   :   Milwaukee, Wisconsin
                            :
      vs.                   :   December 13, 2010
                            :
U.S. BANK, N.A.,            :
                            :
              Defendants.   :
----------------------------
```

TRANSCRIPT OF STATUS HEARING (RE:[5] MOTION FOR RELIEF FROM
AUTOMATIC STAY)(RE:[42] OBJECTION TO CONFIRMATION OF PLAN)
HEARD BEFORE THE HONORABLE JUDGE PEPPER U.S.M.J.

TRANSCRIPT ORDERED BY:

    ROLLIE R. HANSON, S.C.
    (LAW OFFICE OF ROLLIE R. HANSON, S.C., 6737 W. Washington
    Street, Suite 1420, West Allis, WI  53214)

A P P E A R A N C E S:

    ROLLIE R. HANSON, S.C.
    Attorney for Plaintiffs

    REBECCA GARCIA, ESQ.
    Attorney for Chapter 13 Trustee

    PENNY GENGES, ESQ.
    Attorney for Defendants, U.S. BANK

    EDWARD LESNIAK, ESQ.
    Attorney for Defendants, U.S. BANK

AudioEdge Transcription, LLC
425 Eagle Rock Avenue - Suite 201
Roseland, New Jersey  07068
(973) 618-2310
www.audioedgetranscription.com

<u>I N D E X</u>

12/13/2010

<u>ARGUMENT</u>:                                                          <u>PAGE</u>

     BY:  MR. LESNIAK                                         4, 10

     BY:  MR. HANSON                                              6


<u>THE COURT</u>:

Decision - Reserved

1          CLERK:  The Court calls the case 2009-35931, Edward

2    and Patricia Kohler.  Please state your appearances starting

3    with the attorney for the debtors.

4          MR. HANSON:  Attorney Rollie Hanson appearing on

5    behalf of Mr. and Mrs. Kohler.

6          MS. GARCIA:  Attorney Rebecca Garcia appearing for

7    the Chapter 13 Trustee.

8          MR. LESNIAK:  Edward Lesniak for U.S. Bank.

9          MS. GENGES:  Penny Genges for U.S. Bank.

10          THE COURT:  Good morning to everyone.  We had

11    adjourned this hearing until today because Mr. Hanson had

12    requested that the motion for relief and the objection to

13    confirmation to plan be treated as contested matters and

14    indicated that he needed to conduct some discovery, including

15    possibly taking depositions of certain individuals.

16          And I adjourned the hearing until today to give Mr.

17    Hanson an opportunity to contact counsel for the moving

18    creditor and the objecting creditor for U.S. Bank to discuss

19    what items he needed or what actions he needed to take with

20    regard to discovery.  And then today, we could discuss whether

21    or not there remained any objections or concerns with regard to

22    the discovery.  And also whether or not we needed to schedule

23    an evidentiary hearing.

24          So, Mr. Hanson, Mr. Lesniak, Ms. Genges, anything to

25    report?

1        MR. LESNIAK:  Well, Your Honor, this is Mr. Lesniak.

2   I did have some conversation over this weekend with Mr. Hanson

3   and explained some of the Codes and some of the discovery that

4   we've provided.  But we did not discuss much else in the way of

5   discovery other than that if Mr. Hanson is interested in taking

6   the deposition of the custodian of the original documents, that

7   would be Deutsche Bank.  And he would need to file -- serve a

8   subpoena because we don't represent Deutsche Bank and that was

9   the extent of our conversation.

10        From -- from the Bank's perspective, we are prepared

11   for an evidentiary hearing, Your Honor.  We have -- we have

12   requested that the original loan documents on both loans be

13   forwarded to Ms. Genges.

14        Mr. Hanson will have an opportunity to review them.

15   We've certainly agreed to that.  And then we would be prepared

16   to move for an evidentiary -- or present them in an evidentiary

17   hearing.

18        And -- and to be perfectly straight with you, Judge,

19   our position is going to be very simple.  We will tender to the

20   Court original -- signatures, loan documents endorsed in blank

21   and we will present them as agents for U.S. Bank Trust.

22        And, at that point, we -- we would feel we've

23   probably met our burden particularly under the Uniform

24   Commercial Code in Wisconsin, which allows someone who is the

25   holder of a note endorsed in blank with the attended mortgage

1    to -- to enforce them.

2          That would be our basic position.  And from that

3    point, it's up to Mr. Hanson.

4          THE COURT:  Thank you, Mr. Lesniak.  Mr. Lesniak,

5    before I turn to Mr. Hanson, you -- you indicated that you had

6    requested that the original loan documents be forwarded to Ms.

7    Genges.  Do you have any sense of timing of when -- when --

8    when those might be forwarded by whom and when Ms. Genges might

9    receive them?

10         MR. LESNIAK:  Well, I know who will be forwarding

11   them, Judge, because they are being held -- they were released

12   from the custodian, Deutsche Bank, and they were sent to Chase

13   Home -- LLC as the servicer of the Kohler loans for the U.S.

14   Bank Trust.  And they are now held in a vault in Monroe,

15   Louisiana.

16         And I sent an email out as soon as I finished talking

17   to Mr. Hanson on Saturday, asking Chase to forward those

18   immediately to Ms. Genges.

19         I do not have a time frame at this point, but I think

20   I can have those fairly quickly.  I would think within a week

21   to ten days.

22         THE COURT:  All right.  Thank you.  Mr. Hanson?

23         MR. HANSON:  Your Honor, this is attorney Hanson.

24         THE COURT:  Yep.

25         MR. HANSON:  Or shall I wait.

1          THE COURT:  I'm giving you now the opportunity to

2    respond to what Mr. Lesniak said or add anything or --

3          MR. HANSON:  Well, yeah.  There -- just a couple of

4    things.  And I think as the Court is aware the -- the amended

5    claims.  There's an amended claim 12 and an amended claim 13

6    now on file with the Court.

7          I believe that basically, they're virtually identical

8    to the original claims in terms of the documents attached

9    except for we now have another allonge that has come up that

10   kind of -- it's arisen through the course of discovery.  And so

11   we have two undated blank allonges.

12         And, of course, I understand that -- and I also want

13   to thank attorney Lesniak for his time over the weekend with

14   our schedules.  I had sent him a letter trying to address some

15   of my concerns and then he was generous enough to give me some

16   time on Saturday and I do appreciate that because it did help

17   to clarify some things for me.

18         From where I'm at now, we have attached to the

19   amended claims blank undated allonges and, of course, the --

20   and -- and Mr. Lesniak has information from his client, it

21   sounds like verbal information, you know, what I'm hearing is -

22   - is that someone is going to send what's supposed to be the

23   original note.  And, of course, I'm still interested in the --

24   in the allonge.

25         We -- I think one of the things that -- that this

1   case has highlighted for me is now we have -- now that we have

2   another allonge in addition to the allonges that were attached

3   to the original claims 12 and 13, so, of course, one concern

4   I've got is that the original allonges were basically just

5   fabrications.  They were -- they would appear in light of -- of

6   this new allonge potentially just to be, you know, faked up

7   documents that were executed and put together just for the

8   purpose of -- of attempting to file proof of claim in this

9   bankruptcy.

10          Given that, I do have questions about whether or not

11  the current copy of the allonge is something that was actually

12  executed in a time frame that would have transferred the note

13  to the Trust in accordance with the pooling (phonetic) and

14  servicing agreement.

15          And, of course, I'm coming back to that because I

16  don't have enough information to presently to come to the same

17  conclusion that Mr. Lesniak has come to.

18          And I -- and I understand his position and I

19  appreciate it.  Whether or not his client is a holder in due

20  course or is entitled to that status.  And -- and -- and that

21  that would address the issues we have on standing and so forth.

22

23          It's been -- for me to -- to come to that conclusion

24  for me, as well.  So, of course, I'm hoping and anticipating

25  that we're going to not just have a note but there's actually

 1   going to be an allonge and that the note and allonge do comport

 2   with any requirements under the law for the negotiation and

 3   transfer of that note.  So, that -- that's basically where

 4   we're at.

 5          And so I have -- although I've started drafting an

 6   objection to claims 12 and 13 in the amended claims, I have not

 7   filed it.  I think at this point, I should probably, at least

 8   for the record, get those on file and file anything -- other --

 9   other motions that I think would be appropriate at this point.

10          But I think that it certainly would be helpful for

11   everyone, certainly helpful for me, to be able to inspect the

12   documents.  I did request them in discovery some time ago.  And

13   -- and so this is, you know, it's a good time to -- to bring

14   them out and put them on the table and show what they've

15   actually got.

16          THE COURT:  All right.  So, it sounds like the upshot

17   of all that, Mr. Hanson, is that you -- it might be a good idea

18   to adjourn this hearing to give you -- well, first of all to

19   give Mr. Lesniak and Ms. Genges an opportunity to obtain the

20   documents themselves and take a look at them.  And for you to

21   see them and for you to take a look at them and then see if

22   that answers any questions for you at that point?

23          MR. HANSON:  Yeah.  If it answers all my questions,

24   and, of course, I -- I'm -- I think there may still be some

25   legal issues that may have to be decided by the Court.  But

1    since this was something that I have asked for, once I see it,

2    I mean that -- that's -- it's always helpful to be able to --

3    to see that the party can produce what they say they've got.

4            At that point if I want, or feel, that there's a --

5    there would be some reasons for depositions or a deposition,

6    then I, of course, would want the opportunity to do that.

7            I don't disagree with Mr. Lesniak that deposition of

8    the custodian or an employee of the custodian may well be

9    ordered here.  But I'm not sure that that would be the -- the

10   only deposition.  As an example, under the blank allonge to --

11   claim number 12 is signed by an Eleanora Martino, Vice

12   President for Quality Assurance for BNC Mortgage, Inc.

13   (phonetic).

14           And as we, I think, at least the parties to this are

15   aware, BNC went out of business, I believe in August 2007.  And

16   so I would maybe need some information about Ms. Martino and

17   confirm that this is -- that this allonge is the real deal and

18   it's not something that has been produced post filing for the

19   purposes of litigation.  So, that's where I'm at.

20           THE COURT:  Thank you.  Ms. Genges, anything?

21           MS. GENGES:  No, Judge.

22           THE COURT:  All right.  Ms. Garcia, anything from the

23   Trustee?

24           MS. GARCIA:  No, Judge.

25           THE COURT:  All right.

1      MR. LESNIAK:  Your Honor, this is Mr. Lesniak.  May I

2  add something here?

3      THE COURT:  Sure, Mr. Lesniak.

4      MR. LESNIAK:  The question I think becomes how does

5  this -- how do these legal issues that Mr. Hanson refers to get

6  before the Court?  How to do it on the most efficient method?

7      So then, I would suggest to Your Honor that what we

8  would want to focus on is the motion for relief from the

9  automatic stay.  Because frankly, if that motion is granted, I

10 don't think we'll need to proceed with our objection to the

11 plan.  We perhaps could even withdraw our proof of claim as

12 long as we're allowed to foreclose.

13     So, that would be in -- in my view the most important

14 item to address because I think that if that's decided the rest

15 of these concerns go away.

16     And in terms of what discovery Mr. Hanson wants to

17 do, obviously, you are going to allow him whatever you feel is

18 appropriate.  But, in terms of the trust case, it would be very

19 simple because we will have original notes with an original

20 allonge attached to the note as part of the note.  And we'll

21 show the Court the originals.  And we will suggest that they be

22 admitted pursuant to Federal Rule of Evidence 902.9.

23     And from that point forward, it's really up to Mr.

24 Hanson as to how much he wants to object to those things.

25     So, I just want to give you some idea of where we're

 1   coming from and how we might want to get this matter that's

 2   been outstanding for quite some time to a resolution.

 3              THE COURT:  I -- I appreciate that, Mr. Lesniak.  But

 4   -- and -- and I -- I agree that the main issue probably that

 5   needs resolving is the motion for relief from stay and that is

 6   what I set the status on today.  I also combined it with the

 7   objection to  confirmation because the issues are similar.  And

 8   -- and so -- so I treated it that way.

 9              And I am appreciative of you assuring me that what

10   will eventually surface are the original documents.  But as is

11   not unusual in litigation, Mr. Hanson's saying, I'll believe it

12   when I see it.  And he hasn't seen it.  So, I think for

13   everybody keeps saying don't worry.  You'll see the originals

14   and they'll solve the problem, maybe doesn't move the ball down

15   the field very much.

16              I think what's going to have to happen is Mr.

17   Hanson's going to have to see them.

18              MR. LESNIAK:  Well, Your Honor, I've already agreed

19   with Mr. Hanson that he could see them.  That's not -- that's

20   not a problem.

21              THE COURT:  I understand but -- but that you haven't

22   seen them yet.

23              MR. LESNIAK:  That's correct.  But what I have seen,

24   Your Honor, and what we have provided are with our amended

25   proof of claim, are photocopies made not from a file copy but

1    photocopies made directly from the originals.

2              THE COURT:  Okay.

3              MR. LESNIAK:  So, we have produced the photocopy of

4    the actual originals.  And as soon as we have those originals

5    in hand, and I've asked the client to send them directly to Ms.

6    Genges so that they don't have to go routed through me, because

7    Mr. Hanson's there in Wisconsin and he can make arrangements

8    with Ms. Genges to see them as soon as they're delivered.

9    That's not a problem at all.

10             THE COURT:  And that's -- that -- that was the kind

11   of the chain of events that I understood was going to occur and

12   what I was about to suggest or what I was about to say was that

13   I'm going to adjourn this hearing, this status hearing.  Give

14   Ms. Genges an opportunity to get those documents and to get

15   them to Mr. Hanson expeditiously, which I know she will do.

16   And to give him an opportunity to take a look at them.

17             And if it -- if it helps clarify things in any way,

18   shape or form, I think that -- that the issue here with regard

19   to the motion for relief from stay, I understand it is this.

20   There is an entity that has come into court and said, we

21   haven't received payments.  And, therefore, we're not

22   adequately protected.

23             If that entity is the entity who is entitled to

24   receive payments, and it hasn't received them, and it proves

25   that it's the entity who's entitled to receive payments, then I

1    don't think there's much else to discuss other than how many

2    payments have been missed and how far behind things are and

3    whether there's any way that that can be resolved.

4           If that entity cannot demonstrate that it is the one

5    who is entitled to receive payments, then it doesn't have

6    grounds for requesting that there be relief from the stay.

7           So, in terms of focusing the issue away from allonges

8    and notes, and endorsements in blank, and so forth, and getting

9    it to what I think the issue is as relates to the motion for

10   relief from stay, it simply is that.

11          The entity who has come into court alleging that it

12   hasn't received payments, the entity who is entitled to receive

13   those payments and who is entitled to be adequately protected.

14          I am assuming that when Ms. Genges gets the

15   documents, she's going to be looking at them to make sure that

16   that's the case.  And I'm assuming that that's what Mr. Hanson

17   is going to be looking at when he takes a look at them.

18          Once everybody has had a chance to -- to eyeball the

19   original documents.  Then our next status will give you all the

20   opportunity to tell me whether that question has been answered

21   by those documents or not.

22          Is that what everybody understood what we were doing?

23          MR. LESNIAK:  Yes.  Your Honor.

24          MR. HANSON:  That was my basic understanding.  And

25   also I wanted to thank Mr. Lesniak in addition to the time he

1   gave me on Saturday, but the courtesy of sending this -- these

2   documents to Milwaukee to Bass and Milgowski (phonetic) and not

3   requiring me to make a trip down to Chicago to look at them.

4   That's -- that's very nice and a courteous thing --

5          THE COURT:  Yeah.  Mr. --

6          MR. HANSON:  -- to do and I really do appreciate

7   that.

8          In terms of the -- I guess I would say that I would

9   see the other issues that come with the documents, of course,

10  would be how -- how would these documents and what these

11  documents would show in terms of the actual ownership of the

12  Trust of this -- of this mortgage loan.  And that's where I go

13  back to the sequence of conveyances.

14         And so, I think that may be where I'll -- I'll need a

15  deposition to clarify what was required by the Trust and were

16  these conveyance requirements actually met.  And I -- I think

17  that that's going to be -- those -- those -- some of those

18  factual issues would -- would be related to -- to my client's

19  legal position.

20         But seeing the original note and the original allonge

21  certainly will be very helpful to clarify some of this.

22         THE COURT:  All right.  Well, let's -- let's look at

23  giving you all some time to take the next step, which is at

24  least to look at those original documents.

25         MR. HANSON:  Sure.

 1          THE COURT:  I am looking at adjourning this to

 2   Monday, January 31st at 11:15 a.m. by telephone.

 3          MR. HANSON:  That's -- that's very good for me.

 4   Thank you.

 5          MR. LESNIAK:  That's -- that's Monday the 31st of

 6   January, Your Honor?

 7          THE COURT:  Right.  3-1.

 8          MR. LESNIAK:  3-1, at 11:15?

 9          THE COURT:  Right.  By phone.

10          MR. LESNIAK:  I have a nine o'clock court appearance

11   but I'm extremely confident that I will be out well within time

12   to make that telephone conference with her.

13          THE COURT:  Okay.  All right.  Ms. Genges?

14          MS. GENGES:  That's fine with me, Judge.

15          THE COURT:  Ms. Garcia?

16          MS. GARCIA:  That's fine.

17          THE COURT:  Okay.  So, let's say, Monday, January

18   31st at 11:15 by telephone.  By that time, I am assuming that

19   Ms. Genges will have received the documents that are being

20   forwarded from Monroe, Louisiana.  She will have had a chance

21   to take a look at them.  She will have forwarded them to Mr.

22   Hanson and we will have had a chance to take a look at them.

23   And then we can talk at that point about where, if anywhere, we

24   need to go from there.

25          Anything else this morning?

1          MS. GENGES:  No, Your Honor.

2          MR. LESNIAK:  No, Your Honor.

3          MR. HANSON:  No, Judge.  There's nothing more.

4          THE COURT:  All right.  Thank you all.

5          MR. HANSON:  Thank you.

6          MS. GARCIA:  Thanks.

7          MS. GENGES:  Bye now.

8          MR. LESNIAK:  Thanks.

9                    (End of proceeding)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, Lisa M. Wilbur, the assigned transcriber, do hereby certify the foregoing transcript of proceedings in the U.S. District Court on December 13, 2010, Index Nos. 12:01:11 pm to 12:21:55 pm is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.


    S/ Lisa M. Wilbur
LISA M. WILBUR, AOC NO. 585
AudioEdge Transcription, LLC


Date:  August 21, 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

```
----------------------------
EDWARD AND PATRICIA KOHLER, :   Docket No.: 09-35931-PP
                           :
              Plaintiffs,  :   Milwaukee, Wisconsin
                           :
     vs.                   :   January 31, 2011
                           :
U.S. BANK, N.A.,           :
                           :
              Defendants.  :
----------------------------
```

 TRANSCRIPT OF EVIDENTIARY HEARINGS (RE:[39] RENEWED MOTION /
LETTER RENEWAL) (RE:[42] OBJECTION TO CONFIRMATION OF THE PLAN)
      HEARD BEFORE THE HONORABLE JUDGE PEPPER U.S.M.J.

TRANSCRIPT ORDERED BY:

      ROLLIE R. HANSON, S.C.
      (LAW OFFICE OF ROLLIE R. HANSON, S.C.,
      6737 W. Washington Street, Suite 1420, West Allis, WI
      53214)


A P P E A R A N C E S:

      ROLLIE R. HANSON, S.C.
      Attorney for Plaintiffs

      REBECCA GARCIA, ESQ.
      Attorney for Chapter 13 Trustee

      PENNY GENGES, ESQ.
      Attorney for Defendants, U.S. BANK

      EDWARD LESNIAK, ESQ.
      Attorney for Defendants, U.S. BANK

AudioEdge Transcription, LLC
425 Eagle Rock Avenue - Suite 201
Roseland, New Jersey  07068
(973) 618-2310
www.audioedgetranscription.com

<u>I N D E X</u>
1/31/2011

<u>ARGUMENT</u>:                                                      <u>PAGE</u>

        BY:  MR. HANSON                    4, 7, 14, 19, 26

        BY:  MR. GENGES                             6, 25

        BY:  MR. LESNIAK                           10, 19

        BY:  MS. GARCIA                                16

1          CLERK:  The Court calls the case 2009-35931, Edward

2    Blaine Kohler and Patricia Lynn Kohler.  Please state your

3    appearances for the record.

4          MR. LESNIAK:  Edward Lesniak for the U.S. Bank.

5          MS. GARCIA:  Attorney Rebecca Garcia for the Chapter

6    13 Trustee.

7          MR. HANSON:  Rollie Hanson appearing on behalf of the

8    debtors.

9          MS. GENGES:  Penny Genges for U.S. Bank.

10          THE COURT:  Good morning to everyone.  We originally

11   had this morning's hearing scheduled for U.S. Bank's motion for

12   relief from stay, as well as to U.S. Bank's objection to

13   confirmation.

14          I note that in the interim, since we scheduled the

15   hearing, the Kohlers have filed an adversary complaint on

16   December 22nd against U.S. Bank, Chase and others.  And my

17   understanding is that the issues that are raised in that

18   adversary proceeding are probably the same sorts of issues that

19   have been raised in the motion for relief from stay and the

20   objection to confirmation.

21          And so, the question that arises, to some extent, is

22   whether or not it would make sense to put this -- these

23   proceedings on the same schedule with the adversary proceeding

24   or whether there's some reason to handle them differently.

25          I guess, Mr. Hanson, I would turn to you first.

1          MR. HANSON:  Well, thank you, Your Honor.  I won't

2     have -- I would have no objection to -- to doing that.  I would

3     note for the record that there is a motion to dismiss the

4     adversary proceeding.  It was filed about a week ago and I'll

5     respond to that.

6          It would make sense in the sense that discovery could

7     proceed, which would be germane to both the relief from stay

8     and the adversary proceeding.

9          Also, I just wanted to let the Court know that I have

10    prepared an objection to the claims on file.  For various

11    reasons, it didn't get filed before today's date.  But it's --

12    it's basically pretty much ready to go and I would file that.

13    And then, I would think that the -- and that has very similar

14    issues, as well, in -- in regard -- and that will also address

15    issues of -- of standing.

16         So, then we could have discovery on -- on everything

17    and I think it could be decided in one hearing, potentially.

18         THE COURT:  May I just ask, Mr. Hanson, when we

19    adjourned the hearing last time until today's date, you all

20    were anticipating some documents coming from Louisiana.  I

21    think Mr. Lesniak had -- had asked for those and they were

22    allegedly on their way.  And everybody was going to have a

23    chance to review those and see if that didn't help shed some

24    light on anything.  Any, and Ms. Genges is slapping papers and

25    nodding her head.

1          MR. HANSON:  And documents did arrive, Your Honor.

2    And I was able to -- to review them.  We had a little

3    discussion about that because I wanted to be able to -- I

4    wanted my clients to be able to see them.  And so -- one of the

5    things that we explored doing was to take some pictures with a

6    digital camera.

7          And my -- so I brought -- took my legal assistant

8    over there.  And we did get -- take pictures of a couple of the

9    documents.  But then we had a discussion that Ms. Genges

10   thought she could scan them and email them to me.

11         But it turned out that she doesn't have a color

12   scanner.  So, what I wanted to do, and I just had a

13   conversation with attorney Genges this morning about that.  I

14   didn't want to impose on her to ask her if my clients could

15   come and see them on a Saturday.  But I did ask her about that

16   this morning.  And she agreed that that would be appropriate.

17         So, we would like to -- to have my clients look at

18   these documents.  And beyond that, I would like to depose the

19   custodian in Louisiana.  Mr. -- I believe in the past Mr.

20   Lesniak, if he didn't state it on the record, he had indicated

21   to me in a conversation that they located these documents.

22   That the information he has is that the documents were located

23   by someone in Louisiana, a servicer, and they had them passed

24   around, so forth.

25         And so I wanted to talk to the last person that would

1    have had custody of those documents.  And I would -- would like

2    to be able to, you know, work a deposition in on that, maybe a

3    little bit of written discovery.  But other than that, then I

4    think that we would be able to proceed to -- to a hearing.

5         THE COURT:  All right.  Well, it's good to know that

6    the documents we were hoping would show up, showed up at any

7    rate.  And, Ms. Genges, anything to add with regard to

8    discussions with Mr. Hanson about?

9         MS. GENGES:  Your Honor, I -- I brought the original

10   notes and mortgages to court today hoping that Mr. Hanson's

11   clients would be concerned enough to come in and inspect them.

12   I've made them available in my office twice.  We have allowed

13   Mr. Hanson to photograph them.  I have scanned copies to him.

14        We don't have a color scanner.  That's true, Judge.

15   But the documents themselves are black and white.  So --

16        THE COURT:  Well, that's what I was going to ask.  Do

17   we have all sorts of handy dandy fascinating illustrations

18   here?

19        MS. GENGES:  We don't, Judge.  These are very

20   straight forward form notes with allonges.  Even the signatures

21   are in black ink.

22        I -- I'll defer to Mr. Lesniak but we were -- we were

23   planning today to ask the Court today to immediately hold a

24   preliminary hearing on the motions for relief from stay.

25        THE COURT:  Before I turn to Mr. Lesniak, Mr. Hanson,

1   if the documents are in black and white, why won't the scanned

2   copies do?

3       MR. HANSON:  Well, I wanted to be able to show my

4   clients as closely as possible a, you know, some type of copy

5   or photograph so that they could see exactly what the

6   signatures looked like.

7       THE COURT:  Well, wouldn't the scan do that?

8       MR. HANSON:  The reason -- the reason that it's maybe

9   an issue is in discussions with Mr. Kohler he had recalled that

10  he signed the notes with a blue ink pen.  And he recalled doing

11  that intentionally.

12      Now, I don't want to testify for him.  He'd have to

13  testify to that.  But --

14      THE COURT:  And why -- why is it that Ms. Genges she

15  has made the documents, the original documents available twice

16  in her office for your clients to take a look at and what --

17  what happened there?

18      MR. HANSON:  Well, actually that was for me to look

19  at them and to be able to photograph so that I could have

20  something to show to my clients.

21      THE COURT:  All right.  And if you took a photograph,

22  presumably the photograph would be in color.  Why -- why does

23  that not solve the problem of showing Mr. Kohler what color the

24  signatures appear in?

25      MR. HANSON:  Well, it didn't.  It -- it -- it's the

1  problem is still there that my client recalled that he did not

2  sign with -- with black ink.  He's not convinced that's his

3  signature.

4          THE COURT:  Okay.  So, he looked at a photograph and

5  said he doesn't think that's his signature.

6          MR. HANSON:  Right.

7          THE COURT:  And is he going to look at it in person

8  and -- change his mind, do you think?

9          MR. HANSON:  Well, I thought if he saw the original

10  document and -- and the -- and saw the, you know, saw the --

11  the actual note and so forth, if he thought he was mistaken,

12  that -- and he was satisfied with the note.

13          But -- and I did talk to him about being able to get

14  off work to go over to the office and see the note.  Right now,

15  with his work schedule, he -- he wasn't able to do that before

16  today's hearing.

17          But also --

18          THE COURT:  Or at today's hearing, apparently?

19          MR. HANSON:  Pardon me, Judge.

20          THE COURT:  Or at today's hearing, apparently?

21          MR. HANSON:  No.  But my understanding was -- was

22  that this was -- and I mean, if I'm mistaken, I apologize, that

23  this was set more as a status to see where would be today.

24          THE COURT:  It was.

25          MR. HANSON:  And not -- not for any type of final

1    hearing that would require my clients.  In fact, it was a

2    telephonic conference.  So --

3            THE COURT:  That's correct.  And I'm not indicating

4    that they --

5            MR. HANSON:  So, I wasn't anticipating that they

6    should be here to look at it.

7            THE COURT:  I'm not indicating that they were

8    required to be here.  But, I just was wondering if there was

9    some consideration given to them coming in given that Ms.

10   Genges has the documents with her.

11           MR. HANSON:  Well, it wasn't because actually I was

12   going to appear by phone today, as well.  But I was tied up in

13   Milwaukee County Circuit Court on what turned out to be some

14   protracted matters.  And -- and, you know 8:30 hearing didn't

15   get over with until just a few minutes before this hearing.

16   And -- so, I just came down in person.

17           So, I had anticipated -- I actually anticipated

18   appearing by telephone.

19           THE COURT:  Mr. Lesniak?

20           MR. LESNIAK:  Your Honor, I would like to point out a

21   few things to put this proceeding into the proper context, if I

22   might.

23           We sent Mr. Hanson all of the written discovery he

24   had requested back on September 9, 2010.  Included in that

25   discovery were copies of all of the original loan documents

1    made from the original loan documents themselves.  So, Mr.

2    Hanson has had these documents in very clear copies for a very

3    long period of time.

4              In addition, this idea of blue ink versus black ink

5    is a brand new concept.  I don't -- I can't understand that

6    that's going to make any difference in the case.  I haven't

7    heard Mr. Hanson say that his clients are claiming that the

8    signatures are forged.

9              THE COURT:  He just said that.  He just said a few

10   seconds ago actually that his -- Mr. Kohler's apparently now

11   saying that he doesn't think the signature's his.

12             MR. LESNIAK:  Yes, but he's said -- but I think Your

13   Honor also pointed out to him that he's seen the signature.

14   And I haven't heard Mr. Hanson say that he said the signature,

15   even in black ink, is not his.  He's just questioning the color

16   of the ink, as far as I can tell.

17             These -- these loans were -- were, according to the

18   pleadings, executed by his clients.  They've acknowledged that

19   in the pleadings.  They are scheduled in their schedules.  So,

20   this idea of blue ink versus black ink coming up at this stage

21   of the case is really, I must say, quite bizarre.  And to me

22   just smacks of really an intention to delay the proceedings.

23             Our client has received no payments post petition on

24   either of these loans.  They were in default pre-petition.  So,

25   it's been 14, 15 months since any payments were made on these

1    loans, Your Honor.

2            There was a loan modification provided in September

3    2009.  The Kohlers didn't make any payments.  During the course

4    of these proceedings, Chase came up with another loan

5    modification.  We offered it to the Kohlers in the fall of

6    2010.  They rejected it.  So, we haven't been getting no

7    payments whatsoever.

8            And the issues that Mr. Hanson raises with respect to

9    standing and the issue of whether or not you can have an

10   assignment that doesn't comply with this Trust, is an issue

11   that was present in both of his objections to the two motions

12   for relief.  So, those issues have been pending since, at

13   least, March 2010.

14           So, as I view this adversary proceeding that was

15   filed, at best, it's duplicative of the issues that are already

16   pending in the case.  At worse, it's just another pleading

17   intended to delay matters.

18           And quite frankly, I apologize if I'm expressing too

19   much frustration here.  But there is a lot of frustration,

20   Judge, because we are standing before the Court with original

21   loan documents endorsed in blank.  And under Wisconsin law, the

22   party who holds those notes endorsed in blank can enforce those

23   notes.

24           And under Wisconsin law, the party who holds the notes

25   endorsed in blank, also hold the mortgages without any other

1    assignment document necessary.

2         So, we stand before you with original loan documents

3    and the ability to enforce the mortgage and we have Mr. Hanson

4    trying to tell us that that kind of assignment is not viable.

5         Well, we are very prepared to present to the Court

6    our argument that that is a viable assignment. And that's why

7    Ms. Genges and I discussed the notion of asking the Court to

8    have a preliminary hearing on the motions for relief because we

9    can go no further. We've provided Mr. Hanson with everything

10   he's asked for from responding to his written discovery, to

11   conversing with him to explain all the custodian's notes so

12   that we could demonstrate when the notes came into the

13   custodians possession, and who had them, when they had them,

14   when they were sent to counsel.

15        He has not requested any oral discovery previously.

16   So, we feel we've provided everything we have and yet we are

17   still no further along then we were in our view several months

18   ago.

19        So, our feeling is that we really need to get to this

20   issue and get this issue addressed to the Court and if it has

21   to be a contested hearing, that's fine. We have the documents.

22   We don't feel we need anything else. And we're pretty much

23   prepared to go, Your Honor.

24        THE COURT: Thank you, Mr. Lesniak. Just one moment.

25

1          The renewed motion for relief from stay was filed in

2     March of last year.  Objection to confirmation was filed around

3     the same time.  I know we've had a number of hearings on this.

4     And -- and Mr. Lesniak has expressed frustration in previous

5     hearings, as well.  And has -- this is not the first time that

6     he's indicated that -- that he feels like they've provided Mr.

7     Hanson with everything they've got and Ms. Genges is now

8     sitting here in Court holding original documents.

9          MR. HANSON:  Well, Judge, along those lines, there

10    are some issues about the allonges.  And, if the Court -- first

11    of all, I didn't bring these issues up today to delay the

12    proceedings or and I didn't file the adversary proceeding to

13    delay the proceedings.  In fact, I think things did get

14    somewhat off track when I challenged the standing issues

15    through the adversary proceeding.

16         And early on, the Court ordered what was kind of like

17    preliminary -- preliminary discovery.  I did that written

18    discovery and then everything was kind of put on hold pending

19    resolution of those adversary proceedings, which were

20    ultimately dismissed, with some instructions by the Court for

21    me to file a follow-up adversary proceeding.

22         THE COURT:  Well, I didn't order that you had to.

23

24         MR. HANSON:  Right.

25         THE COURT:  I just said if you choose to do that.

1        MR. HANSON:  I understand.  But I don't agree with

2   much of what Mr. Lesniak says.  I mean, he's got what he says

3   are original loan documents.  He can't testify to that.  He

4   can't authenticate those documents.  It's not even clear,

5   Judge, that Wisconsin law applies here because for the Trust to

6   own those documents or for the Trust to own this loan, it has

7   to take possession of those documents pursuant to the pooling

8   and servicing agreement, because there was an agreement among a

9   number of institutional parties for the purchase and transfer -

10  -

11       THE COURT:  Okay.  Well, Mr. Hanson, I'm sorry.  I'm

12  not -- I'm not trying to --

13       MR. HANSON:  So, anyway -- anyway -- there are legal

14  issues there.  And I'm -- I'm not adverse at all for -- for an

15  evidentiary hearing.  I'd just like to have a chance to depose

16  the custodian of Louisiana.

17       And as far as the other stuff that I got, I got some

18  computer print out screens that I, you know, that don't show

19  anything about ownership or possession.        And I don't

20  see how they ever can show anything about ownership or

21  possession.  And I do not have any documents -- original

22  documents that showed the transfer and receipt of these

23  documents by either a sponsor, a depositor or the Trustee.

24  Instead, I got some screen shots out of a computer.

25       So, I -- Mr. Lesniak and I do have an honest

1    disagreement here.

2              THE COURT:  Ms. Garcia, I have not asked for your

3    input.  Anything?

4              MS. GARCIA:  As far as the issues before the Court,

5    no, Your Honor.  We're, you know, obviously this case was

6    filed, oh, we're going on the third, the case was filed in

7    November, 2009.  So, you know, we're in 2011.  We don't have a

8    confirmed case, obviously.  And the Trustee is at this point

9    sitting on about $5,000 in plan payments.

10             The only creditors in this case that are secured and

11   this is a proposed as a zero percent plan to unsecured

12   creditors are the two claims by U.S. Bank and then a very small

13   claim to Landmark Credit Union.  So, that's where we sit.

14             THE COURT:  Thank you, Ms. Garcia.

15             My --

16             MR. LESNIAK:  Judge, this is Mr. Lesniak.  May I be

17   allowed a moment to clarify the legal issues for you?

18             THE COURT:  No, Mr. Lesniak.  Because I'm about to

19   tell you what I think we ought to do.

20             MR. LESNIAK:  Okay.  Thank you, Judge.  I apologize.

21             THE COURT:  My original suggestion that we sort of

22   put this on the same track as the adversary was made, quite

23   frankly, before I remembered the stew that has been stewing

24   here for awhile.  And -- and to be really honest, Mr. Hanson,

25   at this point, if I were to put this -- these proceedings on

1    the same schedule as the adversary, we don't even have an

2    initial pre-trial conference scheduled in the adversary until

3    March 7th.

4            What would happen at that point in time on March 7th

5    is if I were to set a trial date on March 7th, that trial date

6    wouldn't be scheduled until about three months out from the

7    March 7th date.  We would issue our general scheduling order.

8    It would back out discovery deadlines and so forth and so on.

9    And that's what we do in -- in a "traditional" adversary.

10           I don't think this is a traditional adversary because

11   a lot of water has passed under the bridge here.  You've

12   already collected a lot of the discovery that you would collect

13   if this case had just popped up on December 22nd.  You've

14   already got a good deal of that.

15           And, so, I don't want to, contrary to what I said

16   already, and I'll go back and -- and -- and correct myself.

17   But I don't want to put this on the same track as -- as if it

18   were a traditional adversary because a lot of time here has

19   passed already.

20           You're more than welcome, of course, to file a

21   response to the motion to dismiss the adversary.  And I don't

22   know if you have a time frame for when you plan on doing that

23   but you certainly can do that.

24           But it sounds to me as if what you're basically

25   asking for is to depose a custodian.  And I think you ought to

1    be able to give me a period of time in which you can get that

2    done by and than we should set a hearing.

3              And we should go and get this evidence out there,

4    whatever it is --

5              MR. HANSON:  I agree.

6              THE COURT:  -- and let's see.  So, do you know the

7    identity of this human that you're going to be talking to?

8

9              MR. HANSON:  I don't know the name.  But in

10   -- from past conversations with Mr. Lesniak, he explained to me

11   that they located the note.  Because part of the history here

12   was that we started with completely different allonges.

13   Completely different from what is here now.  And so --

14             THE COURT:  Do you know who you need to talk to, Mr.

15   Hanson?

16             MR. HANSON:  Well, I believe that Mr. Lesniak knows

17   who the person was that sent him those documents. And in past

18   conversations, he had indicated to me that he would have no

19   objection to my deposing that person.  And -- and so, I don't

20   recall if he gave me the name or not right off the top of my

21   head.  But, it certainly is discoverable and I can -- can -- I

22   --

23             THE COURT:  And, Mr. Lesniak, is this a person who's

24   in Louisiana?

25             MR. LESNIAK:  Well, I think we need some

1    clarification, Judge, because the documents came to us from

2    Louisiana where they were held by the servicing agent, which is

3    Chase Home Finance.  Okay?

4            THE COURT:  All right.

5            MR. LESNIAK:  The custodian of the documents for the

6    U.S. Bank Trust, who -- which -- who forwarded those documents

7    to Chase Home Finance in order to pursue the motion for relief,

8    the -- the -- the enforcement of the documents, that is

9    Deutsche Bank.

10           And the gentlemen who I would suggest is the person

11   who I know has testified in other cases, is a Mr. Rinaldo Reyes

12   (phonetic) and I believe he Is in -- in San Francisco.  If not

13   San Francisco, he's somewhere else in California.  I believe

14   he's in San Francisco.  I could be wrong about that.  But he's

15   in California.

16           THE COURT:  And he's with Deutsche?

17           MR. LESNIAK:  He's with Deutsche Bank.  Deutsche Bank

18   under all of these security documents that Mr. Hanson keeps

19   referring to is the custodian for the documents.  Deutsche Bank

20   is the one that received the documents and logged them in as

21   custodian or agent for the Trust.

22           THE COURT:  And then forwarded them onto Chase?

23           MR. LESNIAK:  Forwarded them onto Chase when the

24   proceeding -- when the bankruptcy proceeding was filed.

25   Actually, I think, let me correct that.  I think they actually

1   forwarded -- Deutsche Bank forwarded the documents to Chase

2   before the bankruptcy proceeding because I think there was a

3   foreclosure action.  Ms. Genges may recall better than me, but

4   I believe there was a foreclosure action.

5           So, the documents were actually forwarded to the loan

6   servicer so that the foreclosure action could be pursued and

7   that was before this case started.

8           And we obtained the documents from Chase Home Finance

9   in office in Louisiana as loan servicer for U.S. Bank Trust.

10          THE COURT:  Mr. Hanson, does that sound like the

11  person to whom you wish to speak or need to speak?

12          MR. HANSON:  I would certainly like to speak with the

13  person that got these documents in Louisiana.

14          THE COURT:  Well, that's not Mr. Reyes.

15          MR. HANSON:  No.  I'd be --

16          MR. LESNIAK:  Judge, the person that got -- frankly,

17  the person who got the documents in Louisiana is a Chase

18  employee and all he would be saying is we needed these

19  documents to do a foreclosure, so I asked the Trust Custodian

20  to forward them to me.

21          Now, if that's what Mr. Hanson wants to dep-- if

22  that's who Mr. Hanson wants to depose, fine.  But I don't want

23  to be in a situation where he deposes that person and then

24  says, well, geez, I really ought to depose the custodian who

25  has all of the logs that show when these documents came in from

1    their origination.

2            So, he can depose who he wants but I don't want to be

3    in a situation where he deposes one person, finds out they

4    don't really tell him a whole heck of a lot and then he now has

5    to depose another person.

6            He can chose who he wants and I'll produce both of

7    them if we have to, I just don't want to waste any more time.

8            THE COURT:  And I guess what -- what -- what comes to

9    my mind, forgive my simplistic response, but harkening back to

10   my days as a criminal law practitioner is what you're talking

11   about is change of custody here and who -- who's in that chain.

12

13           And -- and I guess the question that comes to my mind

14   is there a relatively expeditious way of saying here are the

15   four people who are in the chain of custody for these documents

16   before they landed in Ms. Genges desk?

17           MR. LESNIAK:  Yes, Your Honor.  There would be, I

18   would think, two people.  There would be a person at Deutsche

19   Bank --

20           THE COURT:  Okay.

21           MR. LESNIAK:  -- who is probably Mr. Reyes who I've

22   referred to.

23           THE COURT:  Right.

24           MR. LESNIAK:  Who would -- who's company, Deutsche

25   Bank, would have logged those documents in as custodian and

1  there would be a person at Chase Home Finance.  I would have to

2  check, but I believe his name is Brian Tucker and his office is

3  in Louisiana, who would have obtained the documents from --

4  from Deutsche Bank and sent them on to Ms. Genges office --

5        THE COURT:  All right.

6        MR. LESNIAK:  -- where they are now in front of you.

7        THE COURT:  Okay.

8        MR. HANSON:  And Your Honor, one thing I perhaps

9  wasn't clear, what I would like to be able to do would be to

10  depose those individuals with the documents.  Is that --

11        THE COURT:  Okay.  Well, let's just take this a step

12  at a time.  Okay?

13        Mr. Lesniak, how long do you think it would take you

14  to confirm that those are the two humans?

15        MR. LESNIAK:  I don't think it would take me very

16  long, Judge.

17        THE COURT:  All right.

18        MR. LESNIAK:  And if I may, just for the record, our

19  -- our position is so I don't -- so I make sure that I'm not

20  giving you the wrong impression.  Our legal position is that we

21  don't need to show chain of custody because Wisconsin law

22  allows the bearer of a note endorsed in blank to proceed.

23        THE COURT:  I understand.

24        MR. LESNIAK:  But -- but I believe that it would be

25  Mr. Tucker and Mr. Reyes.  I would have to check with Deutsche

1  Bank.  Perhaps they would have somebody else who would be a

2  witness.  But I know Mr. Reyes has done that before and I

3  believe I spoke to Mr. Reyes in connection with getting all of

4  the information that Mr. Hanson had requested that we provided

5  previously.

6          THE COURT:  All right.  Well, because what I'd like

7  to do is I'd like to confirm who those people are, set a

8  timetable for Mr. Hanson to depose them and then set a hearing.

9   That's what --

10          MR. HANSON:  Yes.

11          THE COURT:  -- I'd like to do.  I want us to get done

12  with this.  And I'm not talking about three to four month

13  timetable.

14          Ms. Genges, did you have something to contribute?

15          MS. GENGES:  No, Judge.  I have the figures available

16  if the Court's interested to know what the arrears are on the

17  motion for relief from stay and just --

18          THE COURT:  Oh, I'm sure they'll make my nose bleed.

19          MS. GENGES:  And -- and just for the record, Judge,

20  with regard to the issues of the signatures, in accordance with

21  Local Rule, when we filed these motions and renewed the other

22  motion, the Chapter 13, we did provide the Court with an

23  Affidavit setting forth the numbers, containing copies of the

24  documents and no counter affidavit was ever submitted.

25

1          We agree with Mr. Hanson's valuations.  So, as far as

2     what we need to prove on a motion for relief from stay, there's

3     evidence before the Court right now as to what is owed and the

4     value of the property.

5          THE COURT:  I understand.  Thank you, Ms. Genges.

6          Mr. Lesniak, do you think by the end of this week you

7     can confirm for Mr. Hanson the identities of those two folks?

8          MR. LESNIAK:  Yes, Your Honor, for certain.

9          THE COURT:  All right.  Mr. Hanson, how much time do

10    you think you need to set up -- well, I guess Mr. Hanson and

11    Mr. Lesniak, how much time do you think you need to set up

12    depositions for these individuals.

13         MR. HANSON:  Well, once I know who they are, and --

14         THE COURT:  You'll know who they are by the end of

15    the week.

16         MR. HANSON:  -- perhaps I could even -- this is the

17    beginning of February, if we could make arrangements for

18    sometime in -- in March to -- for me to meet with these

19    individuals.  Then what I would like to do would be to send

20    proper notice with a request that they produce themselves with

21    the original documents.

22         And -- and the issues here may go beyond the chain of

23    custody.  But those -- those would be the -- in other words,

24    I'm not deposing them just to ask them if they had these

25    documents.  I want to review the documents with them, including

1    the allonges.

2         So, in -- if we can accomplish this in March, by

3    early April, I guess, depending upon the schedule of opposing

4    counsel, as well.  I would make every effort to get the

5    depositions done by the end of March or the middle of March.

6         THE COURT:  Yeah.  I guess, my question, Mr. Hanson,

7    is if you know who they are at the close of business on the 4th

8    February --

9         MR. HANSON:  Uh-huh.

10        THE COURT:  -- why do you need until March to notice

11   up depositions?

12        MR. HANSON:  Well, I don't necessarily -- but the

13   Federal Rules would require me to give them 30 days notice to

14   produce documents with the deposition.

15        Now, if we can agree that the documents can be

16   produced in less than 30 days, I could do it, I think I could

17   do it more quickly.

18        THE COURT:  I'm sorry to be -- but I thought that Ms.

19   Genges was sitting here in Court with the documents that you

20   want them to look at.  So, this is not them going back through

21   their files and digging through and finding documents that

22   haven't been produced yet.  Right?

23        MR. HANSON:  Right.  That's right.  That's right.

24        THE COURT:  So --

25        MR. HANSON:  And if they're willing to -- you know,

1   if I have to go to Louisiana, then the documents will have to

2   be sent down there.  And then I can depose that individual.

3   And if I have to go to San Francisco, the documents would go

4   out there.  And I can review and depose that -- the individual

5   in -- in San Francisco.

6          And the custodian in San Francisco that's going to

7   identify them, it would be appropriate for that corporate

8   custodian to produce his whole file.  You know, let's see the

9   receipts then for the -- for when they -- they actually

10  received these documents, as well.  And then we don't have to

11  rely upon and quibble over some computer printouts.

12          MR. LESNIAK:  Your Honor, I produced the documents.

13  I produced the custodian's record, the custodian's business

14  record loggings showing when each and every document went in,

15  describing it, identifying whether it was an endorsement,

16  identifying whether it was endorsed in blank, identifying

17  whether there was an assignment of mortgage.

18          And I sat with Mr. Hanson on a Saturday on a phone

19  call that went over about 45 minutes to an hour explaining to

20  him what all the codes mean.  So, in terms of documents we've

21  produced the custodian's log, which is going to be exactly what

22  Mr. Reyes would testify from.

23          And I might -- I might also add that -- that Deutsche

24  Bank is not someone I represent or Ms. Genges represents.  So,

25  in that respect, Mr. Hanson would need to serve a subpoena.

1          As to Mr. Tucker, in Louisiana, if I confirm that he

2     is the correct person, he works for Chase Home Finance, and

3     Chase Home Finance is, at least named as a party in this

4     adversary proceeding, although I don't know why, but it is.

5          So, certainly we would produce Mr. Tucker pursuant to

6     a notice.  As to Mr. Reyes, he would need to be subpoenaed by

7     Mr. Hanson.  But all the documents have already been provided

8     to Mr. Hanson with explanations.

9          THE COURT:  Uh--

10         MR. HANSON:  Your Honor, I'd be happy to subpoena Mr.

11    -- Mr. Reyes.  And then I would like to have, again, 30 days,

12    to produce whatever documents he's got in his file.  And I

13    don't -- and let's see what's there.

14         THE COURT:  If you find out on the 4th the correct

15    identities of the human beings who you need to talk to, then

16    you should be able to be in a position to relatively quickly

17    after that, within a few days, to send out your notices or your

18    subpoenas.

19         MR. HANSON:  I'll start preparing the subpoenas right

20    away and we can -- we can put the name in.  And -- and if Mr.

21    Lesniak can -- if he's able to tell me where the person is so I

22    don't have to look for them as far as being able to get the

23    subpoena out there and get it served on him.

24         THE COURT:  I'm anticipating that Mr. Lesniak will do

25    whatever he can to expedite the process given his expression of

 1   frustration about the speed it has exhibited thus far.

 2              MR. LESNIAK:  You are correct, Your Honor.  We're not

 3   going to hide any information from Mr. Hanson.

 4              THE COURT:  So, Mr. Hanson, I'm anticipating then

 5   that you will be able to conduct and take care of your

 6   depositions by the 14th of March -- Monday, March 14th.

 7              MR. HANSON:  Your Honor, I'll -- I will -- I'll get

 8   the notice out.

 9              THE COURT:  Thank you and then in terms of looking

10   for a date for an evidentiary hearing thereafter -- I'm sorry,

11   I'm just looking at my calendar now.  I have March 30th in the

12   afternoon.

13              MR. LESNIAK:  That's fine for me, Your Honor.

14              MS. GENGES:  That's fine, Judge.

15              MR. HANSON:  I'll make that work, Judge.

16              THE COURT:  All right.

17              MR. LESNIAK:  I'm sorry.  Did I hear Ms. Genges say

18   that was okay?

19              MS. GENGES:  That's fine.  Yes.

20              THE COURT:  She did.

21              MR. LESNIAK:  Okay.  Great.  I'm sorry.

22              THE COURT:  Right.  So, let's -- let's say 1:30 if we

23   can, 1:30 in the afternoon on Wednesday, March 30th for an

24   evidentiary hearing.

25              With regard to the initial pre-trial conference that

1    we have scheduled in the adversary on March 7th, I'd like to

2    leave that on the calendar because, at least, it would give us

3    an opportunity by telephone to make sure that things are on

4    track and that Mr. Hanson's got his notices and subpoenas out

5    and we're -- we're proceeding at pace.

6              And that's a telephone hearing, so nobody will have

7    to show up.  But we can just chat for a few minutes to make

8    sure that we're proceeding.

9              MR. LESNIAK:  Your Honor, what time did you say that

10   was?

11             THE COURT:  The pre-trial?

12             MR. LESNIAK:  Yes, the pre-trial.

13             THE COURT:  Sorry, I'm not --

14             MR. LESNIAK:  I'm sorry I thought I heard you say

15   10:30.  I had it marked in my book at 10:45, so I just wanted

16   to --

17             THE COURT:  I didn't say a time, I don't think.

18             MR. LESNIAK:  Oh, I apologize.

19             THE COURT:  Because I was -- I -- I have the

20   underlying case open and not the -- hang on, 10:45.  You're

21   right, Mr. Lesniak.

22             MR. LESNIAK:  Okay.

23             THE COURT:  Thank you.

24             MR. LESNIAK:  Okay.  So that time will stand,

25   correct, Your Honor?

 1              THE COURT:  That time will stand, yes.

 2              MR. LESNIAK:  Thank you.

 3              THE COURT:  And -- and Mr. Hanson, obviously, between

 4     now and then I'm assuming you'll get a response to the motion

 5     to dismiss --

 6              MR. HANSON:  Yes, Judge.

 7              THE COURT:  -- on file.  Anything else today?

 8              MR. HANSON:  No.  I want to thank the Court for your

 9     time.

10              THE COURT:  Ms. Genges?

11              MS. GENGES:  Your Honor, just one thing and I hate to

12     do this to you but I'm holding the original documents here.

13     And Mr. Hanson has indicated that he wants to question the

14     various witnesses from the original documents.

15              I have provided him copies made from these original

16     documents and the promissory note that I'm holding is bearer

17     paper.  I don't want to just sent that out there.  I was hoping

18     that Mr. Hanson would stipulate that the copies he has are made

19     from the originals and conduct any depositions from those

20     because I don't want to lose possession of these files if we've

21     got a final hearing set for the end of March.

22              I just don't want to let them out of my possession.

23     The copies that I provided to Mr. Hanson were made from the

24     originals.  If he's uncomfortable with that, he can come back

25     to my office and watch me make copies from the originals.  But

1    I -- I don't want to lose control of these files if we have a

2    hearing coming up in just under two months, Judge.

3              THE COURT:  Mr. Hanson?

4              MR. HANSON:  Judge, I don't see how I can do the

5    depositions effectively without the original documents because

6    those witnesses are going to have to identify that that's the

7    document that they had in their possession.  And there are

8    aspects on the allonge that I'm concerned about.

9              Now, the custodian -- well, that I guess -- I don't

10   see how I can do an effective deposition without them and I

11   don't --

12             THE COURT:  Well, here's your choice, Mr. Hanson.

13   I'm either going to ask Ms. Genges to transmit those documents

14   to whatever locations you end up doing the depositions, in

15   which case you assume the risk that they don't show up back

16   here and you don't have them on the date of the evidentiary

17   hearing.

18             And -- and if they don't, I'm not going to be

19   adjourning the evidentiary hearing because somehow they went

20   somewhere and didn't come back.  So, you can either take that

21   risk with regard to the evidentiary hearing or you can take

22   that risk with regard to the depositions.

23             But, you know, we've got copies here.  The copies --

24   the originals are entirely in black ink.  Now, Mr. Kohler may

25   say that's not the ink I used and he certainly has the ability

1    to make that argument.  And if -- but -- I think we're all

2    clear on the fact that there ain't any blue ink on whatever it

3    is Ms. Genges has in her hand.

4          Now, if some custodian says this copy does not look

5    like the document that I had or if your client says, boy, that

6    I -- that's not my signature.  Doesn't look like me.  Then

7    that's certainly something that we can deal with.  But there's

8    one set of originals.  They can't be everywhere at once and

9    you're talking about moving them all sorts of places all over

10   the place.  It already has taken them a while to get from

11   Louisiana to here.  We've got them in hand.  You know where

12   they are and they're, at least, for the moment, somewhere where

13   somebody you know has them.

14         If -- if you're insisting that they be at the

15   depositions instead of copies, then off they can go.  And --

16         MR. HANSON:  Well, Judge, the parties were trusted

17   with them before.  If they were FedEx'd I don't see why they

18   would be lost, although --

19         THE COURT:  Well, fine.  You're telling me you're not

20   worried about it then.

21         MR. HANSON:  -- perhaps -- well, perhaps, I don't if

22   they're FedEx'd I wouldn't be overly concerned.  But perhaps, I

23   could -- I mean I tried a digital camera to get good shots of

24   them before.  Maybe I could try that once more.  I had spoken

25   with Ms. Genges about having my clients go to her office on a

1    Saturday, perhaps this Saturday they could look at them and

2    maybe that would clear some of this stuff up, too.

3           In -- in --

4           THE COURT:  I'm still somewhat confused as to why a

5    photograph won't do that.  But, Mr. Hanson, this -- we're --

6    we're on a planet now of eating cake and still having it.  And

7    -- and we started this hearing 35 minutes ago.  I've got people

8    sitting back here for another hearing.  You make the decision.

9           If -- if you want the originals to go back out into

10   the ether, then they go back out into the ether.  But what I'm

11   telling you is that I'm not going to come in here on the 30th

12   of March and say, well, gee, Judge, we had the originals and

13   now we don't have them.  And I can't possibly conduct this

14   hearing without the originals.

15          We've got them.  They're here.  You've been provided

16   with what Ms. Genges tells me as an Officer of the Court are

17   accurate copies.  So, you can either conduct the depositions

18   using those accurate copies or you can demand the originals in

19   which case we will, I guess, leave it to fate and hope that the

20   originals show back up here by March 30th.  But it -- it -- the

21   originals can't be everywhere at one time.  So --

22          MR. HANSON:  I understand.  And, Your Honor, if it

23   will be alright, I would like to just consider that.  And --

24   and I'll -- if I feel I really need originals, I will inform

25   Ms. Genges and request her to FedEx them.  And if I don't, then

 1    I'll tell her to -- that I'll come over and get copies from her

 2    or something along those lines.

 3              THE COURT:  I think that's fine.  And Ms. Genges, I'm

 4    grateful to you for working with Mr. Hanson in this regard.

 5              MS. GENGES:  Thank you, Judge.

 6              THE COURT:  All right.  Anything else, Mr. Lesniak?

 7              MR. LESNIAK:  No, thank you, Your Honor.

 8              THE COURT:  All right.  Thank you all.  We'll see you

 9    on the 30th.

10              MR. HANSON:  Thank you.

11                         (End of proceeding)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

       I, Lisa M. Wilbur, the assigned transcriber, do hereby certify the foregoing transcript of proceedings in the U.S. District Court on December 13, 2010, Index Nos. 12:01:11 pm to 12:21:55 pm is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.


  S/ Lisa M. Wilbur
LISA M. WILBUR, AOC NO. 585
AudioEdge Transcription, LLC

Date:  August 21, 2011